## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| ENTROPIC COMMUNICATIONS, LLC, | |
| Plaintiff | Civil Action No. 2:22-cv-00125-JRG |
| v. | **JURY TRIAL DEMANDED** |
| CHARTER COMMUNICATIONS, INC.; SPECTRUM ADVANCED SERVICES, LLC; and SPECTRUM MANAGEMENT HOLDING COMPANY, LLC., | ███████████ |
| Defendants. | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR IMPROPER VENUE PURSUANT TO FRCP 12(b)(3)**

## TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     LEGAL BACKGROUND ......................................................................................3

III.    ARGUMENT .........................................................................................................4

    1.      The activities and employees of the subsidiaries are attributable to CCI ...............4

        a.      The subsidiaries are shells with no independent existence .........................4

            i.      The subsidiaries have no employees of their own ..........................4

            ii.     CCI is the manager of each subsidiary .............................................5

            iii.    As manager, CCI executed the lease agreements for Spectrum stores in the District ........................................................................7

            iv.     No individual subsidiary is a complete, functioning business, but rather each plays a discrete, dependent role within the Spectrum business controlled by CCI ............................................................8

            v.      The subsidiaries have no independent officers or directors ............9

            vi.     CCI officers lead company-wide corporate departments, each of which spans numerous subsidiaries .................................................10

            vii.    The subsidiaries do not hold corporate meetings ..........................11

        b.      CCI acts externally as one company, to the public and to the government ..........................................................................................11

            i.      CCI tells investors and the public that it provides the accused products and services ...................................................................11

            ii.     All Charter entities use the same Spectrum branding nation-wide ...................................................................................13

            iii.    All Charter entities use the same website to sell products and services, list store locations, and post job openings......................14

    2.      Venue is proper over CCI in the Eastern District of Texas ...................................14

        a.      CCI has committed acts of infringement in the District ...........................14

         b.      CCI has a regular and established place of business in the District..........15

i.      There are physical Charter/Spectrum locations in the District from which the business of CCI is carried out ......................................16

ii.     Charter's physical locations are regular and established places of business .......................................................................................17

iii.    The physical locations are the places of CCI................................21

IV.     CONCLUSION.................................................................................................23

# TABLE OF AUTHORITIES

**Cases**                                                                              **Pages**

*AGIS Software Development LLC v. Google LLC*, 2:19-cv-361, 2022 WL 1511757 (E.D. Tex. May 12, 2022) ................................................................................................................18, 22

*Andra Group, LP v. Victoria's Secret Stores, LLC*, 6 F.4th 1283 (Fed. Cir. 2021) .......................3

*Entropic Communications, LLC v. DirecTV, LLC*, 2:22-cv-75, Dkt. No. 109, ORDER (E.D. Tex. Oct. 24, 2022) ................................................................................................................15–19, 22

*In re Cray*, 871 F.3d 1355 (Fed. Cir. 2017) ...............................................................3–4, 16–18, 21

*In re Google*, 949 F.3d 1338 (Fed. Cir. 2020) ........................................................................17–18

*Ramirez v. Charter Communications, Inc.*, 75 Cal. App. 5th 365 (2022) ..............................20–21

*Sightline Payments, LLC v. Everi Holdings Inc.*, No. 6:21-cv-1015, 2022 WL 2078215 (W.D. Tex. June 1, 2022) ..........................................................................................................................3

**Statutes**

28 U.S.C. § 1400(b)(2) ....................................................................................................................3

**Other**

*Charter Communications, Inc. v. Rockstar Consortium US LP*, 1:14-cv-00055, Dkt. No. 1, COMPLAINT FOR DECLARATORY JUDGMENT (D. Del. Jan. 17, 2014)..........................12–13

*Montes v. Charter Communications, Inc.*, No. 7:21-cv-489, Dkt. No. 1, NOTICE OF REMOVAL (S.D. Tex. Dec. 20, 2021) ....................................................................................................20

*Montes v. Charter Communications, Inc.*, No. 7:21-cv-489, Dkt. No. 8, MOTION TO COMPEL ARBITRATION AND DISMISS (S.D. Tex. Jan. 31, 2022)..............................................20–21

*Montes v. Charter Communications, Inc.*, No. 7:21-cv-489, Dkt. No. 10, AMENDED MOTION TO DISMISS (S.D. Tex. Feb. 2, 2022) ......................................................................................20

## INTRODUCTION

There is no dispute that Charter provides the accused products and services to customers in the District. And there is no dispute that there are dozens of "Spectrum"-branded Charter physical locations in the District, staffed by numerous employees. Charter nevertheless seeks to nullify venue by asking the Court to play along with an elaborate fiction involving over 200 shell LLCs that CCI set up and entirely controls.

Legally, the Court has only one decision to make: should the activities and employees of Charter's subsidiaries be imputed to the controlling entity, Charter Communications, Inc. ("CCI"), the publicly-traded face of Charter to the world? Under the controlling law, the answer is yes because venue discovery has confirmed that CCI's subsidiaries are shells. They have no independent existence—indeed, Charter's corporate representative ███████████████████ ████████████████████Discovery has revealed:

- All 200+ subsidiaries are limited liability companies (LLCs) with CCI as the sole manager. CCI itself set up the LLCs, dictated the details of their formation and their operating agreements, and as manager CCI itself runs every detail of the entities' operations. *See infra* 5–7.

- None of the LLCs have their own employees, except a single LLC set up to hold all the employment relationships *for all of Charter*. Every single Charter employee (including the Spectrum brand), from the CEO to the technicians and retail workers, is placed in this LLC container. CCI itself then "allocates" employees to the various shells, thereby completely controlling all the employees of the entire collection of entities. *See infra* 4–5.

- CCI signs the contracts for its subsidiaries. Of particular interest, ***the lease agreements for locations in this District are signed by CCI***. *See infra* 7.

- The subsidiaries have no independent officers or directors. All the named officers and directors overlap with CCI. *See infra* 9.

- The subsidiaries do not hold corporate meetings and do not maintain any records of their own. All records that may exist are maintained by CCI. *See infra* 11.

- The internal organization of Charter ignores the LLC boundaries: CCI officers **lead enterprise-wide corporate departments**, each of which spans numerous subsidiaries. *See infra* 10–11.

In summary, no individual subsidiary is a complete, functioning business. The shells are artificially drawn lines that do not exist in the day-to-day operation of Charter's cable and internet services business.

Naturally, this reality of "one Charter" appears in CCI's interactions with the public and government.

- CCI is the publicly-traded entity representing the Charter/Spectrum enterprise. To investors and the SEC, in its annual 10-K, CCI introduces itself as: "We are a leading broadband connectivity company and cable operator serving more than 32 million customers in 41 states through our Spectrum brand." *See infra* 11–12.

- CCI operates a single national website for all of those 41 states and 32 million customers, through which it offers services in this District, advertises physical locations in this District, and posts job openings in this District. *See infra* 14.

- CCI represents to the general public, to its investors, and to the SEC that it has "93,700 employees"—not that it is merely a holding company with zero. *See infra* 12.

- When CCI finds it convenient in interactions with the government, it reveals the single-entity nature of its operations—justifying to the FCC the switching and swapping of communications licenses among various shells because it is all "pro forma" since CCI is the "ultimate controlling entity" of the business. *See infra* 12–13.

- When CCI has sought the relief of the Federal Courts in patent matters by bringing a declaratory judgment action to avoid patent infringement, CCI *itself* brings the suit, and CCI describes *itself* as a party by stating: "Charter is a provider of cable services in the United States, offering a variety of entertainment, information, and communication solutions to residential and commercial customers." *See infra* 12–13.

In summary, the evidence is compelling that CCI's subsidiaries are not separate businesses, but instead are lines drawn through and across the reality of CCI's nationwide enterprise. The law recognizes that in such situations the tangible reality of the operating enterprise controls, not the paper boundaries. Under each of the two established legal tests—lack of separateness and ratification—venue over CCI is fully proper in this District.

## LEGAL BACKGROUND

Venue is proper in any district where the defendant has committed acts of infringement and has a regular and established place of business. *See* 28 U.S.C. § 1400(b)(2). Specifically, a "regular and established place of business" must be (1) "a physical place in the district;" (2) "regular and established;" and (3) "the place of the defendant." *In re Cray*, 871 F.3d 1355, 1360 (Fed. Cir. 2017). The Federal Circuit has set forth a number of considerations relevant to determining if a regular and established place of business is "of the defendant." *Id.* at 1363–64. Those considerations include whether the defendant owns or leases the place, exercises other attributes of possession or control over the place, conditions employment on an employee's continued residence in the district, stores materials at a place in the district so that they can be distributed or sold from that place, advertises a place for its business, or represents that it has a place of business in the district. *Id*. A court may also consider the nature and activity of the alleged place of business of the defendant in the district in comparison with that of other places of business of the defendant in other venues. *Id.* at 1364. These enumerated considerations are not exhaustive but rather illustrative of the types of information relevant for determining whether a physical place is "of the defendant." *See id*. at 1363–64.

In the case of affiliated entities, the place of business of one company can be imputed to another when the two have not maintained corporate separateness or when the defendant has ratified the location as its own. *See Andra Group, LP v. Victoria's Secret Stores, LLC*, 6 F.4th 1283, 1289 (Fed. Cir. 2021). The standard for establishing that two entities lack corporate separateness is "relaxed" when the theory is not used to impose liability, but merely to establish jurisdiction or venue. *See Sightline Payments, LLC v. Everi Holdings Inc.*, No. 6:21-cv-1015, 2022 WL 2078215 at *4 (W.D. Tex. June 1, 2022) (appeal filed June 28, 2022) (quoting *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 681 (S.D.N.Y. 2016)).

3

## ARGUMENT

**1.   The activities and employees of the subsidiaries are attributable to CCI.**

There can be no dispute that this Court has venue over certain Charter entities. As Charter readily acknowledges, there are dozens of Spectrum stores in Texas, including numerous stores in this District. Charter also does not dispute that there are Charter/Spectrum employees conducting business in the District, i.e. by staffing those stores and responding to service calls at customers' homes. Charter also provides the allegedly infringing products and services to customers in the District.[1] The only dispute before the Court is whether venue is proper against CCI—the public-facing, publicly-traded, controller and orchestrator of the enterprise.

### a.   The subsidiaries are shells with no independent existence.

Venue discovery has revealed that CCI's subsidiaries are mere shells. They have no employees, no independent officers or directors, and no operations outside of those directed by CCI. CCI is the true actor behind each subsidiary, controlling and directing each subsidiary's role in the overall Spectrum business. Indeed, CCI's control is so complete that Charter's corporate representative repeatedly referred to ███████████████████████████████████ *See* Exhibit A, Proost Dep. Tr., at 46:3–7, 48:11–13. Specifically, venue discovery revealed the following facts.

### i.   The subsidiaries have no employees of their own.

One subsidiary, Charter Communications, LLC, employs *all* personnel within the Charter business. *See* Exhibit A, Proost Dep. Tr., at 73:20–74:11. Neither CCI nor any of the remaining

---

[1] As discussed further below, CCI does not dispute that it is alleged to have committed acts of infringement in the District and that there are physical places in the district that satisfy the first *Cray* factor. Instead, CCI disputes only the second and third *Cray* factors—that the physical places are "regular and established" and that they are "of the defendant"—on the grounds that CCI does not have any employees and does not own or lease any real property in the District.

subsidiaries have employees of their own. *See id.* ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

### ii.     CCI is the manager of each subsidiary.

All of the Charter subsidiaries, direct and indirect, are limited liability companies (LLCs), and CCI is designated as the corporate manager of every last one of them. *See* Exhibit A, Proost Dep. Tr., at 56:23–57:12. ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████ In addition to the individual operating agreements, CCI has also put in place in Management Agreement which specifies CCI's authority and duties as manager. *See* Exhibit D, Second Amended and Restated Management Agreement ("Management Agreement"). Indeed, ████████████████████████████

████████████████████████████████████████

████

As the manager and ultimate parent, CCI dictates the terms of each subsidiary's operations and existence, including writing and executing the formation documents. For example, this is the signature page of Spectrum Gulf Coast's operating agreement:



Exhibit C, Spectrum Gulf Coast, LLC Operating Agreement, at 12. All internal Charter contracts that Charter has produced in venue discovery are the same, i.e. one person signs for all Charter entities. When asked whether this would be true of the operating and management agreements for all 200+ subsidiaries,

Charter's corporate representative further confirmed that CCI dictates the terms of these agreements, according to how it wants each subsidiary to operate. When asked how the operating agreements are negotiated, he answered:



Exhibit A, Proost Dep. Tr., at 45:25–46:10; *see also* 49:13–16 ███████████████

████████████████████████████████████████████████████████████

████████████████████████████

### iii.    As manager, CCI executed the lease agreements for Spectrum stores in the District.

CCI's control of its subsidiaries is so great that CCI routinely executes contracts on their behalf. Most notably, the leases for Spectrum stores in the District, nominally held by Spectrum Gulf Coast, LLC, were actually negotiated and executed by CCI. As an example, below is the signature line on the lease for the Spectrum store in Beaumont, Texas:



Exhibit E, Beaumont Store Lease, at 34 (highlighting added for clarity). It is worth noting that this was intentional—████████████████████████████████████████████████

████████████████████████████ and essentially every other Charter subsidiary, but chose to sign in his capacity as a CCI officer, not in his capacity as an officer of Spectrum Gulf Coast. This format is mirrored in nearly all of the property leases produced by Defendants as part of venue discovery.

   iv. **No individual subsidiary is a complete, functioning business, but rather each plays a discrete, dependent role within the Spectrum business controlled by CCI.**

No subsidiary operates an independently functioning business. Instead, each subsidiary plays a specific role in the overall national Spectrum business as designated and orchestrated by CCI. Charter's corporate representative testified that the overarching Management Agreement between CCI and the subsidiaries controls the relationship between the companies, ███████

███████████████████████████████████████████████

███████████████ Exhibit A, Proost Dep. Tr., at 71:25–72:6.

For example, on paper Spectrum Gulf Coast operates retail stores and the "plant" in Texas (Charter's term for the equipment used to deliver television and internet services). *See* Exhibit A, Proost Dep. Tr., at 70:8–20, 85:6–18.[2] Spectrum Gulf Coast cannot service customers or operate its stores without Charter Communications, LLC's employees, which are allocated at the direction of CCI. *See* Exhibit A, Proost Dep. Tr., at 85:6–18. And, Charter Communications, LLC does not appear to have any operations or function aside from providing employees to the other subsidiaries.

Other services, such as VoIP and mobile, are provided by different subsidiaries but are sold out of the same stores leased by Spectrum Gulf Coast and operated by Charter Communications, LLC employees. *See* Exhibit A, Proost Dep. Tr., at 86:13–87:19. Equipment, including the accused set-top boxes and back-end CMTS equipment, is owned by Charter Distribution, LLC and then leased to the various subsidiaries.[3] *See* Exhibit B, Boglioli Dep. Tr., at 54:13–55:14, 78:22–79:6. But importantly, no money ever changes hands between the entities. Instead, most of the dollars

---

[2] ██████████████████████████████████████████████████
█████████████████████████████████████████████████████████
██████████████████████████████████████████████

[3] █████████████████████████████████████████████████████
███████████████████████████████████████

are kept within a single entity, Charter Communications Operating, LLC, and then costs and expenses are allocated among the various entities through entity accounting. Exhibit A, Proost Dep. Tr., at 72:10–73:2.

Intellectual property rights are also held by separate entities. Trademarks, for example, including the Spectrum▸ brand under which Charter conducts business, are held by a single entity, Charter Communications Holding Company, LLC. *See* Exhibit B, Boglioli Dep. Tr., at 93:11–21, 95:7–16; *see also* Exhibit F, Trademark Electronic Search System (TESS). There are so many entities, with so many discrete pieces of the business, that Charter's corporate representative, who is the Deputy General Counsel in charge of forming and managing the entities, did not know each one or what they do. *See* Exhibit A, Proost Dep. Tr., at 27:24–28:7, 66:21–23, 76:2–16. Indeed, he testified that, although he is an officer with all 200+ subsidiaries, he does not distinguish between the different entities in his role:



Exhibit A, Proost Dep. Tr., at 30:6–11.

### v.   The subsidiaries have no independent officers or directors.

All 200+ subsidiaries have complete overlap of officers and directors with CCI. As Charter's corporate representative testified, save for a few exceptions that are not relevant here, Charter simply copies the same officer list for every new entity that gets created. *See* Exhibit A, Proost Dep. Tr., at 42:4–12; *see also* 69:15–17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

###### vi. CCI officers lead company-wide corporate departments, each of which spans numerous subsidiaries.

The individual departments within the Charter business (e.g., Field Operations, Human Resources, Sales, etc.) are business-wide and are ultimately headed by CCI's officers. *See* Exhibit G, CCI Officer List; *see also* Exhibit B, Boglioli Dep. Tr., at 100:4–8 ████████████

████████████████████████████████████████████████████████████

████████████████████████████ As an example, ████████████████████

████████████████████████████████████ According to his company bio, he "is responsible for all human resources strategies, policies and practices for more than 93,000 employees" and "oversees all aspects of HR including recruitment, training and development, HR operations including payroll, HR shared services and HR systems, as well as compensation and benefits." *See* Exhibit I. In other words, he oversees HR matters across the entire Charter business. As another example, ████████████████████████████████

████████████████████████ and his company bio states that he "oversees the entire Field Operations organization including Charter's 11 field regions operating across 41 states; engineering and construction...; standards and compliance; and human resources for field operations." *See* Exhibit J. As confirmed by Charter's corporate representative, Mr. Marchand, Mr. Monaghan, and the other department heads have the ability to hire, fire, and direct the work of employees within their respective departments:

███████████████████████████████████████

████████████████████████████

### vii.    The subsidiaries do not hold corporate meetings.

Charter's corporate representative admitted that the subsidiaries do not hold corporate meetings; only CCI does. Exhibit A, Proost Dep. Tr., at 61:23–62:5. He also admitted that Charter maintains all corporate records under a single management system for all subsidiaries. Exhibit A, Proost Dep. Tr., at 38:23–39:11.

### b.  CCI acts externally as one company, to the public and to the government.

In addition to its actual control over the subsidiaries, CCI also represents to its investors and the general public that it, not its subsidiaries, provides the accused products and services.

### i.    CCI tells investors and the public that it provides the accused products and services.

The first sentence of CCI's 10-K annual report states, "[w]e are a leading broadband connectivity company and cable operator serving more than 32 million customers in 41 states through our Spectrum brand." Exhibit K at 1. CCI also tells its investors that it operates in Texas, stating "[w]e operate in geographically diverse areas which are managed centrally on a consolidated level." *Id.* at 3. This is then followed by a map of the company's "footprint":



*See id.*

CCI makes the same representations on its website, https://corporate.charter.com/about-charter.[4] "Charter Communications, Inc. (NASDAQ:CHTR) is a leading broadband connectivity company and cable operator serving more than 32 million customers in 41 states through its Spectrum brand." Exhibit L, About Charter, at 1. Indeed, CCI represents that "Spectrum is a suite of advanced broadband services **offered by Charter Communications, Inc.**" *Id.* at 4 (*emphasis added*). The same "About Charter" page also represents that Charter Communications, Inc. itself has 93,700 employees. *See id.* at 3.

CCI has also represented through Federal Court filings and FCC submissions that it is the entity that provides Charter's cable and internet services to the public. In 2014 for example, CCI—and not one of its operating subsidiaries—brought an action for declaratory judgment of patent non-infringement against Rockstar Consortium. In its complaint for declaratory judgment, CCI described itself as "a provider of cable services in the United States, offering a variety of entertainment, information, and communications solutions to residential and commercial

---

[4] The website includes a footer that reads "© 2022 Charter Communications Inc." *See* Exhibit L at 7.

customers." *See Charter Communications, Inc. v. Rockstar Consortium US LP*, 1:14-cv-00055, Dkt. No. 1 at ¶ 15 (D. Del. Jan. 17, 2014). More recently, Charter submitted an application to the Federal Communications Commission to transfer certain FCC licenses from one operating subsidiary (Spectrum Northeast, LLC) to another (Spectrum NLP, LLC). *See* Exhibit M, "Application for Fixed Satellite Service by Spectrum Northeast, LLC."[5] Charter characterized the assignment as "entirely *pro forma* in nature, as Charter [defined as Charter Communications, Inc.] is currently the ultimate controlling entity of the existing Licensees and will remain the ultimate controlling entity of Spectrum NLP, LLC after the restructuring occurs." *See* Exhibit N, "Description of Transaction."[6] The application goes on to note that the assignment of the FCC licenses "will enable Charter to continue providing cable and other services under a simplified entity structure." *Id*.

### ii. All Charter entities use the same Spectrum branding nation-wide.

All Charter entities use the same "Spectrum" branding and operate as a single Spectrum business. *See* Exhibit B, Boglioli Dep. Tr., at 55:17–19 ███████████████████████ ████████████████ 95:12–14 ████████████████████████████████ ████████████████ As addressed above, the Spectrum trademarks are all held by one Charter entity but used by every subsidiary. *See id.* at 93:11–21. In addition, the same rules and policies on how stores look and operate are used nationwide. *See id.* at 52:16–25. CCI's marketing department also sets nationwide guidelines for marketing. *See id.* at 96:23–97:18.

---

[5] Available at https://fcc report/IBFS/SES-ASG-20200522-00563

[6] Available at https://fcc report/IBFS/SES-ASG-20200522-00563/2362560

### iii.    All Charter entities use the same website to sell products and services, list store locations, and post job openings.

The Charter entities share a public-facing website, www.spectrum.com. Through that website, customers can find Spectrum store locations, research and purchase Spectrum products and services, and even apply for Spectrum jobs. This includes stores within this District, *see e.g.* Exhibit O[7] (Spectrum store location in Plano, TX offering "Spectrum Mobile, Video, Internet and Phone"), products and services offered within this District, *see e.g.* Exhibit P[8] (showing offers for TV, internet, phone, and mobile services for an address in Frisco, TX), and job postings within this District, *see e.g.* Exhibit Q[9] (job posting for a retail sales specialist in Beaumont, TX).

## 2.    Venue is proper over CCI in the Eastern District of Texas.

### a.    CCI has committed acts of infringement in the District.

Charter has not disputed that CCI is engaged in infringing activities within the District. Nor could it. The First Amended Complaint alleges that CCI provides infringing cable television and internet services to customers within the District, a fact confirmed in venue discovery. *See* Dkt. No. 12 at ¶ 11. The First Amended Complaint further alleges that "Charter owns and stores equipment such as modems and set top boxes ("STBs") and demonstrates services provided via those products to Charter customers" and that "Charter employs personnel that install, service, repair and/or replace equipment, as appropriate, in this district." *See id.* at ¶¶ 8–9. This is the very equipment that is used to provide the Accused Services and that Charter provides to its customers through its retail stores. *See id.* at ¶ 14; *see also* Exhibit R (noting that customers can pick up

---

[7] Available at https://www.spectrum.com/locations/tx/plano/700-alma-dr

[8] Available at https://www.spectrum.com/address/localization?zip=75035&a=13286+Guerin+Dr&serviceVendorName=twc&v=ORG&omnitureId=4f8456d9-c71e-4429-95c0-92c76957a824

[9] Available at https://jobs.spectrum.com/job/beaumont/retail-sales-specialist-bilingual-spanish-18-00-per-hour-plus-commission-and-incentives/4673/39929994304

equipment in store). It also is worth noting that the **only** corporate entity listed as the custodian of the documents in Charter's P.R. 3-4 production **is CCI, not any of the shells**.[10] Entropic has met its burden to allege acts of infringement in the District and CCI has not contested Entropic's allegations.

### b.   CCI has a regular and established place of business in the District.

CCI has regular and established places of business in this District, including the Spectrum stores and other locations from which its technicians are dispatched, all of which are staffed by Charter/Spectrum employees. This Court recently addressed this issue on similar facts in *Entropic Communications, LLC v. DirecTV, LLC et al.*, 2:22-cv-75-JRG. That opinion should be dispositive here.

In that case, the Dish defendants argued that physical places of business leased and operated by their California subsidiary could not be attributed to the ultimate parent company. This Court rejected that argument, finding no dispute that Dish-branded products and services are sold and delivered through Dish-branded retail outlets in the District. *Entropic Communications, LLC v. DirecTV, LLC*, 2:22-cv-75, Dkt. No. 109 at 7 (E.D. Tex. Oct. 24, 2022). The Court then cited various instances of overlap between Dish California and the named Dish defendants. For example, Dish California used the same logo, the same standard service agreement, the same headquarters, and shared overlapping leadership with the named defendants, and technicians employed by Dish California carried business cards identifying their employer as the parent company. *See id.* at 8, 9. Finally, the Court noted the various ways in which Dish "is purposefully holding itself out as providing products and services in California." *Id.* at 10. For example, from the main Dish website, a visitor could find Dish service packages, authorized retailers of Dish-branded products, and job

---

[10] For some documents, the custodian is listed as a natural person—a former employee.

listings for potential employment with Dish, all within the District. *See id*. Therefore, the California stores were both "regular and established" and were properly attributable to Dish. *See id.* at 10–11.

In this case, as addressed in further detail below, the Charter entities all use the same "Spectrum" branding, as well as the same public-facing website that promotes service packages, store locations, and employment positions within the District. Charter also uses the same service agreements nationwide and the subsidiaries share headquarters.[11] But when it comes to the relationship between CCI and the subsidiaries that supposedly operate its locations, the facts are even stronger. CCI exerts a degree of control over its subsidiaries that far exceeds the evidence presented in the *DirecTV* case.

        **i.**    **There are physical Charter/Spectrum locations in the District from which the business of CCI is carried out.**

To satisfy the first *Cray* factor, the place need only be a "physical, geographical location in the district from which the business of the defendant is carried out." *In re Cray*, 871 F.3d at 1360. Charter's motion does not contest this factor, nor could it. Entropic's First Amended Complaint identifies at least four such locations, including a facility at 1414 Summit Avenue, Plano, Texas 75074 ("Summit Ave. Facility"), as well as retail outlets located at 700 Alma Drive, Plano, Texas 75075 ("Alma Dr. Store"), 2100 N. Dallas Parkway, Plano, Texas 75075 ("Dallas Pkwy Store"), and 4255-A Dowlen Road, Beaumont, Texas 77706 ("Dowlen Rd. Store"). *See* Dkt.

---

[11] Charter Communications, Inc. was headquartered in St. Louis prior to June 2022 and then began moving their headquarters to a new complex in Stamford, Connecticut. *See* https://corporate.charter.com/newsroom/charter-officially-opens-corporate-headquarters-in-stamford-ct. Spectrum Gulf Coast, LLC's mailing address is listed as the St. Louis address, 12405 Powerscourt Drive, St. Louis, MO 63131, with the Texas Comptroller of Public Accounts. *See* Exhibit S. It does not appear to be registered to conduct business in Missouri, however. *See* Exhibit T (showing no results for "spectrum gulf coast" on the Missouri Secretary of State's business entity search website).

No. 12 at ¶¶ 16–17. Charter's website lists numerous other store locations in the District as well. https://www.spectrum.com/locations/tx.

There can be no doubt that these locations are used to carry out CCI's business of "offer[ing] a full range of state-of-the-art residential and business services including Spectrum Internet®, TV, Mobile and Voice." *See* Exhibit L at 1. Each location displays the **Spectrum** logo. *See* First Amended Complaint, Dkt. No. 12 at ¶¶ 16–17 (logo appearing on the face of each building); *see also* Exhibit U (logo appearing on service vans parked outside the Summit Ave. Facility). Notably, this is the same logo that appears on the face of Charter's customer service agreements used nationwide. *See e.g.* Exhibit V (Spectrum Residential Internet Services Agreement). And the physical stores offer the same Spectrum services that are offered on the main Charter/Spectrum website and that CCI has touted publicly. *See* Exhibit B, Boglioli Dep. Tr., at 49:9–17; *see also* Exhibit P.

These are the same facts that were present in the *DirecTV* case. There, the Court found that retail stores in the district bore the Dish name and provided Dish-branded products and services, even though the stores were leased and operated by a subsidiary. *See Entropic Communications, LLC v. DirecTV, LLC*, No. 2:22-cv-75, Dkt. No. 109 at 7 (E.D. Tex. Oct. 24, 2022). The facts here are indistinguishable.

> ## ii. Charter's physical locations are regular and established places of business.

The second *Cray* factor requires the place of business to be regular and established. "Regular" means "operat[ing] in a steady, uniform, orderly, and methodical manner." *In re Cray Inc.*, 871 F.3d at 1362. The Federal Circuit has also stated the need for "the regular, physical presence of an employee or other agent of the defendant conducting the defendant's business at the alleged place of business." *In re Google*, 949 F.3d 1338, 1345 (Fed. Cir. 2020). An agency

relationship involves "(1) the principal's right to direct or control the agent's actions, (2) the manifestation of consent by the principal to the agent that the agent shall act on his behalf, and (3) the consent by the agent to act." *Id*. The Federal Circuit has also emphasized that "[t]he power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." *Id.* at 1345–46.

In *AGIS Software Development LLC v. Google LLC*, 2:19-cv-361, 2022 WL 1511757 (E.D. Tex. May 12, 2022), this Court found third party CTDI to be Google's agent for venue purposes, based on the fact that Google "directs and controls CTDI's actions" within the established place of business (a portion of a CTDI repair facility designated as the Google Secured Area). *See* 2022 WL 1511757 at *4. The agreement between Google and CTDI allowed Google to set the physical specifications for its secured area; restricted that area to Google's products and services and limited access to CTDI employees authorized to work on Google's products; gave Google authority to move the secured area; and provided instructions for services that CTDI was required to perform for Google customers. *See id.* at *5. Notably, however, CTDI was not an affiliate of Google, and their agreement expressly disclaimed any agency relationship. *See id.* at *8.

Likewise, in the *DirecTV* case, this Court found this element satisfied based on the fact that "DISH holds the locations in CDCA out as its own." *See Entropic Communications, LLC v. DirecTV, LLC*, No. 2:22-cv-75, Dkt. No. 109 at 9 (E.D. Tex. Oct. 24, 2022). Specifically, the Court noted that the Dish logo appears on vans and other property stored at the locations in question. *See id.* at 10. As a result, there was "little real dispute that the locations at issue are 'physical places' within CDCA and that they are 'regular and established.'" *Id*.

Not only are the same facts present here (*see supra* 17 (noting that the **Spectrum** logo appears on vans and the buildings themselves at the locations in question)); there is even more compelling evidence that the Spectrum stores are "regular and established" and that the employees who operate these stores are agents of CCI.

First, it is abundantly clear that CCI, as the manager of Charter Communications, LLC and Spectrum Gulf Coast, has the right to direct or control the employees' actions. ██████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████ This Management Agreement sets forth CCI's authority and duties as manager, including ██████████████ ████████████████████████████ as well as ██████████████████████ ██████████████████████████████████████████████ ████████████████████ *See* Exhibit D at ¶ 2(b)(i)–(ii). In addition, Charter's corporate departments span numerous subsidiaries but are ultimately headed by CCI officers. *See supra* 10– 11. Charter's corporate representative testified that these CCI officers can direct the work of the employees in their respective departments, which they also represent on their biographies as CCI officers. *See supra* at 10–11.

CCI has also manifested its consent that the employees act on the company's behalf, including by representing to the public that the employees work for CCI. This can be seen on CCI's website and in the company's annual shareholder report, both of which characterize CCI as a company with over 93,000 employees. *See* Exhibit L, About Charter, at 1; Exhibit W, 2021 Shareholder Report, at 9. It is also reflected in the fact that, just as in the *DirecTV* case, CCI uses its website to promote Charter/Spectrum job postings around the country, including within the District. *See supra* 14. Furthermore, because the employees, stores, vans, etc. all use the same

19

Spectrum branding, there is no way for a customer to distinguish between the different subsidiaries. CCI even represented in the announcement of its new headquarters in Connecticut that it has "1,700 employees" now working there, even though all are actually employed by Charter Communications, LLC, as venue discovery revealed. *See* Exhibit X, Charter Officially Opens New State-of-the-Art Corporate Headquarters in Stamford, at 1.[12]

CCI has even acknowledged workers as its own employees/agents in federal court filings. One such case involved a wrongful death action, brought by the family of a former employee, against CCI and one of its managers. *Montes v. Charter Communications, Inc.*, No. 7:21-cv-489 (S.D. Tex.). CCI's amended motion to dismiss confirms that Ms. Trevino was "an employee of Charter," which it had earlier defined as Defendant Charter Communications, Inc. *See* Dkt. No. 10 at 1, 2. As for the manager, CCI described him as "Charter's agent." *See* NOTICE OF REMOVAL, Dkt. No. 1 at ¶ 12 ("Plaintiff has failed to plead facts establishing that Anderson[13] was negligent or grossly negligent because, <u>as Charter's agent</u>, he did not owe Ms. Trevino an individual duty") (*emphasis added*).

Finally, there can be no doubt that the Spectrum employees have consented to act as the agents of CCI. When applying for a position at Charter, ███████████████████████ ████████████████████ *See* Exhibit Y. The Agreement does not specify which Charter entity is the counterparty but rather states that it applies to all disputes ████████████████ █████████████████████████████ Exhibit Y at ¶ B(2). Indeed, CCI has repeatedly invoked the agreement by moving to compel arbitration in various employment litigations. *See e.g. Ramirez v. Charter Communications, Inc.*, 75 Cal. App. 5th 365, 368 (2022)

---

[12] Available at https://corporate.charter.com/newsroom/charter-officially-opens-corporate-headquarters-in-stamford-ct

[13] Defendants confirmed that Brian Anderson is employed by Charter Communications, LLC.

(affirming order denying CCI's motion to compel arbitration); *see also Montes v. Charter Communications, Inc.*, No. 7:21-cv-489, MOTION TO COMPEL ARBITRATION AND DISMISS, Dkt. No. 8 (S.D. Tex. Jan. 31, 2022). Moreover, when Charter's corporate representative was asked if employees were generally aware of the distinction between the various Charter entities, he admitted ██████████████████████████ *See* Exhibit A, Proost Dep. Tr., at 74:12–17. As far as the employees are concerned, they simply work for Charter.

CCI thus possesses actual authority as the manager of its subsidiaries and does in fact dictate the allocation of Spectrum employees to its various subsidiaries, while also controlling aspects of their work. Furthermore, CCI has represented to the world that, when a customer walks into a Spectrum store or has a Spectrum technician install equipment at their home, that customer is interacting with an employee/agent of Charter Communications, Inc. There is no dispute that these employees are regularly present at locations within the district, so there can be no doubt that these locations are "regular and established" as required by *Cray*.

### iii.    The physical locations are the places of CCI.

To be the place of the defendant, "the defendant must establish or ratify the place of business." *In re Cray*, 871 F.3d at 1363. There are a number of factors the Court may consider, including whether the defendant owns or leases the place, exercises other attributes of possession or control over the place, conditions employment on an employee's continued residence in the district, stores materials at a place in the District so that they can be distributed or sold from that place, or advertises a place for its business or represents that it has a place of business in the district. *Id.* at 1363–67. The court may also consider the nature and activity of the alleged place of business of the defendant in the District in comparison with that of other places of business of the defendant in other venues. *Id*. These considerations are not exhaustive but rather illustrative of the types of information relevant for determining whether a physical place is "of the defendant." *Id*. at 1363.

In the *DirecTV* case, this Court found that Dish had adopted and ratified the locations of its California subsidiary. The Court noted that customers could use the main Dish website to find Dish service packages and authorized retailers available within the district; prospective employees could find Dish job listings for positions in the district; and the site prominently advertised Dish's "nationwide availability." *See Entropic Communications, LLC v. DirecTV, LLC*, No. 2:22-cv-75, Dkt. No. 109 at 10 (E.D. Tex. Oct. 24, 2022). The Court concluded based on these facts that "DISH is purposefully holding itself out as providing products and services in California." *Id*.

All of these facts are present here, and then some. CCI holds itself out as a company that provides internet and television services across 41 states (*supra* 11–12), and it advertises retail locations, service packages, and job listings through a nationwide website (*supra* 14). Indeed, the casual visitor to Charter's website would have every reason to believe that the Spectrum stores and services are provided by CCI. *Compare with AGIS Software Development LLC v. Google LLC*, 2:19-cv-361, 2022 WL 1511757 at *9 (E.D. Tex. May 12, 2022) (finding Google had ratified the CTDI location as its own, based in part on how Google advertises to its customers that it is the provider of services at the CTDI facility and that "customers are not even aware of CTDI").

As if this were not enough, there is one additional fact that was not present in the *DirecTV* case and which should prove dispositive here: CCI actually negotiated and signed the property leases for Spectrum stores in this district. *See supra* 7. This is consistent with CCI's authority as manager, which includes ██████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████ In fact, ██████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

Finally, it bears repeating that CCI's officers are ultimately the same individuals who are in charge of the various subsidiaries. *See supra* 9–11. One of these officers even admitted that he does not distinguish between his roles at the different entities on a day-to-day basis, and he repeatedly ████████████████████████████████████████████ *See supra* 4, 6. As such, CCI is the entity that is ultimately in control of the activities of its subsidiaries, including the leasing and maintaining of Spectrum stores within the district. There can be no doubt that CCI is "purposely holding itself out as providing products and services" in the district, and the Court should find that it has ratified the Spectrum stores as its own.

## CONCLUSION

Charter asks this Court to hold that a nationwide corporate enterprise can avoid venue and compartmentalize its liability by setting up wholly-controlled shell LLCs with no employees and no independent operations. Such a holding could have far-reaching implications and upend patent venue, leaving venue choice in the hands of defendants through their choice of corporate structure. It could even allow a single enterprise spanning "41 states" as Charter does, to force fragmentation of patent infringement litigation into a multitude of suits around the country by simply setting up LLCs with no real life of their own.

This Court should reject that invitation. The law recognizes that corporate/LLC shells do not authorize enterprises to rig the rules of venue. In this case, venue discovery has confirmed the fact pattern that law exists to address. Charter provides infringing products and services in the district from regular and established places of business. All the relevant acts are legally attributable

to CCI. Entropic respectfully requests the Court find venue proper and deny Charter's motion to dismiss.

Dated: January 10, 2023                                    Respectfully submitted,

                                          */s/ James Shimota by permission Wesley Hill*
                                          James Shimota – LEAD ATTORNEY
                                          Jason Engel
                                          George Summerfield
                                          Devon Beane (*pro hac vice* forthcoming)
                                          **K&L GATES LLP**
                                          70 W. Madison Street, Suite 3300
                                          Chicago, IL 60602
                                          Jim.shimota@klgates.com
                                          Jason.engel@klgates.com
                                          George.summerfield@klgates.com
                                          Devon.beane@klgates.com

                                          Nicholas F. Lenning
                                          **K&L Gates LLP**
                                          925 Fourth Avenue, Suite 2900
                                          Seattle, WA 98104-1158
                                          nicholas.lenning@klgates.com

                                          Darlene Ghavimi
                                          Matthew Blair
                                          **K&L GATES LLP**
                                          2801 Via Fortuna
                                          Suite #650
                                          Austin, Texas 78746
                                          Darlene.ghavimi@klgates.com
                                          Matthew.blair@klgates.com

                                          Wesley Hill
                                          Texas Bar No. 24032294
                                          Andrea Fair
                                          Texas Bar No. 24078488
                                          **WARD, SMITH & HILL, PLLC**
                                          1507 Bill Owens Pkwy
                                          Longview, TX 75604
                                          Tel:  (903) 757-6400

Fax  (903) 757-2323
wh@wsfirm.com
andrea@wsfirm.com

**ATTORNEYS FOR PLAINTIFF
ENTROPIC COMMUNICATIONS, LLC**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a) and served via email on all counsel of record on this tenth day of January, 2023.

*/s/ Wesley Hill*
Wesley Hill

<u>**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**</u>

This is to certify that the above document should be filed under seal because it contains material designated by the parties as confidential pursuant to the Protective Order entered in this case (Dkt. 36).

*/s/ Wesley Hill*
Wesley Hill