**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

ENTROPIC COMMUNICATIONS, LLC,

     Plaintiff

     v.

CHARTER COMMUNICATIONS, INC.,

     Defendant.

Civil Action No. 2:22-cv-00125-JRG

**JURY TRIAL DEMANDED**

████████████

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT FOR IMPROPER VENUE
PURSUANT TO FRCP 12(b)(3)**

## TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................................1

II.  LEGAL BACKGROUND ......................................................................................3

III. ARGUMENT .........................................................................................................5

    1.   The activities and employees of the subsidiaries are attributable to CCI ...............5

        a.   The subsidiaries are controlled by CCI with no independent existence ......5

            i.    The subsidiaries have no employees of their own ..........................5

            ii.   CCI is the manager of each subsidiary ...........................................6

            iii.  As manager, CCI executed the lease agreements for Spectrum stores in the District, among other contracts....................................8

            iv.   No individual subsidiary is a complete, functioning business, but rather each plays a discrete, dependent role within the Spectrum business controlled by CCI ..........................................................10

            v.    The subsidiaries have no independent officers or directors...........11

            vi.   CCI officers lead company-wide corporate departments, each of which spans numerous subsidiaries .................................................12

            vii.  The subsidiaries do not hold corporate meetings and do not maintain their own records ............................................................13

        b.   CCI holds out to the public that Charter is one enterprise and that CCI provides the accused products and services................................................14

            i.    CCI tells investors and the public that it provides the accused products and services ....................................................................14

            ii.   All Charter operations use the same Spectrum branding policies and conduct nationwide, across all subsidiaries ............................15

            iii.  All Charter entities use the same website to sell products and services, list store locations, and post job openings......................15

        c.   CCI admits—indeed affirmatively represents—to the federal government the reality that Charter is one enterprise and that CCI provides the accused products and services ..................................................................16

            i.    To the Federal Communications Commission, CCI emphasizes its control over the single operating enterprise....................................16

|   |   | ii. | To the International Trade Commission, CCI admits that it is part and parcel of a "broadband connectivity company and cable operator" ............................................................................. 17 |

|   |   | iii. | To other Article III Courts outside this District, Charter pleads that CCI provides cable and communications services ........................ 17 |

|   | 2. | | Venue is proper over CCI in the Eastern District of Texas ................................. 18 |

|   |   | a. | CCI has committed acts of infringement in the District ........................... 18 |

|   |   | b. | CCI has a regular and established place of business in the District .......... 19 |

|   |   | i. | There are physical Charter/Spectrum locations in the District from which the business of CCI is carried out ....................................... 21 |

|   |   | ii. | Charter's physical locations are regular and established places of business ...................................................................................... 22 |

|   |   | iii. | The physical locations are the places of CCI ............................... 26 |

| IV. | | | CONCLUSION ............................................................................................................ 29 |

# TABLE OF AUTHORITIES

**Cases**                                                                                               **Pages**

*AGIS Software Development LLC v. Google LLC*, 2:19-cv-361, 2022 WL 1511757 (E.D. Tex.
    May 12, 2022) ...................................................................................................22–23, 27

*Andra Group, LP v. Victoria's Secret Stores, LLC*, 6 F.4th 1283 (Fed. Cir. 2021) ......................4

*Bd. Of Regents v. Medtronic PLC*, No. 17-cv-0942, 2018 WL 4179080 (W.D. Tex. July 19,
    2018) .............................................................................................................................27

*Entropic Communications, LLC v. DirecTV, LLC*, 2:22-cv-75, Dkt. No. 109, ORDER (E.D. Tex.
    Oct. 24, 2022) ...............................................................................3, 19–20, 22–24, 26, 28

*In re Cray*, 871 F.3d 1355 (Fed. Cir. 2017)................................................................4, 21–22, 26

*In re Google*, 949 F.3d 1338 (Fed. Cir. 2020) ...........................................................................22

*Ramirez v. Charter Communications, Inc.*, 75 Cal. App. 5th 365 (2022) ...................................25

*Sightline Payments, LLC v. Everi Holdings Inc.*, No. 6:21-cv-1015, 2022 WL 2078215 (W.D.
    Tex. June 1, 2022)..........................................................................................................4

*Seven Networks, LLC v. Google LLC*, 315 F. Supp. 3d 933 (E.D. Tex. July 19, 2018)...............19


**Statutes**

28 U.S.C. § 1400(b)(2) ................................................................................................................3

**Other**

*Charter Communications, Inc. v. Bear Creek Techs., Inc.*, 1:11-cv-0722-GMS, Dkt. No. 1,
    COMPLAINT FOR DECLARATORY JUDGEMENT (D. Del. Aug. 17, 2011) ............................18

*Charter Communications, Inc. v. Rockstar Consortium US LP*, 1:14-cv-00055, Dkt. No. 1,
    COMPLAINT FOR DECLARATORY JUDGMENT (D. Del. Jan. 17, 2014)...........................1, 18

*Charter Communications, Inc. v. Rockstar Consortium US LP*, 1:14-cv-00055, Dkt. No. 69,
    ANSWERING BRIEF IN OPPOSITION TO MOTION TO DISMISS FOR FAILURE TO STATE A
    CLAIM [REDACTED VERSION] (D. Del. Jan. 17, 2014) .......................................................18

*In the Matter of Certain Digital Set-Top Boxes and Systems and Services Including the Same*,
    No. 337-TA-1315, Response to the Amended Complaint (June 21, 2022)...................1, 17

*Montes v. Charter Communications, Inc.*, No. 7:21-cv-489, Dkt. No. 1, NOTICE OF REMOVAL
    (S.D. Tex. Dec. 20, 2021) .................................................................................................25

*Montes v. Charter Communications, Inc.*, No. 7:21-cv-489, Dkt. No. 8, MOTION TO COMPEL ARBITRATION AND DISMISS (S.D. Tex. Jan. 31, 2022)......................................................25

*Montes v. Charter Communications, Inc.*, No. 7:21-cv-489, Dkt. No. 10, AMENDED MOTION TO DISMISS (S.D. Tex. Feb. 2, 2022) ...............................................................................24–25

## INTRODUCTION

There is no dispute that there are dozens of "Spectrum"-branded Charter physical locations in the District, staffed by numerous employees—discovery even revealed that CCI itself negotiated and signed the lease agreements for these stores. And there is no dispute that Charter provides accused products and services to customers in the District. Finally, there *should* be no dispute that CCI—the publicly-traded controlling corporation of this enterprise—is a provider of these accused products and services. Historically, it has admitted so. In 2014, CCI affirmatively plead (as plaintiff in a declaratory judgment complaint) to the U.S. District Court in Delaware:

> [***CCI, the sole named Charter entity***, is] a provider of cable services in the United States, offering a variety of entertainment, information, and communications solutions to residential and commercial customers.[1]

Eight years later, nothing has changed. In June 2022 CCI admitted to the U.S. ITC:

> Charter admits that ***Charter Communications, Inc.*** (***together*** with its controlled subsidiaries) is a broadband connectivity company and cable operator that provides television and other services to subscribers under the Spectrum brand and provides such services on a variety of platforms, including through digital set-top boxes . . .[2]

These facts close the book on whether venue is proper over CCI. Nevertheless, in front of ***this*** Court, CCI has made—and now renews—a motion that venue is improper. What is going on?

Charter's strategy is to ask this Court to ignore the tangible reality of CCI's operation of the Charter enterprise, in favor of playing along with an elaborate fiction involving over 200 shell LLCs set up and entirely controlled by CCI. Legally, the Court has only one decision to make: should the activities and employees of CCI's subsidiaries be imputed to the controlling entity CCI, the publicly-traded face of Charter to the world? Under controlling law, the answer is yes because

---

[1] *Charter Communications, Inc. v. Rockstar Consortium US LP*, 1:14-cv-00055, Dkt. No. 1 ¶ 15 (D. Del. Jan. 17, 2014) (*emphasis added*).

[2] *In the Matter of Certain Digital Set-Top Boxes and Systems and Services Including the Same*, No. 337-TA-1315, Response to the Amended Complaint (June 21, 2022).

(aside from the prior admissions) venue discovery has confirmed that in reality there is only one enterprise. CCI's subsidiaries have no independent existence—indeed, Charter's corporate representative ████████████████████████████████████ Discovery has revealed:

- All 200+ subsidiaries are limited liability companies (LLCs) with CCI as the sole manager. CCI itself set up the LLCs, dictated the details of their formation and their operating agreements, and as manager CCI itself runs every detail of the entities' operations. *See infra* 6–8.

- None of the LLCs have their own employees, except a single LLC set up to hold all the employment relationships ***for all of Charter***. Every single Charter employee (including the Spectrum brand), from the CEO to the technicians and retail workers, is placed in this LLC container. CCI itself then "allocates" employees to the various shells, thereby directing all the employees of the entire collection of entities. *See infra* 5–6. Moreover, CCI suspects its employees don't even know which entity they work for. *See infra* 25.

- CCI signs the contracts for its subsidiaries, including agreements for the sale and lease of the Accused Instrumentalities ***as well as lease agreements for locations in this District***. *See infra* 8–9.

- The subsidiaries have no independent officers or directors. All the named officers and directors overlap with CCI. *See infra* 11.

- The subsidiaries do not hold corporate meetings and do not maintain any records of their own. All records that may exist are maintained by CCI. *See infra* 13–14.

- The internal organization of Charter ignores the LLC boundaries: CCI officers ***lead enterprise-wide corporate departments***, each of which spans numerous subsidiaries. *See infra* 12–13.

In summary, no individual subsidiary is a complete, functioning business, and CCI has actual control and authority over the actions of its subsidiaries. There is only one Charter, controlled entirely by CCI. The artificial subsidiary lines that Charter extols here do not exist in the day-to-day operation of Charter's cable and internet services business.

Naturally, this reality of "One Charter" appears in CCI's interactions with the public and government:

- Everywhere except here, CCI *is* the "Spectrum"-branded enterprise. To investors and the SEC, in its annual 10-K, CCI introduces itself as: "We are a leading broadband connectivity company and cable operator serving more than 32 million customers in 41 states through our Spectrum brand." *See infra* 14.

- Ditto for its statements on the single national website spanning all territories, operated by CCI and branded as Spectrum. On the "About Charter" page of its website, CCI states "Charter Communications, Inc. (NASDAQ:CHTR) is a leading broadband connectivity company and cable operator serving more than 32 million customers in 41 states through its Spectrum brand." *See infra* 15.

- CCI represents to the general public, to its investors, and to the SEC that it has "93,700 employees"—not that it is merely a holding company with zero. *See infra* 15.

- When CCI finds it convenient in interactions with federal agencies, it reveals the single-entity nature of its operations—justifying to the FCC the switching and swapping of communications licenses among various shells as "pro forma" because CCI is the "ultimate controlling entity" of the business. *See infra* 16-17.

- As noted at the outset, when CCI has sought the relief of the Federal Courts in patent matters, it has characterized *itself* as a provider of cable television and internet services. *See infra* 17–18. And even last summer, CCI admitted to the ITC that it is the actual provider of services. *See infra* 17.

Taken together, the evidence is compelling that CCI's subsidiaries are not separate businesses, but instead are illusory lines sketched on top of the reality of CCI's nationwide enterprise. These contrived lines do not exist in CCI's day-to-day business, but are instead artifices CCI points to when it helps, and eschews when it hurts. The law recognizes that in such situations the tangible reality of the operating enterprise controls, not the paper boundaries. This Court has reached the same conclusion repeatedly, including very recently in *Entropic Communications, LLC v. DirecTV, LLC et al.*, No. 2:22-cv-75-JRG (E.D. Tex.). Under each of the two established legal tests—lack of separateness and ratification—venue over CCI is fully proper in this District without any piercing of the corporate veil, as Charter suggests is necessary.

## LEGAL BACKGROUND

Venue is proper in any district where the defendant has committed acts of infringement and has a regular and established place of business. *See* 28 U.S.C. § 1400(b)(2). Specifically, a

"regular and established place of business" must be (1) "a physical place in the district;" (2) "regular and established;" and (3) "the place of the defendant." *In re Cray*, 871 F.3d 1355, 1360 (Fed. Cir. 2017). The Federal Circuit has set forth a number of considerations relevant to determining if a regular and established place of business is "of the defendant." *Id.* at 1363–64. Those considerations include whether the defendant owns or leases the place, exercises other attributes of possession or control over the place, conditions employment on an employee's continued residence in the district, stores materials at a place in the district so that they can be distributed or sold from that place, advertises a place for its business, or represents that it has a place of business in the district. *Id*. A court may also consider the nature and activity of the alleged place of business of the defendant in the district in comparison with that of other places of business of the defendant in other venues. *Id.* at 1364. These enumerated considerations are not exhaustive but rather illustrative of the types of information relevant for determining whether a physical place is "of the defendant." *See id*. at 1363–64.

In the case of affiliated entities, the place of business of one company can be imputed to another when the two have not maintained corporate separateness or when the defendant has ratified the location as its own. *See Andra Group, LP v. Victoria's Secret Stores, LLC*, 6 F.4th 1283, 1289 (Fed. Cir. 2021). The standard for establishing that two entities lack corporate separateness is "relaxed" when the theory is not used to impose liability, but merely to establish jurisdiction or venue. *See Sightline Payments, LLC v. Everi Holdings Inc.*, No. 6:21-cv-1015, 2022 WL 2078215 at *4 (W.D. Tex. June 1, 2022) (appeal filed June 28, 2022) (quoting *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 681 (S.D.N.Y. 2016)).

## ARGUMENT

**1.  The activities and employees of the subsidiaries are attributable to CCI.**

There can be no dispute that this Court has venue over certain Charter entities. As Charter readily acknowledges, there are dozens of Spectrum stores in Texas, including numerous stores in this District. *See* Dkt. No. 61 at 13; *see also* Dkt. No. 61-14 (Exhibit 12 to Charter Motion). Charter also does not dispute that there are Charter/Spectrum employees conducting business in this District, *i.e.* by staffing those stores and responding to service and installation calls at customers' homes. *See* Dkt. No. 61 at 4–5. Charter also provides the allegedly infringing products and services to customers in this District. The only dispute before the Court is whether venue is proper against CCI—the public-facing, publicly-traded, controller and orchestrator of the enterprise.

### a.  The subsidiaries are controlled by CCI with no independent existence.

The details that follow were unearthed in discovery. CCI saw Entropic's opposition to the original version of the present motion before renewing and re-filing it. In the renewed version, CCI confesses some of the following points. It is notable that none of it was revealed to the Court in the original CCI motion.

### i.  The subsidiaries have no employees of their own.

One subsidiary, Charter Communications, LLC, employs ***all*** personnel within the Charter business. *See* Exhibit A, Proost Dep. Tr., at 73:20–74:11. Neither CCI nor any of the remaining subsidiaries have employees of their own. *See id*. ███████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████

### ii.    CCI is the manager of each subsidiary.

All of the Charter subsidiaries, direct and indirect, are limited liability companies (LLCs), and CCI is designated as the corporate manager of every last one of them. *See* Exhibit A, Proost Dep. Tr., at 56:23–57:12; *see also* Dkt. No. 61 at 7–9. This role is not, as Charter suggests, ceremonial or incidental. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████ In addition to the individual operating agreements, CCI has also put in place a Management Agreement which specifies CCI's authority and duties as manager. *See* Exhibit D, Second Amended and Restated Management Agreement ("Management Agreement"). Indeed, █████████████████████████████████████████████

████████████████████████████████████████████████████

███

As the manager and ultimate parent, CCI dictates the terms of each subsidiary's operations and existence, including writing and executing the formation documents. For example, this is the signature page of Spectrum Gulf Coast's operating agreement:



Exhibit C, Spectrum Gulf Coast, LLC Operating Agreement, at 12. All internal Charter contracts that Charter has produced in venue discovery are the same, *i.e.* one person signs for all Charter entities. When asked whether this would be true of the operating and management agreements for all 200+ subsidiaries, ███████████████████████████████████████

██████████████████████████████████████

Charter's corporate representative further confirmed that CCI dictates the terms of these agreements, according to how it wants each subsidiary to operate. When asked how the operating agreements are negotiated, he answered:



Exhibit A, Proost Dep. Tr., at 45:25–46:10; *see also* 49:13–16 █████████████████████

████████████████████████████████████████

██████████████████████████████ Note that even CCI's representative ████████████

████████████ the distinctions between entities that are played up so strongly to this Court are not

in the vocabulary of CCI/Charter's own designated witness.

### iii. As manager, CCI executed the lease agreements for Spectrum stores in the District, among other contracts.

CCI's control of its subsidiaries is so direct that CCI routinely executes contracts on their

behalf. Most notably, the leases for Spectrum stores in the District, nominally held by Spectrum

Gulf Coast, LLC, were actually negotiated and executed by CCI. As an example, below is the

signature line on the lease for the Spectrum store in Beaumont, Texas:



Exhibit E, Beaumont Store Lease, at 34 (highlighting added for clarity). It is worth noting that this

was intentional— ████████████████████████████████████████████████████

████████████████████████████████ and essentially every other Charter subsidiary,

but chose to sign in his capacity as a CCI officer, not in his capacity as an officer of Spectrum Gulf

Coast. This format is mirrored in nearly all of the property leases produced by Charter as part of

venue discovery.

The same is also true of agreements relating to the Accused Instrumentalities, *e.g.,* CMTS,

cable modem, and set-top box equipment used to deliver the Accused Services. For example,

Charter Communications Operating, LLC entered into a Master Purchase Agreement ███████ ███████████████████████████████████████████████ *See* Exhibit Z. That purchase agreement is signed by CCI, as manager of Charter Communications Operating, LLC. *See id.* at 1.



Furthermore, within the Charter business, equipment is leased by ██████████ ████ to the various operating subsidiaries pursuant to a Master Equipment Lease Agreement. *See* Exhibit AA. Several dozen Charter entities are signatories to the lease agreement, but CCI—and more specifically, the same senior vice president on behalf of CCI—signed on behalf of all of them. *See id.* at 15–22.

Finally, CCI is listed as the custodian of nearly all the technical documents Charter has produced in this case. This includes, for example, a "Request for Quote" document for one of the accused set-top boxes (the Worldbox v2.0). *See* Exhibit AB. Charter has taken the position that "CCI regularly maintains its corporate records separate from those of its subsidiaries." *See* Dkt. No. 61-3, Declaration of Jennifer Smith, at ¶ 7. Although discovery has called this representation into question (*see infra* 13), to the extent it is true, it confirms that the technical documents belong to CCI. This further demonstrates CCI's control over the equipment that is used to deliver Charter's cable services.

### iv.   No individual subsidiary is a complete, functioning business, but rather each plays a discrete, dependent role within the Spectrum business controlled by CCI.

No subsidiary operates an independently functioning business. Instead, each subsidiary plays a specific role in the overall national Spectrum business as designated and orchestrated by CCI. Charter's corporate representative testified that the overarching Management Agreement between CCI and the subsidiaries controls the relationship between the companies, ███████ ██████████████████████████████████████████████████████████████████████ ███████████████████ Exhibit A, Proost Dep. Tr., at 71:25–72:6.

For example, on paper Spectrum Gulf Coast operates retail stores and the "plant" in Texas (Charter's term for the equipment used to deliver television and internet services). *See* Exhibit A, Proost Dep. Tr., at 70:8–20, 85:6–18.[3] Spectrum Gulf Coast cannot service customers or operate its stores without Charter Communications, LLC's employees, which are allocated at the direction of CCI. *See* Exhibit A, Proost Dep. Tr., at 85:6–18. And, Charter Communications, LLC does not appear to have any operations or function aside from providing employees to the other subsidiaries.

Other services, such as VoIP and mobile, are provided by different subsidiaries but are sold out of the same stores leased by Spectrum Gulf Coast and operated by Charter Communications, LLC employees. *See* Exhibit A, Proost Dep. Tr., at 86:13–87:19. Equipment, including the accused set-top boxes and back-end CMTS equipment, █████████████████████████ and then leased to the various subsidiaries.[4] *See* Exhibit B, Boglioli Dep. Tr., at 54:13–55:14, 78:22–79:6. But tellingly, no money ever changes hands between the entities! Instead, most of the dollars are

---

[3] ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

[4] ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████

kept within a single entity, ██████████████████████████████████████

████████████████████████████ Exhibit A, Proost Dep. Tr., at 72:10–73:2. The divisions

are not reality, they are accounting devices.

Intellectual property rights are also nominally held by separate entities. Trademarks, for

example, including the  brand under which Charter conducts business, are held by a single

entity, Charter Communications Holding Company, LLC. *See* Exhibit B, Boglioli Dep. Tr., at

93:11–21, 95:7–16; *see also* Exhibit F, Trademark Electronic Search System (TESS). There are so

many entities, with so many discrete pieces of the business, that Charter's corporate representative,

who is the Deputy General Counsel in charge of forming and managing the entities, did not know

each one or what they do. *See* Exhibit A, Proost Dep. Tr., at 27:24–28:7, 66:21–23, 76:2–16.

Indeed, he testified that, although he is an officer with all 200+ subsidiaries, he does not distinguish

between the different entities in his role:

████████████████████████████████████████
██████████

████████████████████████

████████

████████████

Exhibit A, Proost Dep. Tr., at 30:6–11.

### v.   The subsidiaries have no independent officers or directors.

All 200+ subsidiaries have complete overlap of officers and directors with CCI. As

Charter's corporate representative testified, save for a few exceptions that are not relevant here,

Charter simply copies the same officer list for every new entity that gets created. *See* Exhibit A,

Proost Dep. Tr., at 42:4–12; *see also* 69:15–17 (████████████████████████████████

████████████████████ ).

### vi.   CCI officers lead company-wide corporate departments, each of which spans numerous subsidiaries.

The individual departments within the Charter business (e.g., Field Operations, Human Resources, Sales, etc.) are ***enterprise-wide*** and are headed by ***CCI's*** officers. *See* Exhibit G, CCI Officer List; *see also* Exhibit B, Boglioli Dep. Tr., at 100:4–8 (confirming accuracy). The entity lines dissolve when one examines the actual functioning enterprise.

For example, HR is a unified department slashing across the subsidiaries, headed by CCI itself. ████████████████████████████████████████████████████ According to his company bio, as EVP of CCI he "is responsible for ***all human resources strategies, policies and practices for more than 93,000 employees***" and "oversees all aspects of HR including recruitment, training and development, HR operations including payroll, HR shared services and HR systems, as well as compensation and benefits." *See* Exhibit I (*emphasis added*). When it comes to HR and employee matters, there is "One Charter," and it is controlled by CCI.

So too with Field Operations. ████████████████████████████████████ ████████████████████████, and his company bio states that he "oversees ***the entire Field Operations organization including Charter's 11 field regions operating across 41 states***; engineering and construction…; standards and compliance; and human resources for field operations." *See* Exhibit J (*emphasis added*). Again, the reality of One Charter controlled by CCI surfaces.

Discovery confirmed the enterprise-wide authority of these CCI executives. Charter's designated corporate witness confirmed that Mr. Marchand, Mr. Monaghan, and the other CCI department heads have the power to ***hire, fire, and direct the work*** of employees within their respective departments:

████████████████████████████████████████████████
████████████████████████████████████████



The entity lines simply don't exist for the officers of CCI when they are performing day-to-day duties across the enterprise.

### vii. The subsidiaries do not hold corporate meetings and do not maintain their own records.

In a declaration submitted with Charter's motion to dismiss, Charter's VP Associate General Counsel states that "CCI **[1]** regularly maintains its corporate records separate from those of its subsidiaries, including those referenced herein, and **[2]** conducts meetings of its shareholders and directors separate from those these [*sic*] subsidiaries." Dkt. No. 61-3, Declaration of Jennifer Smith, at ¶ 7 (numeral labels added for clarity). Examine the sworn statements one at a time. First, item **[1]**: Seemingly contrary to the declaration, Charter in fact maintains all corporate records under a single management system for all subsidiaries. *See* Exhibit A, Proost Dep. Tr., at 38:23–39:11. Moreover, as noted above, CCI is listed as the custodian of nearly every technical document Charter has produced in this case. It is unclear how this can be, given CCI's stance that other entities are responsible for the Accused Instrumentalities. *See* Dkt. No. 61 at 5–6. In any event, separate maintenance appears to be a stretch for what is actually a unitary document management system.

Second, for item **[2]**: the corporate meetings are not really separate—discovery revealed that the subsidiaries hold no meetings at all! CCI—head of the whole enterprise—is the ***only*** Charter entity that conducts corporate meetings. *See* Exhibit A, Proost Dep. Tr., at 61:23–62:5

. Perhaps there are "simple explanations,"

13

but the point is that CCI's declaration, carefully crafted for this motion, should be given little weight compared to what CCI does and says everywhere else.

We now turn to what CCI says everywhere else, by first examining what CCI represents to the public and then what CCI represents to the government.

### b. CCI holds out to the public that Charter is one enterprise and that CCI provides the accused products and services

#### i. CCI tells investors and the public that it provides the accused products and services.

The very first sentence of **CCI's** 10-K annual report states, "[w]e are a leading broadband connectivity company and cable operator serving more than 32 million customers in 41 states through our Spectrum brand." Exhibit K at 1. CCI also tells its investors that it operates in Texas, stating "[w]e operate in geographically diverse areas which are managed centrally on a consolidated level." *Id.* at 3. This is then followed by a map of the company's "footprint":



*See id.*

CCI makes the same representations on its website, https://corporate.charter.com/about-charter.[5] "Charter Communications, Inc. (NASDAQ:CHTR) is a leading broadband connectivity company and cable operator serving more than 32 million customers in 41 states through its Spectrum brand." Exhibit L, About Charter, at 1. Indeed, CCI represents that "Spectrum is a suite of advanced broadband services *offered by Charter Communications, Inc.*" *Id.* at 4 (*emphasis added*). The same "About Charter" page also represents that Charter Communications, Inc. itself has 93,700 employees. *See id.* at 3.

        **ii.**    **All Charter operations use the same Spectrum branding policies and conduct nationwide, across all subsidiaries.**

All Charter entities use the same "Spectrum" branding and operate as a single Spectrum business. *See* Exhibit B, Boglioli Dep. Tr., at 55:17–19 ("all our branding in our stores is the Spectrum brand"), 95:12–14 ("The Spectrum brand is used for all customer-facing functions in all retail stores in all service"); *see also* Dkt. No. 61 at 4. As addressed above, the Spectrum trademarks are all held by one Charter entity but used by every subsidiary. *See id.* at 93:11–21. Despite that, Charter Communications, Inc. tells the public that Spectrum is "its" brand. *See* Exhibit L at 4. In addition, ███████████████████████████████████████████ █████████. *See id.* at 52:16–25. CCI's marketing department also ███████████████████████ ████████. *See id.* at 96:23–97:18.

        **iii.**   **All Charter entities use the same website to sell products and services, list store locations, and post job openings.**

Once again, the reality of "One Charter" is confirmed by Charter's website. There is one a public-facing website for consumers, www.spectrum.com.[6] Through that website, customers can

---

[5] The website includes a footer that reads "© 2022 Charter Communications Inc." *See* Exhibit L at 7.

[6] There's also a related "corporate.charter.com" website that is essentially an investor-focused website for all of Charter. It links directly to the Spectrum website, including the careers page of the Spectrum website.

log on and sign up for services anywhere Spectrum offers it, find any Spectrum location, and apply for any posted Spectrum job anywhere in the country—from field technicians to retail to engineers to in-house counsel. There are no boundaries. Thus, the unitary website provides access to: (1) stores within this District, *see e.g.* Exhibit O[7] (Spectrum store location in Plano, TX offering "Spectrum Mobile, Video, Internet and Phone"); (2) products and services offered within this District, *see e.g.* Exhibit P[8] (showing offers for TV, internet, phone, and mobile services for an address in Frisco, TX); and (3) available jobs within this District, *see e.g.* Exhibit Q[9] (job posting for a retail sales specialist in Beaumont, TX).

> **c.   CCI admits—indeed affirmatively represents—to the federal government the reality that Charter is one enterprise and that CCI provides the accused products and services.**

> > **i.   To the Federal Communications Commission, CCI emphasizes its control over the single operating enterprise.**

When dealing with the Federal Communications Commission, it is advantageous to Charter to overlook the subsidiaries. It drastically simplifies shuffling FCC licenses. Thus, CCI tells the FCC not to worry about the subsidiaries because CCI controls the enterprise. In a recent application to transfer certain FCC licenses from one CCI subsidiary (Spectrum Northeast, LLC) to another (Spectrum NLP, LLC), Charter said the proposed assignment was:

> entirely *pro forma* in nature, as Charter [defined therein as CCI] is currently the ultimate controlling entity of the existing Licensees and will remain the ultimate controlling entity of Spectrum NLP, LLC after the restructuring occurs.

---

[7] Available at https://www.spectrum.com/locations/tx/plano/700-alma-dr

[8] Available at https://www.spectrum.com/address/localization?zip=75035&a=13286+Guerin+Dr&serviceVendorName=twc&v=ORG&omnitureId=4f8456d9-c71e-4429-95c0-92c76957a824

[9] Available at https://jobs.spectrum.com/job/beaumont/retail-sales-specialist-bilingual-spanish-18-00-per-hour-plus-commission-and-incentives/4673/39929994304

Exhibits M & N, "Application for Fixed Satellite Service by Spectrum Northeast, LLC" and attachment thereto.[10] The application goes on to note that the assignment of the FCC licenses "will enable Charter [again, defined therein as CCI] to continue providing cable and other services under a simplified entity structure." *Id*.

### ii. To the International Trade Commission, CCI admits that it is part and parcel of a "broadband connectivity company and cable operator."

In June 2022, Charter answered an ITC complaint, *In the Matter of Certain Digital Set-Top Boxes and Systems and Services Including the Same*, No. 337-TA-1315, Response to the Amended Complaint (June 21, 2022). Charter flatly admits the salient point:

> Charter admits that Charter Communications, Inc. (together with its controlled subsidiaries) is a broadband connectivity company and cable operator that provides television and other services to subscribers under the Spectrum brand and provides such services on a variety of platforms, including through digital set-top boxes . . .

*Id*. ¶ 20. Furthermore, "Charter"—defined as the full collection of entities including at its head CCI—sells or leases set-top boxes", ¶ 31, "charges subscribers for lost, damaged, and/or returned set-top boxes", ¶ 64, and "sells and provides Spectrum TV services in the United States and, in certain situations, provides set-top boxes in conjunction with this service", ¶ 66.[11]

### iii. To other Article III Courts outside this District, Charter pleads that CCI provides cable and communications services.

Sometimes, Charter affirmatively seeks out the Article III Courts for help. When it does, CCI files the suit and names itself plaintiff. In such pleadings, CCI confirms that is the service provider. In 2014 for example, CCI—and not one of its operating subsidiaries—brought an action

---

[10] Source: https://fcc.report/IBFS/SES-ASG-20200522-00563, portion quoted at https://fcc.report/IBFS/SES-ASG-20200522-00563/2362560.

[11] The other defined entities in the Answer were Charter Communications Operating, LLC, Charter Communications Holding Company, LLC, and Spectrum Management Holding Company, LLC. All of these are, on paper, employee-less "holding" companies like CCI and not direct operating subsidiaries. Yet there Charter admits the reality—all of these "holding" companies provide the goods and services accused.

for declaratory judgment of patent non-infringement. CCI plead affirmatively that CCI is "a provider of cable services in the United States, offering a variety of entertainment, information, and communications solutions to residential and commercial customers." *See Charter Communications, Inc. v. Rockstar Consortium US LP*, 1:14-cv-00055, Dkt. No. 1 ¶ 15 (D. Del. Jan. 17, 2014).

Further down the docket, when fighting a motion to dismiss, CCI described itself as a "multiple-system operator[]" that "operate[s] . . . cable networks in compliance with common industry standards." *Id.*, Dkt. No. 69 at 1. CCI told the District of Delaware that it filed the declaratory judgment suit (as co-plaintiff with other cable operators) to resolve the controversy over "liability for infringement for their [plaintiffs'] use of identical Cisco and ARRIS equipment, provision of common services, and practice of the same industry standards." *Id.* at 4–5.

Likewise, in 2011 CCI pursued the same strategy and made the same allegations. In that DJ suit, CCI plead that it "is the nation's fifth largest cable communications company, and, through its operating subsidiaries, provides video, high speed data, and voice services to subscribers . . . ." *Charter Communications, Inc. v. Bear Creek Techs., Inc.*, 1:11-cv-0722-GMS, Dkt. No. 1 ¶ 1.

In summary, CCI has been somewhat duplicitous in dealing with the Article III Courts. When seeking their favor, CCI not only admits but affirmatively pleads that CCI is the enterprise. When seeking to dodge the present suit, CCI denies and disavows. The truth is that CCI *is* "a provider of cable services in the United States," exactly as it pleads in the *Rockstar* case.

### 2. **Venue is proper over CCI in the Eastern District of Texas.**

#### a. **CCI has committed acts of infringement in this District**

In its initial motion to dismiss (Dkt. No. 18), CCI did not dispute this element. In its renewed motion, CCI half-heartedly does, denying—in a footnote—that CCI commits acts of

infringement "because it does not own, lease, or distribute the Accused Cable Modem Products and because it does not provide the Accused Services." Dkt. No. 61 at n. 9.

CCI's argument as to this element fails immediately and automatically because it also stands accused of *indirect* infringement. The "acts of infringement required to support venue in a patent infringement action need not be acts of direct infringement, and venue does lie if the defendant only induced the infringement or contributed to the infringement in the forum." *Seven Networks, LLC v. Google LLC*, 315 F. Supp. 3d 933, 943 (E.D. Tex. July 19, 2018). Entropic has alleged that CCI induces infringement that occurs in the District, as well as alleging that CCI commits acts of direct infringement. *See* Dkt. No. 53 at ¶¶ 44, 60, 77, 94, 111; *Id*. at 942 ("Where a complaint alleges infringement, the allegations satisfy the 'acts of infringement' requirement of § 1400(b) although the allegations may be contested.") (quoting *Symbology Innovations, LLC v. Lego Sys., Inc.*, 282 F. Supp. 3d 916, 928 (E.D. Va. 2017)). Standing alone, that is the end of this element.

### b.   CCI has a regular and established place of business in the District.

CCI has regular and established places of business in this District, including the Spectrum stores and other locations from which its technicians are dispatched, all of which are staffed by Charter/Spectrum employees. This Court recently addressed this issue on similar facts in *Entropic Communications, LLC v. DirecTV, LLC et al.*, 2:22-cv-75-JRG. That opinion should be dispositive here.

In that case, the Dish defendants argued that physical stores leased and operated by their California subsidiary could not be considered the places of business of the ultimate parent company. This Court rejected that argument, finding no dispute that Dish-branded products and services are sold and delivered through Dish-branded retail outlets in the District. *Entropic Communications, LLC v. DirecTV, LLC*, 2:22-cv-75, Dkt. No. 109 at 7 (E.D. Tex. Oct. 24, 2022).

19

The Court then cited various instances of overlap between Dish California and the named Dish defendants. For example, Dish California used the same logo, the same standard service agreement, the same headquarters, and shared overlapping leadership with the named defendants, and technicians employed by Dish California carried business cards identifying their employer as the parent company. *See id.* at 8, 9. Finally, the Court noted the various ways in which Dish "is purposefully holding itself out as providing products and services in California." *Id.* at 10. For example, from the main Dish website, a visitor could find Dish service packages, authorized retailers of Dish-branded products, and job listings for potential employment with Dish, all within the District. *See id*. Therefore, the California stores were both "regular and established" and were properly attributable to Dish. *See id.* at 10–11.

In this case, as addressed in further detail below, the Charter entities all use the same "Spectrum" branding, as well as the same public-facing website that promotes service packages, store locations, and employment positions within the District. Charter also uses the same service agreements nationwide and the subsidiaries share headquarters.[12] But when it comes to the relationship between CCI and the subsidiaries that supposedly operate its locations, the facts are even stronger. CCI exerts a degree of control over its subsidiaries that far exceeds the evidence presented in the *DirecTV* case.

---

[12] Charter Communications, Inc. was headquartered in St. Louis prior to June 2022 and then began moving their headquarters to a new complex in Stamford, Connecticut. *See* https://corporate.charter.com/newsroom/charter-officially-opens-corporate-headquarters-in-stamford-ct. Spectrum Gulf Coast, LLC's mailing address is listed as the St. Louis address, 12405 Powerscourt Drive, St. Louis, MO 63131, with the Texas Comptroller of Public Accounts. *See* Exhibit S. It does not appear to be registered to conduct business in Missouri, however. *See* Exhibit T (showing no results for "spectrum gulf coast" on the Missouri Secretary of State's business entity search website).

### i. There are physical Charter/Spectrum locations in the District from which the business of CCI is carried out.

To satisfy the first *Cray* factor, the place need only be a "physical, geographical location in the district from which the business of the defendant is carried out." *In re Cray*, 871 F.3d at 1360. Charter's motion nominally contests this element, but Charter's real gripe is with the second and third factors. This is because Charter readily admits that there are physical Charter locations in this District carrying out Spectrum business. *See* Dkt. No. 61 at 13; *see also* Dkt. No. 61-14 (Exhibit 12 to Charter Motion). Charter just believes these locations are not places of business "of" CCI, which is properly addressed under the other factors. As such, this factor should be undisputed.

Entropic's Second Amended Complaint identifies at least four such locations, including a facility at 1414 Summit Avenue, Plano, Texas 75074 ("Summit Ave. Facility"), as well as retail outlets located at 700 Alma Drive, Plano, Texas 75075 ("Alma Dr. Store"), 2100 N. Dallas Parkway, Plano, Texas 75075 ("Dallas Pkwy Store"), and 4255-A Dowlen Road, Beaumont, Texas 77706 ("Dowlen Rd. Store"). *See* Dkt. No. 53 at ¶¶ 16–17. Charter's website lists numerous other store locations in the District as well. https://www.spectrum.com/locations/tx.

There can be no doubt that these locations are used to carry out CCI's business of "offer[ing] a full range of state-of-the-art residential and business services including Spectrum Internet®, TV, Mobile and Voice." *See* Exhibit L at 1. Each location displays the Spectrum® logo. *See* Second Amended Complaint, Dkt. No. 53 at ¶¶ 16–17 (logo appearing on the face of each building); *see also* Exhibit U (logo appearing on service vans parked outside the Summit Ave. Facility). Notably, this is the same logo that appears on the face of Charter's customer service agreements used nationwide. *See e.g.* Exhibit V (Spectrum Residential Internet Services Agreement). And the physical stores offer the same Spectrum services that are offered on the main

Charter/Spectrum website and that CCI has touted publicly. *See* Exhibit B, Boglioli Dep. Tr., at 49:9–17; *see also* Exhibit P.

These are the same facts that were present in the *DirecTV* case. There, the Court found that retail stores in the district bore the Dish name and provided Dish-branded products and services, even though the stores were leased and operated by a subsidiary. *See Entropic Communications, LLC v. DirecTV, LLC*, No. 2:22-cv-75, Dkt. No. 109 at 7 (E.D. Tex. Oct. 24, 2022). The facts here are indistinguishable.

### ii.   Charter's physical locations are regular and established places of business.

The second *Cray* factor requires the place of business to be regular and established. "Regular" means "operat[ing] in a steady, uniform, orderly, and methodical manner." *In re Cray Inc.*, 871 F.3d at 1362. The Federal Circuit has also stated the need for "the regular, physical presence of an employee or other agent of the defendant conducting the defendant's business at the alleged place of business." *In re Google*, 949 F.3d 1338, 1345 (Fed. Cir. 2020). An agency relationship involves "(1) the principal's right to direct or control the agent's actions, (2) the manifestation of consent by the principal to the agent that the agent shall act on his behalf, and (3) the consent by the agent to act." *Id*. The Federal Circuit has also emphasized that "[t]he power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." *Id.* at 1345–46.

In *AGIS Software Development LLC v. Google LLC*, 2:19-cv-361, 2022 WL 1511757 (E.D. Tex. May 12, 2022), this Court found third party CTDI to be Google's agent for venue purposes, based on the fact that Google "directs and controls CTDI's actions" within the established place of business (a portion of a CTDI repair facility designated as the Google Secured Area). *See* 2022 WL 1511757 at *4. The agreement between Google and CTDI allowed Google to

set the physical specifications for its secured area; restricted that area to Google's products and services and limited access to CTDI employees authorized to work on Google's products; gave Google authority to move the secured area; and provided instructions for services that CTDI was required to perform for Google customers. *See id.* at *5. Notably, however, CTDI was not an affiliate of Google, and their agreement expressly disclaimed any agency relationship. *See id.* at *8.

Likewise, in the *DirecTV* case, this Court found this element satisfied based on the fact that "DISH holds the locations in CDCA out as its own." *See Entropic Communications, LLC v. DirecTV, LLC*, No. 2:22-cv-75, Dkt. No. 109 at 9 (E.D. Tex. Oct. 24, 2022). Specifically, the Court noted that the Dish logo appears on vans and other property stored at the locations in question. *See id.* at 10. As a result, there was "little real dispute that the locations at issue are 'physical places' within CDCA and that they are 'regular and established.'" *Id.*

Not only are the same facts present here (*see supra* 21 (noting that the **Spectrum** logo appears on vans and the buildings themselves at the locations in question)); there is even more compelling evidence that the Spectrum stores are "regular and established" and that the employees who operate these stores are agents of CCI.

First, CCI, as the manager of Charter Communications, LLC and Spectrum Gulf Coast, has the right to direct or control the employees' actions. ██████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████ This Management Agreement sets forth CCI's authority and duties as manager, including ██████████████████████████████████████ ████████ as well as ████████████████████████████████ ██████████████████████████████████████████ *See* Exhibit D at ¶

2(b)(i)–(ii). In addition, Charter's corporate departments span numerous subsidiaries but are ultimately headed by CCI officers. *See supra* 12–13. Charter's corporate representative testified that these CCI officers can direct the work of the employees in their respective departments, which they also represent on their biographies as CCI officers. *See supra* at 12–13.

CCI has also manifested its consent that the employees act on the company's behalf, including by representing to the public that the employees work for CCI. This can be seen on CCI's website and in the company's annual shareholder report, both of which characterize CCI as a company with over 93,000 employees. *See* Exhibit L, About Charter, at 1; Exhibit W, 2021 Shareholder Report, at 9. It is also reflected in the fact that, just as in the *DirecTV* case, CCI uses its website to promote Charter/Spectrum job postings around the country, including within the District. *See supra* 15–16. Furthermore, because the employees, stores, vans, etc. all use the same Spectrum branding, there is no way for a customer to distinguish between the different subsidiaries. CCI even represented in the announcement of its new headquarters in Connecticut that it has "1,700 employees" now working there, even though all are actually employed by Charter Communications, LLC. *See* Exhibit X, Charter Officially Opens New State-of-the-Art Corporate Headquarters in Stamford, at 1.[13]

CCI has even acknowledged workers as its own employees/agents in federal court filings. One such case involved a wrongful death action, brought by the family of a former employee, against CCI and one of its managers. *Montes v. Charter Communications, Inc.*, No. 7:21-cv-489 (S.D. Tex.). CCI's amended motion to dismiss confirms that Ms. Trevino was "an employee of Charter," which it had earlier defined as Defendant Charter Communications, Inc. *See id.*, Dkt.

---

[13] Available at https://corporate.charter.com/newsroom/charter-officially-opens-corporate-headquarters-in-stamford-ct

No. 10 at 1, 2. As for the manager, CCI described him as "Charter's agent." *See id.*, NOTICE OF REMOVAL, Dkt. No. 1 at ¶ 12 ("Plaintiff has failed to plead facts establishing that Anderson[14] was negligent or grossly negligent because, <u>as Charter's agent</u>, he did not owe Ms. Trevino an individual duty") (*emphasis added*).

Finally, the Spectrum employees also have consented to act as the agents of CCI. When people apply to work for Charter, they do so through the single Charter website. When they start work, ███████████████████████████████████████████. *See* Exhibit Y. The Agreement does not specify which Charter entity is the counterparty but rather states that it applies to all disputes ████████████████████████████████████████████

████████   Exhibit Y at ¶ B(2). Indeed, CCI has repeatedly invoked the agreement by moving to compel arbitration in various employment litigations. *See e.g. Ramirez v. Charter Communications, Inc.*, 75 Cal. App. 5th 365, 368 (2022) (affirming order denying CCI's motion to compel arbitration); *see also Montes v. Charter Communications, Inc.*, No. 7:21-cv-489, MOTION TO COMPEL ARBITRATION AND DISMISS, Dkt. No. 8 (S.D. Tex. Jan. 31, 2022).

When Charter's corporate representative was asked if employees were even aware of the distinction between the various Charter entities, he admitted ████████████████████████████

████   *See* Exhibit A, Proost Dep. Tr., at 74:12–17. This appears accurate. Examples abound on LinkedIn of employees who represent that they work for "Charter Communications, Inc." even though CCI apparently disclaims them and says they instead work for a subsidiary. *See, e.g.*:

- https://www.linkedin.com/in/michael-hanrahan-3521751/;

- https://www.linkedin.com/in/lisa-domenick-520aba23/;

- https://www.linkedin.com/in/rose-ayuyu-morales-shrm-cp/;

---

[14] Defendant confirmed that Brian Anderson is employed by Charter Communications, LLC.

- https://www.linkedin.com/in/arshanap/;

- https://www.linkedin.com/in/neilschworm/;

- https://www.linkedin.com/in/steven-widmer-9890ba8/;

- https://www.linkedin.com/in/jim-martin-7228854/.

And here's what CCI's website has to say: "[o]ur diverse, highly skilled employees are our greatest resource . . . ." Exhibit AC, Our Employees, at 1. In summary, CCI has given their employees no reason to believe they work for anyone but CCI. And those employees are delegated the power to carry out Charter's business.

CCI thus possesses actual authority as the manager of its subsidiaries and does in fact dictate the allocation of Spectrum employees to its various subsidiaries, while also controlling aspects of their work. Furthermore, CCI has represented to the world that, when a customer walks into a Spectrum store or has a Spectrum technician install equipment at their home, that customer is interacting with an employee/agent of Charter Communications, Inc. There is no dispute that these employees are regularly present at locations within the district, so there can be no doubt that these locations are "regular and established" as required by *Cray*.

### iii.   The physical locations are the places of CCI.

In the *DirecTV* case, this Court found that Dish had adopted and ratified the locations of its California subsidiary. The Court noted that customers could use the main Dish website to find Dish service packages and authorized retailers available within the district; prospective employees could find Dish job listings for positions in the district; and the site prominently advertised Dish's "nationwide availability." *See Entropic Communications, LLC v. DirecTV, LLC*, No. 2:22-cv-75, Dkt. No. 109 at 10 (E.D. Tex. Oct. 24, 2022). The Court concluded based on these facts that "DISH is purposefully holding itself out as providing products and services in California." *Id.*

All of these facts are present here, and then some. CCI holds itself out as a company that provides internet and television services across 41 states (*supra* 14–15), and it advertises retail locations, service packages, and job listings through a nationwide website (*supra* 15–16). Indeed, CCI says it is Spectrum. *See* Exhibit L, About Charter, at 1, 4. Any visitor to Charter's website or stores would have every reason to believe that the Spectrum-branded stores and Spectrum services are provided by CCI—because that's exactly what CCI tells the public.[15] *Compare with AGIS Software Development LLC v. Google LLC*, 2:19-cv-361, 2022 WL 1511757 at *9 (E.D. Tex. May 12, 2022) (finding Google had ratified the CTDI location as its own, based in part on how Google advertises to its customers that it is the provider of services at the CTDI facility and that "customers are not even aware of CTDI").

*Bd. Of Regents v. Medtronic PLC*, No. 17-CV-0942, 2018 WL 4179080 (W.D. Tex. July 19, 2018), is inapposite. There, the Court determined that the mere appearance of a generic "Medtronic" sign on a building was insufficient to support venue against the parent company Metronic, Inc. *See id.* at *2. In this case, however, CCI has directly represented to the public that *CCI* is the entity that offers broadband services under the Spectrum logo:

---

[15] CCI argues that it is somehow significant that the stores are branded "Spectrum" instead of "Charter Communications Inc." This argument is nonsensical and unsupported by law. Everywhere but here, CCI represents that Spectrum is its brand-name. The fact that Charter has chosen to do its entire business under a different name is immaterial because the same principle holds—CCI is placing its brand-name on stores and services nation-wide, declaring to the public that these stores and services are CCI's stores and services.



Exhibit L, About Charter, at 4 (red annotations added).

Furthermore, there is one additional fact that was not present in the *DirecTV* case and which should prove dispositive here: CCI actually negotiated and signed the property leases for Spectrum stores in this district. *See supra* 8–9. This is consistent with CCI's authority as manager, which includes ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ In fact, ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████

Finally, it bears repeating that CCI's officers are the same individuals who are in charge of the various subsidiaries. *See supra* 11. One of these officers even admitted that he does not distinguish between his roles at the different entities on a day-to-day basis, and he repeatedly ██████████████████████████████████████████████ *See supra* 7, 11. As such, CCI

is the entity that is ultimately in control of the activities of its subsidiaries, including the leasing and maintaining of Spectrum stores within the district. There can be no doubt that CCI is "purposely holding itself out as providing products and services" in the district, and the Court should find that it has ratified the Spectrum stores as its own.

## CONCLUSION

Charter asks this Court to hold that a nationwide corporate enterprise can avoid suit and compartmentalize its liability by setting up wholly-controlled shell LLCs with no employees and no independent operations. Such a holding could have far-reaching implications and upend patent venue (and perhaps liability as well), leaving venue choice in the hands of defendants through their choice of corporate structure. It could even allow a single enterprise of Charter's size, spanning "41 states," to force fragmentation of patent infringement litigation into a multitude of suits around the country by simply setting up LLCs with no real life of their own. This Court should reject that invitation.

The law sensibly rejects Charter's position—not by piercing the corporate veil as CCI posits, but by the existing legal tests of lack of separateness and ratification. This case law recognizes that corporate/LLC shells are not meant to be used as artifices to rig the rules of venue. Here, venue discovery has confirmed the fact pattern that law exists to address. Charter provides infringing products and services in the district from regular and established places of business. All the relevant acts are legally attributable to CCI. Entropic respectfully requests the Court find venue proper and deny Charter's motion to dismiss.

Dated: February 21, 2023

Respectfully submitted,

*/s/ James Shimota by permission Wesley Hill*
James Shimota - LEAD ATTORNEY
Jason Engel
George Summerfield
**K&L GATES LLP**
70 W. Madison Street, Suite 3300
Chicago, IL 60602
Jim.shimota@klgates.com
Jason.engel@klgates.com
George.summerfield@klgates.com

Nicholas F. Lenning
**K&L GATES LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
nicholas.lenning@klgates.com

Darlene Ghavimi
Matthew Blair
**K&L GATES LLP**
2801 Via Fortuna
Suite #650
Austin, Texas 78746
Darlene.ghavimi@klgates.com
Matthew.blair@klgates.com

Wesley Hill
Texas Bar No. 24032294
Andrea Fair
Texas Bar No. 24078488
**WARD, SMITH & HILL, PLLC**
1507 Bill Owens Pkwy
Longview, TX 75604
Tel: (903) 757-6400
wh@wsfirm.com
andrea@wsfirm.com

**ATTORNEYS FOR PLAINTIFF
ENTROPIC COMMUNICATIONS, LLC**

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a) and served via email on all counsel of record on this twenty-first day of February, 2023.

*/s/ Wesley Hill*
Wesley Hill

**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

This is to certify that the above document should be filed under seal because it contains material designated by the parties as confidential pursuant to the Protective Order entered in this case (Dkt. 36).

*/s/ Wesley Hill*
Wesley Hill