# EXHIBIT 9

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2           FOR THE EASTERN DISTRICT OF TEXAS
 3                   MARSHALL DIVISION
 4   _____
                                    )
 5   ENTROPIC COMMUNICATIONS, LLC,)
                                    )
 6          Plaintiff,            )
                                    )
 7      vs.                       )Civil Action No.
                                    )2:22-cv-00125-JRG
 8   CHARTER COMMUNICATIONS, INC.,)
                                    )
 9          Defendants.           )
     _____)
10
11
12
13          VIDEOTAPED REMOTE DEPOSITION OF
14               KEVIN ALMEROTH, PH.D.
15    Deponent testifying from Santa Barbara, California
16               Friday, April 28, 2023
17                    Volume I
18
19
20
21
22   Stenographically Reported By:
     Melissa M. Villagran, RPR
23   CSR No. 12543
24   Job No. 5890301
25   PAGES 1 - 162
```

Page 2

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF TEXAS
 3                MARSHALL DIVISION
 4   _____
                          )
 5   ENTROPIC COMMUNICATIONS, LLC,)
                          )
 6        Plaintiff,    )
                          )
 7     vs.            )Civil Action No.
                )2:22-cv-00125-JRG
 8   CHARTER COMMUNICATIONS, INC.,)
                          )
 9        Defendants.    )
     _____)
10
11
12
13
14
15
16        Videotaped remote deposition of KEVIN
17   ALMEROTH, PH.D., Volume I, taken on behalf of
18   Plaintiff with all participants appearing remotely
19   via videoconference and the Deponent testifying from
20   Santa Barbara, California, beginning at 9:03 a.m.
21   and ending at 2:31 p.m. on Friday, April 28, 2023,
22   before Melissa M. Villagran, RPR, Certified
23   Shorthand Reporter No. 12543.
24
25
```

Page 4

```
 1   APPEARANCES (Continued):
 2   ALL ATTENDEES APPEARING REMOTELY
 3
 4   Videographer:
 5        Dustin Brown
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES:
 2   ALL ATTENDEES APPEARING REMOTELY
 3
 4   For Plaintiff:
 5        K&L GATES
 6        BY:  KATHERINE L. ALLOR
 7           JASON ENGEL
 8        Attorneys at Law
 9        70 West Madison Street, Suite 3300
10        Chicago, Illinois 60602
11        312.372.1121
12        Katy.allor@klgates.com
13        Jason.engel@klgates.com
14
15   For Defendants:
16        ARNOLD & PORTER
17        BY:  DAVID BENYACAR
18        Attorney at Law
19        250 West 55th Street
20        New York, New York  10019
21        212.836.8689
22        david.benyacar@arnoldporter.com
23
24
25
```

Page 5

```
 1                INDEX
 2
 3   DEPONENT                EXAMINATION
 4   KEVIN ALMEROTH, PH.D.
 5   Volume I
 6        BY MS. ALLOR            8
 7
 8
 9           EXHIBITS
10   DEPOSITION              PAGE
11   Exhibit 1   Deposition Notice        15
12
13   Exhibit 2   Declaration        15
14
15   Exhibit 3   '775 patent        23
16
17   Exhibit 4   Excerpts from a Microsoft    65
18           Computer Dictionary, 3rd Edition
19
20   Exhibit 5   Webster's New World Computer  94
21           Dictionary 10th Edition
22
23   Exhibit 6   '690 Patent        119
24
25
```

2 (Pages 2 - 5)

Page 6

INDEX (CONTINUED)

EXHIBITS

DEPOSITION                          PAGE
Exhibit 7    '682 patent           136

INFORMATION REQUESTED
        (None.)

INSTRUCTION NOT TO ANSWER
        (None.)

---

Page 7

1  Santa Barbara, California; Friday, April 28, 2023
2          9:03 a.m.
3
4      THE VIDEOGRAPHER:  Good morning.  We are on
5  record at 9:03 a.m., April 28, 2023.  This is the    09:03:06
6  video-recorded deposition of Dr. Kevin Almeroth.  My
7  name is Dustin Brown here with our court reporter
8  Melissa Villagran.
9      This deposition is being held remotely.  The
10  caption of this case is Entropic Communications, LLC   09:03:24
11  versus Charter Communications, Incorporated.
12      Please note that audio and video recording
13  will take place unless all parties agree to go off
14  the record.  If there are any objections to the
15  proceeding, please state them at the time of your     09:03:40
16  appearance beginning with the noticing attorney.
17      Appearances, please.
18      MS. ALLOR:  Katie Allor from K&L Gates on
19  behalf of the plaintiff, Entropic Communications,
20  LLC, and with me today are my colleagues, Jason       09:03:51
21  Engel and Connor Meggs.
22      MR. BENYACAR:  David Benyacar with the firm
23  of Arnold & Porter representing Charter
24  Communications.
25

---

Page 8

1      KEVIN ALMEROTH, PH.D.,
2  having been administered an oath, was examined and
3  testified as follows:
4
5          EXAMINATION
6  BY MS. ALLOR:
7  Q  Okay.
8      Good morning, Dr. Almeroth.
9  A  Good morning.
10  Q  Have you been deposed before?              09:04:23
11  A  Yes, ma'am.
12  Q  How many times?
13  A  North of 100.
14  Q  So you would say you are pretty good at
15  giving depositions?                          09:04:38
16  A  I've had a lot of practice.  I don't know
17  that I'd say I'm necessarily very good.
18  Q  Okay.
19      Well, I'm just going to go over some quick
20  ground rules with you just today so we're all on the  09:04:49
21  same page.  Since we're on Zoom and sometimes it can
22  be a little -- you know, the signal can go in and
23  out, if you can't hear me or can't understand a
24  question, would you ask me so I can repeat it, and
25  same thing if the court reporter can't hear us,       09:05:03

---

Page 9

1  we'll ask that she lets us know so that we can
2  repeat what we're saying.
3      Is that fair?
4  A  Yes.
5  Q  And, again, you know, since we're, you know,    09:05:11
6  at -- in a deposition, we need to give oral answers.
7  We can't nod our head or shake.  The court reporter
8  needs to you answer for her.
9      Is that fair?
10  A  Yes.                                          09:05:23
11  Q  And since it's on Zoom, it's -- sometimes
12  it's a little hard to talk over each other.  So we
13  got to make sure -- you have to let me finish my
14  question.  I'm going to let you finish your answer
15  unless your attorney, you know, objects accordingly   09:05:35
16  if they need to.
17      Is that fair?
18  A  Yes.
19  Q  So we're here today regarding a declaration
20  you gave on claim construction; is that right?        09:05:45
21  A  Yes.
22  Q  And this declaration is directed to three
23  different patents.  The first patent is U.S.
24  8,223,775.
25      Is it -- is it all right with you if I refer   09:06:03

3 (Pages 6 - 9)

Page 10

1  to that as the '775 patent?
2    A   Yes.
3    Q   And then the second patent is U.S. 8,284,690,
4  and I'm going to refer to that as the '690 patent.
5      Is that all right with you?          09:06:19
6    A   Yes.
7    Q   And then the third patent is U.S. 10,135,682.
8  And I'll refer to that as the '682 patent.
9      Is that all right with you?
10   A   Yes.                              09:06:34
11   Q   So your opinions are directed only to those
12  three patents?
13   A   In this declaration, I believe that is the
14  case.
15   Q   Did you look at the other patents that are   09:06:44
16  involved in this case?
17   A   I might have looked at them at some point.  I
18  don't specifically remember.
19   Q   Do you intend on offering any opinions
20  relating to the other three patents that are being   09:06:59
21  litigated as well?
22   A   I don't have any knowledge about what I might
23  be asked to do in the future.
24   Q   Are you planning to present a technical
25  tutorial to the Court?                  09:07:19

Page 11

1    A   I don't have plans one way or another.  I
2  don't know the answer to that question as I sit here
3  right now.
4    Q   Earlier you said you've been deposed around
5  100 times.                              09:07:34
6      Have all those been for patent cases?
7    A   No.
8    Q   What other types of cases have you been
9  involved in?
10   A   I believe there's been a couple of trade   09:07:45
11  secret cases a couple of copyright cases.
12   Q   Have you been involved in any IPR proceedings
13  at the U.S. Patent Office?
14   A   Yes.
15   Q   Are you planning to be involved in any IPRs   09:08:02
16  for Charter?
17   A   I don't have plans one way or another as I
18  sit here right now.
19   Q   Are you planning to give an infringement
20  or -- sorry, a non-infringement opinion in this   09:08:20
21  litigation?
22   A   As I sit here now, I don't have plans one way
23  or another.
24   Q   What did you do prepare for today?
25   A   Generally reviewed my declaration and   09:08:31

Page 12

1  materials cited in the declaration, the patents,
2  Dr. Kramer's declaration, and met with counsel,
3  Mr. Benyacar.
4    Q   And about how long did you spend reviewing
5  materials?                              09:08:51
6    A   Maybe about eight to ten hours.  I don't have
7  a good estimate for you.
8    Q   And how long did you meet with counsel for?
9    A   I think it was part of that time, maybe six
10  to eight hours.                        09:09:12
11   Q   And was there anyone else present besides
12  David?
13   A   I don't believe so.
14   Q   When were you engaged by Charter for this
15  matter?                                09:09:28
16   A   My best recollection is it would have been
17  sometime earlier this year.
18   Q   And have you ever worked for Charter in the
19  past?
20   A   Yes.                              09:09:44
21   Q   What type of case was it?
22   A   I believe that there were two of them.  One
23  they were sued by Sprint for patent infringement and
24  then also they were accused of copyright
25  infringement by a plaintiff representing copyright   09:10:08

Page 13

1  holders for things like songs, music.
2    Q   And have you ever worked with Arnold &
3  Porter, the attorneys representing Charter in this
4  matter?
5    A   Yes, I have.                      09:10:30
6    Q   And what -- what cases have you worked with
7  them outside of the ones that you mentioned for
8  Charter?
9    A   I actually know that I worked with them on
10  the Sprint case.  I'm not sure I worked with them on   09:10:44
11  the other case, and then I've worked with them
12  probably a couple of additional times on other
13  cases.  I don't have particular cases in mind,
14  though.
15   Q   Have you spoken with any other experts that   09:10:59
16  Charter has engaged in this -- for this matter?
17   A   I don't believe so.
18   Q   Have you talked to anyone by the name of
19  Kathleen Quigley?
20   A   I don't believe so.  I don't recall doing so   09:11:15
21  sitting here right now.
22   Q   Have you spoken with anyone outside of the
23  attorneys at A&P regarding this matter?
24   A   I don't believe so.  I don't remember anyone
25  sitting here right now.                  09:11:39

4 (Pages 10 - 13)

Page 14

1   Q   So no one directly at Charter?  You have not
2   been in contact with anyone directly at Charter?
3   A   I don't believe so especially as it relates
4   to the subject matter of these patents.
5   Q   What did you do to prepare your declaration?   09:11:59
6   A   Reviewed the patents, the other materials
7   that are identified within the declaration,
8   determined what the scope of my assignment was, and
9   then formulated opinions.
10   Q   Did you have input on what terms were going   09:12:29
11   to be involved in claim construction?
12   A   As I sit here now, I don't specifically
13   recall if I did or not.  I might have and -- and
14   don't specifically remember.
15   Q   Were there terms that you suggested for   09:12:47
16   construction that were not put in your declaration?
17   A   I don't believe so, or at least sitting here
18   now, I don't specifically recall.
19   Q   Did you write the first draft of your
20   declaration?   09:13:10
21   A   I would have.
22   Q   About how many hours have you spent or did
23   you spend drafting your declaration?
24   A   I don't have an ability to separate out hours
25   spent drafting versus developing opinions.  All told   09:13:24

Page 15

1   I think it was in the neighborhood of about 20 hours
2   plus or minus.
3   Q   I'm going to introduce your -- sorry.  I
4   previously marked as Exhibit 1 your deposition
5   notice, so that should be in your exhibit folder:   09:13:42
6        (Exhibit 1 was marked for
7        identification and is attached
8        hereto.)
9        MS. ALLOR:  I'm now going to mark as
10   Exhibit 2, your declaration.   09:13:53
11        (Exhibit 2 was marked for
12        identification and is attached
13        hereto.)
14   BY MS. ALLOR:
15   Q   And due to the file size, once I do get it   09:14:05
16   introduced, I would recommend downloading it because
17   it is quite large because it might be easier to use
18   that.
19   A   Great.  I'll do that as soon as it shows up.
20        All right.   09:14:22
21        It just showed up.  I am downloading it.
22   Q   One thing I forgot to cover in the beginning
23   since we are on Zoom and you are on your computer, I
24   want to make sure you don't have any web pages open
25   besides the ones that are through Veritext.   09:14:41

Page 16

1        Is that fair?
2   A   Absolutely.
3        I've -- I've actually got three windows open.
4   One is Exhibit Share.  One is the Zoom and I
5   actually have the PDF for Exhibit 1 open.   09:14:55
6        But that's it.  No other forms of
7   communication, that kind of thing.
8   Q   Great.
9   A   Downloaded what you've marked as Exhibit 2,
10   and I've got it opened.   09:15:09
11   Q   Great.
12        And just sort of a follow-up to your computer
13   stuff, you're not going to be accessing your e-mails
14   during the course of our deposition today.
15        Is that fair?   09:15:18
16   A   Yes, I will not do that.
17   Q   Okay.
18        So if you could just go to the last page of
19   Exhibit 2 and just confirm -- well, actually not the
20   last page -- the last page of your actual   09:15:33
21   declaration of the appendix and just confirm that is
22   your signature.
23   A   Yes.  It looks like Page 44.  Yes, that is my
24   signature.
25   Q   In preparing for today, did you find any   09:15:51

Page 17

1   errors in your declaration that you wish to correct?
2   A   I -- in preparing for today, I did not find
3   anything that I thought needed to be corrected.
4   Q   And I believe we have your CV attached as
5   Appendix A.  If you could turn to that.   09:16:13
6   A   Okay.
7        I have it up.
8   Q   Does your CV accurately reflect your
9   education?
10   A   I believe it does.   09:16:22
11   Q   Does it accurately reflect your work
12   experience?
13   A   I believe it does.
14   Q   Is there anything that's missing from your CV
15   that would be relevant to the proceedings today?   09:16:35
16   A   Not that I can think of.  It looks to be
17   pretty accurate in terms of the things that normally
18   get added over time.  So the very end of the
19   declaration which identifies cases that I've been
20   deposed in, I believe that was accurate as of the   09:16:56
21   time this declaration was filed.  There might be a
22   couple of other cases, and then with respect to some
23   of the service work that I do serving on program
24   committees, there might be a couple of additional
25   program committees for some of the conferences that   09:17:14

5 (Pages 14 - 17)

Page 18

1 are listed there, but I think otherwise,
2 it's -- it's accurate.
3    Q   Would any of the more recent cases that may
4 not be listed, would any of those have to do with
5 cable television signal processing and communication   09:17:29
6 systems?
7    A   I don't believe so.
8    Q   Besides for this current case that you're
9 involved in, what other cases would involve
10 technology relating to cable television, signal       09:17:46
11 processing and communication systems that are listed
12 on your CV?
13    A   I could go through and try and identify the
14 ones.  I suspect the first case with Charter would
15 be relevant.                                           09:18:24
16       Let me just ask for clarification.  Do you
17 want me to go and potentially identify cases that
18 would be relevant.
19    Q   I was just curious if any came up in your
20 mind or in looking at your list that -- that relate   09:18:47
21 to cable television, signal processing and
22 communications?
23    A   Okay.  Certainly the Sprint versus Charter
24 one.  I think there's also a Comcast versus Row V
25 (phonetic).                                            09:18:57

Page 19

1       That was a little bit higher layer in the
2 protocol stack, but it was cable related.
3       There's the Sony Music.  I think Cox is on
4 here.  Charter should be on here somewhere.
5       Those related more to the content delivery      09:19:18
6 itself, though, of course, that content has to be
7 processed, and the content is sent over DOCSIS.  So
8 those might potentially be related.  Those are the
9 ones that come to mind.
10       Any of the ones on the list for -- I think      09:19:42
11 there was Cox, Charter.  Let's see if Comcast is on
12 here.
13       There's a Comcast IPR against Row v. Guides
14 (phonetic).  That might have some -- some relevance
15 as well.  So generally it's some of the different      09:20:01
16 cable providers, Comcast, Charter, Cox, those kinds
17 of companies.
18    Q   And besides doing expert witness work on
19 those cases for those companies, have you ever
20 worked in the cable TV industry?                       09:20:26
21    A   Not as I would characterize as an employee.
22 But I've had collaborations with a number of
23 different companies who were working in this space
24 and then also, you know, working on some of the
25 underlying technologies as an academic researcher.     09:20:55

Page 20

1 I've had that kind of experience.
2    Q   Would any of these collaborations involve
3 developing the cable TV systems, whether that be,
4 you know, the broadband communication systems or
5 solutions?                                             09:21:20
6    A   Generally I have -- would have worked on the
7 technology itself as opposed to kind of the last
8 steps of, say, the manufacturing process for any
9 equipment that the various companies have worked on
10 or developed or used.                                  09:21:48
11    Q   If we could go to Exhibit 2, your
12 declaration, Paragraph 27.
13       Here you give a definition of a POSITA for
14 this proceeding, if you could look at that.
15    A   Yes, I've got that up.                          09:22:13
16    Q   So which part of this definition do you
17 contend that you qualify as a POSITA under?
18    A   All of them.
19    Q   So you worked in the field of cable
20 television signal processing and communication        09:22:49
21 systems for three or more years?
22    A   Yes, ma'am.
23    Q   And is that the work you were talking about,
24 the collaboration work, or are you referring to your
25 expert witness work?                                   09:23:01

Page 21

1    A   I am referring to both of those things plus
2 working in the field as a researcher since at least
3 1994.
4    Q   If you look at Paragraph 25 of your
5 declaration.                                           09:23:31
6    A   Yes.
7    Q   So there you list the materials that you
8 reviewed in preparing your declaration.  Is there
9 anything missing from this list?
10    A   As of the time that I filed this declaration,  09:23:42
11 I believe this list is complete especially in the
12 context of referencing materials that are -- that
13 are part of the declaration cited in the
14 declaration.
15    Q   Were you asked to search for dictionaries or   09:23:58
16 other extrinsic evidence that was not included with
17 your declaration?
18    A   I don't specifically recall.  I think that
19 the things included in the declaration are
20 ultimately what I relied on in forming my opinions,   09:24:22
21 plus my knowledge and experience in the field.
22    Q   There's a couple dictionaries included as
23 appendices -- sorry -- subject dictionaries included
24 as appendices to your declaration.  For example,
25 Appendix B is Newton's Telecom Dictionary.            09:24:42

6 (Pages 18 - 21)

Page 22

1     Did you locate that dictionary for counsel?
2     A  I don't specifically recall.  I don't think
3  so.  Obviously there are some dictionaries that are
4  commonly used in claim construction.  I think that's
5  one of them, so... But I don't specifically recall   09:25:09
6  suggesting that one.
7     Q  What about Appendix C, which is the Microsoft
8  Computer Dictionary?
9     Is that one that you suggested to counsel to
10  use for your declaration?            09:25:24
11     A  I think it's about the same answer.  I don't
12  think that I did.  I don't specifically recall that
13  I did, but it's one that I have seen and used in my
14  work.
15     Q  So I want to start with your opinion on the   09:25:37
16  '775 patent.  So I will introduce that for you so
17  you have it available.
18     A  It just appeared.
19     Q  Shoot.  The label didn't get on there.
20  We'll -- we'll fix that afterwards.  It didn't apply   09:26:19
21  the label.
22     A  Okay.  It's in the file name.  I should be
23  able to refer to it.
24     But, yes, I've got it open.
25     Q  Okay.                    09:26:28

Page 23

1     So we've got -- we've got the '775 patent,
2  which has been marked as Exhibit 3.
3     (Exhibit 3 was marked for
4     identification and is attached
5     hereto.)                09:26:33
6  BY MS. ALLOR:
7     Q  And it also bears the Bates No. Entropic_
8  Charter_0000001.
9     When you were preparing your declaration and
10  opinion with respect to the '775 patent, what date   09:26:52
11  did you use as the priority date?
12     A  My recollection is I assumed for purposes of
13  the priority date, the filing date September 30th,
14  2003.
15     Q  And did you identify that anywhere in your   09:27:09
16  declaration?
17     A  I don't have the declaration memorized.  It's
18  either there or it's not.
19     Q  And so you were -- you were basing your
20  opinion on that priority date; is that correct?    09:27:32
21     A  For the '775, that's what I had assumed.
22     Q  And you would agree that as of that priority
23  date, September 30, 2003, a POSITA would have been
24  familiar with DOCSIS function?
25     A  I think that's reasonable.        09:27:54

Page 24

1     Q  If you look at Appendix C of your
2  declaration, the Microsoft Computer Dictionary, one
3  of the pages that you included was actually a
4  definition for DOCSIS.
5     It's on actually two different pages.  The   09:28:13
6  first one is the full, data over cable service
7  interface specification, and then on the next page
8  it says the actual definition for DOCSIS.
9     Do you see those?
10     A  I do.                    09:28:28
11     Q  Is there a reason you didn't cite to these
12  definitions in your declaration?
13     A  Not that I can think of.
14     Q  Was there a purpose for including them in the
15  appendix?                    09:28:43
16     A  I'm trying to see if there was something else
17  on the page that was specifically referenced that
18  might have been the reason.  But not that I
19  specifically recall.
20     Q  If we turn to Paragraph 40 of your        09:29:04
21  declaration.
22     A  I'm there.
23     Q  Here you've included an image and then you
24  are discussing an ARM processor.
25     A  Yes.                    09:29:31

Page 25

1     Q  Is that correct?
2     A  Yes.
3     Q  What is your understanding of an ARM
4  processor?
5     A  Essential what's here, it's Advanced RISC   09:29:35
6  Machine.  RISC stands for reduced instruction set
7  computer -- controller, I think.  I don't remember
8  exactly what the c is.  But you can have specialized
9  ARM processors to perform functions for whatever
10  they are designed to include.            09:29:57
11     Q  So what is an Advanced RISC Machine?
12     A  I'm not sure what else you would be asking
13  for in terms of the description.
14     Q  Well, there's a definition included in
15  Appendix C that you provided with your declaration.   09:30:28
16     Are those -- if you turn to Appendix C,
17  Microsoft Computer Dictionary, Pages 21 has Advanced
18  RISC.
19     Is that a fair definition for it?
20     A  I think it's on Page 35 at the top.  Let me   09:30:50
21  read it.
22     I mean, I think it's a definition for what an
23  ARM is.  I haven't specifically taken a position or
24  offered a particular construction for that term.
25     I don't recall that it's -- maybe it appears   09:31:30

7 (Pages 22 - 25)

Page 26

1 in one of the dependent claims or -- or something.
2 But I certainly think it's the definition that's
3 included in that dictionary.
4    Q   And did -- was there a reason for including
5 these pages of the dictionary, the one that has both   09:31:52
6 Advanced RISC and ARM, is there a reason for
7 including those with your declaration?
8    A   I think the declaration pretty much speaks
9 for itself on why they were included in terms of
10 providing some context for understanding what the   09:32:07
11 specification discloses with respect to the alleged
12 invention.
13    Q   So are you -- are you saying you relied on
14 these definitions in your declaration?
15       MR. BENYACAR:  Object to the form.   09:32:26
16       THE DEPONENT:  To the extent that I have
17 identified these definitions in the declaration to
18 support the paragraphs in which those descriptions
19 appear, that would be the context for how I have
20 used those definitions in my declaration.   09:32:44
21 BY MS. ALLOR:
22    Q   Oh, so you -- you do cite to Appendix C at 35
23 in Paragraph 40 of your declaration, but there's no
24 citation that I can find to para- -- to Page 21 of
25 that dictionary.   09:33:14

Page 27

1       So I guess my question is, why -- why did you
2 include the Page 21 that has the definition of
3 Advanced RISC?
4    A   I think it provides some background, some
5 context for what's described in the declaration.   09:33:36
6    Q   So you would say it's a fair definition that
7 a POSITA would -- would find this to be a fair
8 definition for Advanced RISC?
9    A   With respect to a fair definition or a kind
10 of formal definition, I don't think I've taken a   09:33:51
11 position that that's what the term should be defined
12 as specifically.  It's really just providing some
13 background.
14       It's not, that I call, a term in a particular
15 claim that I looked at.  So it -- it's not a really   09:34:13
16 formal construction that I would be offering, but I
17 think the -- the dictionaries that are included in
18 the definition, they do provide some context for
19 what a person of skill in the art would have
20 understood an ARM processor to be.   09:34:28
21    Q   And so it's fair to say that these two
22 definitions that are included in the Microsoft
23 Computer Dictionary would be -- would be the plain
24 and ordinary meaning to a POSITA of an ARM?
25    A   Yeah.  I think that's -- that's different   09:34:57

Page 28

1 than what I said in my previous answer.  I'm not
2 sure I have developed an opinion about whether or
3 not they would be a plain and ordinary meaning that
4 I -- that I've offered that kind of analysis or
5 opinion in the declaration.   09:35:15
6    Q   Would you agree that ARM processors were
7 widely known in the art in the time period of the
8 '775 patent?
9    A   Well, I think they were certainly known and
10 referenced with respect to qualifying that -- to be   09:35:39
11 saying widely known or not, I think they were
12 certainly known to people of skill in the art.  They
13 were probably widely known.  I don't think I've
14 taken a formal position on that.
15    Q   So if a POSITA was reading a reference from   09:36:02
16 that time period and they saw the -- the phrase ARM
17 processor, they would understood what that meant,
18 right?
19    A   That's a little bit broader statement and it
20 really depends on what kind of ARM processor and in   09:36:19
21 what context.
22       I think a person of skill in the art reading
23 ARM in the context of the '775 patent would
24 understand how that term is used in the '775.
25    Q   So if we could turn to Figure 1 of the   09:36:47

Page 29

1 '775 patent.
2    A   Okay.
3    Q   And if you look at the block -- the first
4 block at the top that's labeled "data networking
5 engine," and I will probably refer to that as DNE.   09:37:00
6       Is that okay with you?
7    A   Yes.
8    Q   So you see the DNE and there's, in
9 parentheses, ARM No. 3?
10    A   Yes.   09:37:12
11    Q   What would that mean to a POSITA when they
12 were looking at the '775 patent?
13    A   I believe it's described in the
14 specification.  Let me -- well, I think there's
15 references -- I mean, 114 talks about an ARM   09:38:14
16 processor.  That's around Column 3.  And then in
17 column 4 it basically just says ARM1 and ARM2, and
18 it doesn't specifically call out ARM3.  That's kind
19 of the additional processor described around
20 Line 62.   09:38:43
21       So I mean there's a couple different places
22 in the specification where it just generally
23 references the use of an ARM processor.
24    Q   And so the next -- the next block down is --
25 there's three boxes within a box called "Cable Modem   09:39:03

8 (Pages 26 - 29)

Page 30

1 Engine."
2   A   Yes.  I see that.
3   Q   And is it -- is it all right with you if I
4 refer to the cable modem engine throughout our
5 discussion as the CME?                    09:39:17
6   A   Yes.  That's fine.
7   Q   Okay.
8       And so CME is labeled as Box 110.
9   A   I see that.
10   Q   Would you -- would you agree that there is    09:39:26
11 two processors listed as ARM1 and ARM2 within that
12 CME?
13   A   There are two -- at least two processors,
14 ARM1, ARM2.  I had actually looked to see whether or
15 not Box 112 is described as a processor of any type    09:39:46
16 and I -- I didn't see that the specification ever
17 said that it was.  So it looks like there's really
18 just the two.
19   Q   And would a POSITA looking at the CME and the
20 ARM1 and ARM2, would they know what was being    09:40:18
21 referred to there?
22   A   That question is a little bit vague with
23 respect to would they know what's being referred to.
24       They would see the reference to ARM1 and
25 ARM2.  I think based on the specification there    09:40:36

Page 31

1 would be an understanding that those would be
2 processors specific to what's labeled as the DOCSIS
3 controller and the DOCSIS MAP processor
4 respectively.
5       But with respect to would they know what the    09:40:52
6 DOCSIS controller was or what functions it
7 performed, I think you'd have to look at the
8 specification, since I think I've opined those are
9 not terms of art, and there is some overlap between
10 what the specification describes and then that    09:41:14
11 becomes somewhat problematic, I think, which is
12 one -- one of bases for my indefiniteness opinions.
13   Q   So I think you were looking at Column 3 when
14 you answered a question for me earlier and pointing
15 to the ARM processors that are described there.    09:41:29
16       Is that fair?
17   A   Yes.  I did point to Column 3.
18   Q   And at line -- Column 3, Line 17, it says (as
19 read):
20       "Processor 114 is an ARM9    09:41:47
21       TDMI-based RISC processor."
22       Do you see that?
23   A   I do.
24   Q   What does that phrase, ARM9 TDMI based RISC
25 processor mean to you?    09:42:04

Page 32

1   A   It's just describing a particular type of ARM
2 processor.
3   Q   And is there a significance to the word
4 "based" in that phrase?
5   A   I'm not sure what you're asking.  It says    09:42:25
6 based, so it would be for the particular type of ARM
7 processor there's some characteristics beyond just a
8 general ARM processor.  And so saying that it's --
9 it's based would indicate that it's describing maybe
10 processors within that family of processors.    09:42:55
11   Q   So is it fair to say that RISC processors are
12 a family of a type of processors?
13   A   It depends.
14   Q   What does it depend on?
15   A   Which processors you're talking about,    09:43:16
16 whether they have families, whether or not you
17 consider the different versions of the processors to
18 be in the same families.  It depends.
19   Q   Is it fair to say an ARM processor is just a
20 processor that implements a particular ARM core?    09:43:34
21   A   It depends on the context in terms of how
22 much specificity you need or want in providing a
23 description as to what the processor is.
24   Q   So the ARM9 TDMI, is it fair to say that that
25 refers to a family of general purpose    09:44:04

Page 33

1 microprocessors?
2   A   I don't believe I've taken a position on
3 whether or not they are general purpose or not.  In
4 a general sense, someone can probably characterize
5 them as general purpose.    09:44:35
6   Q   So as of the priority date of the
7 '775 patent, September 30, 2003, is it fair to say
8 that there were many known types of general
9 processors?
10   MR. BENYACAR:  Object to the form.    09:44:55
11   THE DEPONENT:  I haven't really tried to
12 answer that question.  I suppose it depends on what
13 you would consider a general processor, what would
14 be considered many.  So it -- it probably depends.
15 BY MS. ALLOR:    09:45:21
16   Q   Well, as a POSITA, what would you consider a
17 general processor to be?
18   A   I haven't really tried to define that term in
19 the context of these patents or established some
20 threshold for determining what's a general processor    09:45:33
21 versus not.
22   Q   You can't provide me with an explanation as a
23 POSITA of what a general processor is as of 2003?
24   A   With respect to some formal definition, I
25 don't believe I've included it in the declaration.    09:45:52

9 (Pages 30 - 33)

Page 34

1 So I'm not really prepared to give you a formal
2 opinion on the fly.
3    Q  What is a circuit?
4    A  That is a good question.  It really doesn't
5 have a particular definition in the context of the        09:46:16
6 '775 patent.
7       I think as my declaration says, there's
8 particular definitions of what a circuit can be and
9 then trying to understand what that term means with
10 any kind of reasonable certainty in the '775 patent        09:46:40
11 becomes difficult, if not impossible.
12    Q  There's no known definition for a circuit as
13 of 2003?
14       MR. BENYACAR:  Object to the form.
15       THE DEPONENT:  That's not what I said.          09:47:04
16 BY MS. ALLOR:
17    Q  If you turn to Appendix C at Page 100 of your
18 PDF exhibit -- Exhibit 2 of your declaration, you've
19 included a definition from the Microsoft Computer
20 Dictionary for a circuit.                    09:47:27
21       Isn't that right?
22    A  Appendix B is Newton, so maybe Appendix C.
23    Q  I'm sorry.  Appendix C.  C.  On Page 100.
24    A  Yes.  I've included that definition of
25 circuit and referenced in Paragraph 65 of my          09:47:49

Page 35

1 declaration.
2       And I think attempting to apply that
3 definition of circuit in the context of the
4 '775 patent leads to problems with understanding
5 what the scope of the claims are and the fact that        09:48:11
6 there's isn't reasonable certainty as to what the
7 scope of the claim would be trying to apply this
8 kind of definition.
9    Q  So my question was actually:  Is that what a
10 circuit is?                            09:48:31
11       Is that definition you have provided in
12 Appendix C, where it says (as read):
13       "Circuit, No. 1, any path that can
14       carry electrical current.
15       Number 2, the combination of          09:48:41
16       electrical components interconnected
17       to perform a particular task."
18       Are those definitions of circuits?
19       MR. BENYACAR:  Objection.  You didn't read
20 the whole definition.                    09:48:52
21 BY MS. ALLOR:
22    Q  Oh, I'm sorry.  (As read):
23       "At one level a computer consists
24       of a single circuit, at another it
25       consists of hundreds of interconnected          09:49:00

Page 36

1       circuits."
2    A  So I -- I think that is a definition of
3 circuit and I think applying that kind of definition
4 in the context of the claims at issue in the '775
5 creates a problem of what the reasonable certainty        09:49:14
6 of the scope of the claims are for the reasons set
7 forth in the declaration.
8    Q  That analysis you've done in your
9 declaration, that's really an infringement analysis
10 not a claim construction?                    09:49:31
11       MR. BENYACAR:  Object to the form.
12       THE DEPONENT:  I -- are you asking me or is
13 that your characterization?
14 BY MS. ALLOR:
15    Q  Yeah.  Yes.  I'm asking.              09:49:42
16    A  I -- I disagree.
17    Q  So the question in claim construction is
18 whether or not a POSITA would understand the term,
19 and are you telling me that you don't understand
20 what a circuit is?                        09:49:56
21    A  I disagree with your characterization of the
22 question.  It's not -- the question of
23 indefiniteness is not whether or not a definition
24 for a term would have existed, but whether or not a
25 person of skill in the art, at the time of patent,        09:50:14

Page 37

1 could determine the scope of the claim with
2 reasonable certainty.
3       So this definition demonstrates that there is
4 ambiguity with respect to how the claim is
5 describing and claiming a circuit.  Given that it        09:50:32
6 could mean lots of different things, a person of
7 skill in the art would not know how to interpret
8 what a circuit was in the context of the claims.
9    Q  But a POSITA reading the '775 patent would
10 know what a circuit is and would understand that        09:50:56
11 this definition you provided are two possible
12 definitions for a circuit; is that correct?
13    A  A person of skill in the art reading the
14 specification would have in mind what a circuit is
15 consistent with what I think I've identified in        09:51:13
16 Paragraph 65, but that definition results in
17 unreasonable certain -- uncertainty with respect to
18 what the scope of the claims are and how the claims
19 are claiming a circuit.  The claims don't say what a
20 circuit is supposed to be in the context of the        09:51:32
21 alleged invention.
22       And so the -- part of the definition
23 demonstrates the range of ambiguity -- sorry -- the
24 range of possible definition for what a circuit
25 could be.  I think focusing on -- it has lots of        09:51:50

10 (Pages 34 - 37)

Page 38

1 different definitions at different levels.
2      So at one level it can mean a single circuit,
3 at another it could be a set of hundreds of
4 interconnected circuits.  It could be a circuit
5 board, it could be a whole chip.  And so the          09:52:04
6 specification doesn't say which level of the circuit
7 to use in understanding what the scope of the claims
8 are.  And so that results in unreasonable certainty
9 or uncertainty with respect to what the scope of the
10 claims are.                                           09:52:31
11   Q   So if the court were to construe the term
12 circuit with respect to the '775 patent according to
13 this first definition given in the Microsoft
14 Computer Dictionary, the definition says (as read):
15      "Any path that can carry electrical            09:52:45
16 current."
17      Would it be your opinion that the claim --
18 the claims are indefinite if that is the definition
19 of circuit?
20   A   Yes.                                            09:52:57
21   Q   So you wouldn't be able to define the
22 boundaries of the first and second circuit based on
23 this definition?
24   A   It's not the boundaries of -- of any circuit.
25      If we look at the '775 patent, for example      09:53:14

Page 39

1 claim 1, you have a data network engine implemented
2 in a first circuit, you have a cable modem engine
3 implemented in a second circuit, and so those have
4 to be separate from each other.
5      And -- and that becomes the issue with          09:53:36
6 respect to how do you define what's part of the data
7 network engine circuit and what's part of the cable
8 modem engine circuit, and then trying to understand
9 how those are supposed to be separate.
10   Q   And I believe you turned to claim 1, but I     09:53:55
11 don't think claim 1 is at issue here.
12      So is your opinion the same with respect to
13 claim 18?
14   A   Yes.
15   Q   So if the construed circuit to mean any path   09:54:15
16 that can carry electrical current, it's your opinion
17 that a data networking engine implemented in a first
18 circuit would be indefinite?
19   A   Yes.
20   Q   And the same question with respect to a cable  09:54:36
21 modem implemented in the second circuit.
22      It's your opinion that if the court applied
23 that first construction from the dictionary, that
24 that -- that term would be indefinite?
25   A   That term would be indefinite with respect to  09:54:48

Page 40

1 understanding what the scope of the claims is
2 especially in the context of how the second circuit
3 has to be separate from the first circuit.
4   Q   Well, the claims itself -- claim 18 itself
5 says it would be separate -- separated by a data      09:55:11
6 box, correct?
7      MR. BENYACAR:  Object to the form.
8      THE DEPONENT:  I don't think claim 18 is
9 saying that the data bus establishes what the
10 separate requirement is, that just having a data bus  09:55:30
11 between the two would be sufficient to establish the
12 separateness between the first circuit and the
13 second circuit.
14      In fact, I think that was an issue I've
15 addressed in the declaration as it relates to the     09:55:44
16 prosecution history.
17 BY MS. ALLOR:
18   Q   I don't mean that was my question though.
19      My question was:  If we apply this first
20 construction and you look at the -- the language of   09:55:54
21 the claim, there's a data networking engine
22 implementing -- or implemented in a first circuit
23 and then we've got a cable modem implemented -- a
24 cable modem engine implemented in a second circuit,
25 and then we have got a data bus that connects the     09:56:11

Page 41

1 data networking engine to the cable mode engine.
2      So my question is:  If we're applying the
3 definition of circuit that says any path that can
4 carry electrical current, can you not identify where
5 the first circuit and the second circuits are?        09:56:25
6   A   You're question implies that you have a
7 system and you're attempting to apply the claim
8 against that system.
9      While there might be examples of systems
10 where you could identify a first circuit and a        09:56:48
11 second circuit, the problem with using that
12 definition of circuit, a person of skill in the art
13 is not able to determine with reasonable certainty
14 what the scope of the claim is with respect to what
15 constitutes the first circuit and what would          09:57:00
16 constitute the second circuit.  And that's
17 particularly problematic when there's a claim
18 requirement that the second circuit be separate from
19 the first circuit.
20      What the claim -- the patent doesn't specify    09:57:16
21 what's required for that separateness to be achieved
22 and so that has an impact on how you apply or what
23 could constitute a first or a second circuit.
24   Q   If we look at the second definition (as
25 read):                                                09:57:38

11 (Pages 38 - 41)

Page 42

1      "A combination of electric
2   components interconnected to perform a
3   particular task," ignoring the second
4   half of that, if the Court were to
5   apply that definition, would the          09:57:51
6   term -- would the term in a first
7   circuit and in a second circuit still
8   be indefinite too?
9      MR. BENYACAR:  Object to the form.
10     THE DEPONENT:  The phrases as to a first     09:58:06
11  circuit that includes at least one processor and
12  then continues from there and then a cable modem
13  engine implemented in a second circuit and that it
14  be separate from the first and second circuit, I
15  think it would be separate even if person skilled in  09:58:26
16  the art even attempting to apply that second
17  definition would recognize there's uncertainty with
18  respect to what the scope of the claim should be.
19  BY MS. ALLOR:
20    Q   So a POSITA wouldn't be able to read the     09:58:41
21  specification and understand that the first circuit,
22  the data networking engine, would be implementing
23  tasks differently or different tasks from the cable
24  modem engine that's implemented in the second
25  circuit?                                 09:59:00

Page 43

1    A   So two things.  Reading the specification,
2   there's no description of what a circuit is.  I
3   don't think the term "circuit" is used anywhere
4   except in the claims.
5       With respect to a person of skill in the art     09:59:10
6   understanding what the functions are, certainly
7   there are exemplary functions for each of those two
8   engines, but that doesn't help inform a person of
9   skill in the art as to what the scope of the circuit
10  would include.                          09:59:33
11      And even applying the second definition that
12  says (as read):
13      "A combination of components
14  interconnected to perform a
15  particular task," there's no context     09:59:41
16  provided in the specification as to
17  where -- where that circuit would
18  end especially where those two
19  circuits have to also be separate.
20     And so it becomes problematic to understand     09:59:59
21  what the scope of the claim is with respect to what
22  would constitute the required circuits and the
23  required separateness.
24    Q   You said there's no description of what a
25  circuit is in the specification.          10:00:18

Page 44

1      Is that -- is that fair?
2    A   I don't believe the specification uses the
3   term "circuit."  So I don't know that it provides
4   any context for how that term should be understood
5   in the specification or the...          10:00:34
6    Q   But you would agree that a POSITA at the time
7   of invention in 2003, someone with three years of
8   experience and an undergraduate degree in electrical
9   engineering would understand what a circuit is?
10    A   They would understand -- they would     10:00:55
11  understand that there's definitions of circuits that
12  are quite broad and non-specific as to what the
13  scope of a circuit would include.
14      As the definition says, it could -- there's a
15  lot of different levels at which you could determine  10:01:13
16  what a circuit would be, and the patent doesn't
17  provide any guidance on which of those levels to
18  use.
19      And so it's unclear what the scope of a
20  circuit would need to be in order to meet the     10:01:26
21  requirements of Page 18 and 19.
22    Q   But they would at least have an understanding
23  of the different types of circuits, correct?
24    A   I think a person of skill in the art would
25  understand that there are many different levels at     10:01:44

Page 45

1   which circuits can be identified, and it requires
2   context to understand which level is appropriate in
3   describing what a circuit is and that the
4   specification doesn't provide any guidance on what
5   level the claims should be understood to be read at.  10:02:02
6    Q   Would a POSITA understand a processor to be a
7   circuit?
8    A   I think a POSITA would understand that in
9   some context a processor could be a circuit.  That's
10  one of the levels that is possible, but then that     10:02:23
11  creates problems in the context of how the
12  specification in the invention is described.  I
13  think I've identified some of those in the
14  declaration.
15    Q   Would a POSITA view a computer as a circuit?  10:02:36
16    A   I think at one level it could be -- a
17  computer could be a circuit.  A chip, a board, a set
18  of transistors, all of those are different levels
19  that could be considered a circuit.
20      And it's unclear which --               10:03:04
21    Q   So --
22    A   -- which of those levels to apply in the
23  context of Claims 18 and 19.
24    Q   So it's your opinion that because there are
25  multiple possibilities for how to define a circuit  10:03:14

12 (Pages 42 - 45)

Page 46

1 that makes it indefinite?
2    A  No.  It's not a question of multiple
3 definitions.  It's that the definition includes
4 multiple levels.
5        And the different levels create ambiguity and   10:03:27
6 uncertainty with respect to which of those levels
7 the claims are requiring.  One level, multiple
8 levels any level, it wouldn't be clear to a person
9 of skill in the art what the scope of the claim is
10 supposed to include with respect to what level of   10:03:49
11 circuit the claims are talking about.
12    Q  If you look at Paragraph 69 of your
13 declaration here, you've included an annotated
14 version of Figure 1 from the '775 patent.
15    A  Yes.   10:04:29
16    Q  And you've included -- one, two, three, four,
17 five, six -- six red boxes.
18       Do you see that?
19    A  Yes.
20    Q  And if we look at the red box at the top   10:04:49
21 that's around the data networking engine 120, that
22 includes ARM No. 3.
23       Do you see that?
24    A  It does include ARM No. 3.  It's a box around
25 the entire Box 120 of which ARM 3 is part of that   10:05:04

Page 47

1 box.
2    Q  And you would agree that is a processor
3 included in the data networking engine?
4    A  I think the ARM 3 is a processor and it would
5 be part of the data networking engine.   10:05:22
6    Q  Would you agree that that is showing that
7 there is a circuit in the data networking engine?
8    A  When you say "that is showing," it's unclear
9 what you are referring to.
10    Q  The box that you've drawn.  Is your box that   10:05:45
11 you've drawn around the data networking engine which
12 we've just agreed include the processor, would you
13 agree that that box is surrounding a circuit?
14    A  At one level of what a circuit could be, that
15 box could be a circuit.  And consistent with some of   10:06:06
16 the rest of the figures, all sorts of other things
17 could be circuits.
18        And that ambiguity, the patent not describing
19 what it means by a circuit, means it could be all
20 sorts of different things all of which have   10:06:23
21 different meanings and all of which affect the scope
22 of the claims and create unreasonable certainty.
23    Q  But you would agree there's at least one --
24 one circuit being disclosed for the data networking
25 engine?   10:06:40

Page 48

1        MR. BENYACAR:  Object to the form.
2        THE DEPONENT:  Could you repeat the question?
3 BY MS. ALLOR:
4    Q  So earlier you -- you stated that you agreed
5 with me that a processor is a circuit.   10:06:49
6        Is that fair?
7        MR. BENYACAR:  Object to the form.  Misstates
8 testimony.
9        THE DEPONENT:  No.  I said, applying the
10 definition of a circuit, all sorts of different   10:07:00
11 things could be circuits, and it's unclear which of
12 those levels is -- the claim is talking about.
13        So I think to be clear and so it's not taken
14 out of context, Paragraph 69 is saying if the level
15 is interpreted to be something related to its own   10:07:18
16 specialized tasks, then that's one way that you
17 could draw the set of circuits.
18        There's a paragraph after it that shows a
19 different level of the circuit.  So a different
20 meaning of the circuit.   10:07:38
21        And then there's also a paragraph before
22 where it's -- the whole thing is also a circuit.
23 And so there's this ambiguity with respect to what
24 the inventors intend to be the right level of the
25 circuit.   10:07:54

Page 49

1        Is it the example that is shown above
2 Paragraph 68?  Is it the one above Paragraph 70?  Is
3 it the one above Paragraph 72?  Is it the one above
4 Paragraph 74?
5        And these all have different scopes with   10:08:11
6 respect to then what has to be separate, and so
7 that's why there's no reasonable certainty with
8 respect to what the claims describe.
9 BY MS. ALLOR:
10    Q  But the fact that you can draw a box around   10:08:34
11 the data networking engine that contains a
12 processor, you can identify at least one circuit
13 with that box.
14        Is that right -- is that fair?
15    A  No.  I don't think it's fair.  The fact that   10:08:48
16 you can do it one time doesn't mean that there's all
17 sorts of other ways that can you draw the box that
18 leads to no reasonable certainty as to what the
19 scope of the claims mean.
20        Just because you can do it once ignores the   10:09:01
21 fact that there are others, and it's the existence
22 of the one and the others and the uncertainty that
23 exists that creates the problem.
24    Q  A POSITA looking at the specifications for
25 the '775 patent, would they understand what was   10:09:41

13 (Pages 46 - 49)

1 meant by a data networking engine implemented in a
2 first circuit that includes at least one processor?
3    A  I don't understand the question.
4    Q  Did they understand what -- the electrical
5 components that are being used for the -- for the      10:10:10
6 data networking engine implemented in a first
7 circuit that includes at least one processor?
8    A  The uncertainty that I have with your
9 question is when you say "would they understand."
10 If -- if you're asking by "would they understand,"     10:10:31
11 would they understand the scope of what that is
12 referring to, then the answer is no because there's
13 no reasonable certainty as to what that would
14 include.
15    Q  So when you are faced with a cable modem that  10:10:50
16 contains a data networking engine and a cable modem
17 engine, as a POSITA, would you understand what
18 function each of those engines are performing?
19    A  It becomes somewhat circular.  If -- if I was
20 told what functions they were performing or if I had  10:11:43
21 some -- some evidence that described what functions
22 they were performing, then I would know what
23 functions they were performing.
24       But if you just handed me a cable modem,
25 first of all, it's not clear to me what would be      10:12:05

1 considered the circuit for the data networking
2 engine and the circuit for the cable modem engine
3 and how they would be separate.
4       It depends, again, on what level you consider
5 the circuit to be and whether or not they are        10:12:27
6 separate.  But with respect to the functions, if I
7 knew what the functions were, I could say what the
8 functions were.
9    Q  Doesn't the specifications describe what the
10 functions of the data networking engine are?         10:12:43
11    A  For the data networking engine, my
12 recollection is there were some examples of what was
13 described at least with respect to the data
14 networking engine.
15    Q  And what about with respect to the cable      10:13:05
16 modem engine?
17       Does the specification describe exemplary
18 functions that would be performing?
19    A  Yeah, so that's part of the next problem,
20 which is for both the DOCSIS controller and the      10:13:24
21 DOCSIS MAC processor, there are examples of
22 functions that are described.  I think it's
23 described as examples, and then they tend to be
24 overlapping with respect to what those functions
25 are.                                                 10:13:39

1       So it's unclear, at least based on the
2 specification, what the set of functions are that
3 would constitute the DOCSIS controller and what set
4 of functions there would be for the DOCSIS MAC
5 processor.                                           10:13:57
6    Q  If we look at Figure 2 of the '775 patent,
7 Figure 2 is described as a functional block diagram
8 implementing the cable modem architecture of
9 Figure 1.
10    A  I see that.                                   10:14:29
11    Q  And you see that the box at the top is
12 labeled DNE-120?
13    A  Yes.
14    Q  Would you agree that the DNE includes a
15 processor to perform the function being shown there?  10:14:46
16    A  My recollection is that DNE is described as
17 having a processor to perform functions.  I
18 understood Figure 2 -- if you're saying that the DNE
19 performs exactly the functions that are shown in
20 Figure 2 and not other functions and that's what the  10:15:25
21 invention is, then I certainly think DNE is showing
22 that specific set of functions.
23    Q  I think we can agree that the specification
24 is describing exemplary functions that the DNE-120
25 performs.                                            10:16:03

1       Is that fair?
2    A  Right.
3       So then it's kind of an open-ended list as to
4 what the DNE is supposed to be performing.  There
5 are some examples, but there's not some constraint   10:16:11
6 as to what functions the DNE is not supposed to be
7 performing.
8    Q  Well, if we use the definition of circuit
9 that's included in the Microsoft dictionary that you
10 included with your declaration, would you agree that  10:16:32
11 the DNE includes at least one circuit?
12    A  Applying that definition, it either is a
13 circuit, is composed of many circuits, or is part of
14 a circuit.
15       Applying that definition, the specification  10:17:03
16 doesn't say that the DNE is a circuit.  So it --
17 like I said, it could be -- it could have lots of
18 circuits.  It could itself be a circuit, a
19 self-contained circuit, or it could be part of a
20 larger circuit.                                      10:17:25
21       There's no guidance in the specification as
22 to how to apply the definition of a circuit with
23 respect to what's required of the DNE.
24    Q  So you would agree there's at least one
25 circuit being described in the DNE in Figure 2?      10:17:55

14 (Pages 50 - 53)

1      MR. BENYACAR: Object to the form.  Misstates
2  the testimony.
3      THE DEPONENT:  I -- it depends on what level
4  of circuit you're applying.
5      Like I said, it could either be lots of      10:18:09
6  circuits in the DNE, the DNE could be one circuit or
7  it could be lots of other circuits or it could be
8  part of one larger circuit.  There's no guidance as
9  to which of those it is.
10  BY MS. ALLOR:                          10:18:29
11   Q  So the second box in Figure 2 is the -- it's
12  label CME, and that's the cable modem engine 110.
13      Do you see that?
14   A  Yes.
15   Q  And would you agree that the CME- 110      10:18:41
16  includes at least one processor?
17   A  As described in 110, 110, I wouldn't say it's
18  described as at least one processor.  There's at
19  least two processors in 110.
20   Q  So at least one includes a possibility of      10:19:11
21  two, would you agree?
22   A  I would agree that that's what at least one
23  means, but I don't think that's what 110 is showing.
24   Q  You don't think it's showing two processors?
25   A  No.  I think 110 shows at least two      10:19:35

1  processors, and in Figure 1, which is the same 110
2  box, it is showing the DOCSIS controller is ARM
3  No. 1 and the DOCSIS MAC is ARM No. 2.
4   Q  Is there any reason those couldn't be
5  implemented in a single processor?      10:19:58
6   A  That's not what the invention is described
7  as.  It's -- if you implemented it as a single
8  processor, it's unclear how you would meet the
9  requirements of the Claim 18 and 19 with respect to
10  the requirement of being able bypass the DOCSIS      10:20:25
11  controller to be able to send PDU packets and
12  forward them directly to the data networking engine
13  without the involvement of the DOCSIS controller.
14      The invention is described as being a
15  processor for the DOCSIS controller and then a      10:20:47
16  separate processor for the DOCSIS MAC processor.
17   Q  And couldn't those be implemented into
18  processors that are part of the same circuit?
19   A  So your hypothetical as to could they be, it
20  depends on the constraints of the hypothetical.  If      10:21:08
21  the constraint of the hypothetical is implemented in
22  a single processor in such a way that would be able
23  to meet the requirements of Claim 18, I don't think
24  so.
25      Or that would be implemented in a way that's      10:21:24

1  described with respect to the invention, the only
2  embodiment that's described in the '775 patent, I
3  think the answer would also be no.
4   Q  So two processors can't be part of the same
5  circuit?                          10:21:45
6   A  Your question is a hypothetical with no
7  context to it.  So removing any context associated
8  with the '775, I can envision instances where you
9  can implement functionality formerly implemented on
10  two processors on a single processor.      10:22:05
11      That's not what's taught on a '775 patent and
12  it's -- so would make meeting all of the limitations
13  of Claim 18 essentially impossible.
14   Q  Okay.
15      I think this might be a good time for a      10:22:23
16  break.
17      THE VIDEOGRAPHER:  Going off record,
18  10:22 a.m.
19      (Recess.)
20      THE VIDEOGRAPHER:  We're back on record.      10:34:27
21  10:34 a.m.
22  BY MS. ALLOR:
23   Q  Dr. Almeroth, before we went on break, we
24  were talking about your Appendix C, the Microsoft
25  Computer Dictionary definition of circuit.      10:34:45

1      If you could just look at that again.
2   A  Sure.
3   Q  So you understand that, you know, the outcome
4  of this process is, you know, that the judge is
5  going to construe terms in the patent, and one of      10:35:00
6  the terms that you are looking at is first circuit
7  and second circuit.
8      Do you understand that?
9   A  Generally, I do.
10   Q  So if the Court decides to construe circuit      10:35:14
11  according to this definition that you have provided
12  in the Microsoft dictionary, any path that can carry
13  electrical current, is it your opinion that the
14  claim would be indefinite?
15   A  Yes.                          10:35:35
16   Q  So you would disagree with the Court adopting
17  a definition for circuit?
18   A  No.  The Court can adopt that definition for
19  circuit, but it still creates unreasonable -- I
20  would say unreasonable certainty.  What I mean is no  10:35:53
21  reasonable certainty with respect to what the scope
22  of the claim is and what's actually being claimed as
23  the circuit.
24   Q  So if the Court adopts that definition, that
25  first definition, you wouldn't be able to perform a  10:36:07

15 (Pages 54 - 57)

Page 58

1  infringement analysis.
2      Is that -- is that fair?
3   A   The question of indefiniteness is not a test
4  of whether or not you could perform an infringement
5  analysis. Somebody like Dr. Kramer could draw boxes   10:36:22
6  however they wanted.
7      But with respect to a person of skill in the
8  art attempting to develop a system that they
9  believed wouldn't infringe because they either
10  didn't want to have a first or second circuit or      10:36:37
11  they didn't want them to be separate, it
12  would -- there's no reasonable certainty on how
13  to -- how to implement that functionality.
14      Dr. Kramer could still come back and draw
15  boxes however he wanted in order to say that the      10:36:54
16  first circuit and the second circuit were separate.
17  So there's no -- there's no guidance or scope of the
18  claim that would exist that would allow a person of
19  skill in the art to determine with reasonable
20  certainty what the -- what the claim means, what the  10:37:12
21  scope of the claim is.
22   Q   So we're, you know, looking at this
23  definition and applying it to a cable modem. One
24  way to not infringe would to be to have this one
25  single processor.                                     10:37:38

Page 59

1      Is that fair?
2   A   It would depend. Maybe there's an expert who
3  would say, "Well, a circuit could be any path that
4  can carry electrical current."
5      So I'm going to draw a box around some of the    10:38:02
6  processor and another box around another part of the
7  processor and say that those are separate circuits.
8   Q   But the claim requires two separate
9  processors, right, Claim 18?
10   A   Claim 18 requires a data networking engine     10:38:23
11  implemented in the first circuit. That includes at
12  least one processor and a cable modem engine
13  implemented in a second circuit that includes at
14  least one processor.
15      That's what the claim language says. So with    10:38:47
16  respect to drawing boxes around circuits or
17  transistors or pads or boards, a person of skill in
18  the art wouldn't know how to implement a system that
19  wouldn't meet the requirement.
20      Now, your focus was also on the requirement    10:39:07
21  of whether or not you had a processor in the circuit
22  or not. But the ambiguity is with respect to
23  whether or not you had two circuits that were
24  separate from each other.
25      You might be able to do something else to not   10:39:21

Page 60

1  meet another part of the claim, but if you had two
2  different processors, again, it becomes a box
3  drawing exercise that it's not clear to a person of
4  skill in the art what the scope of the claim would
5  be.                                                    10:39:36
6   Q   Are you saying it's not clear from the claim
7  language whether two processors are required?
8   A   That's not what I'm saying.
9   Q   Well, my question was, if there was only one
10  processor in your cable modem system, would you meet  10:39:51
11  the claim?
12   A   I would have to see what that system looked
13  like. It likely would not, but it depends.
14      I mean, maybe there's some aspect of the way
15  that's designed or some DOE argument that the         10:40:11
16  plaintiff would make. I would have to give it some
17  thought.
18   Q   But you haven't given the opinion that the
19  term processor is indefinite, have you?
20   A   In this declaration I have not.                 10:40:24
21   Q   So I want to go back to a question that you
22  didn't actually answer earlier. So my question
23  earlier was if the Court applies the No. 1
24  construction from the Microsoft Computer Dictionary
25  to circuit, any path that can carry electrical        10:40:48

Page 61

1  current, is your opinion that you then would not be
2  able to apply this -- the claims to an accused
3  product and determine whether there is infringement
4  or not?
5   A   I believe I did answer that question. And my   10:41:03
6  question -- my answer was with respect to whether or
7  not you could determine infringement, I'm sure
8  someone could draw boxes however they wanted and
9  start checking off limitations.
10      But then I continued to say, the question of   10:41:22
11  indefiniteness is not with respect to whether or not
12  you can't find an example of a system that would fit
13  within the scope of the claims.
14      The question is with respect to whether or
15  not a person of skill in the art could determine the  10:41:40
16  scope of the claims with reasonable certainty.
17      And so it's not an infringement analysis that
18  determines definiteness. It's whether a person of
19  skill in the art would understand the scope of the
20  claims.                                                10:41:57
21   Q   Well, if the Court construed circuit in the
22  claims to mean that second definition under the
23  Microsoft Computer Dictionary, so if a circuit means
24  a combination of electrical components
25  interconnected to perform a particular task, are you  10:42:16

16 (Pages 58 - 61)

Page 62

1 saying that the claims would be indefinite and you
2 would not be able to determine whether there's
3 infringement?
4     A  So at first observation that's not all of the
5 second definition.                          10:42:33
6       MR. BENYACAR:  I was on mute when I was
7 trying to object.  I apologize.  That was the basis
8 for my objection.
9       Go ahead.
10       THE DEPONENT:  So there's that observation.   10:42:42
11 The second is, my answers would parallel the
12 same kind of answers that I gave if the Court
13 adopted definition 1.
14       And to briefly summarize those, the question
15 of indefiniteness is not with respect to whether or   10:43:05
16 not you can find an example of a system that would
17 be within scope of the claims.
18       The question of definiteness would be with
19 respect to determining what the scope of the claims
20 are to a person of skill in the art without         10:43:21
21 reasonable uncertainty.
22 BY MS. ALLOR:
23     Q  So you would find the claim to be indefinite
24 if the Court adopted either of those definitions in
25 the Microsoft Computer Dictionary and you would not   10:43:43

Page 63

1 be able to determine the scope of the claim.
2       Is that fair?
3     A  Right.
4       Regardless of which definition for circuit a
5 person of skill in the art would use, there would     10:44:04
6 still be unreasonable certainty -- or there would be
7 no reasonable certainty with respect to what the
8 scope of the claims would be.
9     Q  And so if either of those definitions get
10 adopted, it's your opinion that you couldn't do an    10:44:20
11 infringement analysis because the claims would be
12 indefinite; is that fair?
13     A  No.  That's not what my opinion was.
14     Q  What does it mean for two circuits to be
15 separate?                                     10:44:53
16     A  I -- I don't think there is a clear
17 distinction or understanding as to what they would
18 need to be in order for them to be separate.
19 That -- that's part of the problem that's
20 illustrated in the prosecution history.          10:45:08
21     Q  And if we look at the -- the claim language
22 of 18, it says (as read):
23       "A data bus that connects the data
24       networking engine to the cable modem
25       engine where the cable modem functions    10:45:26

Page 64

1       formed by the cable modem are
2       completely partitioned from the home
3       networking function performed by the
4       data networking engine."
5     Q  Do you see that?                        10:45:36
6     A  Yes.
7     Q  So what does it mean to be completely
8 partitioned?
9     A  I don't think there's a clear understanding
10 as to what that would mean in the context of this    10:45:48
11 claim, and in light of the intrinsic record.
12     Q  Did you consider any dictionary definitions
13 of partitioned?
14     A  I don't recall that I did.  To the extent I
15 did, they would be included in the declaration.      10:46:09
16       The question of indefiniteness doesn't
17 revolve what the -- the definition of partitioned
18 is.
19     Q  Do you have an understanding of what the
20 definition of partitioned is?                 10:46:25
21     A  Partitioned, I don't have some dictionary
22 definition I can give you to off the top of my head.
23       I think partitioned means partitioned.
24     Q  So what does it mean to you as a POSITA?
25     A  Again, I don't have a dictionary definition   10:46:45

Page 65

1 off the top of my head to give you.  Whatever plain
2 and ordinary meaning for partitioned would be.
3     Q  So I'm introducing Exhibit 4.
4       MR. BENYACAR:  How do I get access to the
5 exhibits?  Did I log on the wrong way?         10:47:10
6       MS. ALLOR:  Did you -- can we go off the
7 record for a minute?
8       MR. BENYACAR:  Sure.
9       THE VIDEOGRAPHER:  Going off record at
10 10:47 a.m.                                    10:47:23
11       (Recess.)
12       THE VIDEOGRAPHER:  On the record at
13 10:49 a.m.
14       (Exhibit 4 was marked for
15       identification and is attached        10:49:32
16       hereto.)
17 BY MS. ALLOR:
18     Q  So, Dr. Almeroth, I just introduced as
19 Exhibit 4 some excerpts from a Microsoft Computer
20 Dictionary, 3rd Edition.                      10:49:42
21       If you look at Page 3 of the PDF, it shows
22 the copyright date of 1997.
23     A  I see that on the page.
24     Q  So if we go to the fourth page of the PDF,
25 it's Page 90 of the dictionary, you'll see a    10:49:59

17 (Pages 62 - 65)

Page 66

1  definition of circuit there.
2      Do you see that?
3      A  I see that.
4      Q  And this is the same definition that was
5  included in the Microsoft dictionary that you          10:50:10
6  included as your exhibit; is that fair?
7      A  It does look to be the same.
8      Q  Okay.
9          I don't want to look at that.  I want to
10  actually go to the next page.  I just want you to      10:50:20
11  know that I didn't have access to the one that you
12  had, so I have a 1997 version.
13      A  Okay.
14      Q  If we go to the last page, 355.
15      A  Okay.                                           10:50:39
16      Q  So there's a definition of partition there
17  and it says (as read):
18      "A logically distinct portion of
19      memory or a storage device that
20      functions as though it were a                      10:50:47
21      physically separate unit."
22      Do you see that?
23      A  I see that.
24      Q  Is that a fair definition of partition?
25      A  In this context of the '775 patent, I don't    10:51:00

Page 67

1  think it is.
2      Q  And why not?
3      A  The definition of partition from the
4  Microsoft dictionary looks to be in the context of a
5  storage device or -- or memory.                        10:51:18
6          So you create a partition on your hard drive,
7  like a C drive and a D drive, and so it's -- it's a
8  portion of memory or storage that's being divided
9  here.  The -- the completely partitioned in Claim 18
10  and 19 is referencing cable modem functions          10:51:44
11  performed by the cable modem engine completely
12  partitioned from the home networking functions.
13          So that definition of partition of how you
14  are dividing up memory I don't think would inform a
15  person of skill in the art as to how you're            10:52:03
16  partitioning functions of engines.
17      Q  Are you saying this definition is not
18  consistent with what a POSITA would understand at
19  the time of invention in 2003?
20      A  I -- I don't think this definition would help  10:52:26
21  a person of skill in the art understand what
22  Claim 18 and 19 meant with respect to completely
23  partitioned, especially in the context of the
24  intrinsic record that's present as it relates to
25  this portion of Claim 18 and 19.                       10:52:41

Page 68

1      Q  So in the context of this definition of
2  partition and the discussion that you just had right
3  before this question, would that be only applicable
4  to a hard drive having, you know, two separate
5  logical drives within that single hard drive?          10:53:05
6      A  I don't understand the question.
7      Q  Well, so you said that this definition is not
8  referencing being completely partitioned from the
9  home networking function; the cable modem engine
10  being completely partitioned.                          10:53:24
11          So -- so what is this definition referring
12  to?  Is it referring to a single piece of hardware
13  having only function partitions?
14      A  Sorry.  When you say "this definition," I
15  don't understand if you are referring to Exhibit 4     10:53:43
16  or something in Claim 18.
17      Q  I'm -- I'm referring to the definition of
18  partition in Exhibit 4 that's the dictionary.
19          So I asked you if that was consistent with
20  the '775 patent's use of partitioning.                 10:53:58
21          You told me no; is that fair?
22      A  I am not sure how to judge consistency.  They
23  are talking about two different things.
24          I -- I think they are talking about two
25  different things.  I don't think that the definition   10:54:13

Page 69

1  from Exhibit 4 is relevant or would inform a person
2  of skill in the art as to how the term completely
3  partitioned was used in the context of Claim 18 and
4  19, especially in the context of the intrinsic
5  record of the '775 patent.                             10:54:36
6      Q  If we put the -- the claim language aside and
7  patent aside, and we look at just the definition
8  from the 1997 dictionary, it says (as read):
9      "A logically distinct portion of
10      memory or storage device that                     10:54:48
11      functions as though it were a
12      physically separate unit."
13      Is it your position that that definition only
14  applies to logical partitioning and not physical
15  partitioning?                                          10:55:00
16      A  I am not sure how to answer that question.  I
17  guess maybe the answer is it depends.
18      Q  Can something be partitioned based on this
19  definition in the Microsoft dictionary, can it be
20  both logically distinct and not physically separate?  10:55:30
21      A  Again, I'm not sure what that question is
22  really asking or what it means.
23      Q  Do you understand what this definition means?
24      A  I do.
25      Q  So my question is:  When you're applying this  10:55:53

18 (Pages 66 - 69)

Page 70

1  definition in the real world in the time of a
2  POSITA, would you understand that only to be
3  applicable to partitioning logical hard drives or
4  logical functions and not physical hard drive?
5      The partitioning will be between the logical    10:56:17
6  step and not the physical hard drive.
7      A  I don't understand the question.  You have
8  used terms like logical hard drive, you've -- you've
9  mixed and matched hard drive with functions.  I'm
10  not sure what a logical function would be or how a    10:56:36
11  function would be relevant to the definition.
12      Your question just doesn't really make any
13  sense.  I'm sorry.
14      Q  Could you partition a single hard drive?
15      A  I guess there's two parts of the question.    10:57:11
16  Could you and would that use of the term make sense
17  in that context.
18      The one example that comes to mind is where
19  you have a hard drive in a PC and you can partition
20  it so that there's a C drive and a D drive.  That's    10:57:25
21  a typical way in which I would expect that term to
22  be used.  Maybe there's other contexts in which it
23  could be used.
24      Q  And so that is partitioning portions of the
25  hard drive into, as you said, a C drive and a D    10:57:47

Page 71

1  drive.  That's the function being partitioned,
2  right?
3      A  No.  I disagree with your characterization.
4      Q  So that's a physical partition?
5      A  I disagree with that characterization.    10:58:03
6      Q  So what kind of partitioning is it?
7      A  I mean, I'm not sure what types of partitions
8  there could be.  I mean, it's -- the example I have
9  provided is it's a partition.  I'm not sure what
10  adjective I would use to modify partition in that    10:58:28
11  sense.
12      Q  Well, you said that this definition of
13  partition is not the same as what's being used in
14  the '775 patent.  So I'm trying to understand what
15  this definition means.    10:58:43
16      A  The definition means what it says it means.
17  I can -- I gave you one example and I'm not sure
18  what else you're asking at this point.
19      Q  So how is the use of partition in the
20  '775 patent inconsistent with this definition in the    10:59:03
21  Microsoft dictionary?
22      A  It's a hard question to answer.  I'm not
23  sure, you know, if you're comparing apples and
24  oranges how or -- how is the comparison
25  inconsistent.  I mean size, shape, color for apples    10:59:21

Page 72

1  and oranges.
2      I guess in this case partition is referencing
3  distinct portions of memory whereas Claim 18 and 19
4  are referencing complete partitioning of cable modem
5  engines functions and home networking functions.    10:59:50
6  The cable modem engine and the data networking
7  engine.
8      Q  So is it your opinion that in your hard drive
9  example drive C and drive D could not share
10  connecting circuitry data paths or memory devices    11:00:19
11  and still be partitioned?
12      A  I am not even sure how to apply claim
13  language to that particular scenario.  Again, I
14  think because the terms are talking about different
15  things, it's -- it's again kind of apples and    11:00:37
16  oranges.  I think also in the context of the
17  '775 patent there's prosecution histories, part of
18  the intrinsic record that help explain what the
19  applicant considered or thought or stated with
20  respect to completely partitioned.    11:00:59
21      Q  Can two circuits be separate but still share
22  circuitry, data path, or memory devices?
23      A  Can you repeat the question?
24      Q  So can two circuits be separate but still
25  share connecting circuitry, data path, or memory    11:01:43

Page 73

1  devices?
2      A  I would have to give some thought to that
3  hypothetical.  I mean, you're -- you're using the
4  term "separate," and then with respect to what
5  they're sharing and they're not really asking in the    11:02:09
6  context if Claim 18 or considering the intrinsic
7  record.
8      So I'm a little uncertain as to what the
9  context of the question is and how to evaluate the
10  requirements of your question versus kind of the    11:02:26
11  incomplete hypothetical.
12      Q  What does it mean for two circuits to be
13  separate?
14      A  I think that's part of the problem with the
15  indefiniteness of the claim.  It's not clear what    11:02:46
16  the scope of the claim is for the required
17  separation and for the functions to be partitioned,
18  especially given the intrinsic record.
19      Q  So you don't know what it means for two
20  circuits to be separate?    11:03:10
21      A  Not in the context of how that term is used
22  in Claim 18 and 19, given what the applicant said
23  during prosecution.  It's not clear to me with any
24  reasonable certainty as to what that term means or
25  what the scope of the claim would be when it uses    11:03:27

19 (Pages 70 - 73)

Page 74

1 that term.
2   Q   Are you familiar with SOCs that have various
3 circuits on a single chip?
4   A   Yes.
5   Q   Would you consider the components of the SOC   11:03:48
6 to have separate circuits?
7   A   It would be the same kind of answer.
8       Applying separate as it's used in the context
9 of Claim 18 and in light of the prosecution history,
10 I don't think I have the ability to answer that   11:04:11
11 question one way or another.
12   Q   So as a POSITA, understanding what a SOC is,
13 if there was a single chip with various circuits on
14 it, would you say that all those circuits are
15 separate?                                11:04:30
16   A   Same answer.
17   Q   Can those circuits have separate functions
18 even though they are connected on the single chip?
19   A   Can they have separate functions?
20       It seems like you are using that term   11:04:54
21 different than how it's used in the context of the
22 requirements of Claim 18.
23       I think in an unbounded hypothetical
24 certainly circuits on a chip can have separate
25 functions.  I mean it -- again, it depends on if   11:05:08

Page 75

1 you're trying to apply the language of Claims 18 and
2 19 to that hypothetical or not.
3   Q   Well, I was not applying it to the claim
4 terms.  I was just asking about a SOC that is a
5 single chip and that has various circuits on it.   11:05:35
6       Would those be considered separate?
7   A   You would have to tell me what the test for
8 separateness is.
9   Q   What's your understanding as a POSITA of the
10 term "separate" with respect to an SOC that has   11:05:58
11 various circuits on it?
12   A   I think the understanding of a POSITA would
13 be it's -- it's not a term with a specific enough
14 definition that I can answer your question yes or
15 no.                                     11:06:12
16       And in one context maybe it is separate and
17 another context maybe it is not separate.  It
18 depends on -- on what specific definition of
19 separate you want me to apply in evaluating whether
20 or not your hypothetical has separate functions or   11:06:32
21 circuits.
22   Q   Wouldn't a POSITA have been familiar with an
23 SOC?
24   A   Yes, but familiarity with an SOC doesn't
25 provide the context for how you want me to apply the   11:06:47

Page 76

1 test for separateness in your hypothetical.
2   Q   Well, wouldn't you -- as a POSITA, wouldn't
3 you be familiar with seeing circuitry depicted as a
4 series of separate blocks on a block diagram?
5   A   It would be the same answer.         11:07:06
6       You're -- you're not giving me a definition
7 of what separateness requires or allows for, so I
8 can't say whether or not circuits, chips are
9 separate on an SOC or not.
10       And that's, again, all divorced from any   11:07:26
11 particular meaning or understanding in the context
12 of Claim 18 and 19 of the '775 patent.
13   Q   So if we look at Claim 18 of the '775 patent,
14 is it your position that the cable modem engine and
15 the data networking engine can't share any   11:07:54
16 connecting circuitry or data path?
17   A   It is not clear what the scope of the claims
18 allows for given what the applicant said as part of
19 the prosecution.
20       There was a pretty clear example in the prior   11:08:23
21 art where there were components that were shared
22 between the two and there's examples identified in
23 Paragraph 61 of things like a memory controller and
24 a bus that seemed to be shared between the two
25 processors that are used as a basis for   11:09:07

Page 77

1 distinguishing Brooks and saying that it -- it
2 shared circuitry and therefore were not separate
3 circuits.
4   Q   So I don't think you answered my question.
5       My question was: Does Claim 18 of the   11:09:30
6 '775 patent, is it your position that the cable
7 modem engine and the data networking engine can't
8 share any circuitry or data -- any connecting
9 circuitry or data path?
10       MR. BENYACAR:  Objection; asked and answered.   11:09:45
11       THE DEPONENT:  I absolutely answered it, so I
12 stand by the answer I just gave on the record.
13 BY MS. ALLOR:
14   Q   How do they communicate with each other?
15   A   I don't understand the context of the   11:09:57
16 question.  What are the they and what the
17 hypothetical is.
18   Q   How does the cable modem engine in Claim 18
19 communicate with the data networking engine?
20   A   I don't understand the question.   11:10:12
21       Are you asking about a system that would
22 implement Claim 18?  I mean, because with respect
23 to -- I mean, it's a long limitation.  I'm -- I'm
24 trying to see where there's a specific requirement
25 in Claim 18 that the cable modem engine and the data   11:10:37

20 (Pages 74 - 77)

Page 78

1  network engine communicate with each other.
2   Q  So could you have a functioning cable modem
3  system that didn't have communication between the
4  data networking engine and the cable modem engine?
5   A  I would have to give that some thought.  I'm    11:11:04
6  not -- I'd have to think about how you could
7  implement a system under those constraints and if it
8  would -- would operate.
9   Q  So you don't know whether in a functioning
10  cable modem, you know, one of -- maybe the accused    11:11:23
11  products, whether they need to communicate between
12  the data networking engine and the cable model
13  engine?
14      MR. BENYACAR:  Object to the form.
15      THE DEPONENT:  So your question about how a    11:11:37
16  system would work if they didn't communicate versus
17  a description of an example of a system where they
18  do communicate seems to be two different things.
19      So I -- I don't understand your -- your last
20  question being asked in the context of the previous    11:11:54
21  question.  So maybe you could restate it so that I
22  understand it.
23  BY MS. ALLOR:
24   Q  There were two separate questions, so I --
25  I'll ask each of them again.                11:12:06

Page 79

1      So my first question was:  If it's your
2  position that the cable model engine and the data
3  networking engine in Claim 18 cannot share any
4  connecting circuitry or data path, how would they
5  communicate with one another?              11:12:22
6   A  Okay.  So that question presumes that I've
7  offered the opinion that they can't share anything.
8      What I have said is based on what the
9  applicant said during the prosecution history and
10  the lack of disclosure in the specification, it's    11:12:45
11  not clear how to -- what the scope of the claims is
12  with any reasonable certainty as to how the circuits
13  can be separate from each other, how the functions
14  can be completely partitioned, given statements that
15  the applicant made during prosecution.  That leads    11:13:02
16  to the indefiniteness.
17      And so with respect to asking me to assume
18  that to be the case, I can then answer the rest of
19  the question which is how you would implement a
20  system if that were to be the assumption and the    11:13:27
21  hypothetical, and that's what I answered to you
22  previously as I haven't given thought to what the
23  structure of a hypothetical system would look like
24  sufficient to meet the assumptions in your question
25  about a hypothetical.                    11:13:41

Page 80

1   Q  It you could turn to Paragraph 74 of your
2  declaration.
3      And above that paragraph there is an
4  annotated copy of Figure 1 from the '775 patent?
5      Do you see that?                    11:14:08
6   A  Yes.
7   Q  And you put a purple box around the cable
8  modem engine 110; is that correct?
9   A  Yes.
10   Q  So why do you say the specification doesn't    11:14:21
11  explain what this box is?
12   A  Why do I say that?  I say that in the context
13  of going back to understanding what a circuit is and
14  the point that there's Box 110 that's described as
15  the cable modem engine but there's no description or    11:14:48
16  explanation as to whether that box is a circuit
17  board on which all of the components of the CME are
18  placed or if it means something else, kind of
19  consistent with the rest of what Paragraph 74 says.
20   Q  So your issue with this figure and with the    11:15:08
21  specification is that it doesn't identify how the
22  CME is physically implemented?
23   A  I think that is an inaccurate
24  characterization of what my indefiniteness opinions
25  are.                            11:15:35

Page 81

1   Q  Well, your Paragraph 74 says the
2  specification doesn't explain what this box is,
3  meaning the purple box, but the purple box is
4  clearly labeled as the cable model engine.
5      Is it not?                    11:15:50
6   A  It has that label but it doesn't inform a
7  person of skill in the art as to what the circuit is
8  supposed to be.  And there's multiple possible
9  meanings that I go through with respect to
10  Paragraph 74.  And then understanding Paragraph 74    11:16:07
11  in the context of all of the other ways in which
12  Figure 1 can be -- can have boxes drawn on it
13  demonstrates that even if you had a definition of
14  circuit, it doesn't tell you at what level the claim
15  is supposed to be claiming a circuit at.        11:16:27
16      And the point of Paragraph 74 when it says it
17  doesn't explain what this box is, is referring to it
18  doesn't explain how this box would inform a person
19  of skill in the art as to what the scope of circuit
20  would be as it's required in the claims.        11:16:48
21   Q  But you would agree that this box, the purple
22  box around the cable modem engine 110, it includes
23  at least one processor?
24      MR. BENYACAR:  Objection; asked and answered.
25      THE DEPONENT:  No.  It includes two        11:17:07

21 (Pages 78 - 81)

Page 82

1 processors.
2 BY MS. ALLOR:
3    Q   Isn't two processors at least one?
4    A   Asking if this box shows at least one
5 processor, it shows exactly two processors.  So it    11:17:27
6 doesn't show one processor or three processors.
7    Q   Does it need to show one single processor to
8 meet the claim limitation of at least one processor?
9    A   With respect to whether or not that would be
10 a necessary or a sufficient requirement to explain    11:17:59
11 what the claim meant when it said one or more
12 processors for the cable modem engine, it -- there'd
13 have to be something.
14       Whether it's shown in this figure or an
15 explanation provided, the fact that the limitation    11:18:21
16 says one or more processors creates an issue with
17 respect to, if you only had one processor according
18 to the claim, how you would be able to have a DOCSIS
19 controller and a DOCSIS MAC processor on a single
20 processor be able to meet the requirements of    11:18:56
21 the claim where you have -- packets are forwarded
22 directly to the data networking engine without the
23 involvement of the DOCSIS controller.
24       So that's another indefiniteness problem as
25 it relates to Claims 18 and 19.        11:19:18

Page 83

1    Q   Is it your opinion that you couldn't meet the
2 claim limitations by having two processors on the
3 cable modem engine?
4    A   You know, I think -- I think the point is the
5 opposite of that.  The disclosed invention has two    11:19:55
6 processors in the cable modem engine, and that's
7 what's disclosed, the DOCSIS MAC processor and the
8 DOCSIS controller.  Having one processor creates
9 problems in the claim for the reasons I just
10 described.        11:20:18
11    Q   Where in the claim language is -- does it
12 require that the first circuit and the second
13 circuit be on separate circuit boards?
14       MR. BENYACAR:  Object to the form.
15       THE DEPONENT:  I don't think it says that's    11:20:35
16 requirement of the claims explicitly, but because it
17 doesn't say what the first circuit and second
18 circuit are or can be, there's no guidance to a
19 person of skill in the art how they can be separate
20 and how you can have functions that are completely    11:21:11
21 partitioned creates the indefiniteness problem.
22 BY MS. ALLOR:
23    Q   Are you -- are you saying that if you had two
24 circuits on a single circuit board you wouldn't
25 consider those to be separate?        11:21:34

Page 84

1    There would be no way for them to be
2 separate?
3    A   As to -- there are two parts of that
4 question.  Whether or not I would consider them to
5 be separate, there's no guidance in the claim for    11:21:43
6 whether or not they would be separate or not because
7 there's no guidance as to what level of circuit is
8 claimed.
9       With respect to the second part of the
10 question, there would be no way for them to be    11:21:56
11 separate.  It would depend on how they're
12 implemented.  It would depend on the level of
13 separateness that was required.
14       And that's -- that's the problem.  Because
15 the claim doesn't provide a person of skill in the    11:22:09
16 art what the scope of the claim would be, it creates
17 uncertainty as what that scope of the claim would be
18 in a scenario like what you described.
19    Q   If you could look at the '775 patent,
20 Column 4, Line 58 to 62.        11:22:34
21    A   Yes.
22    Q   So there the specifications describe a single
23 chip; is that correct?
24    A   No.
25    Q   So you don't think it describes implementing    11:22:57

Page 85

1 cable modem system 100 on a single chip?
2    A   No.
3    Q   What does it describe then?
4    A   It says (as read):
5       "A chip implementing cable        11:23:11
6    modem system 100 will only have a
7    small incremental hardware cost or
8    function over standalone cable modem
9    chips.  The major cost difference
10   relative to current chips is the        11:23:25
11   addition of another R940-type
12   processor to the chip."
13      So it's describing the addition of the DNE as
14 the additional chip, which would be the required
15 functionality that's shown for cable modem 100, and    11:23:39
16 then it's also describing in the context of current
17 standalone cable modem chips, which in the context
18 of cable modem system 100 is the ARM1 for the DOCSIS
19 controller and ARM2 for the DOCSIS MAC processor.
20    Q   Right.        11:24:03
21       But it says in addition to the chip, you
22 could add another processor.  So wouldn't that be
23 referring to multiple processors on a single chip?
24    A   It -- it's referring to the cable modem
25 system 100 which is described -- I mean, it's    11:24:33

22 (Pages 82 - 85)

Page 86

1 referring to that embodiment, and in that embodiment
2 there are three chips -- I'm sorry, there are three
3 processors, not three chips.
4    Q   But you would agree it's discussing adding a
5 processor for the DNE to the chip?                11:24:59
6    A   And if it's -- it's adding another processor
7 to the two that are already there to create cable
8 modem 100.
9    Q   Right.
10       And all three processors are on a single      11:25:19
11 chip, correct?
12    A   With respect to the relationship between a
13 processor and a chip, it's whether it's in -- the
14 chip is an SOC or not.  It doesn't really say.  So
15 there isn't some description of what a chip is as it  11:25:35
16 relates to what the processors are.
17    Q   Your answer earlier was it's adding another
18 processor to the two that are already there to
19 create cable modem 100.
20       Is that a fair recitation of your answer?    11:25:56
21    A   Yes.
22    Q   So wouldn't you agree that in that scenario
23 of what's being described here, cable modem 100 has
24 three processors on a single chip?
25    A   It is using the term "chip" but not tying it  11:26:11

Page 87

1 specifically to how that relates to a processor or
2 any requirement for separateness.
3    Q   I'm -- I'm not saying anything about the
4 separateness requirement.
5       I'm simply asking you whether a current       11:27:08
6 standalone cable modem chip has two processors and
7 this is describing adding an additional processor to
8 that chip to get to the cable modem system 100 being
9 described there.
10    A   Yeah, I think the focus of Figure -- Figure   11:27:26
11 1, Box 100 is with respect to the inclusion of the
12 three processors as to what the chip is referring to
13 in that scenario.
14       That is not -- doesn't tie that chip to the
15 relationship of the three processors.             11:27:54
16    Q   That wasn't my question.
17       My question was simply, this is describing a
18 possibility that this cable modem system 100 can be
19 implemented on a single chip with at least three
20 processors?                                       11:28:10
21    A   It is saying that you would have cable modem
22 system with three processors.  I would agree with
23 that.
24       With respect to what --
25    Q   Okay.                                        11:28:26

Page 88

1       That was not --
2    A   -- would be part of the chip versus not, it
3 doesn't say.
4    Q   That wasn't my question.  So -- thank you.
5       So with respect to a system (indecipherable)  11:28:41
6 chip, the processors would be on that single chip;
7 is that correct?
8    A   That's the --
9       MR. BENYACAR:  Object to form.
10       THE DEPONENT:  That's the part you           11:28:49
11 interrupted me on.  It doesn't say.
12 BY MS. ALLOR:
13    Q   So you interpreted the word "chip" to not
14 mean a chip?
15    A   That's not what my answer was.              11:29:07
16    Q   Are you familiar with the concept of virtual
17 decoupling?
18    A   In a general sense, it's something of a broad
19 term, so it again depends on the context.
20    Q   Well, what does it mean to you as a POSITA?   11:29:32
21    A   It depends on the context.
22    Q   Well, if you look at the '775 patent, the
23 Column 3, Line 58 to 62.
24    A   Okay.
25    Q   It's describing the ability to virtually     11:30:05

Page 89

1 decouple the cable modem engine 100 from the data
2 networking engine 120.
3       Is that fair?
4    A   Sorry.
5       Could you repeat the question.               11:30:20
6    Q   I said, this portion of the specification is
7 describing virtually decoupling the data networking
8 engine 120 from the cable modem engine 110.
9       Do you see that?
10    A   I do see where it says those words.         11:30:36
11    Q   And what is your understanding of what that
12 would mean?
13    A   I think it says in the previous sentence --
14 because the sentence that you read says as a result
15 and then it's using virtually decoupling to         11:31:06
16 characterize the sentence that appears before.
17       So that sentence says (as read):
18       "In one implementation the entire
19       embedded portal service, PS,
20       functionality of the cable home           11:31:18
21       specification, is contained within
22       data networking engine 120 with a
23       cable home functionality being
24       completely decoupled from the packet
25       cable and DOCSIS functionality          11:31:32

23 (Pages 86 - 89)

Page 90

1     provided by cable modem 110."
2     Q   Right.
3         So the sentence after it is describing that
4   that decoupling is a virtual decoupling.
5         Do you agree with that?          11:31:46
6     A   It is using the term "virtual decoupling" to
7   refer to what I just read.
8     Q   And what is your understanding of virtual
9   decoupling?
10    A   It's what I just read.  I'll read it for you  11:31:59
11  again.
12        It says (as read):
13          "In one implementation the entire
14        embedded portal services functionality
15        of the cable home specification is       11:32:08
16        contained within data networking
17        engine 120 with a cable home
18        functionality being completely
19        decoupled from the packet table and
20        DOCSIS functionality provided by cable   11:32:19
21        modem engine 110."
22    Q   Is this describing that the function of the
23  two engines, the data networking engine and the
24  cable modem engine, they are operating separately?
25    A   It does not make that characterization.  11:32:38

Page 91

1     Q   So how would you be able to independently
2   upgrade software to one engine, so say the data
3   networking engine, without impacting the
4   functionality of the cable modem engine?
5     A   I would have to give that question some    11:33:14
6   thought.  I haven't tried to answer what the design
7   of a cable modem would look like that would
8   accomplish that functionality under those
9   constraints.
10    Q   So would you be able to independently upgrade  11:33:29
11  the software of one engine if they were not
12  functioning separately?
13    A   I would have to give that some thought,
14  whether or not you could implement a hypothetical
15  system under that constraint.             11:33:46
16    Q   In context of this portion of the
17  specification, what is it describing?
18    A   I don't understand the question.  It's
19  describing exactly what it says.  So I'm not sure
20  what you're asking about beyond the description  11:34:07
21  that's in the words of the sentences.
22    Q   Is it describing the functions of the cable
23  modem engine as operating separately from the
24  functions of the data networking engine?
25    A   I don't see where it says that.  I'm sorry.  11:34:26

Page 92

1   Actually maybe repeat your question because it was
2   the words at the end that I think you were asking
3   whether or not that concept was conveyed or not.
4     Q   So the last part of that Column 3, Lines 58
5   to 62 is describing (as read):            11:35:01
6         "As a result of the virtual
7         decoupling."
8         So my question is, the virtual decoupling,
9   isn't that describing that the functions of the
10  cable modem engine are operating separately from the  11:35:14
11  functions of the data networking engine such that
12  you can separately upgrade the software of each
13  without -- without affecting the functionality of
14  the other.
15    MR. BENYACAR:  Object to the form.        11:35:31
16    THE DEPONENT:  I see where it says (as read):
17          "As a result of the virtual
18        decoupling" that you've asked me about
19        a couple times what you're able to do.
20        But with respect to what you're able to do  11:35:46
21  having further implications about what that virtual
22  decoupling is describing, I don't see where -- for
23  example, it's -- it just says the functionality
24  is being completely decoupled as opposed to any sort
25  of condition as it relates to operation.    11:36:10

Page 93

1         And so to your hypothetical about, well, it
2   says decoupling functions, doesn't that mean it has
3   to decouple operation in order to achieve
4   independently software upgrading, I don't think that
5   that necessarily follows from decoupling        11:36:31
6   functionality.
7     BY MS. ALLOR:
8     Q   Do you understand what the term "MAC" means?
9     A   Yes.  You mean the acronym for medium access
10  control, yes.                    11:37:06
11    Q   Yes.
12        So what does MAC -- besides the acronym, what
13  does it actually mean?
14    A   I think I had a definition from one of the
15  dictionaries.  Let me find go find the paragraph for  11:37:21
16  you.
17        It's paragraph 46.  (As read):
18          "MAC functions relate to accessing
19        shared physical transmission medium by
20        network attached devices."            11:37:29
21    Q   So you rely on the dictionary definition for
22  that term?
23    A   I do.  To provide --
24    Q   Would a POSITA have an understanding of what
25  MAC means in the time period of the '775 patent?  11:37:47

24 (Pages 90 - 93)

Page 94

1    A  With respect to how I have described it in
2  Paragraph 46, I think a person of skill in the art
3  would understand at that level.
4    Q  Why did you choose the dictionary definition
5  for MAC that you included?                    11:38:17
6    A  Because I thought it was a fair description
7  of how I describe MAC functionality.
8    Q  I'm introducing as Exhibit 5 -- I'm
9  introducing Exhibit 5 for you, and this is Webster's
10 New World Computer Dictionary 10th Edition.  I      11:39:05
11 believe the date on it is 2003.
12    (Exhibit 5 was marked for
13    identification and is attached
14    hereto.)
15 BY MS. ALLOR:                                 11:39:11
16    Q  There is -- are you able to see that exhibit?
17    A  Yes, I downloaded.  I have it open.
18    Q  Okay.
19    If we turn --
20    MR. BENYACAR:  Wait.  I haven't.  Hold on.   11:39:19
21 I'm trying to get it.  I apologize.
22    Okay.
23    Sorry, go ahead.
24 BY MS. ALLOR:
25    Q  So here is a definition on Page 4 for the    11:39:33

Page 95

1  media access control, MAC.
2    Do you see that?
3    A  Yes.
4    Q  Is that acronym, media access control, is
5  that equivalent to the medium access control map you   11:39:48
6  included in your appendix?
7    A  Generally it is the same.
8    Q  So is that a fair definition for MAC?
9    A  Let me look.  The second sentence (as read):
10    "A protocol is needed to prevent          11:40:35
11    data collisions which occur when two
12    work stations begin broadcasting
13    simultaneously."
14    Whether or not that function needs to be
15  present or not depends on the protocol.       11:40:48
16    Q  Would a POSITA in the context of the
17  '775 patent have an understanding of what a MAC
18  processor is?
19    A  No.
20    Q  Why not?                                11:41:17
21    A  It's not a term of art, so it's unclear what
22  functions a MAC processor would have to perform.
23    Q  So how would a POSITA determine whether a
24  processor was able to perform the MAC functions
25  described in these two definitions, your definition   11:41:39

Page 96

1  and the one I provided to you?
2    A  I don't think they would be able to.
3    Q  So a POSITA wouldn't know how to implement
4  the functions described under MAC with a processor?
5    A  No.  That's not what my opinion is.  The     11:42:02
6  challenge in the '775 patent is it has a MAC
7  processor and a DOCSIS controller and it's not clear
8  how to divide functionality between those two
9  processors.
10    Your question kind of ignores the required    11:42:27
11  distinction of a DOCSIS MAC processor and a DOCSIS
12  controller in the invention and in the claims.
13    Q  And my question was not tied to the DOCSIS
14  MAC -- MAC processor or the DOCSIS controller.  It
15  was simply asking you about a MAC processor.        11:42:52
16    Would a POSITA understand what a MAC
17  processor is?
18    A  That's a term in the claims.  And as I said
19  and as it says in Paragraph 45, a DOCSIS MAC
20  processor doesn't have a plain and ordinary meaning.  11:43:16
21  So it's not clear what functions a DOCSIS MAC
22  processor would have to perform especially in the
23  context of understanding it versus a DOCSIS
24  controller.
25    Q  So if a processor was implementing the MAC   11:43:37

Page 97

1  functions, would a -- would it be reasonable for a
2  POSITA to refer to that as a MAC processor?
3    A  If a POSITA wanted to define a MAC processor
4  that way, then they could say that's the definition
5  that I'm using for a MAC processor.            11:44:12
6    Q  So if you saw the term "MAC processor," would
7  you understand that to be a processor that is
8  implementing MAC functions?
9    A  That's really just reordering the words of
10  the terms.  So it doesn't tell me what it is or what   11:44:46
11  it does, and that level of specificity is required
12  to understand what the scope of the claims are.
13    Q  Will you agree there can be different types
14  of processors that implement MAC functions for
15  things such as Ethernet or Wi-Fi?               11:45:21
16    A  Certainly theoretically you can have
17  different processors implement functionality
18  associated with one or more different kinds of data
19  link layer protocols.
20    Q  And you can have one processor that         11:45:49
21  implements MAC or Ethernet, and you can have one
22  processor that implements MAC or Wi-Fi; correct?
23    A  So then that characterization becomes vague
24  and it's that vagueness that becomes an issue when
25  you try and understand how those terms are used in   11:46:17

25 (Pages 94 - 97)

Page 98

1  the context of the '775 patent.
2      So designing a hypothetical system or
3  processor and saying, this is a processor that
4  implements the functionality required to communicate
5  via Ethernet, you're essentially saying what that     11:46:32
6  Ethernet processor is or does.
7      The problem in the patent becomes in
8  understanding the difference between a DOCSIS
9  controller and a DOCSIS MAC processor.
10   Q  Do you understand what a controller is?     11:46:55
11   A  It's one of those terms that depends on what
12  the context is as to what its specific meaning is.
13  So it depends on the context.
14   Q  So you don't know what a controller is?
15      MR. BENYACAR:  Object to the form.     11:47:16
16      THE DEPONENT:  That's not what I said.
17  BY MS. ALLOR:
18   Q  Well, you didn't answer my question of asking
19  you what a controller is?
20   A  I believe I did.     11:47:25
21   Q  You said it depends on context.  So can you
22  give me your understanding based on the '775 patent?
23   A  Sure.
24      The '775 patent doesn't say what a DOCSIS
25  controller is.  It identifies some exemplary     11:47:43

Page 99

1  functions but doesn't provide any guidance for
2  understanding four functions related to DOCSIS,
3  whether it's a DOCSIS controller function or a
4  DOCSIS MAC processor function.
5      In fact, it seems to suggest overlapping     11:48:07
6  functions across those two processors.
7   Q  So you added in DOCSIS controller.  I was
8  asking you:  What is your understanding of a
9  controller?
10   A  Sorry.  I thought you asked -- last question     11:48:23
11  asked in the context of the '775 patent.
12      Back to your original question as to what a
13  controller is, it's going to be the same answer I
14  gave you before.  It depends on what the context of
15  that term is.     11:48:37
16   Q  So is it your opinion that the only
17  controller discussed or described in the
18  specification of the '775 patent is a DOCSIS
19  controller?
20   A  It's my opinion that there's only the DOCSIS     11:48:51
21  controller Box 116 that uses that term in the
22  context of a label in Figure 1.  And I'm not sure if
23  it the specification calls anything else a
24  controller.
25   Q  So as a POSITA, you are being asked to put     11:49:11

Page 100

1  together a cable modem system with a controller.
2      What would you understand that controller to
3  be?
4   A  I would need clarification as to what kind of
5  controller you're asking about.     11:49:40
6   Q  What kind of controllers are out there?
7   A  There's all sorts of controllers.  I mean, it
8  depends, again, on the context.  Depends on what
9  functionality you would define for a controller.
10  There isn't some dictionary definition of a     11:50:05
11  controller for -- that applies in all contexts as it
12  relates to what particular functionality is
13  associated with that controller or not.
14      And, in fact, if you look at the
15  specification of the '775 patent, it describes an     11:50:27
16  open-ended set of functions for the DOCSIS
17  controller that overlap with functions that are
18  described for the DOCSIS MAC processor which -- that
19  creates the issue.
20   Q  Would you agree with me that a controller is     11:50:44
21  a device on which other devices rely for access to a
22  computer subsystem?
23   A  That seems like a pretty high-level
24  engineering definition.  It probably can apply in at
25  least some scenarios as to what a controller is.     11:51:24

Page 101

1   Q  So taking that definition of controller,
2  would you agree that a controller is not necessarily
3  a processor?
4   A  I think that question needs to be clearly
5  articulated.  Well, my understanding of that     11:51:56
6  question is you're not asking about a controller
7  that's in any way related to the '775 patent.
8      And then without that context, it's kind of a
9  vague hypothetical.  I'd have to give it some
10  thought, probably depends on what you would consider     11:52:16
11  a processor as opposed to an embedded circuit.  It
12  would -- depends.
13   Q  As a POSITA you don't understand whether a
14  controller can be a processor?
15   A  Your question is too vague to answer it one     11:52:48
16  way or another.  I could answer it if you gave me
17  more information, but as stated it is too vague to
18  answer.
19   Q  In context of claims of the '775 patent in
20  your opinion that you have given, is it fair to say     11:53:10
21  that it's your opinion that the DOCSIS MAC processor
22  and the DOCSIS controller has to be implemented on
23  separate processors?
24   A  So two things.  That's how the invention is
25  described at least in the specification.     11:53:47

26 (Pages 98 - 101)

Page 102

1      With respect to the requirements of the
2  claim, it's not clear how something different than
3  that, for example, a DOCSIS controller and a DOCSIS
4  MAC processor implemented on the same processor,
5  could meet the other requirements of Claims 18 and      11:54:16
6  19, for example, without the involvement portion of
7  the claim.
8      Q   So it's your opinion that Claim 18 requires
9  that the DOCSIS controller and the DOCSIS MAC
10  processor be implemented on separate processors?       11:54:44
11     A   That's not what I just answered.  That's not
12  my opinion.
13     Q   Well, I asked you if they could be
14  implemented on the same processor, and I believe
15  your answer was the specification and the claims say   11:55:09
16  they have to be on separate processors, right?
17     A   No.  That was not my full answer.
18     Q   Again, I'm asking:  Can they be implemented
19  on the same processors?
20     A   Then it would be the answer I gave you the      11:55:40
21  first time you asked that question.
22     Q   If you could turn to Column 2 of the
23  '775 patent, Lines 55 to 59 -- I'm sorry -- 58.  It
24  says (as read):
25         "Cable modem engine 110 implements             11:56:05

Page 103

1  the entire DOCSIS cable modem
2  functionality and is further divided
3  into three functional blocks:  DOCSIS
4  PHI layer 112, DOCSIS MAC processor
5  114, and DOCSIS controller 116."          11:56:21
6      What is your understanding of the functional
7  block of it being divided to three functional
8  blocks?
9      A   It's describing as one of the functional
10  blocks the DOCSIS MAC processor 114 and the DOCSIS    11:56:54
11  controller 116.  So those functional blocks are then
12  described as processor 114, which in Column 3 it
13  says (as read):
14         "In one implementation that
15  processor is in ARM9 TDMI RISC-based       11:57:12
16  processor."
17         And then with respect to the DOCSIS
18  controller, it describes that starting at Column 21.
19  And I'll not read the rest into it.
20         It says (as read):                  11:57:45
21         "In one implementation controller
22  116 is an ARM940-based RISC
23  processor."
24         And then it goes on from there.  So those
25  functional blocks are then defined in terms of the    11:57:57

Page 104

1  processors for each of block 114 and block 116.
2      The DOCSIS PHI layer 112 doesn't use the term
3  "processor" so we can review what the specification
4  then says about that aspect.
5      Q   Would a POSITA reading that passage          11:58:39
6  understand when it refers to three functional blocks
7  that it could be implemented on a single processor?
8      A   That's not how the invention is described.
9  So with respect to could you implement that
10  functionality in one processor and deviate from the   11:59:04
11  way the invention is described, possibly a person of
12  skill in the art would think that.
13     Q   And a POSITA would be familiar with blocked
14  diagrams that show these separate functions and
15  three separate blocks?                                11:59:36
16     A   Well, there's certainly the concept of
17  functional blocks and functions, you know,
18  potentially consistent with Figure 2.
19         And I think a person of skill in the art
20  would also be consistent -- would understand the      11:59:50
21  teachings of the '775 patent with respect to
22  describing the invention from the processor
23  perspective as conveyed both in Figure 1 and in
24  Column 3.
25     Q   Is it reasonable for a POSITA to interpret    12:00:08

Page 105

1  this portion of the specification as implementing
2  those three separate functional blocks in the same
3  physical hardware?
4      A   In the same physical hardware is vague.  It
5  depends on -- I mean, does physical hardware mean      12:00:40
6  the same form factor, the same overall cable modem?
7  Does it mean the same processor, the same board, the
8  same set of circuits?
9      That question is too vague to give you an
10  accurate answer.                                      12:00:59
11     Q   Would they read that passage and think that
12  all three functional blocks could be implemented in
13  a single processor?
14     A   It's hard to say what a person of skill in
15  the art would understand just based on looking at     12:01:14
16  that paragraph.
17      Understanding the specification as a whole, I
18  don't see where they would understand the invention
19  to be implementing the functional blocks as
20  described here of 114 and 116 with a single           12:01:36
21  processor.
22     Q   If you look at Column 4 of the '775 patent
23  Lines 13 to 19, it describes functional
24  partitioning.
25     A   Yes, I see that.                              12:01:56

27 (Pages 102 - 105)

Page 106

1    Q   And it says -- at Line 16 it says (as read):
2        "This is accomplished by localizing
3    data networking functions in the data
4    networking engine processor single and
5    localizing cable modem function in the        12:02:09
6    cable modem engine processor,"
7    single -- singular not plural.
8        Would you agree with that?
9    A   I think that's what it says.  But I don't
10   think the use of those words there are consistent    12:02:26
11   with how the invention is described or what's being
12   described in Figure 1 which is what that paragraph
13   is referring to.
14   Q   But you agree it does describe a possible
15   embodiment where there is a single processor for the   12:02:50
16   cable modem engine?
17   A   No.  That is not correct.  This isn't an
18   embodiment that separate from what's described for
19   cable modem 100.  So cable modem 100 is what this
20   paragraph is talking about.              12:03:06
21       I agree that for the data networking engine
22   it's described as having one processor, but with
23   respect to the cable modem engine, the cable modem
24   100 that's described in the invention is implemented
25   using two processors.              12:03:25

Page 107

1        I don't think that the use of the word
2    "processor" after "cable modem engine" at Line 19 is
3    supposed to be teaching there's yet some other
4    embodiment where the cable modem engine can be
5    implemented with one processor.         12:03:44
6        It's either a typo, or it's just referring to
7    the cable modem engine of the invention as described
8    in Figure 1.
9    Q   I think this passage is consistent with the
10   claim language which says at least one processor for   12:03:59
11   the cable modem engine, right?
12   A   I disagree that it's consistent with the
13   claim language because, again, as I testified, if
14   you had a -- just one processor, then it's not clear
15   how you would meet the requirements of the      12:04:16
16   limitation where packets are directed to the data
17   networking engine without the involvement of the
18   DOCSIS controller.
19       If the CME is implemented in one chip, then
20   every packet would be handled by the processor      12:04:36
21   implementing both DOCSIS controller and DOCSIS MAC
22   processor functionality, and so it wouldn't ever be
23   possible to forward packets directly to data network
24   engine without the involvement of the DOCSIS
25   controller.              12:04:58

Page 108

1        And that's --
2    Q   Do you think it's not -- I'm sorry.
3    A   Sorry.  That's part of what makes the claim
4    indefinite, and I suspect that if that is being
5    described as a viable option for the claim scope, or   12:05:09
6    if it's determined that that's a viable option for
7    the claim scope, there certainly is no written
8    description for how you could accomplish that
9    functionality without the involvement of the DOCSIS
10   controller if it's all in the same processor.      12:05:31
11   Q   Well, I think it describes it with the
12   heading right there, functional partitioning, which
13   means the functions are partitioned on a single
14   processor, wouldn't you agree?
15   A   No.  The functional partitioning that it's   12:05:51
16   describing is the functional partitioning between
17   the data network engine and the cable modem engine.
18   Q   But it's also referring to the ability to
19   functionally partition the functions that are part
20   of the cable modem engine?              12:06:10
21   A   I don't think it's saying that.
22   Q   I believe your opinion relating to the MAC
23   processor is that it has to be the ARM9 TDMI-based
24   RISC processor that's listed in the specification.
25       Is that -- is that fair?              12:06:56

Page 109

1    A   You have to point me to where I say that in
2    the declaration.  I don't believe that's what I say.
3    Q   I think in Paragraph 47, I'm testing you, you
4    describe how there are certain ARM processors
5    described in the specification.              12:08:14
6        Let me see if I -- so if you could turn
7    there.
8    A   Yes, I see those two paragraphs.  I don't
9    think they say what you say I said.
10   Q   Well, earlier when we were talking about the   12:08:39
11   ARM1, the ARM2, you pointed me to the specification
12   where you said that ARM2 was the ARM9 TDMI-based
13   RISC processor, and I believe you pointed to
14   Column 3 when you made that statement?
15   A   Right.              12:09:08
16       So I think what Paragraphs 47 and 50 say is,
17   I think, at least for processor 114, it is described
18   as an ARM processor.
19       As to the further detail, it's an ARM9
20   TDMI-based RISC processor.  That is under the      12:09:40
21   description where it says (as read):
22       "In one implementation."
23       So in one implementation it's an ARM9
24   TDMI-based RISC processor, but in the rest of the
25   specification, it says that it's an ARM processor.   12:10:02

28 (Pages 106 - 109)

Page 110

1  Q  Okay.
2      So it's not limited to that processor, is
3  what you were saying?
4      A  I don't think that it's -- at least in Claims
5  18 and 19, it's not limited to an ARM9 TDMI-based      12:10:18
6  RISC processor because that's described as an
7  embodiment, but it is more generally defined in the
8  invention as being an ARM processor.
9      MS. ALLOR:  Okay.
10      I think this might be a good time for a      12:10:39
11  break.
12      THE DEPONENT:  Okay.
13      THE VIDEOGRAPHER:  We're off the record.
14  12:10 p.m.
15      (Whereupon, at the hour of 12:10      12:11:49
16      p.m., a luncheon recess was taken,
17      the deposition to be resumed at
18      12:47 p.m.)
19
20
21
22
23
24
25

Page 111

1  Santa Barbara, California; Friday, April 28, 2023
2          12:47 p.m.
3
4      THE VIDEOGRAPHER:  On record.  12:47 p.m.
5
6          KEVIN ALMEROTH, PH.D.,
7      having been previously duly sworn,
8      was examined and testified as follows:
9
10          EXAMINATION (RESUMED)      12:47:12
11  BY MS. ALLOR:
12      Q  Welcome back, Dr. Almeroth.
13      Before we went on lunch, we were talking at
14  great detail about the '775 patent.  I just have a
15  couple more questions on that.      12:47:23
16      If you could look at Claim 18.
17      A  Okay.  Got it.
18      Q  So you see that the last element of Claim 18
19  is a data bus that connects the data networking
20  engine to the cable modem engine.      12:47:41
21      Do you see that?
22      A  I do.
23      Q  And earlier when we were talking about, you
24  know, your opinion that there has to be two
25  processors -- at least two processors in the cable      12:47:54

Page 112

1  modem engine, you were pointing me to Figure 1.
2      Is that fair?
3      A  I was saying that in -- in the invention as
4  described in Figure 1 there are two processors, ARM1
5  and ARM2 described.      12:48:17
6      Q  And it's your opinion that the fact that
7  there's a data bus between the cable modem engine
8  and the data networking engine, that's why it's
9  indefinite to you.
10      Is that -- is that fair?      12:48:29
11      MR. BENYACAR:  Object to the form.
12      THE DEPONENT:  No.  I don't think that
13  characterization is wholly accurate.
14  BY MS. ALLOR:
15      Q  If you look at Paragraph 79 of your opinion      12:49:12
16  in your declaration, it says -- it recites Claim 18
17  of the data bus element that we just talked about.
18  It says (as read):
19      "This limitation renders a claim
20      indefinite as the wherein clause is      12:49:27
21      incompatible, the requirement that a
22      data bus connects the DNE and the
23      CME."
24      A  Right.
25      Q  So is it the fact that there is a data bus      12:49:37

Page 113

1  present, that that is why you believe the claim is
2  indefinite?
3      A  The claim is indefinite for the -- the part
4  that you didn't read.  It's -- it's -- the wherein
5  clause is incompatible with the requirement that the      12:49:59
6  data bus connect the DNE and CME because of what the
7  applicant said during prosecution and identified the
8  data bus in Brooks as being one of the reasons why
9  there was no separation between the first circuit
10  and the second circuit.      12:50:20
11      Q  But you would agree that the claim described
12  the data bus and that Figure 1 shows the data bus?
13      A  The claims do require a data bus, and
14  Figure 1 does show a data bus, but in light of what
15  the applicant said during prosecution, I think that      12:50:51
16  the statements made during prosecution create a
17  significant problem for a person of skill in the art
18  to understand what the claims would actually cover.
19      Q  So it's your position that the data bus
20  connecting the cable modem engine, the data      12:51:16
21  networking engine result in them not being
22  completely partitioned?
23      A  It's my opinion that's what the applicant
24  said.  Actually, so to be clear, the completely
25  partitioned -- yes.  It's my opinion that that's      12:51:38

29 (Pages 110 - 113)

Page 114

1 what the applicant said during prosecution.
2      And so if that's correct, then that creates
3 an indefiniteness problem in the claims.
4   Q  So when you say that that's what the
5 applicant said, the applicant did not say that you    12:52:04
6 couldn't have a data bus.
7      The data bus was in the claim element, was it
8 not?
9   A  What the applicant said -- and probably the
10 most appropriate paragraph there is Paragraph 61 --    12:52:15
11 that the applicant identified what was part of 102
12 and 104, kind of what the analogous identified CME
13 and DNE were and said because they were sharing the
14 same data paths and sharing the same direct memory
15 access controller and then there's the parenthetical    12:52:53
16 that includes ASB 210, which in the Brooks figure
17 which is included on the next page, that ASB 210 is
18 the data bus, the applicant said, because there is
19 that shared data path between them, that Brooks
20 didn't disclose the claim.                12:53:25
21      So that seemed pretty clear to me as to what
22 the basis was for why Brooks was described by the
23 applicant as not meeting the limitation.
24   Q  Putting aside your opinion on the prosecution
25 history, is the claim on its own indefinite because    12:54:28

Page 115

1 there's a data bus connecting the cable modem engine
2 and the data networking engine?
3   A  First part is it's a little hard for me to
4 separate out and ignore the intrinsic record and
5 create a hypothetical where the intrinsic record is    12:55:11
6 not to be considered in understanding what a person
7 of skill in the art would understand about the
8 claims.
9      But in attempting to do so, the challenge
10 still becomes with respect to the wherein clause of    12:55:28
11 the data bus limitations where you have the cable
12 modem engine and the home networking functions of
13 the data networking engine being completely
14 partitioned and having separate circuits when how a
15 circuit is to be interpreted by a person of skill in    12:55:54
16 the art in the context of the '775 patent is not
17 reasonably clear.
18   Q  But isn't it your opinion -- and we've
19 discussed this a lot today -- that you can't tell me
20 what the meaning of circuit is with respect to the    12:56:13
21 '775 patent?
22      MR. BENYACAR:  Object to the form.  Misstates
23 testimony.
24      THE DEPONENT:  Yeah.  It's not about whether
25 or not there's a definition.  It's -- the    12:56:24

Page 116

1 definitions are all -- that it's a broad term and
2 you have to have some context for it.
3      I think the testimony revolves around there
4 being a lot of different levels, and if you
5 considered different possible levels, even some    12:56:36
6 introduced by Dr. Kramer, as additional levels, then
7 it makes the claim not reasonably understandable or
8 reasonably certain to a person of skill in the art.
9 BY MS. ALLOR:
10   Q  But you are aware the examiner never issued    12:57:16
11 any indefiniteness rejections, right?
12   A  I would have to go back and check.  I thought
13 there was an indefiniteness before the claims were
14 amended.  Maybe I'm misremembering.  But I think
15 the -- the prosecution history...            12:57:36
16   Q  Well, the examiner didn't issue an
17 indefiniteness rejection at the -- you know, after
18 the claims were amended and prior to allowance?
19   A  Right.  And I thought about that.  And I
20 think what happened is in terms of coming up with a    12:57:58
21 reason to traverse Brooks the applicant made
22 statements that distinguished the claims from Brooks
23 but there wasn't really a consideration of the
24 totality of the impact of those statements as it
25 relates to how a person of skill in the art would    12:58:21

Page 117

1 actually understand as to what the scope of the
2 claims -- the resulting scope of the claims would be
3 and that's, I think, in part when you do start to
4 think of the scope of the claims as understood by a
5 person of skill in the art, it becomes clear that    12:58:44
6 they are not reasonably certain because of what the
7 applicant said -- or at least one of the reasons.
8   Q  So if you look at your Paragraph 62 where you
9 reproduced Figure 2, Brooks.
10   A  Yes.                    12:59:28
11   Q  Is it your understanding that the examiner
12 mapped processor 1, which is No. 102, with a data
13 networking engine and processor 2, which is No. 104,
14 to the cable modem engine?
15   A  That is my recollection.  I'd have to go back    12:59:51
16 and double-check.  I think that's -- that's correct.
17 And then I think the applicant came back and said,
18 no, there's some additional things, components that
19 needed to be considered.  Those are in Paragraph 61.
20 So it's also blocks 114, 118, 224 and 228.        01:00:05
21   Q  So wasn't the real issue that the CMAC, which
22 is 224, that the examiner was attributing cable
23 modem engine functionality to both processor 2
24 No. 104, and the CMAC?
25   A  You know, I -- I don't think that is    01:00:47

30 (Pages 114 - 117)

Page 118

1 accurate.  More importantly, I think it's pretty
2 clear in that quote in Paragraph 61 -- and it's the
3 italicized portion -- it's what the applicant said.
4 So kind of -- I know there's been some statements
5 from Dr. Kramer about, well, the applicant was          01:01:10
6 uncertain what the examiner was saying and they are
7 a little bit hard to parse.
8        He's almost saying, like, I think the
9 applicant was thinking the examiner was thinking.
10        But ultimately the important point is when          01:01:25
11 the applicant identified what was part of the DNE
12 and the CME, it identified additional numbered parts
13 of the figure that's reproduced as being something
14 that shares the same data path and the same direct
15 memory access controller and pointed to the data          01:01:52
16 bus, ASB 210 and said that was an example where the
17 data paths between the CME and the DNE were shared.
18        And that's -- that pretty clear description
19 is what I think creates the indefiniteness problem
20 as it relates to the data bus portion of the claim.          01:02:23
21    Q    Did you look at the rest of the file history
22 and the rest of the arguments regarding Brooks?
23    A    Yes, I did.
24        And I even considered what Dr. Kramer said
25 about other portions of the file history and, you          01:03:10

Page 119

1 know, I've looked through each of the things that he
2 said about the file history.
3        And it ultimately doesn't change my opinion
4 with respect to what the applicant wrote and that
5 I've cited in Paragraph 61.          01:03:25
6    Q    So you don't think that the applicant
7 argument that the processor 1, No. 102, that handled
8 some cable modem function so you don't think that's
9 relevant at all?
10    A    No.  Didn't say that.          01:03:45
11    Q    So I'm going to turn to Paragraph 80 of your
12 declaration, the '690 patent, and let's add the '690
13 patent as an exhibit for you.
14        (Exhibit 6 was marked for
15        identification and is attached          01:04:17
16        hereto.)
17 BY MS. ALLOR:
18    Q    You should have Exhibit 6 now in your folder.
19    A    I have it downloaded and open.
20        It's on my phone.  I put it on.          01:04:57
21    Q    So when you prepared your declaration, with
22 respect to the '690 patent, what was the priority
23 date that you applied?
24    MR. BENYACAR:  I think you're on mute.
25    THE DEPONENT:  I assumed for purposes of the          01:05:27

Page 120

1 provisional -- the provisional was the earliest
2 priority date, December 15, 2008.
3    Q    And in Paragraph 80 you're quoting some lines
4 from -- from the '690 patent at Column 1, 48 to 63.
5        Do you see that?          01:05:56
6    A    I am.
7    Q    Is that -- is that language directed to the
8 '690 patent -- the invention of the '690 patent or
9 is it directed to prior art?
10    A    This particular sentence would apply to both.  01:06:35
11 The distinction becomes as the '690 patent would
12 allow for allow for is instead of using a fixed
13 predetermined probe that a dynamic probe can be
14 determined.
15    Q    And where are you reading that from?          01:07:12
16    A    So the first part of the answer with respect
17 to the idea that between nodes of the network that
18 probes are sent into predefined format, that's
19 applicable to both the prior art and the '690
20 patent.          01:07:31
21        With respect to what the '690 patent is
22 supposed to innovate on, that's at the bottom of
23 Column 1 where sending kind of a fixed predetermined
24 probe reduces the amount of the flexibility of the
25 characterization process.          01:07:57

Page 121

1        And so the summary of the invention would be
2 allow -- to create the ability to send a probe
3 pattern that's based on what the requirements of the
4 invention in the claim are.
5    Q    We should look at Claim 1 of the '690 patent.  01:08:31
6    A    Yes.
7    Q    Is it your position that Claim 1 requires a
8 receiving node to be the node that initially sends
9 the probe request?
10    A    Sorry.  Could you repeat that?          01:09:13
11    Q    So Claim 1 -- and also I'm looking at your
12 opinion in Paragraph 83.  So I'm trying to
13 understand what it is that your opinion is and
14 whether it's -- the fact that you believe Claim 1
15 requires that the receiving node be the node that          01:09:36
16 initially sends the probe requests.
17    A    So consistent with Figure 4 the thing that's
18 receiving the probe request is the first node, and
19 the first node would be the probe transmitter.
20        So it's receiving a request for a probe from   01:10:14
21 the probe receiver, and then it's going to determine
22 the second plurality of parameters and then generate
23 the probe and then transmit the probe.
24        I mean, that's kind of consistent with how
25 Figure 4 is describing the invention.          01:10:35

31 (Pages 118 - 121)

Page 122

1  Q  Where in the claim language does it say that
2  the requesting node is the same as the receiving
3  node?
4    A  I think maybe it would -- Figure 4 in the
5  context of Claim 1, so you said the receiving node.   01:11:29
6  So I'm assuming you're asking about receiving in a
7  first node.  Okay.
8       So that's -- the first node is receiving, and
9  then it says a probe request.  So there's a first
10  node that receives a probe request.       01:11:46
11      And I'll stop there.  The -- there's an idea
12  of -- the question of who's going to be transmitting
13  the probe request.  That's shown in Figure 4 is
14  coming from the probe receiver.
15      It doesn't say where the probe request is      01:12:11
16  coming from in Claim 1, but I think, based on
17  Figure 4 as to what the invention is and kind of the
18  goals of the invention and how it's described, it
19  would be understood that that probe request is
20  coming from the probe receiver.             01:12:31
21      And so the probe receiver is not the first
22  node.  It would be some other node.
23  Q  You use the word "requesting node" in your
24  Paragraph 83.  I didn't say that was in the claim
25  language at all.                     01:12:57

Page 123

1    A  Okay.
2    Q  So I was trying to understand your opinion in
3  83 and where in the claim language of number --
4  Claim 1, where do you see the requirement that the
5  receiving node be the node that initially sends the     01:13:13
6  probe requests?
7    MR. BENYACAR:  Objection; asked and answered.
8    THE DEPONENT:  Maybe I understand your
9  confusion.  In Paragraph 83 it says (as read):
10      "Wherein the receiving node."       01:13:36
11      And you're interpreting that to refer to
12  Limitation 1A that says receiving in a first node.
13  And that receiving node and receiving in a first
14  node are the same thing.  And that's -- that's not
15  the case.                      01:13:54
16      So to kind of use the terminology of Figure 4
17  and the claim in Paragraph 83, let me try and
18  resolve it.
19      So the way that this works is there's a probe
20  request that's sent from what's called the probe      01:14:09
21  receiver, and it's a little bit confusing because
22  you send -- send a request from a receiver.
23      But the idea is that the probe receiver tells
24  the probe transmitter, "Hey, this is a first
25  plurality of parameters," and the rest of the      01:14:26

Page 124

1  language.
2       The probe transmitter receives that,
3  generates the probe, and there's a second set of
4  parameters, and then sends the probe.
5       And now the probe receiver gets it, and using   01:14:41
6  the pattern it's received is able to tell something
7  about the communication path.
8       So the probe -- receiving in a first node is
9  actually the probe transmitter.  In Paragraph 83
10  when I said "wherein the receiving node," and it      01:14:58
11  says in parentheses, which can also be referred to
12  as the requesting node, that's the probe receiver.
13      So 1A is talking about the probe transmitter
14  as being the first node.  And I'm talking about in
15  the first sentence of 83, the probe receiver, the      01:15:16
16  thing that receives the probe.
17 BY MS. ALLOR:
18  Q  So with respect to Claim 1, receiving in a
19  first node, you're referring to that in your
20  Paragraph 83 as the receiving node; is that correct?   01:15:41
21  A  No.  No.
22  Q  You're referring to that as the problem
23  transmitter of Figure 4?
24  A  In the first sentence of 83, that's correct.
25  Q  So where in the claim language does it say      01:16:03

Page 125

1  that the second node, which is if we map that to
2  Figure 4, is, in your opinion, the probe receiver,
3  where does it say that the second node has to be the
4  same node that transmitted that initial request?
5    A  That's all the invention ever describes it      01:16:28
6  as.  That's the only thing that would make sense in
7  the context of the invention.
8  Q  If you look at specification at Column 7,
9  Lines 12 to 13, it says --
10  A  I did.                      01:16:57
11  Q  (As read):
12      "In other embodiments the probe
13      request might be transmitted by a
14      different probe than the probe
15      receiver."                   01:17:07
16      Do you see that?
17  A  On a different node but otherwise I think you
18  read it correctly, and I see it.
19  Q  So doesn't that say that it does not have to
20  be set up the way you just argued that Claim 1 is?   01:17:18
21  A  I see that embodiment with respect to who
22  does the transmitting of the probe request.
23      You are right.  It doesn't say that it has to
24  come from a second node.  It could come from a third
25  node.                        01:18:47

32 (Pages 122 - 125)

Page 126

1    There's no as of yet second or third node
2  identified in Claim 1.  That doesn't -- that's not
3  the point of the first sentence, though, I see your
4  point.
5    Q  Okay.                    01:19:01
6        And, in fact, dependent Claim 6 actually adds
7  that requirement, that probe request be generated by
8  the second node.
9        So would you agree with me that claim
10 differentiation means that the dependent claim has   01:19:15
11 to add something to the independent claim, and so
12 the probe request does not need to be generated by
13 the second node in Claim 1?
14   A  I see that I'd have to look at claim
15 differentiation in Claim 6.  I haven't looked at it   01:19:37
16 so far.
17       I'd have to give it a little bit more
18 thought, but that seems right as least with respect
19 to who can generate the probe request.
20   Q  So if we look at the rest of your      01:19:56
21 Paragraph 83, you say that both Claims 1 and 9
22 require a first plurality of parameters and a second
23 plurality of parameters.
24       Do you see that?
25   A  I see that.                 01:20:15

Page 127

1    Q  In your --
2    A  Let me back up.
3        Can you repeat the question?  Because I'm
4  trying to -- I just want to double-check the
5  language you used in your question.       01:20:37
6    Q  So in your Paragraph 83, you say that Claims
7  1 and 9 require or have a first plurality of
8  parameters and a second plurality of parameters.
9        Do you see that?
10   A  I see that.                 01:21:04
11   Q  And if we look at Claims 1 and Claim 9, we
12 see the language showing up in both of them, a first
13 plurality of parameters and a second plurality of
14 parameters.
15       Is that fair?              01:21:23
16   A  Yes.
17   Q  So my question is, is it your understanding
18 that Claims 1 and in Claims 9 that the first
19 plurality of parameters are specified in the probe
20 requests?                    01:21:38
21   A  That's what it says, a probe request
22 specifying the first plurality of parameters at
23 least in Claim 1.  I think there's something similar
24 in Claim 9, the probe request specifying a first
25 plurality of probe parameters for a physical layer   01:21:59

Page 128

1  probe.
2    Q  And then you would agree that the claim
3  language specifies or states that the second
4  plurality of parameters are determined, for example,
5  in the node that generates the probe?       01:22:25
6    A  I know Claim 9 explicitly says (as read):
7        "The second plurality of parameters
8        are determined by the second node."
9        That's at the very end of the claim.  In
10 Claim 1 it doesn't say what determines a second   01:22:58
11 plurality of parameters associated with generation
12 and transmission of the probe.
13       It could be, for example, the second node.  I
14 think -- that's not shown -- I don't think that's
15 discussed in the specification, to my recollection.   01:23:27
16 I don't think there's much of a discussion of the
17 second plurality of parameters.
18   Q  We can just focus on Claim 9 then because my
19 question is, what is the difference between
20 specifying the parameters with respect to the first   01:23:53
21 plurality and determining the parameters with
22 respect to the second plurality?
23   A  I'm not sure I can articulate a difference
24 between the two.  I think in the way in which they
25 are used provides some guidance so the probe request   01:24:19

Page 129

1  has to specify.
2        So the probe request would, for example, be a
3  message, and so that would have to specify in the
4  message.
5        The determining would be more about creating   01:24:31
6  those second plurality of parameters, determining
7  what they are.
8    Q  So if we go back to look at Claim 1 there it
9  uses the language dictated by the first plurality of
10 parameters.                   01:25:17
11       Do you see that?  Wherein the form -- wherein
12 the probe has a form dictated by the first plurality
13 of parameters?
14   A  Yes.
15   Q  And if we look at Claim 9, it says (as read):   01:25:30
16       "Wherein the probe is generated in
17       accordance with the first plurality of
18       parameters" -- oh, sorry.  I meant to
19       read (as read):
20       "Comprising a form for the probe."     01:25:48
21       So I want to compare in Claim 1 wherein the
22 probe has a form dictated by the first plurality of
23 parameters to Claim 9 where it says (as read):
24       "The first plurality of probe
25       parameters comprising a form for the   01:26:10

33 (Pages 126 - 129)

Page 130

1    probe."
2        And my question is, what is the difference in
3    the claim language there?
4    A  I'm not sure what you're asking.  I mean, I
5    see that -- the different words.        01:26:27
6        If you're asking me to compare and contrast
7    the claim scope between the two of those, I'm not
8    sure how you would want me to do that even if that's
9    what you're asking.
10       So maybe you have to provide a better worded  01:26:48
11   question.
12   Q  Well, in Paragraph 84 you -- you make the
13   statement that those are similar.
14       And my question is, how are they similar and
15   if they -- if it is your opinion that they are  01:27:01
16   similar, I want to understand how come you think
17   they are similar?
18   A  The claims -- they are similar.  The claims
19   appear to both cover the form of the probe being
20   determined only by the parameters sent by the  01:27:32
21   requesting node, by what's included in the first
22   plurality of parameters.
23   Q  In your opinion, there's no difference in
24   those phrases?
25   A  I didn't say there were any differences.  You  01:27:59

Page 131

1    asked about the similarities.
2        I identified -- that sentence is identifying
3    the similarities that doesn't lead to a conclusion
4    that there's no differences.
5    Q  How would you determine the term "parameter"  01:28:10
6    from the prospective of a POSITA?
7    A  I don't have a particular dictionary
8    definition that I've offered.  I believe there are
9    some examples of what parameters would be in the
10   patent.                                01:28:41
11       I think it's around Column 2 about Lines 10.
12   It talks about what parameters can include.
13   Q  Are there other kinds of parameters besides
14   those listed in Column 2?
15   A  There could be as long as they meet the  01:29:12
16   requirements of -- of both what the claims require,
17   right?  It does -- in Column 2, it says (as read):
18       "Accordingly the probe request
19       specifies a plurality of parameters
20       associated with the generation and  01:29:35
21       transmission of a probe, including the
22       content of the payload of the probe."
23       And then it goes on to say -- in one
24   embodiment it talks about what some of those
25   examples would be.  So I think consistent with the  01:29:48

Page 132

1    way the patent talks about what the parameters would
2    be, that would define how that term is used in the
3    claims.
4    Q  Is there information that's included in the
5    creation of the probe so in the message that's being  01:30:17
6    sent besides just the parameters?
7    A  That question is vague with respect to in the
8    creation of the probe.
9    Q  Well, I believe you said that the parameters
10   are specified in the probe request.  Is there other  01:30:43
11   information that's included in that probe request?
12   A  I don't understand the question as to whether
13   or not you're asking whether or not there could be a
14   hypothetical system where there are messages that
15   include additional information in the probe request  01:31:04
16   or whether or not the claims require it, allow for
17   it.
18       Your question is not specific.
19   Q  So you pointed me to some parameters in
20   Column 2, and I'm just asking if there's other  01:31:23
21   information that could be transmitted in the probe
22   request besides the parameters that are described
23   there.
24   A  That question does not resolve the ambiguity
25   I had with the previous question.        01:31:38

Page 133

1    Q  In the context of a CMTS and a cable modem,
2    wouldn't you agree that the purpose of the probe is
3    to communicate information and measurements from the
4    cable modem back to the CMTS?
5    A  No.                              01:32:05
6    Q  So what is the purpose of the probe?
7    A  Well, the probe is what would get sent from
8    the CMTS to the cable modem, I think, consistent
9    with the DOCSIS describes a probe.
10       So that would have -- whatever the particular  01:32:34
11   pattern that would be identified in the probe, cable
12   modem would receive that and could potentially
13   generate some results based on having received that
14   probe.
15       But I think what you described in your  01:32:51
16   question was something different than what the probe
17   would be.
18   Q  What information is being transmitted from
19   the cable modem to the CMTS?
20   A  Again, your question is vague with respect to  01:33:15
21   what it says in the specification, what the claims
22   require, what's identified in DOCSIS in some accused
23   system, some hypothetical system.
24       Your question doesn't provide any context.
25   Q  So as a POSITA you can't explain to me what  01:33:29

34 (Pages 130 - 133)

Page 134

1 information is being sent back from the cable modem?
2     MR. BENYACAR:  Object to the form.
3     THE DEPONENT:  It would be the same answer.
4 I could if you told me information sufficient to
5 answer the question.          01:33:47
6 BY MS. ALLOR:
7   Q   So isn't it true that the node that receives
8 the probe request, that that node is what's
9 determining the information to include in the probe?
10   A   Your -- again, your question isn't really      01:34:26
11 specific to -- you're talking about the patent, the
12 claim. I can assume one or you can tell me which
13 one.
14   Q   Well, if you look at Claim 1, it says (as
15 read):          01:34:46
16     "Receiving in the first node a
17     probe request."
18     And so my question is in that first node
19 that's receiving the probe request, it is then
20 specifying the responsive information and      01:35:05
21 measurements that it's going to include in the
22 transmission of a probe.
23     Is that correct?
24   A   No.
25   Q   Okay.          01:35:20

Page 135

1     Why not?
2   A   You said, information and measurements?
3 That's -- that's not what would go into a probe.
4     It's not what -- the specification describes,
5 for example, in Figure 4, generating -- (as read):      01:35:45
6     "Generate probe according to
7     specified parameters."
8     And then transmitting the generated probe
9 signal. That's not information and measurements.
10     Information is vague, but consistent with, I      01:35:57
11 think, how you started the discussion of this whole
12 patent, that's supposed to be whatever sequence of
13 information that's been created.
14     So instead of a predetermined probe, it's now
15 a probe whose form is determined -- well, then the      01:36:17
16 claim says it's supposed to be dictated by the first
17 plurality of parameters, and that creates the
18 indefinite issue in Claim 1 and Claim 9 because that
19 form is actually determined by the first and second
20 plurality of parameters.          01:36:41
21     So it's not information and
22 measurement -- measurements.
23   Q   It's a plurality of parameters, parameters
24 being the described in the specification.
25   A   There's multiple pluralities of parameters      01:37:04

Page 136

1 described in the claims and in this specification.
2 Well, there's at least the first plurality of
3 parameters that's described in the specification.
4 The claims have two pluralities.
5   Q   I'm introducing as Exhibit 7 the '682 patent.   01:37:18
6     (Exhibit 7 was marked for
7     identification and is attached
8     hereto.)
9 BY MS. ALLOR:
10   Q   Let me know when you have it.          01:38:21
11   A   I have downloaded it and I have it open.
12 Exhibit 7.
13   Q   Okay.
14     Great. The portion of your declaration that
15 addresses the '682 patent, it starts with          01:38:38
16 Paragraph 85.
17     Do you see that?
18   A   Yes.
19   Q   When you were preparing your declaration,
20 what priority date did you assume for the '682      01:38:48
21 patent?
22   A   For purposes of evaluating this patent, I
23 assumed it was the earliest provisional that was
24 filed.
25     I believe it's July 23, 2012, and just to be   01:39:05

Page 137

1 clear, that's the assumption I made.
2     I didn't do any analysis to determine if --
3 the provisional support, the priority date, et
4 cetera.
5   Q   That's -- that's fine. I mean, I'm just      01:39:22
6 asking because you don't have a date listed
7 anywhere.
8     So I was just trying to get your
9 understanding of what time your opinions are based
10 in.          01:39:29
11   A   Understood.
12   Q   So if you could turn to Paragraph 90 of your
13 declaration.
14   A   Okay.
15   Q   So here you've annotated Figure 2B?          01:39:47
16   A   Yes.
17   Q   Why have you labeled each step of this graph
18 as an individual cable modem?
19   A   So the reason for that is at -- by
20 Paragraph 90 we now have this hypothetical service      01:40:08
21 group.
22     So we've gone through the limitations of
23 Claim 1 where the CMTS has assigned each cable modem
24 among a plurality of service groups.
25     So now what I'm trying to describe is this      01:40:27

35 (Pages 134 - 137)

Page 138

1 composite worst case S&R profile.
2     And so that composite worst case S&R profile
3 is for each of the cable modems in this hypothetical
4 service group and for each of the sub-frequencies
5 that are identified, there is going to be a worst     01:40:47
6 case S&R value among the members of the service
7 group.
8     And so the reason why you look at the worst
9 case S&R profile or the worst case S&R at each of
10 the frequency sub-bands is to understand among the     01:41:11
11 service group what the worst case S&R is.
12     And so the -- the labeled version of 2B shows
13 that the composite at each of the sub-frequencies is
14 to pick among the S&R values at each sub-frequency
15 what's the worst case S&R.     01:41:38
16     And so the reason that kind of description is
17 contained in Paragraph 90, the sentence that
18 transitions from Page 40 to 41 says I've annotated
19 that figure to show those particular examples.
20     And so CMA has the worst -- sorry, CMA, cable     01:42:02
21 modem A, has the worst S&R at sub-carriers 2, 5 and
22 7. CMB is at sub-carrier 1. And then, et cetera.
23     And then that's kind of the modified version
24 of 2B that's shown after Paragraph 90.
25   Q   Okay.     01:42:26

Page 139

1     I believe you said that this is the composite
2 worst case S&R for each of these cable modems?
3     Is that -- that what you said?
4   A   No.
5   Q   You said (as read):     01:42:50
6     "And so that -- the composite worst
7     case S&R profile is -- these are the
8     cable modems in this hypothetical
9     where -- at the sub-frequencies you're
10     identifying."     01:43:04
11   A   Right. That last part you didn't add.
12     So the composite is a combination, and so at
13 each sub-frequency, you look at the S&R values from
14 each of the five cable modems in the hypothetical
15 service group, and you pick the worst case S&R     01:43:18
16 value.
17     And that becomes the worst case S&R value for
18 that particular sub-frequency.
19     And the profile then is the worst case S&R
20 value at each of the sub-frequencies and the     01:43:38
21 composite is for the collection of the five cable
22 modems as measured across the five cable modems in
23 the hypothetical service group.
24   Q   So are you saying that -- so the figure that
25 you have there shows -- if I start at the top of the   01:44:08

Page 140

1 left corner, you have CMB. So is that cable modem
2 B?
3   A   Yes.
4   Q   And then we move down, and we've got cable
5 modem A --     01:44:18
6   A   Yes.
7   Q   -- at sub 2.
8     So my question is, you show cable modem A
9 three times.
10   A   Right.     01:44:30
11   Q   So are those -- are those -- are you
12 identifying what's the worst case -- or, sorry,
13 what's the worst cable modem at each step?
14   A   So the worst case S&R among the set of five
15 cable modems at each step.     01:44:49
16   Q   Okay.
17     So if -- if our service group was cable modem
18 A, B, C, D, E, you're saying at sub-frequency 1,
19 cable modem B has got the worst S&R. At
20 sub-frequency 2, cable modem A has the worst case     01:45:07
21 S&R?
22   A   That's correct. That would be the composite
23 worst case S&R value for each sub-frequency. So
24 when you do all of the sub-frequencies together,
25 that makes a profile.     01:45:32

Page 141

1   Q   Okay.
2     I think I understand what you are saying.
3     So if we turn to Paragraph 94, the first --
4 the first sentence -- well, sorry, the second
5 sentence, you said (as read):     01:45:52
6     "Since the worst case S&R is always
7     an S&R of zero, a POSITA seeing the
8     term "worst case S&R profile" would
9     likely assume" -- "well, would most
10     likely assume and is an S&R profile     01:46:05
11     containing only zeros."
12     Do you see that?
13   A   I do.
14   Q   So where did you get your opinion that the
15 worst case S&R is always an S&R of zero?     01:46:14
16   A   So this is on the point that a worst case S&R
17 profile without understanding what that means in the
18 context of the invention and what the set of values
19 are that this -- claims in the patent describes as
20 being the basis for selecting the worst case S&R     01:46:38
21 profile to build a composite, just saying you have a
22 worst case S&R profile.
23     It would be a -- the worst case for
24 signal-to-noise ratio is a zero signal, so a zero.
25     The point of this paragraph is to show that     01:47:00

36 (Pages 138 - 141)

Page 142

1 what this is really referring to when you talk about
2 a worst case S&R profile is there has to be a set of
3 S&R values or -- for one sub-frequency or an S&R
4 profile across multiple frequencies against which
5 you have to pick the worst case.                01:47:23
6      So it's like saying if I had five
7 number -- if I said, what's the lowest possible
8 number, you would say, well, it's zero, assuming
9 non-negative numbers.  So it's always going to be
10 zero.                01:47:39
11      If I said, what's the -- the lowest value
12 among 2, 3, 8, 7, and 10, you would say, oh, okay,
13 well, in that sense it's 2.  It's the lowest value
14 among that set of values.
15      So the point I'm making in the first couple    01:47:52
16 of sentences of Paragraph 94 is this term doesn't
17 have a plain and ordinary meaning because if -- if
18 you look at the plain and ordinary meaning, it's
19 always going to be zero.  You have to look at what
20 the claim in the specification says when it refers    01:48:09
21 to a worst case S&R profile.
22      And so it's referring to the composite worst
23 case S&R profile, the composite being the
24 combination of those values in the set to make the
25 value meaningful.                01:48:25

Page 143

1 Q  If I look at Figure 2B, isn't it true that
2 Line 224 is the minimums and that's not set at zero?
3      A  So 224 is described once, so that's saying
4 the S&R needed for receiving the message 202 may be
5 the Line 224.  So in order to determine what 224 is,    01:49:41
6 it has to be less than all of the values at 222.
7      And that's -- that's not actually a worst
8 case value if it's -- even if you're asking about
9 the worst case to be able to successfully transmit,
10 that's a worst case -- I mean, it would depend on    01:50:26
11 the sub-frequency.  It would actually be just below
12 each of those sub-frequencies which would be what's
13 described in the next figure, Figure 2C, as the
14 solid line, 226.
15      There's also a difference in the line at 224    01:50:52
16 where it looks to be taking a worst case value of
17 all of the sub-frequencies and identifying something
18 below that for all of the sub-frequencies.  So if
19 you compared 224 to 226.
20      So that's -- 224 is something different than    01:51:21
21 226.
22 Q  Well, wouldn't you agree that if the signal
23 ratio, the S&R was a zero, you wouldn't be able to
24 receive and accurately measure the S&R profile?
25      A  You wouldn't be able to do much with an S&R    01:51:47

Page 144

1 of zero, which is why just saying a worst case S&R
2 profile, a person of skill in the art, seeing that
3 term in the claim, would look to the specification
4 to understand what it means by a worst case S&R
5 profile, and what the specification described is    01:52:05
6 when you have a worst case, in the context of an S&R
7 profile, it's talking about a composite worst case.
8      You're figuring out the lowest value among
9 the set of values.  If you don't have the context
10 for the set of values, then it's just going to be    01:52:24
11 zero.  It's back to my example of what's the
12 smallest number possible.
13      Without -- it finding a set of values over
14 which to evaluate that condition, it's just going to
15 be zero.  So I think your question goes to why it    01:52:37
16 has to be something other than just zero, and I
17 agree, I think a person of ordinary skill in the art
18 would accept that and look to understand what the
19 patent means when it says a worst case S&R profile,
20 and that would be the composite.                01:53:01
21 Q  Right.
22      But if there was a cable modem in the service
23 group that was at zero, and they set the composite
24 at zero, that cable modem would not be receiving and
25 transmitting -- I'm sorry, receiving and accurately    01:53:29

Page 145

1 measuring S&R.
2      A  That's an interesting hypothetical.  If you
3 had a cable modem with an S&R of zero, it logically
4 would not be in the service group.  I mean, the
5 whole point of what the patent is describing here is    01:53:40
6 for each service group being able to identify a
7 worst case S&R sufficient to meet all the
8 requirements of the cable modems in the service
9 group.
10 Q  I know we have been talking about S&R.  Just    01:54:16
11 for clarity's sake, what does S&R mean to you?
12      A  It stands for signal-to-noise ratio.
13 Q  What is the noise part of the S&R?
14      A  It's usually the noise that's introduced on a
15 channel, can come from a variety of sources,    01:54:31
16 interference, cross-talk, signal fade, those kinds
17 of things.
18 Q  Is there such thing as harmonic noise in a
19 cable communications system?
20      A  I would have to double-check.  I think there    01:54:46
21 can be a variety of sources of noise in a cable TV
22 system.  I don't have the set of noise sources
23 memorized.
24 Q  Have you heard of first noise?
25 A  Yes.                01:55:02

37 (Pages 142 - 145)

Page 146

1    Q   And what about electromagnetic interference
2  noise?
3    A   I did mention interference as a source of
4  noise already.
5    Q   Okay.                           01:55:18
6    A   It depends on the system whether or not those
7  are the kinds of noises -- noise sources that you
8  are trying to adjust for.
9    Q   So you are not sure if the '682 patent is
10  describing measurements of those types of noises?   01:55:36
11    A   Tying it back to the '682 and what the '682
12  patent covers, I don't have the list of noise
13  sources contemplated in the invention and according
14  to the claims memorized.  I would have to go through
15  and see if there are certain noise sources that are   01:55:57
16  included or excluded based on what it says.  That's
17  not an analysis I've yet done.
18    Q   And how is S&R measured?
19    A   It depends on the system.
20    Q   Do you know how it's measured with respect to   01:56:33
21  the system described in the '682 patent?
22    A   I don't know that the system of the '682
23  patent describes a particular way.  I'd have to go
24  back and check the specification.  It's not a
25  question I tried to answer, so maybe there are   01:56:52

Page 147

1  limits within the invention or in the claims, but
2  I'd have to look and see.
3    Q   Why don't we take a short break?
4    MR. BENYACAR:  Okay.
5    THE VIDEOGRAPHER:  Going off record at   01:57:16
6  1:57 p.m.
7    (Recess.)
8    THE VIDEOGRAPHER:  We're back on record.
9  2:09 p.m.
10  BY MS. ALLOR:                          02:09:57
11    Q   Dr. Almeroth, before we breaked (sic), we
12  were talking about measuring S&R.
13    Do you have an example of a system that's
14  used to measure S&R?
15    A   I remember a paper that we worked on.  It was   02:10:11
16  more in the wireless context than cable TV.  At
17  least in that context, when we were sending signals
18  over the air, we would compare probe requests and
19  particular patterns of bits that were sent to what
20  was received, and we'd have to do it kind of at the   02:10:47
21  physical layer for the signal itself to be able to
22  try and determine the difference between what was
23  transmitted and what was actually received in our
24  case to try and develop the noise profile so that we
25  could make determinations about the status of the --   02:11:06

Page 148

1  in that case, again, wireless channel.
2    Q   What does the phrase "S&R metric" mean to you
3  as a POSITA?
4    A   I think there's a discussion of S&R metric
5  versus profile.  I don't think an S&R metric has a   02:11:33
6  specific meaning to a person of skill in the art,
7  but with respect to how that term is used in the
8  '682 claims, I believe there's a discussion about
9  the similarity between metric and profile, and I
10  think that there's a citation that points to   02:12:01
11  essentially where they are used interchangeably.
12    Q   If we look at Claim 1 on the '682 patent.
13    A   I'm there.
14    Q   So it says (as read):
15    "Generating -- generating by the   02:12:31
16    CMTS for each one of said plurality of
17    service groups a composite S&R-related
18    metric based at least in part on a
19    worst case S&R profile of said S&R
20    related metrics corresponding to said   02:12:49
21    one of said plurality of service
22    groups."
23    Do you see that?
24    A   I do.
25    Q   I believe this is the element that is in your   02:12:59

Page 149

1  opinion that you say this element is the reason
2  that, you know, the claim is indefinite.  I think he
3  points you to a few other things as well.
4    But focusing on this element, I think one of
5  your positions is that the composite S&R-related   02:13:14
6  metric is the same as the worst case S&R profile; is
7  that accurate?
8    A   I mean, that's close.  When trying to
9  understand what the worst case S&R profile is, you
10  have to look at -- that's the part that says, well,   02:13:36
11  that's actually a composite worst case S&R profile
12  for the reasons that I think we talked about in
13  Paragraph 94.
14    Then with respect to a composite S&R related
15  metric, the first kind of analysis is looking at   02:13:54
16  what a metric is versus a profile.  That's the first
17  part of 95.
18    And then if it's a composite S&R-related
19  profile, the composite that the patent described is
20  a composite of the worst case.               02:14:10
21    And I know Dr. Kramer said, oh, well, it
22  could be the best case or some other case.  But
23  that's -- that doesn't make any sense in the context
24  of the invention or what's described specifically as
25  the invention.  You are looking for the worst case.   02:14:26

38 (Pages 146 - 149)

Page 150

1  So when you understand that the composite
2  S&R-related metric based at least in part on worst
3  case S&R profile, would mean to a person of skill in
4  the art that you are talking about a composite worst
5  case S&R-related profile be based on the same thing,   02:14:43
6  that's part of -- that's the first argument as it
7  relates to this limitation and indefiniteness.
8       The second is also in that limitation as it
9  relates to an antecedent basis point, and that's in
10 Paragraph 97.                        02:15:02
11  Q  So I think you're inserting the word
12 "composite" -- or sorry -- yeah, "composite into the
13 claim term worst case S&R profiles.  And I'm not
14 sure where you're getting that from.  So maybe you
15 could explain to me why your calling the composite   02:15:18
16 the worst case composite S&R profile?
17  A  It's -- I'm saying the worst case S&R profile
18 doesn't have a meaning in the art.  This is all in
19 Paragraph 94.
20       And I think it's where you started, but I'll   02:15:36
21 try and re-describe it again.  I'll summarize, and
22 you can look to Paragraph 94 for details.
23       It doesn't have a plain and ordinary meaning
24 to the extent that you do -- that you do look at it.
25 Then there's no context for it, that it would just   02:15:51

Page 151

1  be zero.
2       So you have to look at -- you're really
3  trying to figure out as a worst case among a set of
4  values.  Otherwise, if you have no values, it would
5  all be zero; right?                  02:16:05
6       And I gave you an example of no set of values
7  at zero, and then the other case you look at numbers
8  like 3, 4, 5 and 10.  It would be the worst case, so
9  it will be 3.
10       So when a person of skill in the art, reading   02:16:18
11 that portion of the limitations sees worst case S&R
12 profile, the specification supports that it's
13 actually talking about a composite worst case S&R
14 profile.
15       So that's why I believe that's what a person   02:16:33
16 of skill in the art would understand it to mean.
17 Moreover, the language itself says a worst case S&R
18 profile of said S&R-related metrics corresponding to
19 set 1 of said one service groups.  So setting aside
20 the antecedent basis, it says that it's a composite   02:16:52
21 of the S&R-related metrics for at least one of the
22 groups.  And so it's saying it's a composite value
23 based on the worst case that following S&R profile.
24  Q  And you would agree with me that the claim
25 language says that the composite S&R-related metric   02:17:14

Page 152

1  is only based in part on a worst case S&R profile.
2  So there -- it could be based on something else as
3  well.
4       Would you agree with that?
5    A  I see the language of the claim.  When you   02:17:27
6  look at what it actually means, it's not saying what
7  else it's based on.  But the idea that something is
8  based at least in part on itself and then being
9  open-ended creates the no reasonable certainty that,
10 I think, creates the first indefiniteness problem.   02:17:57
11 In addition to not being able to describe how
12 something is based on itself would make any sense in
13 the context of the claim.
14  Q  Well, I don't agree with your statement that
15 it's based on itself because if you turn to Column 4   02:18:11
16 and you look at, you know, from Lines 40 down, it's
17 discussing S&R profiles, and it's also discussing a
18 composite S&R profile as a different component.
19       There's a different item that it determines.
20       And so I would disagree, and I would ask you   02:18:40
21 to point me to where you -- in the specification
22 where you find support that the worst case S&R
23 profile has to be the composite S&R profile?
24  A  So, I mean, look at the claim language
25 itself.  You're ignoring the prepositional phrase   02:19:00

Page 153

1  that comes after it.  It's worst case S&R profile of
2  said S&R-related metrics.
3       And said S&R-related metrics are metrics that
4  are collected from the cable modem.  So it's a worst
5  case profile of that set.            02:19:18
6       In the context of the specification, that's
7  the composite worst case S&R profile.  Moreover, if
8  you are saying that you are going to just use a
9  worst case S&R profile and you want to ignore the
10 rest of the claim language, a worst case S&R profile   02:19:39
11 is always zero.
12       So you -- in order to consider something
13 that's meaningful in the context of the claim for
14 what a worst case S&R profile of said S&R-related
15 metrics would be, it's a composite.  You're looking   02:19:56
16 at the worst case, and it's a profile so the worst
17 case among the set of cable modems at each
18 sub-frequency.
19       That is exactly described in the
20 specification as a composite worst case S&R profile.   02:20:12
21 So to suggest -- I mean, if there's -- if you are
22 saying it's something else -- there's just nothing
23 else that's described in this specification.  You
24 have pointed to Column 4, I think it was, around
25 Line 40.  And that's going through and saying, okay,   02:20:34

39 (Pages 150 - 153)

Page 154

1 first of all, you generate a S&R-related metric for
2 each cable modem, and now that you have that, you
3 assign the cable modems to a corresponding -- to a
4 service group. So now that they are in the service
5 group, you have the set of modems and you want to          02:21:01
6 build a worst case -- composite worst case S&R
7 profile, which is kind of the first profile because
8 it's all sub-frequencies.
9       It's a composite because your taking the
10 worst case for each cable modem in the service group   02:21:17
11 at each sub-frequency. It's a worst case as opposed
12 to any other case because you're trying to establish
13 the minimum required transmission parameters so that
14 you can reach all of the cable modems without
15 significant error in that group.                         02:21:40
16      So, I mean, this goes to kind of the second
17 part why it has to be a worst case as opposed to a
18 best case or some alternative. It's really the only
19 interpretation that makes any sense in the context
20 of the invention as it's described in the              02:21:54
21 specification.
22   Q  So, again, I would point you back to the
23 claim language and say that the claim language
24 itself says that the composite S&R-related metric is
25 based at least in part, not -- not wholly on worst      02:22:13

Page 155

1 case S&R profile.
2       So, again, I guess I'm not seeing how you're
3 making these two equivalent when the specification
4 discusses them separately, and the claim itself says
5 it's only based in part on that worst case S&R?        02:22:31
6   A  No, the reason why they're the same thing is
7 not based on language. It's by looking
8 at what the term worst case S&R profile and said S&R
9 related metrics means to a person of skill in the
10 art in the context of the specification.               02:22:51
11      That's Step 1, and that's in Paragraph 94.
12 That worst case S&R profile, when you work through
13 the analysis included in 94, and you look through
14 the specification, that is actually describing a
15 composite worst case S&R profile.                      02:23:09
16      And the reasons for that are in Paragraph 94.
17 Okay.
18      So now turning to the term "composite S&R
19 related metric" there's two steps there. One is
20 what's a metric as opposed to a profile?               02:23:23
21      Does the claim make any sense if you're
22 looking at a metric versus a profile? And that's
23 the first part of Paragraph 95 where it's really
24 using -- that the metric is a profile, and there's a
25 cite to that in the specification.                     02:23:39

Page 156

1       And so what it's really talking about is a
2 composite S&R-related profile. Now, the next
3 question is, well, a composite of what S&R-related
4 profiles, and you turn back to the specification to
5 understand what it is saying and the composite       02:24:01
6 S&R-related profiles that are described are where
7 you are talking a composite of the worst case.
8       And I know Dr. Kramer said, oh, well, it
9 doesn't say worst case so it could be best case
10 or -- or any other kind of case.                       02:24:16
11      Well, let's take as an example the best case.
12 So you're going to transmit to everyone in a service
13 group so that only the person with the best network
14 connection can hear you. I mean, that makes zero
15 sense. The system doesn't work in that sense.          02:24:31
16      So supported by the specification, the only
17 thing that makes sense for a composite S&R-related
18 metric is a composite worst case S&R-related
19 profile. So now that term is understood by a person
20 of skill in the art is the same -- the same thing as  02:24:49
21 what comes after based at least in part on.
22      So you have A is at least based in part on A,
23 and that creates no certainty with respect -- or
24 it's not unreasonably certain with respect to how a
25 person of skill in the art would understand how you   02:25:12

Page 157

1 can have the same things being based on each other.
2   Q  So when you were discussing S&R-related
3 metrics is the same as an S&R-related profile, I
4 wanted to point you to the description of Figure 2
5 at the bottom of Column 3, and here it talks about    02:25:39
6 there being one or more measured performance
7 metrics.
8       So I'm not sure I agree or understand how
9 you're having a one-to-one equivalency of an S&R
10 profile to an S&R-related metric. So I guess if you   02:25:56
11 could point me to somewhere in the specification
12 where it makes that equivalency argument, and
13 explain where your getting this one-to-one
14 relationship...
15      MR. BENYACAR: Well, I'm going to object.        02:26:13
16 This question has been answered numerous times now.
17      But go ahead.
18      THE DEPONENT: Column 4, Line 47 through 49.
19 And that's --
20 BY MS. ALLOR:                                         02:26:23
21   Q  Oh, I'm sorry. Sorry.
22      Column 3, the Figure 2A. That's where I was
23 reading from. I apologize.
24   A  Okay.
25      So the portion --                                02:26:31

40 (Pages 154 - 157)

Page 158

1  Q  Sorry.  At the bottom of Column 3, it says
2  (as read):
3      "As shown in Figure 2A, determine
4      one or more measured performance
5      metrics."                    02:26:43
6  A  I see that.  And at a particular frequency,
7  S&R over a range of frequencies and S&R profile.
8  There's also -- I mean, that's -- that exactly says
9  that the metric -- the profile is metrics at each
10  frequency value.  Also Column 4, Lines 47 through    02:27:15
11  49, it says (as read):
12      "The CMs assigned to that service
13      group, e.g., composite S&R profile for
14      the CMs of the service group."
15      And it's talking about each CM's respective    02:27:36
16  metrics, e.g., each CM's S&R profile, and in the
17  context of Claim 1, when it's talking about
18  generating by said CMTS for each one of said
19  plurality and service groups, a composite
20  S&R-related metric for the service group.    02:27:58
21      So that -- again, composite S&R-related
22  metric for the service group would be for each CM at
23  each frequency.
24      So it's -- in the claim language, when it's
25  referring to a composite S&R-related metric, I kind    02:28:18

Page 159

1  of walked through the steps for why it's referring
2  to a composite worst case S&R-related profile, and
3  the reasons, those exact steps are described in
4  Paragraph 95.
5  Q  Would you agree that the claim covered more    02:28:46
6  than one S&R-related metric?
7  A  I'm not sure what that question is asking.
8  Q  So you said to me that the passages are in
9  Column 3 that I pointed you to supporting your
10  opinion that S&R profile is a number of S&R metrics,    02:29:13
11  and that's why they are the same.
12  A  No.  It's not that -- it's an S&R value at
13  each sub-frequency consistent with what's shown in
14  Figure 2 -- actually it's in all of them 2B, 2C.  It
15  shows as the x-axis, that there's a sub-band    02:29:38
16  frequency across the whole spectrum.
17      So those are each of the frequencies at which
18  there is an S&R metric value that's being
19  considered, and you are trying to find the worst
20  case at each one of those sub-frequencies so you    02:29:57
21  know what the performance parameters -- sorry, the
22  one or more physical layer communication parameters
23  should be at each of those sub-frequencies.
24  Q  Would you agree with me that when a claim
25  such as Claim 1 refers to a plurality of service    02:30:35

Page 160

1  groups or a plurality of a plurality, that it's
2  referring to more than one?
3  A  Usually plurality means two or more.
4      MS. ALLOR:  Okay.  I have don't have anymore
5  questions for you.  I'll turn it over to David if    02:31:12
6  you would like any redirect.
7      MR. BENYACAR:  No, I have no questions for
8  Dr. Almeroth.
9      THE DEPONENT:  Okay.  Thank you all.
10      THE VIDEOGRAPHER:  All right.    02:31:24
11  Going off the record at 2:31 p.m.
12  This concludes today's testimony given by
13  Dr. Kevin Almeroth.
14      (Whereupon the deposition was
15      concluded at 2:31 p.m.)
16  ///
17  ///
18
19
20
21
22
23
24
25

Page 161

1
2
3
4
5
6
7
8      I, KEVIN ALMEROTH, PH.D., do hereby declare
9  under penalty of perjury that I have read the
10  foregoing transcript; that I have made any
11  corrections as appear noted, in ink, initialed by
12  me, or attached hereto; that my testimony as
13  contained herein, as corrected, is true and correct.
14      EXECUTED this _____ day of _____,
15  _____, at _____, _____.
         (City)              (State)
16
17
18
19
20      _____
         KEVIN ALMEROTH, PH.D.
21      VOLUME I
22
23
24
25

41 (Pages 158 - 161)

Page 162

1       I, the undersigned, a Certified Shorthand

2  Reporter of the State of California, Registered

3  Professional Reporter, Certified Live Note Reporter,

4  do hereby certify:

5       That the foregoing proceedings were taken

6  before me at the time and place herein set forth;

7  that any witnesses in the foregoing proceedings,

8  prior to testifying, were duly sworn; that a record

9  of the proceedings was made by me using machine

10 shorthand which was thereafter transcribed under my

11 direction; that the foregoing transcript is a true

12 record of the testimony given.

13      Further, that if the foregoing pertains to

14 the original transcript of a deposition in a Federal

15 Case, before completion of the proceedings, review

16 of the transcript [  ] was [  ] was not requested.

17 I further certify I am neither financially

18 interested in the action nor a relative or employee

19 of any attorney or party to this action.

20      IN WITNESS WHEREOF, I have this date

21 subscribed my name.

22

23 Dated: May 3, 2023

24

25                MELISSA M. VILLAGRAN
                 CSR No. 12543 RPR

Veritext Legal Solutions
www.veritext.com                      888-391-3376

| & | | | |
|---|---|---|---|
| **&**   3:16 7:23 13:2 | **10,135,682**   10:7 | **118**   117:20 | **19**   44:21 45:23 |
| | **100**   8:13 11:5 | **119**   5:23 | 55:9 67:10,22 |
| **0** | 34:17,23 85:1 | **12**   125:9 | 67:25 69:4 |
| **0000001**   23:8 | 85:6,15,18,25 | **120**   46:21,25 | 72:3 73:22 |
| **00125**   1:7 2:7 | 86:8,19,23 | 52:12,24 89:2 | 75:2 76:12 |
| | 87:8,11,18 | 89:8,22 90:17 | 82:25 102:6 |
| **1** | 89:1 106:19,19 | **12543**   1:23 | 105:23 107:2 |
| **1**   1:25 5:11 | 106:24 | 2:23 162:25 | 110:5 |
| 15:4,6 16:5 | **10019**   3:20 | **12:10**   110:14 | **1994**   21:3 |
| 28:25 35:13 | **102**   114:11 | 110:15 | **1997**   65:22 |
| 39:1,10,11 | 117:12 119:7 | **12:47**   110:18 | 66:12 69:8 |
| 46:14 52:9 | **104**   114:12 | 111:2,4 | **1:57**   147:6 |
| 55:1,3 60:23 | 117:13,24 | **13**   105:23 | **1a**   123:12 |
| 62:13 80:4 | **10:22**   56:18 | 125:9 | 124:13 |
| 81:12 87:11 | **10:34**   56:21 | **136**   6:5 | |
| 99:22 104:23 | **10:47**   65:10 | **15**   5:11,13 | **2** |
| 106:12 107:8 | **10:49**   65:13 | 120:2 | **2**   5:13 15:10,11 |
| 112:1,4 113:12 | **10th**   5:21 94:10 | **16**   106:1 | 16:9,19 20:11 |
| 113:14 117:12 | **110**   30:8 54:12 | **162**   1:25 | 34:18 35:15 |
| 119:7 120:4,23 | 54:15,17,17,19 | **17**   31:18 | 52:6,7,18,20 |
| 121:5,7,11,14 | 54:23,25 55:1 | **18**   39:13 40:4,8 | 53:25 54:11 |
| 122:5,16 123:4 | 80:8,14 81:22 | 44:21 45:23 | 55:3 102:22 |
| 124:18 125:20 | 89:8 90:1,21 | 55:9,23 56:13 | 104:18 117:9 |
| 126:2,13,21 | 102:25 | 59:9,10 63:22 | 117:13,23 |
| 127:7,11,18,23 | **112**   30:15 | 67:9,22,25 | 131:11,14,17 |
| 128:10 129:8 | 103:4 104:2 | 68:16 69:3 | 132:20 138:21 |
| 129:21 134:14 | **114**   29:15 | 72:3 73:6,22 | 140:7,20 |
| 135:18 137:23 | 31:20 103:5,10 | 74:9,22 75:1 | 142:12,13 |
| 138:22 140:18 | 103:12 104:1 | 76:12,13 77:5 | 157:4 159:14 |
| 148:12 151:19 | 105:20 109:17 | 77:18,22,25 | **20**   15:1 |
| 155:11 158:17 | 117:20 | 79:3 82:25 | **2003**   23:14,23 |
| 159:25 | **116**   99:21 | 102:5,8 110:5 | 33:7,23 34:13 |
| **10**   131:11 | 103:5,11,22 | 111:16,18 | 44:7 67:19 |
| 142:12 151:8 | 104:1 105:20 | 112:16 | 94:11 |
| | | | **2008**   120:2 |

**[2012 - 775]**

**2012**   136:25
**202**   143:4
**2023**   1:16 2:21
  7:1,5 111:1
  162:23
**21**   25:17 26:24
  27:2 103:18
**210**   114:16,17
  118:16
**212.836.8689**
  3:21
**222**   143:6
**224**   117:20,22
  143:2,3,5,5,15
  143:19,20
**226**   143:14,19
  143:21
**228**   117:20
**23**   5:15 136:25
**25**   21:4
**250**   3:19
**27**   20:12
**28**   1:16 2:21
  7:1,5 111:1
**2:09**   147:9
**2:22**   1:7 2:7
**2:31**   2:21
  160:11,15
**2a**   157:22
  158:3
**2b**   137:15
  138:12,24
  143:1 159:14
**2c**   143:13
  159:14

**3**

**3**   5:15 23:2,3
  29:9,16 31:13
  31:17,18 46:22
  46:24,25 47:4
  65:21 88:23
  92:4 103:12
  104:24 109:14
  142:12 151:8,9
  157:5,22 158:1
  159:9 162:23
**30**   23:23 33:7
**30th**   23:13
**312.372.1121**
  3:11
**3300**   3:9
**35**   25:20 26:22
**355**   66:14
**3rd**   5:18 65:20

**4**

**4**   5:17 29:17
  65:3,14,19
  68:15,18 69:1
  84:20 94:25
  105:22 121:17
  121:25 122:4
  122:13,17
  123:16 124:23
  125:2 135:5
  151:8 152:15
  153:24 157:18
  158:10
**40**   24:20 26:23
  138:18 152:16
  153:25

**41**   138:18
**44**   16:23
**45**   96:19
**46**   93:17 94:2
**47**   109:3,16
  157:18 158:10
**48**   120:4
**49**   157:18
  158:11

**5**

**5**   5:20 94:8,9
  94:12 138:21
  151:8
**50**   109:16
**55**   102:23
**55th**   3:19
**58**   84:20 88:23
  92:4 102:23
**5890301**   1:24
**59**   102:23

**6**

**6**   5:23 119:14
  119:18 126:6
  126:15
**60602**   3:10
**61**   76:23
  114:10 117:19
  118:2 119:5
**62**   29:20 84:20
  88:23 92:5
  117:8
**63**   120:4
**65**   5:17 34:25
  37:16

**68**   49:2
**682**   6:5 10:8
  136:5,15,20
  146:9,11,11,21
  146:22 148:8
  148:12
**69**   46:12 48:14
**690**   5:23 10:4
  119:12,12,22
  120:4,8,8,11,19
  120:21 121:5

**7**

**7**   6:5 125:8
  136:5,6,12
  138:22 142:12
**70**   3:9 49:2
**7131**   162:24
**72**   49:3
**74**   49:4 80:1,19
  81:1,10,10,16
**775**   5:15 10:1
  22:16 23:1,10
  23:21 28:8,23
  28:24 29:1,12
  33:7 34:6,10
  35:4 36:4 37:9
  38:12,25 46:14
  49:25 52:6
  56:2,8,11
  66:25 68:20
  69:5 71:14,20
  72:17 76:12,13
  77:6 80:4
  84:19 88:22
  93:25 95:17

96:6 98:1,22
98:24 99:11,18
100:15 101:7
101:19 102:23
104:21 105:22
111:14 115:16
115:21
**79** 112:15

**8**

**8** 5:6 142:12
**8,223,775** 9:24
**8,284,690** 10:3
**80** 119:11
120:3
**83** 121:12
122:24 123:3,9
123:17 124:9
124:15,20,24
126:21 127:6
**84** 130:12
**85** 136:16

**9**

**9** 126:21 127:7
127:11,18,24
128:6,18
129:15,23
135:18
**90** 65:25
137:12,20
138:17,24
**94** 5:20 141:3
142:16 149:13
150:19,22
155:11,13,16

**95** 149:17
155:23 159:4
**97** 150:10
**9:03** 2:20 7:2,5

**a**

**a&p** 13:23
**a.m.** 2:20 7:2,5
56:18,21 65:10
65:13
**ability** 14:24
74:10 88:25
108:18 121:2
**able** 22:23
38:21 41:13
42:20 55:10,11
55:22 57:25
59:25 61:2
62:2 63:1
82:18,20 91:1
91:10 92:19,20
94:16 95:24
96:2 124:6
143:9,23,25
145:6 147:21
152:11
**above** 49:1,2,3
49:3 80:3
**absolutely** 16:2
77:11
**academic** 19:25
**accept** 144:18
**access** 65:4
66:11 93:9
95:1,4,5
100:21 114:15

118:15
**accessing** 16:13
93:18
**accomplish**
91:8 108:8
**accomplished**
106:2
**accordance**
129:17
**accurate** 17:17
17:20 18:2
105:10 112:13
118:1 149:7
**accurately** 17:8
17:11 143:24
144:25
**accused** 12:24
61:2 78:10
133:22
**achieve** 93:3
**achieved** 41:21
**acronym** 93:9
93:12 95:4
**action** 1:7 2:7
162:18,19
**actual** 16:20
24:8
**actually** 13:9
16:3,5,19 24:3
24:5 30:14
35:9 57:22
60:22 66:10
92:1 93:13
113:18,24
117:1 124:9

126:6 135:19
143:7,11
147:23 149:11
151:13 152:6
155:14 159:14
**add** 85:22
119:12 126:11
139:11
**added** 17:18
99:7
**adding** 86:4,6
86:17 87:7
**addition** 85:11
85:13,21
152:11
**additional**
13:12 17:24
29:19 85:14
87:7 116:6
117:18 118:12
132:15
**addressed**
40:15
**addresses**
136:15
**adds** 126:6
**adjective** 71:10
**adjust** 146:8
**administered**
8:2
**adopt** 57:18
**adopted** 62:13
62:24 63:10
**adopting** 57:16

| | | | |
|---|---|---|---|
| **adopts** 57:24 | 36:14 40:17 | **amount** 120:24 | **antecedent** |
| **advanced** 25:5 | 42:19 48:3 | **analogous** | 150:9 151:20 |
| 25:11,17 26:6 | 49:9 54:10 | 114:12 | **anymore** 160:4 |
| 27:3,8 | 56:22 62:22 | **analysis** 28:4 | **apologize** 62:7 |
| **affect** 47:21 | 65:6,17 77:13 | 36:8,9 58:1,5 | 94:21 157:23 |
| **affecting** 92:13 | 78:23 82:2 | 61:17 63:11 | **appear** 26:19 |
| **agree** 7:13 | 83:22 88:12 | 137:2 146:17 | 130:19 161:11 |
| 23:22 28:6 | 93:7 94:15,24 | 149:15 155:13 | **appearance** |
| 30:10 44:6 | 98:17 110:9 | **annotated** | 7:16 |
| 47:2,6,13,23 | 111:11 112:14 | 46:13 80:4 | **appearances** |
| 52:14,23 53:10 | 116:9 119:17 | 137:15 138:18 | 3:1 4:1 7:17 |
| 53:24 54:15,21 | 124:17 134:6 | **answer** 6:14 | **appeared** 22:18 |
| 54:22 81:21 | 136:9 147:10 | 9:8,14 11:2 | **appearing** 2:18 |
| 86:4,22 87:22 | 157:20 160:4 | 22:11 28:1 | 3:2 4:2 |
| 90:5 97:13 | **allow** 58:18 | 33:12 50:12 | **appears** 25:25 |
| 100:20 101:2 | 120:12,12 | 56:3 60:22 | 89:16 |
| 106:8,14,21 | 121:2 132:16 | 61:5,6 69:16 | **appendices** |
| 108:14 113:11 | **allowance** | 69:17 71:22 | 21:23,24 |
| 126:9 128:2 | 116:18 | 74:7,10,16 | **appendix** 16:21 |
| 133:2 143:22 | **allows** 76:7,18 | 75:14 76:5 | 17:5 21:25 |
| 144:17 151:24 | **almeroth** 1:14 | 77:12 79:18 | 22:7 24:1,15 |
| 152:4,14 157:8 | 2:17 5:4 7:6 | 86:17,20 88:15 | 25:15,16 26:22 |
| 159:5,24 | 8:1,8 56:23 | 91:6 98:18 | 34:17,22,22,23 |
| **agreed** 47:12 | 65:18 111:6,12 | 99:13 101:15 | 35:12 56:24 |
| 48:4 | 147:11 160:8 | 101:16,18 | 95:6 |
| **ahead** 62:9 | 160:13 161:8 | 102:15,17,20 | **apples** 71:23,25 |
| 94:23 157:17 | 161:20 | 105:10 120:16 | 72:15 |
| **air** 147:18 | **alternative** | 134:3,5 146:25 | **applicable** 68:3 |
| **alleged** 26:11 | 154:18 | **answered** | 70:3 120:19 |
| 37:21 | **ambiguity** 37:4 | 31:14 77:4,10 | **applicant** 72:19 |
| **allor** 3:6 5:6 | 37:23 46:5 | 77:11 79:21 | 73:22 76:18 |
| 7:18,18 8:6 | 47:18 48:23 | 81:24 102:11 | 79:9,15 113:7 |
| 15:9,14 23:6 | 59:22 132:24 | 123:7 157:16 | 113:15,23 |
| 26:21 33:15 | **amended** | **answers** 9:6 | 114:1,5,5,9,11 |
| 34:16 35:21 | 116:14,18 | 62:11,12 | 114:18,23 |

**[applicant - assumptions]**                                    Page 5

116:21 117:7
117:17 118:3,5
118:9,11 119:4
119:6
**applied**   39:22
119:23
**applies**   60:23
69:14 100:11
**apply**   22:20
35:2,7 40:19
41:7,22 42:5
42:16 45:22
53:22 61:2
72:12 75:1,19
75:25 100:24
120:10
**applying**   36:3
41:2 43:11
48:9 53:12,15
54:4 58:23
69:25 74:8
75:3
**appropriate**
45:2 114:10
**april**   1:16 2:21
7:1,5 111:1
**architecture**
52:8
**argued**   125:20
**argument**
60:15 119:7
150:6 157:12
**arguments**
118:22

**arm**   24:24 25:3
25:9,23 26:6
27:20,24 28:6
28:16,20,23
29:9,15,23
31:15 32:1,6,8
32:19,20 46:22
46:24,25 47:4
55:2,3 109:4
109:18,25
110:8
**arm1**   29:17
30:11,14,20,24
85:18 109:11
112:4
**arm2**   29:17
30:11,14,20,25
85:19 109:11
109:12 112:5
**arm3**   29:18
**arm9**   31:20,24
32:24 103:15
108:23 109:12
109:19,23
110:5
**arm940**   103:22
**arnold**   3:16
7:23 13:2
**arnoldporter....**
3:22
**art**   27:19 28:7
28:12,22 31:9
36:25 37:7,13
41:12 42:16
43:5,9 44:24

46:9 58:8,19
59:18 60:4
61:15,19 62:20
63:5 67:15,21
69:2 76:21
81:7,19 83:19
84:16 94:2
95:21 104:12
104:19 105:15
113:17 115:7
115:16 116:8
116:25 117:5
120:9,19 144:2
144:17 148:6
150:4,18
151:10,16
155:10 156:20
156:25
**articulate**
128:23
**articulated**
101:5
**asb**   114:16,17
118:16
**aside**   69:6,7
114:24 151:19
**asked**   10:23
21:15 68:19
77:10 78:20
81:24 92:18
99:10,11,25
102:13,21
123:7 131:1
**asking**   25:12
32:5 36:12,15

50:10 69:22
71:18 73:5
75:4 77:21
79:17 82:4
87:5 91:20
92:2 96:15
98:18 99:8
100:5 101:6
102:18 122:6
130:4,6,9
132:13,20
137:6 143:8
159:7
**aspect**   60:14
104:4
**assign**   154:3
**assigned**
137:23 158:12
**assignment**
14:8
**associated**   56:7
97:18 100:13
128:11 131:20
**assume**   79:17
134:12 136:20
141:9,10
**assumed**   23:12
23:21 119:25
136:23
**assuming**   122:6
142:8
**assumption**
79:20 137:1
**assumptions**
79:24

**[attached - box]**

**attached**  15:7
  15:12 17:4
  23:4 65:15
  93:20 94:13
  119:15 136:7
  161:12
**attempting**
  35:2 41:7
  42:16 58:8
  115:9
**attendees**  3:2
  4:2
**attorney**  3:18
  7:16 9:15
  162:19
**attorneys**  3:8
  13:3,23
**attributing**
  117:22
**audio**  7:12
**available**  22:17
**aware**  116:10
**axis**  159:15

**b**

**b**  21:25 34:22
  140:2,18,19
**back**  56:20
  58:14 60:21
  80:13 99:12
  111:12 116:12
  117:15,17
  127:2 129:8
  133:4 134:1
  144:11 146:11
  146:24 147:8

154:22 156:4
**background**
  27:4,13
**band**  159:15
**bands**  138:10
**barbara**  1:15
  2:20 7:1 111:1
**based**  30:25
  31:21,24 32:4
  32:6,9 38:22
  52:1 69:18
  79:8 98:22
  103:15,22
  105:15 108:23
  109:12,20,24
  110:5 121:3
  122:16 133:13
  137:9 146:16
  148:18 150:2,5
  151:23 152:1,2
  152:7,8,12,15
  154:25 155:5,7
  155:7 156:21
  156:22 157:1
**bases**  31:12
**basically**  29:17
**basing**  23:19
**basis**  62:7
  76:25 114:22
  141:20 150:9
  151:20
**bates**  23:7
**bears**  23:7
**beginning**  2:20
  7:16 15:22

**behalf**  2:17
  7:19
**believe**  10:13
  11:10 12:13,22
  13:17,20,24
  14:3,17 17:4
  17:10,13,20
  18:7 21:11
  29:13 33:2,25
  39:10 44:2
  61:5 94:11
  98:20 102:14
  108:22 109:2
  109:13 113:1
  121:14 131:8
  132:9 136:25
  139:1 148:8,25
  151:15
**believed**  58:9
**benyacar**  3:17
  7:22,22 12:3
  26:15 33:10
  34:14 35:19
  36:11 40:7
  42:9 48:1,7
  54:1 62:6 65:4
  65:8 77:10
  78:14 81:24
  83:14 88:9
  92:15 94:20
  98:15 112:11
  115:22 119:24
  123:7 134:2
  147:4 157:15
  160:7

**best**  12:16
  149:22 154:18
  156:9,11,13
**better**  130:10
**beyond**  32:7
  91:20
**bit**  19:1 28:19
  30:22 118:7
  123:21 126:17
**bits**  147:19
**block**  29:3,4,24
  52:7 76:4
  103:7 104:1,1
**blocked**  104:13
**blocks**  76:4
  103:3,8,10,11
  103:25 104:6
  104:15,17
  105:2,12,19
  117:20
**board**  38:5
  45:17 80:17
  83:24 105:7
**boards**  59:17
  83:13
**bottom**  120:22
  157:5 158:1
**boundaries**
  38:22,24
**box**  29:25 30:8
  30:15 40:6
  46:20,24,25
  47:1,10,10,13
  47:15 49:10,13
  49:17 52:11

**[box - case]**                                          Page 7

54:11 55:2
59:5,6 60:2
80:7,11,14,16
81:2,3,3,17,18
81:21,22 82:4
87:11 99:21
**boxes**   29:25
46:17 58:5,15
59:16 61:8
81:12
**break**   56:16,23
110:11 147:3
**breaked**   147:11
**briefly**   62:14
**broad**   44:12
88:18 116:1
**broadband**
20:4
**broadcasting**
95:12
**broader**   28:19
**brooks**   77:1
113:8 114:16
114:19,22
116:21,22
117:9 118:22
**brown**   4:5 7:7
**build**   141:21
154:6
**bus**   40:9,10,25
63:23 76:24
111:19 112:7
112:17,22,25
113:6,8,12,12
113:13,14,19

114:6,7,18
115:1,11
118:16,20
**bypass**   55:10

**c**

**c**   22:7 24:1 25:8
25:15,16 26:22
34:17,22,23,23
35:12 56:24
67:7 70:20,25
72:9 140:18
**cable**   18:5,10
18:21 19:2,16
19:20 20:3,19
24:6 29:25
30:4 39:2,7,20
40:23,24 41:1
42:12,23 50:15
50:16,24 51:2
51:15 52:8
54:12 58:23
59:12 60:10
63:24,25 64:1
67:10,11 68:9
72:4,6 76:14
77:6,18,25
78:2,4,10,12
79:2 80:7,15
81:4,22 82:12
83:3,6 85:1,5,8
85:15,17,18,24
86:7,19,23
87:6,8,18,21
89:1,8,20,23,25
90:1,15,17,20

90:24 91:4,7
91:22 92:10
100:1 102:25
103:1 105:6
106:5,6,16,19
106:19,23,23
107:2,4,7,11
108:17,20
111:20,25
112:7 113:20
115:1,11
117:14,22
119:8 133:1,4
133:8,11,19
134:1 137:18
137:23 138:3
138:20 139:2,8
139:14,21,22
140:1,4,8,13,15
140:17,19,20
144:22,24
145:3,8,19,21
147:16 153:4
153:17 154:2,3
154:10,14
**california**   1:15
2:20 7:1 111:1
162:2
**call**   27:14
29:18
**called**   29:25
123:20
**calling**   150:15
**calls**   99:23

**caption**   7:10
**carrier**   138:22
**carriers**   138:21
**carry**   35:14
38:15 39:16
41:4 57:12
59:4 60:25
**case**   7:10 10:14
10:16 12:21
13:10,11 18:8
18:14 72:2
79:18 123:15
138:1,2,6,9,9
138:11,15
139:2,7,15,17
139:19 140:12
140:14,20,23
141:6,8,15,16
141:20,22,23
142:2,5,21,23
143:8,9,10,16
144:1,4,6,7,19
145:7 147:24
148:1,19 149:6
149:9,11,20,22
149:22,25
150:3,5,13,16
150:17 151:3,7
151:8,11,13,17
151:23 152:1
152:22 153:1,5
153:7,9,10,14
153:16,17,20
154:6,6,10,11
154:12,17,18

155:1,5,8,12,15
156:7,9,9,10,11
156:18 159:2
159:20 162:15
**cases** 11:6,8,11
11:11 13:6,13
13:13 17:19,22
18:3,9,17
19:19
**certain** 37:17
109:4 115:17
116:8 117:6
146:15 156:24
**certainly** 18:23
26:2 28:9,12
43:6 52:21
74:24 97:16
104:16 108:7
**certainty** 34:10
35:6 36:5 37:2
38:8 41:13
47:22 49:7,18
50:13 57:20,21
58:12,20 61:16
63:6,7 73:24
79:12 152:9
156:23
**certified** 2:22
162:1,3
**certify** 162:4,17
**cetera** 137:4
138:22
**challenge** 96:6
115:9

**change** 119:3
**channel** 145:15
148:1
**characteristics**
32:7
**characterizati...**
36:13,21 71:3
71:5 80:24
90:25 97:23
112:13 120:25
**characterize**
19:21 33:4
89:16
**charter** 1:8 2:8
7:11,23 11:16
12:14,18 13:3
13:8,16 14:1,2
18:14,23 19:4
19:11,16 23:8
**check** 116:12
117:16 127:4
145:20 146:24
**checking** 61:9
**chicago** 3:10
**chip** 38:5 45:17
74:3,13,18,24
75:5 84:23
85:1,5,12,14,21
85:23 86:5,11
86:13,14,15,24
86:25 87:6,8
87:12,14,19
88:2,6,6,13,14
107:19

**chips** 76:8 85:9
85:10,17 86:2
86:3
**choose** 94:4
**circuit** 34:3,8
34:12,20,25
35:3,10,13,24
36:3,20 37:5,8
37:10,12,14,19
37:20,24 38:2
38:4,6,12,19,22
38:24 39:2,3,7
39:8,15,18,21
40:2,3,12,13,22
40:24 41:3,5
41:10,11,12,15
41:16,18,19,23
42:7,7,11,13,14
42:21,25 43:2
43:3,9,17,25
44:3,9,13,16,20
45:3,7,9,15,17
45:19,25 46:11
47:7,13,14,15
47:19,24 48:5
48:10,19,20,22
48:25 49:12
50:2,7 51:1,2,5
53:8,11,13,14
53:16,18,19,20
53:22,25 54:4
54:6,8 55:18
56:5,25 57:6,7
57:10,17,19,23
58:10,16,16

59:3,11,13,21
60:25 61:21,23
63:4 66:1
80:13,16 81:7
81:14,15,19
83:12,13,13,17
83:18,24 84:7
101:11 113:9
113:10 115:15
115:20
**circuitry** 72:10
72:22,25 76:3
76:16 77:2,8,9
79:4
**circuits** 35:18
36:1 38:4 41:5
43:19,22 44:11
44:23 45:1
47:17 48:11,17
53:13,18 54:6
54:7 59:7,16
59:23 63:14
72:21,24 73:12
73:20 74:3,6
74:13,14,17,24
75:5,11,21
76:8 77:3
79:12 83:24
105:8 115:14
**circular** 50:19
**citation** 26:24
148:10
**cite** 24:11 26:22
155:25

**[cited - column]**

| | | | |
|---|---|---|---|
| **cited**   12:1 | 112:16,19 | 40:1,4 43:4 | 107:14 113:24 |
| 21:13 119:5 | 113:1,3,11 | 45:5,23 46:7 | 114:21 117:5 |
| **city**   161:15 | 114:7,20,25 | 46:11 47:22 | 118:2,18 137:1 |
| **civil**   1:7 2:7 | 116:7 118:20 | 49:8,19 61:2 | **clearly**   81:4 |
| **claim**   9:20 | 121:4,5,7,11,14 | 61:13,16,20,22 | 101:4 |
| 14:11 22:4 | 122:1,5,16,24 | 62:1,17,19 | **close**   149:8 |
| 27:15 35:7 | 123:3,4,17 | 63:8,11 75:1 | **cm**   158:22 |
| 36:10,17 37:1 | 124:18,25 | 76:17 79:11 | **cm's**   158:15,16 |
| 37:4 38:17 | 125:20 126:2,6 | 81:20 82:25 | **cma**   138:20,20 |
| 39:1,10,11,13 | 126:9,10,11,13 | 83:16 96:12,18 | **cmac**   117:21,24 |
| 40:4,8,21 41:7 | 126:14,15 | 97:12 101:19 | **cmb**   138:22 |
| 41:14,17,20 | 127:11,23,24 | 102:5,15 110:4 | 140:1 |
| 42:18 43:21 | 128:2,6,9,10,18 | 113:13,18 | **cme**   30:5,8,12 |
| 46:9 48:12 | 129:8,15,21,23 | 114:3 115:8 | 30:19 54:12,15 |
| 55:9,23 56:13 | 130:3,7 134:12 | 116:13,18,22 | 80:17,22 |
| 57:14,22 58:18 | 134:14 135:16 | 117:2,2,4 | 107:19 112:23 |
| 58:20,21 59:8 | 135:18,18 | 126:21 127:6 | 113:6 114:12 |
| 59:9,10,15 | 137:23 142:20 | 127:11,18,18 | 118:12,17 |
| 60:1,4,6,11 | 144:3 148:12 | 130:18,18 | **cms**   158:12,14 |
| 62:23 63:1,21 | 149:2 150:13 | 131:16 132:3 | **cmts**   133:1,4,8 |
| 64:11 67:9,22 | 151:24 152:5 | 132:16 133:21 | 133:19 137:23 |
| 67:25 68:16 | 152:13,24 | 136:1,4 141:19 | 148:16 158:18 |
| 69:3,6 72:3,12 | 153:10,13 | 146:14 147:1 | **collaboration** |
| 73:6,15,16,22 | 154:23,23 | 148:8 | 20:24 |
| 73:25 74:9,22 | 155:4,21 | **clarification** | **collaborations** |
| 75:3 76:12,13 | 158:17,24 | 18:16 100:4 | 19:22 20:2 |
| 77:5,18,22,25 | 159:5,24,25 | **clarity's**   145:11 | **colleagues**   7:20 |
| 79:3 81:14 | **claimed**   57:22 | **clause**   112:20 | **collected**   153:4 |
| 82:8,11,18,21 | 84:8 | 113:5 115:10 | **collection** |
| 83:2,9,11 84:5 | **claiming**   37:5 | **clear**   46:8 | 139:21 |
| 84:15,16,17 | 37:19 81:15 | 48:13 50:25 | **collisions**   95:11 |
| 102:2,7,8 | **claims**   26:1 | 60:3,6 63:16 | **color**   71:25 |
| 107:10,13 | 35:5 36:4,6 | 64:9 73:15,23 | **column**   29:16 |
| 108:3,5,7 | 37:8,18,18,19 | 76:17,20 79:11 | 29:17 31:13,17 |
| 111:16,18 | 38:7,10,18 | 96:7,21 102:2 | 31:18 84:20 |

[column - consider]                                                      Page 10

| | | | |
|---|---|---|---|
| 88:23 92:4 | 124:7 159:22 | 76:21 80:17 | 62:25 65:19 |
| 102:22 103:12 | **communicati...** | 117:18 | 94:10 100:22 |
| 103:18 104:24 | 1:5,8 2:5,8 | **composed** | **concept** 88:16 |
| 105:22 109:14 | 7:10,11,19,24 | 53:13 | 92:3 104:16 |
| 120:4,23 125:8 | 18:22 145:19 | **composite** | **concluded** |
| 131:11,14,17 | **companies** | 138:1,2,13 | 160:15 |
| 132:20 152:15 | 19:17,19,23 | 139:1,6,12,21 | **concludes** |
| 153:24 157:5 | 20:9 | 140:22 141:21 | 160:12 |
| 157:18,22 | **compare** | 142:22,23 | **conclusion** |
| 158:1,10 159:9 | 129:21 130:6 | 144:7,20,23 | 131:3 |
| **combination** | 147:18 | 148:17 149:5 | **condition** 92:25 |
| 35:15 42:1 | **compared** | 149:11,14,18 | 144:14 |
| 43:13 61:24 | 143:19 | 149:19,20 | **conferences** |
| 139:12 142:24 | **comparing** | 150:1,4,12,12 | 17:25 |
| **comcast** 18:24 | 71:23 | 150:15,16 | **confirm** 16:19 |
| 19:11,13,16 | **comparison** | 151:13,20,22 | 16:21 |
| **come** 19:9 | 71:24 | 151:25 152:18 | **confusing** |
| 58:14 125:24 | **complete** 21:11 | 152:23 153:7 | 123:21 |
| 125:24 130:16 | 72:4 | 153:15,20 | **confusion** |
| 145:15 | **completely** | 154:6,9,24 | 123:9 |
| **comes** 70:18 | 64:2,7 67:9,11 | 155:15,18 | **connect** 113:6 |
| 153:1 156:21 | 67:22 68:8,10 | 156:2,3,5,7,17 | **connected** |
| **coming** 116:20 | 69:2 72:20 | 156:18 158:13 | 74:18 |
| 122:14,16,20 | 79:14 83:20 | 158:19,21,25 | **connecting** |
| **committees** | 89:24 90:18 | 159:2 | 72:10,25 76:16 |
| 17:24,25 | 92:24 113:22 | **comprising** | 77:8 79:4 |
| **commonly** 22:4 | 113:24 115:13 | 129:20,25 | 113:20 115:1 |
| **communicate** | **completion** | **computer** 5:18 | **connection** |
| 77:14,19 78:1 | 162:15 | 5:20 15:23 | 156:14 |
| 78:11,16,18 | **component** | 16:12 22:8 | **connects** 40:25 |
| 79:5 98:4 | 152:18 | 24:2 25:7,17 | 63:23 111:19 |
| 133:3 | **components** | 27:23 34:19 | 112:22 |
| **communication** | 35:16 42:2 | 35:23 38:14 | **connor** 7:21 |
| 16:7 18:5,11 | 43:13 50:5 | 45:15,17 56:25 | **consider** 32:17 |
| 20:4,20 78:3 | 61:24 74:5 | 60:24 61:23 | 33:13,16 51:4 |

**[consider - correct]**

64:12 74:5
83:25 84:4
101:10 153:12
**consideration**
116:23
**considered**
33:14 45:19
51:1 72:19
75:6 115:6
116:5 117:19
118:24 159:19
**considering**
73:6
**consistency**
68:22
**consistent**
37:15 47:15
67:18 68:19
80:19 104:18
104:20 106:10
107:9,12
121:17,24
131:25 133:8
135:10 159:13
**consists**  35:23
35:25
**constitute**
41:16,23 43:22
52:3
**constitutes**
41:15
**constraint**  53:5
55:21 91:15
**constraints**
55:20 78:7

91:9
**construction**
9:20 14:11,16
22:4 25:24
27:16 36:10,17
39:23 40:20
60:24
**construe**  38:11
57:5,10
**construed**
39:15 61:21
**contact**  14:2
**contained**
53:19 89:21
90:16 138:17
161:13
**containing**
141:11
**contains**  49:11
50:16
**contemplated**
146:13
**contend**  20:17
**content**  19:5,6
19:7 131:22
**context**  21:12
26:10,19 27:5
27:18 28:21,23
32:21 33:19
34:5 35:3 36:4
37:8,20 40:2
43:15 44:4
45:2,9,11,23
48:14 56:7,7
64:10 66:25

67:4,23 68:1
69:3,4 70:17
72:16 73:6,9
73:21 74:8,21
75:16,17,25
76:11 77:15
78:20 80:12
81:11 85:16,17
88:19,21 91:16
95:16 96:23
98:1,12,13,21
99:11,14,22
100:8 101:8,19
115:16 116:2
122:5 125:7
133:1,24
141:18 144:6,9
147:16,17
149:23 150:25
152:13 153:6
153:13 154:19
155:10 158:17
**contexts**  70:22
100:11
**continued**  4:1
6:1 61:10
**continues**
42:12
**contrast**  130:6
**control**  93:10
95:1,4,5
**controller**  25:7
31:3,6 51:20
52:3 55:2,11
55:13,15 76:23

82:19,23 83:8
85:19 96:7,12
96:14,24 98:9
98:10,14,19,25
99:3,7,9,13,17
99:19,21,24
100:1,2,5,9,11
100:13,17,20
100:25 101:1,2
101:6,14,22
102:3,9 103:5
103:11,18,21
107:18,21,25
108:10 114:15
118:15
**controllers**
100:6,7
**conveyed**  92:3
104:23
**copy**  80:4
**copyright**
11:11 12:24,25
65:22
**core**  32:20
**corner**  140:1
**correct**  17:1
23:20 25:1
37:12 40:6
44:23 80:8
84:23 86:11
88:7 97:22
106:17 114:2
117:16 124:20
124:24 134:23
140:22 161:13

[corrected - decoupling]                                    Page 12

**corrected** 17:3
 161:13
**corrections**
 161:11
**correctly**
 125:18
**corresponding**
 148:20 151:18
 154:3
**cost** 85:7,9
**counsel** 12:2,8
 22:1,9
**couple** 11:10,11
 13:12 17:22,24
 21:22 29:21
 92:19 111:15
 142:15
**course** 16:14
 19:6
**court** 1:1 2:1
 7:7 8:25 9:7
 10:25 38:11
 39:22 42:4
 57:10,16,18,24
 60:23 61:21
 62:12,24
**cover** 15:22
 113:18 130:19
**covered** 159:5
**covers** 146:12
**cox** 19:3,11,16
**create** 46:5
 47:22 67:6
 86:7,19 113:16
 115:5 121:2

**created** 135:13
**creates** 36:5
 45:11 49:23
 57:19 82:16
 83:8,21 84:16
 100:19 114:2
 118:19 135:17
 152:9,10
 156:23
**creating** 129:5
**creation** 132:5
 132:8
**cross** 145:16
**csr** 1:23 162:25
**curious** 18:19
**current** 18:8
 35:14 38:16
 39:16 41:4
 57:13 59:4
 61:1 85:10,16
 87:5
**cv** 1:7 2:7 17:4
 17:8,14 18:12

**d**

**d** 67:7 70:20,25
 72:9 140:18
**data** 24:6 29:4
 39:1,6,17 40:5
 40:9,10,21,25
 41:1 42:22
 46:21 47:3,5,7
 47:11,24 49:11
 50:1,6,16 51:1
 51:10,11,13
 55:12 59:10

63:23,23 64:4
72:6,10,22,25
76:15,16 77:7
77:8,9,19,25
78:4,12 79:2,4
82:22 89:1,7
89:22 90:16,23
91:2,24 92:11
95:11 97:18
106:3,3,21
107:16,23
108:17 111:19
111:19 112:7,8
112:17,22,25
113:6,8,12,12
113:13,14,19
113:20 114:6,7
114:14,18,19
115:1,2,11,13
117:12 118:14
118:15,17,20
**date** 23:10,11
 23:13,13,20,23
 33:6 65:22
 94:11 119:23
 120:2 136:20
 137:3,6 162:20
**dated** 162:23
**david** 3:17 7:22
 12:12 160:5
**david.benyacar**
 3:22
**day** 161:14
**december**
 120:2

**decides** 57:10
**declaration**
 5:13 9:19,22
 10:13 11:25
 12:1,2 14:5,7
 14:16,20,23
 15:10 16:21
 17:1,19,21
 20:12 21:5,8
 21:10,13,14,17
 21:19,24 22:10
 23:9,16,17
 24:2,12,21
 25:15 26:7,8
 26:14,17,20,23
 27:5 28:5
 33:25 34:7,18
 35:1 36:7,9
 40:15 45:14
 46:13 53:10
 60:20 64:15
 80:2 109:2
 112:16 119:12
 119:21 136:14
 136:19 137:13
**declare** 161:8
**decouple** 89:1
 93:3
**decoupled**
 89:24 90:19
 92:24
**decoupling**
 88:17 89:7,15
 90:4,4,6,9 92:7
 92:8,18,22

**[decoupling - describes]**                                                    Page 13

| | | | |
|---|---|---|---|
| 93:2,5 | 68:25 69:7,13 | 88:19,21 95:15 | 152:11 |
| **defendants**   1:9 | 69:19,23 70:1 | 98:11,13,21 | **described**   27:5 |
| 2:9 3:15 | 70:11 71:12,15 | 99:14 100:8,8 | 29:13,19 30:15 |
| **define**   33:18 | 71:16,20 75:14 | 101:10,12 | 31:15 45:12 |
| 38:21 39:6 | 75:18 76:6 | 105:5 146:6,19 | 50:21 51:13,22 |
| 45:25 97:3 | 81:13 93:14,21 | **depicted**   76:3 | 51:23 52:7,16 |
| 100:9 132:2 | 94:4,25 95:8 | **deponent**   1:15 | 53:25 54:17,18 |
| **defined**   27:11 | 95:25 97:4 | 2:19 5:3 26:16 | 55:6,14 56:1,2 |
| 103:25 110:7 | 100:10,24 | 33:11 34:15 | 80:14 83:10 |
| **definiteness** | 101:1 115:25 | 36:12 40:8 | 84:18 85:25 |
| 61:18 62:18 | 131:8 | 42:10 48:2,9 | 86:23 87:9 |
| **definition** | **definitions** | 54:3 62:10 | 94:1 95:25 |
| 20:13,16 24:4 | 24:12 26:14,17 | 77:11 78:15 | 96:4 99:17 |
| 24:8 25:14,19 | 26:20 27:22 | 81:25 83:15 | 100:18 101:25 |
| 25:22 26:2 | 34:8 35:18 | 88:10 92:16 | 103:12 104:8 |
| 27:2,6,8,9,10 | 37:12 38:1 | 98:16 110:12 | 104:11 105:20 |
| 27:18 33:24 | 44:11 46:3 | 112:12 115:24 | 106:11,12,18 |
| 34:5,12,19,24 | 62:24 63:9 | 119:25 123:8 | 106:22,24 |
| 35:3,8,11,20 | 64:12 95:25 | 134:3 157:18 | 107:7 108:5 |
| 36:2,3,23 37:3 | 116:1 | 160:9 | 109:5,17 110:6 |
| 37:11,16,22,24 | **degree**   44:8 | **deposed**   8:10 | 112:4,5 113:11 |
| 38:13,14,18,23 | **delivery**   19:5 | 11:4 17:20 | 114:22 122:18 |
| 41:3,12,24 | **demonstrates** | **deposition**   1:13 | 132:22 133:15 |
| 42:5,17 43:11 | 37:3,23 81:13 | 2:16 5:10,11 | 135:24 136:1,3 |
| 44:14 46:3 | **depend**   32:14 | 6:4 7:6,9 9:6 | 143:3,13 144:5 |
| 48:10 53:8,12 | 59:2 84:11,12 | 15:4 16:14 | 146:21 149:19 |
| 53:15,22 56:25 | 143:10 | 110:17 160:14 | 149:24 153:19 |
| 57:11,17,18,24 | **dependent**   26:1 | 162:14 | 153:23 154:20 |
| 57:25 58:23 | 126:6,10 | **depositions** | 156:6 159:3 |
| 61:22 62:5,13 | **depends**   28:20 | 8:15 | **describes**   31:10 |
| 63:4 64:17,20 | 32:13,18,21 | **describe**   49:8 | 84:25 100:15 |
| 64:22,25 66:1 | 33:12,14 51:4 | 51:9,17 84:22 | 103:18 105:23 |
| 66:4,16,24 | 54:3 55:20 | 85:3 94:7 | 108:11 125:5 |
| 67:3,13,17,20 | 60:13 69:17 | 106:14 109:4 | 133:9 135:4 |
| 68:1,7,11,14,17 | 74:25 75:18 | 137:25 150:21 | 141:19 146:23 |

describing   32:1
  32:9 37:5 45:3
  47:18 52:24
  85:13,16 87:7
  87:17 88:25
  89:7 90:3,22
  91:17,19,22
  92:5,9,22
  103:9 104:22
  108:16 121:25
  145:5 146:10
  155:14
description
  25:13 32:23
  43:2,24 78:17
  80:15 86:15
  91:20 94:6
  108:8 109:21
  118:18 138:16
  157:4
descriptions
  26:18
design   91:6
designed   25:10
  60:15
designing   98:2
detail   109:19
  111:14
details   150:22
determinations
  147:25
determine   37:1
  41:13 44:15
  58:19 61:3,7
  61:15 62:2

63:1 95:23
  121:21 131:5
  137:2 143:5
  147:22 158:3
determined
  14:8 108:6
  120:14 128:4,8
  130:20 135:15
  135:19
determines
  61:18 128:10
  152:19
determining
  33:20 62:19
  128:21 129:5,6
  134:9
develop   58:8
  147:24
developed
  20:10 28:2
developing
  14:25 20:3
deviate   104:10
device   66:19
  67:5 69:10
  100:21
devices   72:10
  72:22 73:1
  93:20 100:21
diagram   52:7
  76:4
diagrams
  104:14
dictated   129:9
  129:12,22

135:16
dictionaries
  21:15,22,23
  22:3 27:17
  93:15
dictionary   5:18
  5:21 21:25
  22:1,8 24:2
  25:17 26:3,5
  26:25 27:23
  34:20 38:14
  39:23 53:9
  56:25 57:12
  60:24 61:23
  62:25 64:12,21
  64:25 65:20,25
  66:5 67:4
  68:18 69:8,19
  71:21 93:21
  94:4,10 100:10
  131:7
difference   85:9
  98:8 128:19,23
  130:2,23
  143:15 147:22
differences
  130:25 131:4
different   9:23
  19:15,23 24:5
  27:25 29:21
  32:17 37:6
  38:1,1 42:23
  44:15,23,25
  45:18 46:5
  47:20,21 48:10

48:19,19 49:5
  60:2 68:23,25
  72:14 74:21
  78:18 97:13,17
  97:18 102:2
  116:4,5 125:14
  125:17 130:5
  133:16 143:20
  152:18,19
differentiation
  126:10,15
differently
  42:23
difficult   34:11
direct   114:14
  118:14
directed   9:22
  10:11 107:16
  120:7,9
direction
  162:11
directly   14:1,2
  55:12 82:22
  107:23
disagree   36:16
  36:21 57:16
  71:3,5 107:12
  152:20
disclose   114:20
disclosed   47:24
  83:5,7
discloses   26:11
disclosure
  79:10

discussed  99:17
115:19 128:15
discusses  155:4
discussing
24:24 86:4
152:17,17
157:2
discussion  30:5
68:2 128:16
135:11 148:4,8
distinct  66:18
69:9,20 72:3
distinction
63:17 96:11
120:11
distinguished
116:22
distinguishing
77:1
district  1:1,2
2:1,2
divide  96:8
divided  67:8
103:2,7
dividing  67:14
division  1:3 2:3
divorced  76:10
dne  29:5,8
52:12,14,16,18
52:21,24 53:4
53:6,11,16,23
53:25 54:6,6
85:13 86:5
112:22 113:6
114:13 118:11

118:17
docsis  19:7
23:24 24:4,8
31:2,3,6 51:20
51:21 52:3,4
55:2,3,10,13,15
55:16 82:18,19
82:23 83:7,8
85:18,19 89:25
90:20 96:7,11
96:11,13,14,19
96:21,23 98:8
98:9,24 99:2,3
99:4,7,18,20
100:16,18
101:21,22
102:3,3,9,9
103:1,3,4,5,10
103:10,17
104:2 107:18
107:21,21,24
108:9 133:9,22
doe  60:15
doing  13:20
19:18
double  117:16
127:4 145:20
downloaded
16:9 94:17
119:19 136:11
downloading
15:16,21
dr  7:6 8:8 12:2
56:23 58:5,14
65:18 111:12

116:6 118:5,24
147:11 149:21
156:8 160:8,13
draft  14:19
drafting  14:23
14:25
draw  48:17
49:10,17 58:5
58:14 59:5
61:8
drawing  59:16
60:3
drawn  47:10
47:11 81:12
drive  67:6,7,7
68:4,5 70:4,6,8
70:9,14,19,20
70:20,25,25
71:1 72:8,9,9
drives  68:5
70:3
due  15:15
duly  111:7
162:8
dustin  4:5 7:7
dynamic
120:13

| e |
| --- |

e  16:13 140:18
e.g.  158:13,16
earlier  11:4
12:17 31:14
48:4 60:22,23
86:17 109:10
111:23

earliest  120:1
136:23
easier  15:17
eastern  1:2 2:2
edition  5:18,21
65:20 94:10
education  17:9
eight  12:6,10
either  23:18
53:12 54:5
58:9 62:24
63:9 107:6
electric  42:1
electrical  35:14
35:16 38:15
39:16 41:4
44:8 50:4
57:13 59:4
60:25 61:24
electromagne...
146:1
element  111:18
112:17 114:7
148:25 149:1,4
embedded
89:19 90:14
101:11
embodiment
56:2 86:1,1
106:15,18
107:4 110:7
125:21 131:24
embodiments
125:12

**[employee - exhibits]**                                    Page 16

| | | | |
|---|---|---|---|
| **employee**  19:21 | 108:17,20 | **establish**  40:11 | 102:3,6 118:16 |
| 162:18 | 111:20,20 | 154:12 | 128:4,13 129:2 |
| **ended**  53:3 | 112:1,7,8 | **established** | 135:5 144:11 |
| 100:16 152:9 | 113:20,21 | 33:19 | 147:13 151:6 |
| **engaged**  12:14 | 115:1,2,12,13 | **establishes** | 156:11 |
| 13:16 | 117:13,14,23 | 40:9 | **examples**  41:9 |
| **engel**  3:7 7:21 | **engineering** | **estimate**  12:7 | 51:12,21,23 |
| **engine**  29:5 | 44:9 100:24 | **et**  137:3 138:22 | 53:5 76:22 |
| 30:1,4 39:1,2,7 | **engines**  43:8 | **ethernet**  97:15 | 131:9,25 |
| 39:8,17 40:21 | 50:18 67:16 | 97:21 98:5,6 | 138:19 |
| 40:24 41:1,1 | 72:5 90:23 | **evaluate**  73:9 | **except**  43:4 |
| 42:13,22,24 | **entire**  46:25 | 144:14 | **excerpts**  5:17 |
| 46:21 47:3,5,7 | 89:18 90:13 | **evaluating** | 65:19 |
| 47:11,25 49:11 | 103:1 | 75:19 136:22 | **excluded** |
| 50:1,6,16,17 | **entropic**  1:5 | **evidence**  21:16 | 146:16 |
| 51:2,2,10,11,14 | 2:5 7:10,19 | 50:21 | **executed** |
| 51:16 54:12 | 23:7 | **exact**  159:3 | 161:14 |
| 55:12 59:10,12 | **envision**  56:8 | **exactly**  25:8 | **exemplary**  43:7 |
| 63:24,25 64:4 | **equipment** | 52:19 82:5 | 51:17 52:24 |
| 67:11 68:9 | 20:9 | 91:19 153:19 | 98:25 |
| 72:6,7 76:14 | **equivalency** | 158:8 | **exercise**  60:3 |
| 76:15 77:7,7 | 157:9,12 | **examination** | **exhibit**  5:11,13 |
| 77:18,19,25 | **equivalent**  95:5 | 5:3 8:5 111:10 | 5:15,17,20,23 |
| 78:1,4,4,12,13 | 155:3 | **examined**  8:2 | 6:5 15:4,5,6,10 |
| 79:2,3 80:8,15 | **error**  154:15 | 111:8 | 15:11 16:4,5,9 |
| 81:4,22 82:12 | **errors**  17:1 | **examiner** | 16:19 20:11 |
| 82:22 83:3,6 | **especially**  14:3 | 116:10,16 | 23:2,3 34:18 |
| 89:1,2,8,8,22 | 21:11 40:2 | 117:11,22 | 34:18 65:3,14 |
| 90:17,21,23,24 | 43:18 67:23 | 118:6,9 | 65:19 66:6 |
| 91:2,3,4,11,23 | 69:4 73:18 | **example**  21:24 | 68:15,18 69:1 |
| 91:24 92:10,11 | 96:22 | 38:25 49:1 | 94:8,9,12,16 |
| 102:25 106:4,6 | **essential**  25:5 | 61:12 62:16 | 119:13,14,18 |
| 106:16,21,23 | **essentially** | 70:18 71:8,17 | 136:5,6,12 |
| 107:2,4,7,11,17 | 56:13 98:5 | 72:9 76:20 | **exhibits**  5:9 6:3 |
| 107:24 108:17 | 148:11 | 78:17 92:23 | 65:5 |

exist 58:18
existed 36:24
existence 49:21
exists 49:23
expect 70:21
experience
 17:12 20:1
 21:21 44:8
expert 19:18
 20:25 59:2
experts 13:15
explain 72:18
 80:11 81:2,17
 81:18 82:10
 133:25 150:15
 157:13
explanation
 33:22 80:16
 82:15
explicitly 83:16
 128:6
extent 26:16
 64:14 150:24
extrinsic 21:16

**f**

faced 50:15
fact 35:5 40:14
 49:10,15,21
 82:15 99:5
 100:14 112:6
 112:25 121:14
 126:6
factor 105:6
fade 145:16

fair 9:3,9,17
 16:1,15 25:19
 27:6,7,9,21
 31:16 32:11,19
 32:24 33:7
 44:1 48:6
 49:14,15 53:1
 58:2 59:1 63:2
 63:12 66:6,24
 68:21 86:20
 89:3 94:6 95:8
 101:20 108:25
 112:2,10
 127:15
familiar 23:24
 74:2 75:22
 76:3 88:16
 104:13
familiarity
 75:24
families 32:16
 32:18
family 32:10,12
 32:25
far 126:16
federal 162:14
fi 97:15,22
field 20:19 21:2
 21:21
figure 28:25
 46:14 52:6,7,9
 52:18,20 53:25
 54:11 55:1
 80:4,20 81:12
 82:14 87:10,10

99:22 104:18
 104:23 106:12
 107:8 112:1,4
 113:12,14
 114:16 117:9
 118:13 121:17
 121:25 122:4
 122:13,17
 123:16 124:23
 125:2 135:5
 137:15 138:19
 139:24 143:1
 143:13,13
 151:3 157:4,22
 158:3 159:14
figures 47:16
figuring 144:8
file 15:15 22:22
 118:21,25
 119:2
filed 17:21
 21:10 136:24
filing 23:13
financially
 162:17
find 16:25 17:2
 26:24 27:7
 61:12 62:16,23
 93:15,15
 152:22 159:19
finding 144:13
fine 30:6 137:5
finish 9:13,14
firm 7:22

first 9:23 14:19
 18:14 24:6
 29:3 38:13,22
 39:2,17,23
 40:3,12,19,22
 41:5,10,15,19
 41:23 42:6,10
 42:14,21 50:2
 50:6,25 57:6
 57:25 58:10,16
 59:11 62:4
 79:1 83:12,17
 102:21 113:9
 115:3 120:16
 121:18,19
 122:7,8,9,21
 123:12,13,24
 124:8,14,15,19
 124:24 126:3
 126:22 127:7
 127:12,18,22
 127:24 128:20
 129:9,12,17,22
 129:24 130:21
 134:16,18
 135:16,19
 136:2 141:3,4
 142:15 145:24
 149:15,16
 150:6 152:10
 154:1,7 155:23
fit 61:12
five 46:17
 139:14,21,22
 140:14 142:6

**[fix - generated]**                                                      Page 18

| | | | |
|---|---|---|---|
| **fix**  22:20 | 33:24 34:1 | **function**  23:24 | 63:25 66:20 |
| **fixed**  120:12,23 | **format**  120:18 | 50:18 52:15 | 67:10,12,16 |
| **flexibility** | **formed**  64:1 | 64:3 68:9,13 | 69:11 70:4,9 |
| 120:24 | **formerly**  56:9 | 70:10,11 71:1 | 72:5,5 73:17 |
| **fly**  34:2 | **forming**  21:20 | 85:8 90:22 | 74:17,19,25 |
| **focus**  59:20 | **forms**  16:6 | 95:14 99:3,4 | 75:20 79:13 |
| 87:10 128:18 | **formulated** | 106:5 119:8 | 83:20 91:22,24 |
| **focusing**  37:25 | 14:9 | **functional**  52:7 | 92:9,11 93:2 |
| 149:4 | **forth**  36:7 | 103:3,6,7,9,11 | 93:18 95:22,24 |
| **folder**  15:5 | 162:6 | 103:25 104:6 | 96:4,21 97:1,8 |
| 119:18 | **forward**  55:12 | 104:17 105:2 | 97:14 99:1,2,6 |
| **follow**  16:12 | 107:23 | 105:12,19,23 | 100:16,17 |
| **following** | **forwarded** | 108:12,15,16 | 104:14,17 |
| 151:23 | 82:21 | **functionality** | 106:3 108:13 |
| **follows**  8:3 | **four**  46:16 99:2 | 56:9 58:13 | 108:19 115:12 |
| 93:5 111:8 | **fourth**  65:24 | 85:15 89:20,23 | **further**  92:21 |
| **foregoing** | **frequencies** | 89:25 90:14,18 | 103:2 109:19 |
| 161:10 162:5,7 | 138:4,13 139:9 | 90:20 91:4,8 | 162:13,17 |
| 162:11,13 | 139:20 140:24 | 92:13,23 93:6 | **future**  10:23 |
| **forgot**  15:22 | 142:4 143:12 | 94:7 96:8 | |
| **form**  26:15 | 143:17,18 | 97:17 98:4 | **g** |
| 33:10 34:14 | 154:8 158:7 | 100:9,12 103:2 | **gates**  3:5 7:18 |
| 36:11 40:7 | 159:17,20,23 | 104:10 107:22 | **general**  32:8,25 |
| 42:9 48:1,7 | **frequency** | 108:9 117:23 | 33:3,4,5,8,13 |
| 54:1 78:14 | 138:10,14 | **functionally** | 33:17,20,23 |
| 83:14 88:9 | 139:13,18 | 108:19 | 88:18 |
| 92:15 98:15 | 140:18,20,23 | **functioning** | **generally**  11:25 |
| 105:6 112:11 | 142:3 143:11 | 78:2,9 91:12 | 19:15 20:6 |
| 115:22 129:11 | 153:18 154:11 | **functions**  25:9 | 29:22 57:9 |
| 129:12,20,22 | 158:6,10,23 | 31:6 43:6,7 | 95:7 110:7 |
| 129:25 130:19 | 159:13,16 | 50:20,21,23 | **generate** |
| 134:2 135:15 | **friday**  1:16 | 51:6,7,8,10,18 | 121:22 126:19 |
| 135:19 | 2:21 7:1 111:1 | 51:22,24 52:2 | 133:13 135:6 |
| **formal**  27:10 | **full**  24:6 102:17 | 52:4,17,19,20 | 154:1 |
| 27:16 28:14 | | 52:22,24 53:6 | **generated** |
| | | | 126:7,12 |

[generated - hypothetical]                                   Page 19

129:16 135:8
**generates**
  124:3 128:5
**generating**
  135:5 148:15
  148:15 158:18
**generation**
  128:11 131:20
**getting**  150:14
  157:13
**give**  9:6 11:19
  20:13 34:1
  60:16 64:22
  65:1 73:2 78:5
  91:5,13 98:22
  101:9 105:9
  126:17
**given**  37:5
  38:13 60:18
  73:18,22 76:18
  79:14,22
  101:20 160:12
  162:12
**giving**  8:15
  76:6
**go**  7:13 8:19,22
  16:18 18:13,17
  20:11 60:21
  62:9 65:6,24
  66:10,14 81:9
  93:15 94:23
  116:12 117:15
  129:8 135:3
  146:14,23
  157:17

**goals**  122:18
**goes**  103:24
  131:23 144:15
  154:16
**going**  8:19 9:14
  10:4 14:10
  15:3,9 16:13
  56:17 57:5
  59:5 65:9
  80:13 99:13
  119:11 121:21
  122:12 134:21
  138:5 142:9,19
  144:10,14
  147:5 153:8,25
  156:12 157:15
  160:11
**good**  7:4 8:8,9
  8:14,17 12:7
  34:4 56:15
  110:10
**graph**  137:17
**great**  15:19
  16:8,11 111:14
  136:14
**ground**  8:20
**group**  137:21
  138:4,7,11
  139:15,23
  140:17 144:23
  145:4,6,9
  154:4,5,10,15
  156:13 158:13
  158:14,20,22

**groups**  137:24
  148:17,22
  151:19,22
  158:19 160:1
**guess**  27:1
  69:17 70:15
  72:2 155:2
  157:10
**guidance**  44:17
  45:4 53:21
  54:8 58:17
  83:18 84:5,7
  99:1 128:25
**guides**  19:13

**h**

**half**  42:4
**handed**  50:24
**handled**  107:20
  119:7
**happened**
  116:20
**hard**  9:12 67:6
  68:4,5 70:3,4,6
  70:8,9,14,19,25
  71:22 72:8
  105:14 115:3
  118:7
**hardware**
  68:12 85:7
  105:3,4,5
**harmonic**
  145:18
**head**  9:7 64:22
  65:1

**heading**  108:12
**hear**  8:23,25
  156:14
**heard**  145:24
**held**  7:9
**help**  43:8 67:20
  72:18
**hereto**  15:8,13
  23:5 65:16
  94:14 119:16
  136:8 161:12
**hey**  123:24
**high**  100:23
**higher**  19:1
**histories**  72:17
**history**  40:16
  63:20 74:9
  79:9 114:25
  116:15 118:21
  118:25 119:2
**hold**  94:20
**holders**  13:1
**home**  64:2
  67:12 68:9
  72:5 89:20,23
  90:15,17
  115:12
**hour**  110:15
**hours**  12:6,10
  14:22,24 15:1
**hundreds**
  35:25 38:3
**hypothetical**
  55:19,20,21
  56:6 73:3,11

[hypothetical - indefinite]                                             Page 20

74:23 75:2,20
76:1 77:17
79:21,23,25
91:14 93:1
98:2 101:9
115:5 132:14
133:23 137:20
138:3 139:8,14
139:23 145:2

**i**

**idea**   120:17
122:11 123:23
152:7
**identification**
15:7,12 23:4
65:15 94:13
119:15 136:7
**identified**   14:7
26:17 37:15
45:1,13 76:22
113:7 114:11
114:12 118:11
118:12 126:2
131:2 133:11
133:22 138:5
**identifies**   17:19
98:25
**identify**   18:13
18:17 23:15
41:4,10 49:12
80:21 145:6
**identifying**
131:2 139:10
140:12 143:17

**ignore**   115:4
153:9
**ignores**   49:20
96:10
**ignoring**   42:3
152:25
**illinois**   3:10
**illustrated**
63:20
**image**   24:23
**impact**   41:22
116:24
**impacting**   91:3
**implement**   56:9
58:13 59:18
77:22 78:7
79:19 91:14
96:3 97:14,17
104:9
**implementati...**
89:18 90:13
103:14,21
109:22,23
**implemented**
39:1,3,17,21
40:22,23,24
42:13,24 50:1
50:6 55:5,7,17
55:21,25 56:9
59:11,13 80:22
84:12 87:19
101:22 102:4
102:10,14,18
104:7 105:12
106:24 107:5

107:19
**implementing**
40:22 42:22
52:8 84:25
85:5 96:25
97:8 105:1,19
107:21
**implements**
32:20 97:21,22
98:4 102:25
**implications**
92:21
**implies**   41:6
**important**
118:10
**importantly**
118:1
**impossible**
34:11 56:13
**inaccurate**
80:23
**include**   25:10
27:2 43:10
44:13 46:10,24
47:12 50:14
131:12 132:15
134:9,21
**included**   21:16
21:19,22,23
24:3,23 25:14
26:3,9 27:17
27:22 33:25
34:19,24 46:13
46:16 47:3
53:9,10 64:15

66:5,6 94:5
95:6 114:17
130:21 132:4
132:11 146:16
155:13
**includes**   42:11
46:3,22 50:2,7
52:14 53:11
54:16,20 59:11
59:13 81:22,25
114:16
**including**   24:14
26:4,7 131:21
**inclusion**   87:11
**incompatible**
112:21 113:5
**incomplete**
73:11
**inconsistent**
71:20,25
**incorporated**
7:11
**incremental**
85:7
**indecipherable**
88:5
**indefinite**
38:18 39:18,24
39:25 42:8
46:1 57:14
60:19 62:1,23
63:12 108:4
112:9,20 113:2
113:3 114:25
135:18 149:2

**indefiniteness**
  31:12 36:23
  58:3 61:11
  62:15 64:16
  73:15 79:16
  80:24 82:24
  83:21 114:3
  116:11,13,17
  118:19 150:7
  152:10
**independent**
  126:11
**independently**
  91:1,10 93:4
**index**   5:1 6:1
**indicate**   32:9
**individual**
  137:18
**industry**   19:20
**inform**   43:8
  67:14 69:1
  81:6,18
**information**
  6:10 101:17
  132:4,11,15,21
  133:3,18 134:1
  134:4,9,20
  135:2,9,10,13
  135:21
**infringe**   58:9
  58:24
**infringement**
  11:19,20 12:23
  12:25 36:9
  58:1,4 61:3,7

61:17 62:3
  63:11
**initial**   125:4
**initialed**   161:11
**initially**   121:8
  121:16 123:5
**ink**   161:11
**innovate**
  120:22
**input**   14:10
**inserting**
  150:11
**instances**   56:8
**instruction**
  6:14 25:6
**intend**   10:19
  48:24
**interchangea...**
  148:11
**interconnected**
  35:16,25 38:4
  42:2 43:14
  61:25
**interested**
  162:18
**interesting**
  145:2
**interface**   24:7
**interference**
  145:16 146:1,3
**interpret**   37:7
  104:25
**interpretation**
  154:19

**interpreted**
  48:15 88:13
  115:15
**interpreting**
  123:11
**interrupted**
  88:11
**intrinsic**   64:11
  67:24 69:4
  72:18 73:6,18
  115:4,5
**introduce**   15:3
  22:16
**introduced**
  15:16 65:18
  116:6 145:14
**introducing**
  65:3 94:8,9
  136:5
**invention**   26:12
  37:21 44:7
  45:12 52:21
  55:6,14 56:1
  67:19 83:5
  96:12 101:24
  104:8,11,22
  105:18 106:11
  106:24 107:7
  110:8 112:3
  120:8 121:1,4
  121:25 122:17
  122:18 125:5,7
  141:18 146:13
  147:1 149:24
  149:25 154:20

**inventors**   48:24
**involve**   18:9
  20:2
**involved**   10:16
  11:9,12,15
  14:11 18:9
**involvement**
  55:13 82:23
  102:6 107:17
  107:24 108:9
**ipr**   11:12 19:13
**iprs**   11:15
**issue**   36:4 39:5
  39:11 40:14
  80:20 82:16
  97:24 100:19
  116:16 117:21
  135:18
**issued**   116:10
**italicized**   118:3
**item**   152:19

**j**

**jason**   3:7 7:20
**jason.engel**
  3:13
**job**   1:24
**jrg**   1:7 2:7
**judge**   57:4
  68:22
**july**   136:25

**k**

**k&l**   3:5 7:18
**katherine**   3:6

**kathleen**   13:19
**katie**   7:18
**katy.allor**   3:12
**kevin**   1:14 2:16
  5:4 7:6 8:1
  111:6 160:13
  161:8,20
**kind**   16:7 20:1
  20:7 27:9 28:4
  28:20 29:18
  34:10 35:8
  36:3 53:3
  62:12 71:6
  72:15 73:10
  74:7 80:18
  96:10 100:4,6
  101:8 114:12
  118:4 120:23
  121:24 122:17
  123:16 138:16
  138:23 147:20
  149:15 154:7
  154:16 156:10
  158:25
**kinds**   19:16
  97:18 131:13
  145:16 146:7
**klgates.com**
  3:12,13
**knew**   51:7
**know**   8:16,22
  9:1,5,5,15 11:2
  13:9 19:24
  20:4 30:20,23
  31:5 37:7,10

44:3 50:22
57:3,4 58:22
59:18 66:11
68:4 71:23
73:19 78:9,10
83:4 96:3
98:14 104:17
111:24 116:17
117:25 118:4
119:1 128:6
136:10 145:10
146:20,22
149:2,21
152:16 156:8
159:21
**knowledge**
  10:22 21:21
**known**   28:7,9
  28:11,12,13
  33:8 34:12
**kramer**   58:5,14
  116:6 118:5,24
  149:21 156:8
**kramer's**   12:2

**l**

**l**   3:6
**label**   22:19,21
  54:12 81:6
  99:22
**labeled**   29:4
  30:8 31:2
  52:12 81:4
  137:17 138:12
**lack**   79:10

**language**   40:20
  59:15 60:7
  63:21 69:6
  72:13 75:1
  83:11 107:10
  107:13 120:7
  122:1,25 123:3
  124:1,25 127:5
  127:12 128:3
  129:9 130:3
  151:17,25
  152:5,24
  153:10 154:23
  154:23 155:7
  158:24
**large**   15:17
**larger**   53:20
  54:8
**law**   3:8,18
**layer**   19:1
  97:19 103:4
  104:2 127:25
  147:21 159:22
**lead**   131:3
**leads**   35:4
  49:18 79:15
**left**   140:1
**level**   35:23 38:2
  38:6 45:2,5,16
  46:7,8,10
  47:14 48:14,19
  48:24 51:4
  54:3 81:14
  84:7,12 94:3
  97:11 100:23

**levels**   38:1
  44:15,17,25
  45:10,18,22
  46:4,5,6,8
  48:12 116:4,5
  116:6
**light**   64:11 74:9
  113:14
**likely**   60:13
  141:9,10
**limitation**
  77:23 82:8,15
  107:16 112:19
  114:23 123:12
  150:7,8
**limitations**
  56:12 61:9
  83:2 115:11
  137:22 151:11
**limited**   110:2,5
**limits**   147:1
**line**   29:20
  31:18,18 84:20
  88:23 106:1
  107:2 143:2,5
  143:14,15
  153:25 157:18
**lines**   92:4
  102:23 105:23
  120:3 125:9
  131:11 152:16
  158:10
**link**   97:19
**list**   18:20 19:10
  21:7,9,11 53:3

146:12
**listed** 18:1,4,11
  30:11 108:24
  131:14 137:6
**litigated** 10:21
**litigation** 11:21
**little** 8:22 9:12
  19:1 28:19
  30:22 73:8
  115:3 118:7
  123:21 126:17
**live** 162:3
**llc** 1:5 2:5 7:10
  7:20
**localizing**
  106:2,5
**locate** 22:1
**log** 65:5
**logical** 68:5
  69:14 70:3,4,5
  70:8,10
**logically** 66:18
  69:9,20 145:3
**long** 12:4,8
  77:23 131:15
**look** 10:15
  20:14 21:4
  24:1 29:3 31:7
  38:25 40:20
  41:24 46:12,20
  52:6 57:1
  63:21 65:21
  66:7,9 69:7
  76:13 79:23
  84:19 88:22

91:7 95:9
  100:14 105:22
  111:16 112:15
  117:8 118:21
  121:5 125:8
  126:14,20
  127:11 129:8
  129:15 134:14
  138:8 139:13
  142:18,19
  143:1 144:3,18
  147:2 148:12
  149:10 150:22
  150:24 151:2,7
  152:6,16,24
  155:13
**looked** 10:17
  27:15 30:14
  60:12 119:1
  126:15
**looking** 18:20
  29:12 30:19
  31:13 49:24
  57:6 58:22
  105:15 121:11
  149:15,25
  153:15 155:7
  155:22
**looks** 16:23
  17:16 30:17
  67:4 143:16
**lot** 8:16 44:15
  115:19 116:4
**lots** 37:6,25
  53:17 54:5,7

**lowest** 142:7,11
  142:13 144:8
**lunch** 111:13
**luncheon**
  110:16

| m |
|---|

**m** 1:22 2:22
  162:25
**ma'am** 8:11
  20:22
**mac** 51:21 52:4
  55:3,16 82:19
  83:7 85:19
  93:8,12,18,25
  94:5,7 95:1,8
  95:17,22,24
  96:4,6,11,14,14
  96:15,16,19,21
  96:25 97:2,3,5
  97:6,8,14,21,22
  98:9 99:4
  100:18 101:21
  102:4,9 103:4
  103:10 107:21
  108:22
**machine** 25:6
  25:11 162:9
**made** 79:15
  109:14 113:16
  116:21 137:1
  161:10 162:9
**madison** 3:9
**mails** 16:13
**major** 85:9

**make** 9:13
  15:24 56:12
  60:16 70:12,16
  90:25 125:6
  130:12 142:24
  147:25 149:23
  152:12 155:21
**makes** 46:1
  108:3 116:7
  140:25 154:19
  156:14,17
  157:12
**making** 142:15
  155:3
**manufacturing**
  20:8
**map** 31:3 95:5
  125:1
**mapped** 117:12
**mark** 15:9
**marked** 15:4,6
  15:11 16:9
  23:2,3 65:14
  94:12 119:14
  136:6
**marshall** 1:3
  2:3
**matched** 70:9
**materials** 12:1
  12:5 14:6 21:7
  21:12
**matter** 12:15
  13:4,16,23
  14:4

**[mean - model]**                                        Page 24

| mean   25:22 | 58:20 61:23 | meeting   56:12 | 153:2,3,3,15 |
|---|---|---|---|
| 29:11,15,21 | 64:23 69:22,23 | 114:23 | 155:9 157:3,7 |
| 31:25 37:6 | 71:15,16,16 | meggs   7:21 | 158:5,9,16 |
| 38:2 39:15 | 73:19,24 80:18 | melissa   1:22 | 159:10 |
| 49:16,19 57:20 | 93:8,25 108:13 | 2:22 7:8 | microprocess... |
| 60:14 61:22 | 126:10 141:17 | 162:25 | 33:1 |
| 63:14 64:7,10 | 144:4,19 152:6 | members   138:6 | microsoft   5:17 |
| 64:24 71:7,8 | 155:9 160:3 | memorized | 22:7 24:2 |
| 71:25 73:3,12 | meant   28:17 | 23:17 145:23 | 25:17 27:22 |
| 74:25 77:22,23 | 50:1 67:22 | 146:14 | 34:19 38:13 |
| 85:25 88:14,20 | 82:11 129:18 | memory   66:19 | 53:9 56:24 |
| 89:12 93:2,9 | measure | 67:5,8,14 | 57:12 60:24 |
| 93:13 100:7 | 143:24 147:14 | 69:10 72:3,10 | 61:23 62:25 |
| 105:5,5,7 | measured | 72:22,25 76:23 | 65:19 66:5 |
| 121:24 130:4 | 139:22 146:18 | 114:14 118:15 | 67:4 69:19 |
| 137:5 143:10 | 146:20 157:6 | mention   146:3 | 71:21 |
| 145:4,11 148:2 | 158:4 | mentioned   13:7 | mind   13:13 |
| 149:8 150:3 | measurement | message   129:3 | 18:20 19:9 |
| 151:16 152:24 | 135:22 | 129:4 132:5 | 37:14 70:18 |
| 153:21 154:16 | measurements | 143:4 | minimum |
| 156:14 158:8 | 133:3 134:21 | messages | 154:13 |
| meaning   27:24 | 135:2,9,22 | 132:14 | minimums |
| 28:3 48:20 | 146:10 | met   12:2 | 143:2 |
| 65:2 76:11 | measuring | metric   148:2,4 | minus   15:2 |
| 81:3 96:20 | 145:1 147:12 | 148:5,9,18 | minute   65:7 |
| 98:12 115:20 | media   95:1,4 | 149:6,15,16 | misremember... |
| 142:17,18 | medium   93:9 | 150:2 151:25 | 116:14 |
| 148:6 150:18 | 93:19 95:5 | 154:1,24 | missing   17:14 |
| 150:23 | meet   12:8 | 155:19,20,22 | 21:9 |
| meaningful | 44:20 55:8,23 | 155:24 156:18 | misstates   48:7 |
| 142:25 153:13 | 59:19 60:1,10 | 157:10 158:9 | 54:1 115:22 |
| meanings | 79:24 82:8,20 | 158:20,22,25 | mixed   70:9 |
| 47:21 81:9 | 83:1 102:5 | 159:6,18 | mode   41:1 |
| means   34:9 | 107:15 131:15 | metrics   148:20 | model   78:12 |
| 47:19,19 54:23 | 145:7 | 151:18,21 | 79:2 81:4 |

**[modem - noted]**                                          Page 25

**modem**  29:25
  30:4 39:2,8,21
  40:23,24 42:12
  42:24 50:15,16
  50:24 51:2,16
  52:8 54:12
  58:23 59:12
  60:10 63:24,25
  64:1 67:10,11
  68:9 72:4,6
  76:14 77:7,18
  77:25 78:2,4
  78:10 80:8,15
  81:22 82:12
  83:3,6 85:1,6,8
  85:15,17,18,24
  86:8,19,23
  87:6,8,18,21
  89:1,8 90:1,21
  90:24 91:4,7
  91:23 92:10
  100:1 102:25
  103:1 105:6
  106:5,6,16,19
  106:19,23,23
  107:2,4,7,11
  108:17,20
  111:20 112:1,7
  113:20 115:1
  115:12 117:14
  117:23 119:8
  133:1,4,8,12,19
  134:1 137:18
  137:23 138:21
  140:1,5,8,13,17

  140:19,20
  144:22,24
  145:3 153:4
  154:2,10
**modems**  138:3
  139:2,8,14,22
  139:22 140:15
  145:8 153:17
  154:3,5,14
**modified**
  138:23
**modify**  71:10
**morning**  7:4
  8:8,9
**move**  140:4
**multiple**  45:25
  46:2,4,7 81:8
  85:23 135:25
  142:4
**music**  13:1 19:3
**mute**  62:6
  119:24

---

**n**

**name**  7:7 13:18
  22:22 162:21
**necessarily**
  8:17 93:5
  101:2
**necessary**
  82:10
**need**  9:6,16
  32:22 44:20
  63:18 78:11
  82:7 100:4
  126:12

**needed**  17:3
  95:10 117:19
  143:4
**needs**  9:8 95:14
  101:4
**negative**  142:9
**neighborhood**
  15:1
**neither**  162:17
**network**  39:1,7
  78:1 93:20
  107:23 108:17
  120:17 156:13
**networking**
  29:4 39:17
  40:21 41:1
  42:22 46:21
  47:3,5,7,11,24
  49:11 50:1,6
  50:16 51:1,10
  51:11,14 55:12
  59:10 63:24
  64:3,4 67:12
  68:9 72:5,6
  76:15 77:7,19
  78:4,12 79:3
  82:22 89:2,7
  89:22 90:16,23
  91:3,24 92:11
  106:3,4,21
  107:17 111:19
  112:8 113:21
  115:2,12,13
  117:13

**never**  116:10
**new**  3:20,20
  5:20 94:10
**newton**  34:22
**newton's**  21:25
**nod**  9:7
**node**  121:8,8
  121:15,15,18
  121:19 122:2,3
  122:5,7,8,10,22
  122:22,23
  123:5,5,10,12
  123:13,14
  124:8,10,12,14
  124:19,20
  125:1,3,4,17,24
  125:25 126:1,8
  126:13 128:5,8
  128:13 130:21
  134:7,8,16,18
**nodes**  120:17
**noise**  141:24
  145:12,13,14
  145:18,21,22
  145:24 146:2,4
  146:7,12,15
  147:24
**noises**  146:7,10
**non**  11:20
  44:12 142:9
**normally**  17:17
**north**  8:13
**note**  7:12 162:3
**noted**  161:11

notice  5:11
15:5
noticing  7:16
number  19:22
35:15 123:3
142:7,8 144:12
159:10
numbered
118:12
numbers  142:9
151:7
numerous
157:16

**o**

oath  8:2
object  26:15
33:10 34:14
36:11 40:7
42:9 48:1,7
54:1 62:7
78:14 83:14
88:9 92:15
98:15 112:11
115:22 134:2
157:15
objection  35:19
62:8 77:10
81:24 123:7
objections  7:14
objects  9:15
observation
62:4,10
obviously  22:3
occur  95:11

offered  25:24
28:4 79:7
131:8
offering  10:19
27:16
office  11:13
oh  26:22 35:22
129:18 142:12
149:21 156:8
157:21
okay  8:7,18
16:17 17:6
18:23 22:22,25
29:2,6 30:7
56:14 66:8,13
66:15 79:6
87:25 88:24
94:18,22 110:1
110:9,12
111:17 122:7
123:1 126:5
134:25 136:13
137:14 138:25
140:16 141:1
142:12 146:5
147:4 153:25
155:17 157:24
160:4,9
once  15:15
49:20 143:3
ones  13:7 15:25
18:14 19:9,10
open  15:24
16:3,5 22:24
53:3 94:17

100:16 119:19
136:11 152:9
opened  16:10
operate  78:8
operating
90:24 91:23
92:10
operation
92:25 93:3
opined  31:8
opinion  11:20
22:15 23:10,20
28:2,5 34:2
38:17 39:12,16
39:22 45:24
57:13 60:18
61:1 63:10,13
72:8 79:7 83:1
96:5 99:16,20
101:20,21
102:8,12
108:22 111:24
112:6,15
113:23,25
114:24 115:18
119:3 121:12
121:13 123:2
125:2 130:15
130:23 141:14
149:1 159:10
opinions  10:11
10:19 14:9,25
21:20 31:12
80:24 137:9

opposed  20:7
92:24 101:11
154:11,17
155:20
opposite  83:5
option  108:5,6
oral  9:6
oranges  71:24
72:1,16
order  44:20
58:15 63:18
93:3 143:5
153:12
ordinary  27:24
28:3 65:2
96:20 142:17
142:18 144:17
150:23
original  99:12
162:14
outcome  57:3
outside  13:7,22
overall  105:6
overlap  31:9
100:17
overlapping
51:24 99:5
own  48:15
114:25

**p**

p.m.  2:21
110:14,16,18
111:2,4 147:6
147:9 160:11
160:15

packet  89:24
90:19 107:20
packets  55:11
82:21 107:16
107:23
pads  59:17
page  5:10 6:4
8:21 16:18,20
16:20,23 24:7
24:17 25:20
26:24 27:2
34:17,23 44:21
65:21,23,24,25
66:10,14 94:25
114:17 138:18
pages  1:25
15:24 24:3,5
25:17 26:5
paper  147:15
para  26:24
paragraph
20:12 21:4
24:20 26:23
34:25 37:16
46:12 48:14,18
48:21 49:2,2,3
49:4 76:23
80:1,3,19 81:1
81:10,10,16
93:15,17 94:2
96:19 105:16
106:12,20
109:3 112:15
114:10,10
117:8,19 118:2

119:5,11 120:3
121:12 122:24
123:9,17 124:9
124:20 126:21
127:6 130:12
136:16 137:12
137:20 138:17
138:24 141:3
141:25 142:16
149:13 150:10
150:19,22
155:11,16,23
159:4
paragraphs
26:18 109:8,16
parallel  62:11
parameter
131:5
parameters
121:22 123:25
124:4 126:22
126:23 127:8,8
127:13,14,19
127:22,25
128:4,7,11,17
128:20,21
129:6,10,13,18
129:23,25
130:20,22
131:9,12,13,19
132:1,6,9,19,22
135:7,17,20,23
135:23,25
136:3 154:13
159:21,22

parentheses
29:9 124:11
parenthetical
114:15
parse  118:7
part  12:9 20:16
21:13 37:22
39:6,7 46:25
47:5 51:19
53:13,19 54:8
55:18 56:4
59:6 60:1
63:19 72:17
73:14 76:18
84:9 88:2,10
92:4 108:3,19
113:3 114:11
115:3 117:3
118:11 120:16
139:11 145:13
148:18 149:10
149:17 150:2,6
152:1,8 154:17
154:25 155:5
155:23 156:21
156:22
participants
2:18
particular
13:13 25:24
27:14 32:1,6
32:20 34:5,8
35:17 42:3
43:15 61:25
72:13 76:11

100:12 120:10
131:7 133:10
138:19 139:18
146:23 147:19
158:6
particularly
41:17
parties  7:13
partition  66:16
66:24 67:3,6
67:13 68:2,18
70:14,19 71:4
71:9,10,13,19
72:2 108:19
partitioned
64:2,8,13,17,20
64:21,23,23
65:2 67:9,12
67:23 68:8,10
69:3,18 71:1
72:11,20 73:17
79:14 83:21
108:13 113:22
113:25 115:14
partitioning
67:16 68:20
69:14,15 70:3
70:5,24 71:6
72:4 105:24
108:12,15,16
partitions
68:13 71:7
parts  70:15
84:3 118:12

**party** 162:19
**passage** 104:5
  105:11 107:9
**passages** 159:8
**past** 12:19
**patent** 5:15,23
  6:5 9:23 10:1,3
  10:4,7,8 11:6
  11:13 12:23
  22:16 23:1,10
  28:8,23 29:1
  29:12 33:7
  34:6,10 35:4
  36:25 37:9
  38:12,25 41:20
  44:16 46:14
  47:18 49:25
  52:6 56:2,11
  57:5 66:25
  69:5,7 71:14
  71:20 72:17
  76:12,13 77:6
  80:4 84:19
  88:22 93:25
  95:17 96:6
  98:1,7,22,24
  99:11,18
  100:15 101:7
  101:19 102:23
  104:21 105:22
  111:14 115:16
  115:21 119:12
  119:13,22
  120:4,8,8,11,20
  120:21 121:5

131:10 132:1
134:11 135:12
136:5,15,21,22
141:19 144:19
145:5 146:9,12
146:21,23
148:12 149:19
**patent's** 68:20
**patents** 9:23
  10:12,15,20
  12:1 14:4,6
  33:19
**path** 35:13
  38:15 39:15
  41:3 57:12
  59:3 60:25
  72:22,25 76:16
  77:9 79:4
  114:19 118:14
  124:7
**paths** 72:10
  114:14 118:17
**pattern** 121:3
  124:6 133:11
**patterns**
  147:19
**payload** 131:22
**pc** 70:19
**pdf** 16:5 34:18
  65:21,24
**pdu** 55:11
**penalty** 161:9
**people** 28:12
**perform** 25:9
  35:17 42:2

43:14 52:15,17
  57:25 58:4
  61:25 95:22,24
  96:22
**performance**
  157:6 158:4
  159:21
**performed** 31:7
  64:3 67:11
**performing**
  50:18,20,22,23
  51:18 53:4,7
**performs** 52:19
  52:25
**period** 28:7,16
  93:25
**perjury** 161:9
**person** 27:19
  28:22 36:25
  37:6,13 41:12
  42:15 43:5,8
  44:24 46:8
  58:7,18 59:17
  60:3 61:15,18
  62:20 63:5
  67:15,21 69:1
  81:7,18 83:19
  84:15 94:2
  104:11,19
  105:14 113:17
  115:6,15 116:8
  116:25 117:5
  144:2,17 148:6
  150:3 151:10
  151:15 155:9

156:13,19,25
**perspective**
  104:23
**pertains** 162:13
**ph.d.** 1:14 2:17
  5:4 8:1 111:6
  161:8,20
**phi** 103:4 104:2
**phone** 119:20
**phonetic** 18:25
  19:14
**phrase** 28:16
  31:24 32:4
  148:2 152:25
**phrases** 42:10
  130:24
**physical** 69:14
  70:4,6 71:4
  93:19 105:3,4
  105:5 127:25
  147:21 159:22
**physically**
  66:21 69:12,20
  80:22
**pick** 138:14
  139:15 142:5
**piece** 68:12
**place** 7:13
  162:6
**placed** 80:18
**places** 29:21
**plain** 27:23
  28:3 65:1
  96:20 142:17
  142:18 150:23

**plaintiff** 1:6 2:6
2:18 3:4 7:19
12:25 60:16
**planning** 10:24
11:15,19
**plans** 11:1,17
11:22
**please** 7:12,15
7:17
**plural** 106:7
**pluralities**
135:25 136:4
**plurality**
121:22 123:25
126:22,23
127:7,8,13,13
127:19,22,25
128:4,7,11,17
128:21,22
129:6,9,12,17
129:22,24
130:22 131:19
135:17,20,23
136:2 137:24
148:16,21
158:19 159:25
160:1,1,3
**plus** 15:2 21:1
21:21
**point** 10:17
31:17 71:18
80:14 81:16
83:4 109:1
118:10 126:3,4
141:16,25

142:15 145:5
150:9 152:21
154:22 157:4
157:11
**pointed** 109:11
109:13 118:15
132:19 153:24
159:9
**pointing** 31:14
112:1
**points** 148:10
149:3
**portal** 89:19
90:14
**porter** 3:16
7:23 13:3
**portion** 66:18
67:8,25 69:9
89:6 91:16
102:6 105:1
118:3,20
136:14 151:11
157:25
**portions** 70:24
72:3 118:25
**posita** 20:13,17
23:23 27:7,24
28:15 29:11
30:19 33:16,23
36:18 37:9
42:20 44:6
45:6,8,15
49:24 50:17
64:24 67:18
70:2 74:12

75:9,12,22
76:2 88:20
93:24 95:16,23
96:3,16 97:2,3
99:25 101:13
104:5,13,25
131:6 133:25
141:7 148:3
**position** 25:23
27:11 28:14
33:2 69:13
76:14 77:6
79:2 113:19
121:7
**positions** 149:5
**possibilities**
45:25
**possibility**
54:20 87:18
**possible** 37:11
37:24 45:10
81:8 106:14
107:23 116:5
142:7 144:12
**possibly** 104:11
**potentially**
18:17 19:8
104:18 133:12
**practice** 8:16
**predefined**
120:18
**predetermined**
120:13,23
135:14

**prepare** 11:24
14:5
**prepared** 34:1
119:21
**preparing**
16:25 17:2
21:8 23:9
136:19
**prepositional**
152:25
**present** 10:24
12:11 67:24
95:15 113:1
**presumes** 79:6
**pretty** 8:14
17:17 26:8
76:20 100:23
114:21 118:1
118:18
**prevent** 95:10
**previous** 28:1
78:20 89:13
132:25
**previously** 15:4
79:22 111:7
**prior** 76:20
116:18 120:9
120:19 162:8
**priority** 23:11
23:13,20,22
33:6 119:22
120:2 136:20
137:3
**probably** 13:12
28:13 29:5

33:4,14 100:24
101:10 114:9
**probe** 120:13
120:13,24
121:2,9,16,18
121:19,20,21
121:23,23
122:9,10,13,14
122:15,19,20
122:21 123:6
123:19,20,23
123:24 124:2,3
124:4,5,8,9,12
124:13,15,16
125:2,12,14,14
125:22 126:7
126:12,19
127:19,21,24
127:25 128:1,5
128:12,25
129:2,12,16,20
129:22,24
130:1,19
131:18,21,22
132:5,8,10,11
132:15,21
133:2,6,7,9,11
133:14,16
134:8,9,17,19
134:22 135:3,6
135:8,14,15
147:18
**probes** 120:18
**problem** 36:5
41:11 49:23

51:19 63:19
73:14 82:24
83:21 84:14
98:7 113:17
114:3 118:19
124:22 152:10
**problematic**
31:11 41:17
43:20
**problems** 35:4
45:11 83:9
**proceeding**
7:15 20:14
**proceedings**
11:12 17:15
162:5,7,9,15
**process** 20:8
57:4 120:25
**processed** 19:7
**processing** 18:5
18:11,21 20:20
**processor**
24:24 25:4
27:20 28:17,20
29:16,19,23
30:15 31:3,20
31:21,25 32:2
32:7,8,19,20,23
33:13,17,20,23
42:11 45:6,9
47:2,4,12 48:5
49:12 50:2,7
51:21 52:5,15
52:17 54:16,18
55:5,8,15,16,16

55:22 56:10
58:25 59:6,7
59:12,14,21
60:10,19 81:23
82:5,6,7,8,17
82:19,20 83:7
83:8 85:12,19
85:22 86:5,6
86:13,18 87:1
87:7 95:18,22
95:24 96:4,7
96:11,14,15,17
96:20,22,25
97:2,3,5,6,7,20
97:22 98:3,3,6
98:9 99:4
100:18 101:3
101:11,14,21
102:4,4,10,14
103:4,10,12,15
103:16,23
104:3,7,10,22
105:7,13,21
106:4,6,15,22
107:2,5,10,14
107:20,22
108:10,14,23
108:24 109:13
109:17,18,20
109:24,25
110:2,6,8
117:12,13,23
119:7
**processors** 25:9
28:6 30:11,13

31:2,15 32:10
32:10,11,12,15
32:17 33:9
54:19,24 55:1
55:18 56:4,10
59:9 60:2,7
76:25 82:1,3,5
82:6,12,16
83:2,6 85:23
86:3,10,16,24
87:6,12,15,20
87:22 88:6
96:9 97:14,17
99:6 101:23
102:10,16,19
104:1 106:25
109:4 111:25
111:25 112:4
**product** 61:3
**products** 78:11
**professional**
162:3
**profile** 138:1,2
138:9 139:7,19
140:25 141:8
141:10,17,21
141:22 142:2,4
142:21,23
143:24 144:2,5
144:7,19
147:24 148:5,9
148:19 149:6,9
149:11,16,19
150:3,5,16,17
151:12,14,18

**[profile - read]**

Page 31

151:23 152:1
152:18,23,23
153:1,5,7,9,10
153:14,16,20
154:7,7 155:1
155:8,12,15,20
155:22,24
156:2,19 157:3
157:10 158:7,9
158:13,16
159:2,10
**profiles**   150:13
152:17 156:4,6
**program**   17:23
17:25
**prosecution**
40:16 63:20
72:17 73:23
74:9 76:19
79:9,15 113:7
113:15,16
114:1,24
116:15
**prospective**
131:6
**protocol**   19:2
95:10,15
**protocols**   97:19
**provide**   27:18
33:22 44:17
45:4 75:25
84:15 93:23
99:1 130:10
133:24

**provided**   25:15
35:11 37:11
43:16 57:11
71:9 82:15
90:1,20 96:1
**providers**
19:16
**provides**   27:4
44:3 128:25
**providing**
26:10 27:12
32:22
**provisional**
120:1,1 136:23
137:3
**ps**   89:19
**purple**   80:7
81:3,3,21
**purpose**   24:14
32:25 33:3,5
133:2,6
**purposes**   23:12
119:25 136:22
**put**   14:16 69:6
80:7 99:25
119:20
**putting**   114:24

**q**

**qualify**   20:17
**qualifying**
28:10
**question**   8:24
9:14 11:2 27:1
30:22 31:14
33:12 34:4

35:9 36:17,22
36:22 39:20
40:18,19 41:2
41:6 46:2 48:2
50:3,9 56:6
58:3 60:9,21
60:22 61:5,6
61:10,14 62:14
62:18 64:16
68:3,6 69:16
69:21,25 70:7
70:12,15 71:22
72:23 73:9,10
74:11 75:14
77:4,5,16,20
78:15,20,21
79:1,6,19,24
84:4,10 87:16
87:17 88:4
89:5 91:5,18
92:1,8 96:10
96:13 98:18
99:10,12 101:4
101:6,15
102:21 105:9
122:12 127:3,5
127:17 128:19
130:2,11,14
132:7,12,18,24
132:25 133:16
133:20,24
134:5,10,18
140:8 144:15
146:25 156:3
157:16 159:7

**questions**   78:24
111:15 160:5,7
**quick**   8:19
**quiqley**   13:19
**quite**   15:17
44:12
**quote**   118:2
**quoting**   120:3

**r**

**r940**   85:11
**range**   37:23,24
158:7
**ratio**   141:24
143:23 145:12
**reach**   154:14
**read**   25:21
31:19 35:12,19
35:22 38:14
41:25 42:20
43:12 45:5
63:22 66:17
69:8 85:4
89:14,17 90:7
90:10,10,12
92:5,16 93:17
95:9 102:24
103:13,19,20
105:11 106:1
109:21 112:18
113:4 123:9
125:11,18
128:6 129:15
129:19,19,23
131:17 134:15
135:5 139:5

141:5 148:14
158:2,11 161:9
**reading**   28:15
28:22 37:9,13
43:1 104:5
120:15 151:10
157:23
**real**   70:1
117:21
**really**   27:12,15
28:20 30:17
33:11,18 34:1
34:4 36:9
69:22 70:12
73:5 86:14
97:9 116:23
134:10 142:1
151:2 154:18
155:23 156:1
**reason**   24:11
24:18 26:4,6
55:4 116:21
137:19 138:8
138:16 149:1
155:6
**reasonable**
23:25 34:10
35:6 36:5 37:2
41:13 49:7,18
50:13 57:21
58:12,19 61:16
62:21 63:7
73:24 79:12
97:1 104:25
152:9

**reasonably**
115:17 116:7,8
117:6
**reasons**   36:6
83:9 113:8
117:7 149:12
155:16 159:3
**recall**   13:20
14:13,18 21:18
22:2,5,12
24:19 25:25
64:14
**receive**   133:12
143:24
**received**   124:6
133:13 147:20
147:23
**receiver**   121:21
122:14,20,21
123:21,22,23
124:5,12,15
125:2,15
**receives**   122:10
124:2,16 134:7
**receiving**   121:8
121:15,18,20
122:2,5,6,8
123:5,10,12,13
123:13 124:8
124:10,18,20
134:16,19
143:4 144:24
144:25
**recent**   18:3

**recess**   56:19
65:11 110:16
147:7
**recitation**
86:20
**recites**   112:16
**recognize**
42:17
**recollection**
12:16 23:12
51:12 52:16
117:15 128:15
**recommend**
15:16
**record**   7:5,14
56:17,20 64:11
65:7,9,12
67:24 69:5
72:18 73:7,18
77:12 110:13
111:4 115:4,5
147:5,8 160:11
162:8,12
**recorded**   7:6
**recording**   7:12
**red**   46:17,20
**redirect**   160:6
**reduced**   25:6
**reduces**   120:24
**refer**   9:25 10:4
10:8 22:23
29:5 30:4 90:7
97:2 123:11
**reference**   28:15
30:24

**referenced**
24:17 28:10
34:25
**references**
29:15,23
**referencing**
21:12 67:10
68:8 72:2,4
**referred**   30:21
30:23 124:11
**referring**   20:24
21:1 47:9
50:12 68:11,12
68:15,17 81:17
85:23,24 86:1
87:12 106:13
107:6 108:18
124:19,22
142:1,22
158:25 159:1
160:2
**refers**   32:25
104:6 142:20
159:25
**reflect**   17:8,11
**regarding**   9:19
13:23 118:22
**regardless**   63:4
**registered**
162:2
**rejection**
116:17
**rejections**
116:11

**relate**  18:20
93:18
**related**  19:2,5,8
48:15 99:2
101:7 148:17
148:20 149:5
149:14,18
150:2,5 151:18
151:21,25
153:2,3,14
154:1,24 155:9
155:19 156:2,3
156:6,17,18
157:2,3,10
158:20,21,25
159:2,6
**relates**  14:3
40:15 67:24
82:25 86:16
87:1 92:25
100:12 116:25
118:20 150:7,9
**relating**  10:20
18:10 108:22
**relationship**
86:12 87:15
157:14
**relative**  85:10
162:18
**relevance**
19:14
**relevant**  17:15
18:15,18 69:1
70:11 119:9

**relied**  21:20
26:13
**rely**  93:21
100:21
**remember**
10:18 13:24
14:14 25:7
147:15
**remote**  1:13
2:16
**remotely**  2:18
3:2 4:2 7:9
**removing**  56:7
**renders**  112:19
**reordering**
97:9
**repeat**  8:24 9:2
48:2 72:23
89:5 92:1
121:10 127:3
**reported**  1:22
**reporter**  2:23
7:7 8:25 9:7
162:2,3,3
**representing**
7:23 12:25
13:3
**reproduced**
117:9 118:13
**request**  121:9
121:18,20
122:9,10,13,15
122:19 123:20
123:22 125:4
125:13,22

126:7,12,19
127:21,24
128:25 129:2
131:18 132:10
132:11,15,22
134:8,17,19
**requested**  6:10
162:16
**requesting**
122:2,23
124:12 130:21
**requests**
121:16 123:6
127:20 147:18
**require**  83:12
113:13 126:22
127:7 131:16
132:16 133:22
**required**  41:21
43:22,23 53:23
60:7 73:16
81:20 84:13
85:14 96:10
97:11 98:4
154:13
**requirement**
40:10 41:18
55:10 59:19,20
77:24 82:10
83:16 87:2,4
112:21 113:5
123:4 126:7
**requirements**
44:21 55:9,23
73:10 74:22

82:20 102:1,5
107:15 121:3
131:16 145:8
**requires**  45:1
59:8,10 76:7
102:8 121:7,15
**requiring**  46:7
**researcher**
19:25 21:2
**resolve**  123:18
132:24
**respect**  17:22
23:10 26:11
27:9 28:10
30:23 31:5
33:24 37:4,17
38:9,12 39:6
39:12,20,25
41:14 42:18
43:5,21 46:6
46:10 48:23
49:6,8 51:6,13
51:15,24 53:23
55:9 56:1
57:21 58:7
59:16,22 61:6
61:11,14 62:15
62:19 63:7
67:22 72:20
73:4 75:10
77:22 79:17
81:9 82:9,17
84:9 86:12
87:11,24 88:5
92:20 94:1

**[respect - says]** Page 34

| | | | |
|---|---|---|---|
| 102:1 103:17 | **reviewed** 11:25 | **rules** 8:20 | 159:2,6,10,10 |
| 104:9,21 | 14:6 21:8 | **s** | 159:12,18 |
| 106:23 115:10 | **reviewing** 12:4 | | **sake** 145:11 |
| 115:20 119:4 | **revolve** 64:17 | **s&r** 138:1,2,6,9 | **santa** 1:15 2:20 |
| 119:22 120:16 | **revolves** 116:3 | 138:9,11,14,15 | 7:1 111:1 |
| 120:21 124:18 | **right** 9:20,25 | 138:21 139:2,7 | **saw** 28:16 97:6 |
| 125:21 126:18 | 10:5,9 11:3,18 | 139:13,15,17 | **saying** 9:2 |
| 128:20,22 | 13:21,25 15:20 | 139:19 140:14 | 26:13 28:11 |
| 132:7 133:20 | 28:18 30:3 | 140:19,21,23 | 32:8 40:9 |
| 146:20 148:7 | 34:21 48:24 | 141:6,7,8,10,15 | 48:14 52:18 |
| 149:14 156:23 | 49:14 53:2 | 141:15,16,20 | 60:6,8 62:1 |
| 156:24 | 59:9 63:3 68:2 | 141:22 142:2,3 | 67:17 77:1 |
| **respective** | 71:2 85:20 | 142:3,21,23 | 83:23 87:3,21 |
| 158:15 | 86:9 90:2 | 143:4,23,24,25 | 98:3,5 108:21 |
| **respectively** | 102:16 107:11 | 144:1,4,6,19 | 110:3 112:3 |
| 31:4 | 108:12 109:15 | 145:1,3,7,10,11 | 118:6,8 139:24 |
| **responsive** | 112:24 116:11 | 145:13 146:18 | 140:18 141:2 |
| 134:20 | 116:19 125:23 | 147:12,14 | 141:21 142:6 |
| **rest** 47:16 | 126:18 131:17 | 148:2,4,5,17,19 | 143:3 144:1 |
| 79:18 80:19 | 139:11 140:10 | 148:19 149:5,6 | 150:17 151:22 |
| 103:19 109:24 | 144:21 151:5 | 149:9,11,14,18 | 152:6 153:8,22 |
| 118:21,22 | 160:10 | 150:2,3,5,13,16 | 153:25 156:5 |
| 123:25 126:20 | **risc** 25:5,6,11 | 150:17 151:11 | **says** 24:8 29:17 |
| 153:10 | 25:18 26:6 | 151:13,17,18 | 31:18 32:5 |
| **restate** 78:21 | 27:3,8 31:21 | 151:21,23,25 | 34:7 35:12 |
| **result** 89:14 | 31:24 32:11 | 152:1,17,18,22 | 38:14 40:5 |
| 92:6,17 113:21 | 103:15,22 | 152:23 153:1,2 | 41:3 43:12 |
| **resulting** 117:2 | 108:24 109:13 | 153:3,7,9,10,14 | 44:14 59:15 |
| **results** 37:16 | 109:20,24 | 153:14,20 | 63:22 66:17 |
| 38:8 133:13 | 110:6 | 154:1,6,24 | 69:8 71:16 |
| **resumed** | **row** 18:24 | 155:1,5,8,8,12 | 80:19 81:1,16 |
| 110:17 111:10 | 19:13 | 155:15,18 | 82:16 83:15 |
| **review** 104:3 | **rpr** 1:22 2:22 | 156:2,3,6,17,18 | 85:4,21 89:10 |
| 162:15 | 162:25 | 157:2,3,9,10 | 89:13,14,17 |
| | | 158:7,7,13,16 | 90:12 91:19,25 |
| | | 158:20,21,25 | |

92:16,23 93:2
96:19 102:24
103:13,20
104:4 106:1,1
106:9 107:10
109:21,25
112:16,18
122:9 123:9,12
124:11 125:9
127:21 128:6
129:15,23
131:17 133:21
134:14 135:16
138:18 142:20
144:19 146:16
148:14 149:10
151:17,20,25
154:24 155:4
158:1,8,11
**scenario**   72:13
84:18 86:22
87:13
**scenarios**
100:25
**scope**   14:8 35:5
35:7 36:6 37:1
37:18 38:7,9
40:1 41:14
42:18 43:9,21
44:13,19 46:9
47:21 49:19
50:11 57:21
58:17,21 60:4
61:13,16,19
62:17,19 63:1

63:8 73:16,25
76:17 79:11
81:19 84:16,17
97:12 108:5,7
117:1,2,4
130:7
**scopes**   49:5
**search**   21:15
**second**   10:3
38:22 39:3,21
40:2,13,24
41:5,11,16,18
41:23,24 42:3
42:7,13,14,16
42:24 43:11
54:11 57:7
58:10,16 59:13
61:22 62:5,11
83:12,17 84:9
95:9 113:10
121:22 124:3
125:1,3,24
126:1,8,13,22
127:8,13 128:3
128:7,8,10,13
128:17,22
129:6 135:19
141:4 150:8
154:16
**secret**   11:11
**see**   19:11 24:9
24:16 29:8
30:2,9,14,16,24
31:22 46:18,23
52:10,11 54:13

60:12 64:5
65:23,25 66:2
66:3,22,23
77:24 80:5
89:9,10 91:25
92:16,22 94:16
95:2 105:18,25
109:6,8 111:18
111:21 120:5
123:4 125:16
125:18,21
126:3,14,24,25
127:9,10,12
129:11 130:5
136:17 141:12
146:15 147:2
148:23 152:5
158:6
**seeing**   76:3
141:7 144:2
155:2
**seemed**   76:24
114:21
**seems**   74:20
78:18 99:5
100:23 126:18
**seen**   22:13
**sees**   151:11
**selecting**
141:20
**self**   53:19
**send**   55:11
121:2 123:22
123:22

**sending**   120:23
147:17
**sends**   121:8,16
123:5 124:4
**sense**   33:4
70:13,16 71:11
88:18 125:6
142:13 149:23
152:12 154:19
155:21 156:15
156:15,17
**sent**   19:7
120:18 123:20
130:20 132:6
133:7 134:1
147:19
**sentence**   89:13
89:14,16,17
90:3 95:9
120:10 124:15
124:24 126:3
131:2 138:17
141:4,5
**sentences**   91:21
142:16
**separate**   14:24
39:4,9 40:3,5
40:10 41:18
42:14,15 43:19
49:6 51:3,6
55:16 58:11,16
59:7,8,24
63:15,18 66:21
68:4 69:12,20
72:21,24 73:4

73:13,20 74:6
74:8,15,17,19
74:24 75:6,10
75:16,17,19,20
76:4,9 77:2
78:24 79:13
83:13,19,25
84:2,5,6,11
101:23 102:10
102:16 104:14
104:15 105:2
106:18 115:4
115:14
**separated** 40:5
**separately**
90:24 91:12,23
92:10,12 155:4
**separateness**
40:12 41:21
43:23 75:8
76:1,7 84:13
87:2,4
**separation**
73:17 113:9
**september**
23:13,23 33:7
**sequence**
135:12
**series** 76:4
**service** 17:23
24:6 89:19
137:20,24
138:4,6,11
139:15,23
140:17 144:22

145:4,6,8
148:17,21
151:19 154:4,4
154:10 156:12
158:12,14,19
158:20,22
159:25
**services** 90:14
**serving** 17:23
**set** 25:6 36:6
38:3 45:17
48:17 52:2,3
52:22 100:16
105:8 124:3
125:20 140:14
141:18 142:2
142:14,24
143:2 144:9,10
144:13,23
145:22 151:3,6
151:19 153:5
153:17 154:5
162:6
**setting** 151:19
**shake** 9:7
**shape** 71:25
**share** 16:4 72:9
72:21,25 76:15
77:8 79:3,7
**shared** 76:21
76:24 77:2
93:19 114:19
118:17
**shares** 118:14

**sharing** 73:5
114:13,14
**shoot** 22:19
**short** 147:3
**shorthand** 2:23
162:1,10
**show** 82:6,7
104:14 113:14
138:19 140:8
141:25
**showed** 15:21
**showing** 47:6,8
52:21 54:23,24
55:2 127:12
**shown** 49:1
52:15,19 82:14
85:15 122:13
128:14 138:24
158:3 159:13
**shows** 15:19
48:18 54:25
65:21 82:4,5
113:12 138:12
139:25 159:15
**sic** 147:11
**signal** 8:22
18:5,10,21
20:20 135:9
141:24,24
143:22 145:12
145:16 147:21
**signals** 147:17
**signature** 16:22
16:24 162:24

**significance**
32:3
**significant**
113:17 154:15
**similar** 127:23
130:13,14,16
130:17,18
**similarities**
131:1,3
**similarity**
148:9
**simply** 87:5,17
96:15
**simultaneously**
95:13
**single** 35:24
38:2 55:5,7,22
56:10 58:25
68:5,12 70:14
74:3,13,18
75:5 82:7,19
83:24 84:22
85:1,23 86:10
86:24 87:19
88:6 104:7
105:13,20
106:4,7,15
108:13
**singular** 106:7
**sit** 11:2,18,22
14:12
**sitting** 13:21,25
14:17
**six** 12:9 46:17
46:17

| | | | |
|---|---|---|---|
| **size**  15:15 | **songs**  13:1 | **specifically** | 157:11 |
| 71:25 | **sony**  19:3 | 10:18 14:12,14 | **specifications** |
| **skill**  27:19 | **soon**  15:19 | 14:18 21:18 | 49:24 51:9 |
| 28:12,22 36:25 | **sorry**  11:20 | 22:2,5,12 | 84:22 |
| 37:7,13 41:12 | 15:3 21:23 | 24:17,19 25:23 | **specificity** |
| 43:5,9 44:24 | 34:23 35:22 | 27:12 29:18 | 32:22 97:11 |
| 46:9 58:7,19 | 37:23 68:14 | 87:1 149:24 | **specified** |
| 59:17 60:4 | 70:13 86:2 | **specification** | 127:19 132:10 |
| 61:15,19 62:20 | 89:4 91:25 | 24:7 26:11 | 135:7 |
| 63:5 67:15,21 | 94:23 99:10 | 29:14,22 30:16 | **specifies**  128:3 |
| 69:2 81:7,19 | 102:23 108:2,3 | 30:25 31:8,10 | 131:19 |
| 83:19 84:15 | 121:10 129:18 | 37:14 38:6 | **specify**  41:20 |
| 94:2 104:12,19 | 138:20 140:12 | 42:21 43:1,16 | 129:1,3 |
| 105:14 113:17 | 141:4 144:25 | 43:25 44:2,5 | **specifying** |
| 115:7,15 116:8 | 150:12 157:21 | 45:4,12 51:17 | 127:22,24 |
| 116:25 117:5 | 157:21 158:1 | 52:2,23 53:15 | 128:20 134:20 |
| 144:2,17 148:6 | 159:21 | 53:21 79:10 | **spectrum** |
| 150:3 151:10 | **sort**  16:12 | 80:10,21 81:2 | 159:16 |
| 151:16 155:9 | 92:24 | 89:6,21 90:15 | **spend**  12:4 |
| 156:20,25 | **sorts**  47:16,20 | 91:17 99:18,23 | 14:23 |
| **skilled**  42:15 | 48:10 49:17 | 100:15 101:25 | **spent**  14:22,25 |
| **small**  85:7 | 100:7 | 102:15 104:3 | **spoken**  13:15 |
| **smallest**  144:12 | **source**  146:3 | 105:1,17 | 13:22 |
| **soc**  74:5,12 | **sources**  145:15 | 108:24 109:5 | **sprint**  12:23 |
| 75:4,10,23,24 | 145:21,22 | 109:11,25 | 13:10 18:23 |
| 76:9 86:14 | 146:7,13,15 | 125:8 128:15 | **stack**  19:2 |
| **socs**  74:2 | **space**  19:23 | 133:21 135:4 | **stand**  77:12 |
| **software**  91:2 | **speaks**  26:8 | 135:24 136:1,3 | **standalone** |
| 91:11 92:12 | **specialized** | 142:20 144:3,5 | 85:8,17 87:6 |
| 93:4 | 25:8 48:16 | 146:24 151:12 | **stands**  25:6 |
| **solid**  143:14 | **specific**  31:2 | 152:21 153:6 | 145:12 |
| **solutions**  20:5 | 44:12 52:22 | 153:20,23 | **start**  22:15 |
| **somebody**  58:5 | 75:13,18 77:24 | 154:21 155:3 | 61:9 117:3 |
| **somewhat** | 98:12 132:18 | 155:10,14,25 | 139:25 |
| 31:11 50:19 | 134:11 148:6 | 156:4,16 | |

started   135:11
  150:20
starting   103:18
starts   136:15
state   7:15
  161:15 162:2
stated   48:4
  72:19 101:17
statement
  28:19 109:14
  130:13 152:14
statements
  79:14 113:16
  116:22,24
  118:4
states   1:1 2:1
  128:3
stations   95:12
status   147:25
stenographic...
  1:22
step   70:6
  137:17 140:13
  140:15 155:11
steps   20:8
  155:19 159:1,3
stop   122:11
storage   66:19
  67:5,8 69:10
street   3:9,19
structure   79:23
stuff   16:13
sub   138:4,10,13
  138:14,21,22
  139:9,13,18,20

140:7,18,20,23
140:24 142:3
143:11,12,17
143:18 153:18
154:8,11
159:13,15,20
159:23
subject   14:4
  21:23
subscribed
  162:21
subsystem
  100:22
successfully
  143:9
sued   12:23
sufficient   40:11
  79:24 82:10
  134:4 145:7
suggest   99:5
  153:21
suggested
  14:15 22:9
suggesting   22:6
suite   3:9
summarize
  62:14 150:21
summary   121:1
support   26:18
  137:3 152:22
supported
  156:16
supporting
  159:9

supports
  151:12
suppose   33:12
supposed   37:20
  39:9 46:10
  53:4,6 81:8,15
  107:3 120:22
  135:12,16
sure   9:13 13:10
  15:24 25:12
  28:2 32:5 57:2
  61:7 65:8
  68:22 69:16,21
  70:10 71:7,9
  71:17,23 72:12
  91:19 98:23
  99:22 128:23
  130:4,8 146:9
  150:14 157:8
  159:7
surrounding
  47:13
suspect   18:14
  108:4
sworn   111:7
  162:8
system   41:7,8
  58:8 59:18
  60:10,12 61:12
  62:16 77:21
  78:3,7,16,17
  79:20,23 85:1
  85:6,18,25
  87:8,18,22
  88:5 91:15

98:2 100:1
132:14 133:23
133:23 145:19
145:22 146:6
146:19,21,22
147:13 156:15
systems   18:6,11
  20:3,4,21 41:9

t

table   90:19
take   7:13 147:3
  156:11
taken   2:17
  25:23 27:10
  28:14 33:2
  48:13 110:16
  162:5
talk   9:12 142:1
  145:16
talked   13:18
  112:17 149:12
talking   20:23
  32:15 46:11
  48:12 56:24
  68:23,24 72:14
  106:20 109:10
  111:13,23
  124:13,14
  134:11 144:7
  145:10 147:12
  150:4 151:13
  156:1,7 158:15
  158:17
talks   29:15
  131:12,24

| | | | |
|---|---|---|---|
| 132:1 157:5 | 44:4 60:19 | **testing**   109:3 | 36:3 37:15,25 |
| **task**   35:17 42:3 | 69:2 70:16,21 | **texas**   1:2 2:2 | 39:11 40:8,14 |
| 43:15 61:25 | 73:4,21,24 | **thank**   88:4 | 40:18 42:15 |
| **tasks**   42:23,23 | 74:1,20 75:10 | 160:9 | 43:3 44:24 |
| 48:16 | 75:13 86:25 | **theoretically** | 45:8,13,16 |
| **taught**   56:11 | 88:19 90:6 | 97:16 | 47:4 48:13 |
| **tdmi**   31:21,24 | 93:8,22 95:21 | **thing**   8:25 | 49:15 51:22 |
| 32:24 103:15 | 96:18 97:6 | 15:22 16:7 | 52:21,23 54:23 |
| 108:23 109:12 | 99:15,21 104:2 | 48:22 121:17 | 54:24,25 55:23 |
| 109:20,24 | 116:1 131:5 | 123:14 124:16 | 56:3,15 63:16 |
| 110:5 | 132:2 141:8 | 125:6 145:18 | 64:9,23 67:1 |
| **teaching**   107:3 | 142:16 144:3 | 150:5 155:6 | 67:14,20 68:24 |
| **teachings** | 148:7 150:13 | 156:17,20 | 68:25 72:14,16 |
| 104:21 | 155:8,18 | **things**   13:1 | 73:14 74:10,23 |
| **technical**   10:24 | 156:19 | 17:17 21:1,19 | 75:12 77:4 |
| **technologies** | **terminology** | 37:6 43:1 | 78:6 80:23 |
| 19:25 | 123:16 | 47:16,20 48:11 | 83:4,4,15 |
| **technology** | **terms**   14:10,15 | 68:23,25 72:15 | 84:25 87:10 |
| 18:10 20:7 | 17:17 25:13 | 76:23 78:18 | 89:13 92:2 |
| **telecom**   21:25 | 26:9 31:9 | 97:15 101:24 | 93:4,14 94:2 |
| **television**   18:5 | 32:21 57:5,6 | 117:18 119:1 | 96:2 101:4 |
| 18:10,21 20:20 | 70:8 72:14 | 145:17 149:3 | 104:12,19 |
| **tell**   75:7 81:14 | 75:4 97:10,25 | 157:1 | 105:11 106:9 |
| 97:10 115:19 | 98:11 103:25 | **think**   12:9 15:1 | 106:10 107:1,9 |
| 124:6 134:12 | 116:20 | 17:16 18:1,24 | 108:2,11,21 |
| **telling**   36:19 | **test**   58:3 75:7 | 19:3,10 21:18 | 109:3,9,16,17 |
| **tells**   123:23 | 76:1 | 22:2,4,11,12 | 110:4,10 |
| **ten**   12:6 | **testified**   8:3 | 23:25 24:13 | 112:12 113:15 |
| **tend**   51:23 | 107:13 111:8 | 25:7,20,22 | 116:3,14,20 |
| **term**   25:24 | **testifying**   1:15 | 26:2,8 27:4,10 | 117:3,4,16,17 |
| 27:11,14 28:24 | 2:19 162:8 | 27:17,25 28:9 | 117:25 118:1,8 |
| 33:18 34:9 | **testimony**   48:8 | 28:11,13,22 | 118:19 119:6,8 |
| 36:18,24 38:11 | 54:2 115:23 | 29:14 30:25 | 119:24 122:4 |
| 39:24,25 42:6 | 116:3 160:12 | 31:7,8,11,13 | 122:16 125:17 |
| 42:6 43:3 44:3 | 161:12 162:12 | 34:7 35:2 36:2 | 127:23 128:14 |

**[think - two]**                                                    Page 40

128:14,16,24
130:16 131:11
131:25 133:8
133:15 135:11
141:2 144:15
144:17 145:20
148:4,5,10
149:2,4,12
150:11,20
152:10 153:24
**thinking** 118:9
118:9
**third** 10:7
125:24 126:1
**thought** 17:3
60:17 72:19
73:2 78:5
79:22 91:6,13
94:6 99:10
101:10 116:12
116:19 126:18
**three** 9:22
10:12,20 16:3
20:21 29:25
44:7 46:16
82:6 86:2,2,3
86:10,24 87:12
87:15,19,22
103:3,7 104:6
104:15 105:2
105:12 140:9
**threshold**
33:20
**tie** 87:14

**tied** 96:13
**time** 7:15 12:9
17:18,21 21:10
28:7,16 36:25
44:6 49:16
56:15 67:19
70:1 93:25
102:21 110:10
137:9 162:6
**times** 8:12 11:5
13:12 92:19
140:9 157:16
**today** 7:20 8:20
9:19 11:24
16:14,25 17:2
17:15 115:19
**today's** 160:12
**together** 100:1
140:24
**told** 14:25
50:20 68:21
134:4
**top** 25:20 29:4
46:20 52:11
64:22 65:1
139:25
**totality** 116:24
**trade** 11:10
**transcribed**
162:10
**transcript**
161:10 162:11
162:14,16
**transistors**
45:18 59:17

**transitions**
138:18
**transmission**
93:19 128:12
131:21 134:22
154:13
**transmit**
121:23 143:9
156:12
**transmitted**
125:4,13
132:21 133:18
147:23
**transmitter**
121:19 123:24
124:2,9,13,23
**transmitting**
122:12 125:22
135:8 144:25
**traverse** 116:21
**tried** 33:11,18
91:6 146:25
**true** 134:7
143:1 161:13
162:11
**try** 18:13 97:25
123:17 147:22
147:24 150:21
**trying** 24:16
34:9 35:7 39:8
62:7 71:14
75:1 77:24
94:21 121:12
123:2 127:4
137:8,25 146:8

149:8 151:3
154:12 159:19
**turn** 17:5 24:20
25:16 28:25
34:17 80:1
94:19 102:22
109:6 119:11
137:12 141:3
152:15 156:4
160:5
**turned** 39:10
**turning** 155:18
**tutorial** 10:25
**tv** 19:20 20:3
145:21 147:16
**two** 12:22 24:5
27:21 30:11,13
30:13,18 37:11
40:11 43:1,7
43:18 46:16
54:19,21,24,25
56:4,10 59:8
59:23 60:1,7
63:14 68:4,23
68:24 70:15
72:21,24 73:12
73:19 76:22,24
78:18,24 81:25
82:3,5 83:2,5
83:23 84:3
86:7,18 87:6
90:23 95:11,25
96:8 99:6
101:24 106:25
109:8 111:24

**[two - usually]**

111:25 112:4
128:24 130:7
136:4 155:3,19
160:3
**tying**  86:25
146:11
**type**  12:21
30:15 32:1,6
32:12 85:11
**types**  11:8 33:8
44:23 71:7
97:13 146:10
**typical**  70:21
**typo**  107:6

**u**

**u.s.**  9:23 10:3,7
11:13
**ultimately**
21:20 118:10
119:3
**unbounded**
74:23
**uncertain**  73:8
118:6
**uncertainty**
37:17 38:9
42:17 46:6
49:22 50:8
62:21 84:17
**unclear**  44:19
45:20 47:8
48:11 52:1
55:8 95:21
**under**  20:17
61:22 78:7

91:8,15 96:4
109:20 161:9
162:10
**undergraduate**
44:8
**underlying**
19:25
**undersigned**
162:1
**understand**
8:23 28:24
34:9 36:18,19
37:10 39:8
42:21 43:20
44:9,10,11,25
45:2,6,8 49:25
50:3,4,9,10,11
50:17 57:3,8
61:19 67:18,21
68:6,15 69:23
70:2,7 71:14
77:15,20 78:19
78:22 91:18
93:8 94:3
96:16 97:7,12
97:25 98:10
100:2 101:13
104:6,20
105:15,18
113:18 115:7
117:1 121:13
123:2,8 130:16
132:12 138:10
141:2 144:4,18
149:9 150:1

151:16 156:5
156:25 157:8
**understandable**
116:7
**understanding**
25:3 26:10
31:1 35:4 38:7
40:1 43:6
44:22 63:17
64:9,19 74:12
75:9,12 76:11
80:13 81:10
89:11 90:8
93:24 95:17
96:23 98:8,22
99:2,8 101:5
103:6 105:17
115:6 117:11
127:17 137:9
141:17
**understood**
27:20 28:17
44:4 45:5
52:18 117:4
122:19 137:11
156:19
**unit**  66:21
69:12
**united**  1:1 2:1
**unreasonable**
37:17 38:8
47:22 57:19,20
63:6
**unreasonably**
156:24

**upgrade**  91:2
91:10 92:12
**upgrading**  93:4
**use**  15:17 22:10
23:11 29:23
38:7 44:18
53:8 63:5
68:20 70:16
71:10,19 104:2
106:10 107:1
122:23 123:16
153:8
**used**  20:10 22:4
22:13 26:20
28:24 43:3
50:5 69:3 70:8
70:22,23 71:13
73:21 74:8,21
76:25 97:25
127:5 128:25
132:2 147:14
148:7,11
**uses**  44:2 73:25
99:21 129:9
**using**  41:11
73:3 74:20
86:25 89:15
90:6 97:5
106:25 120:12
124:5 155:24
162:9
**usually**  145:14
160:3

| v | | | |
|---|---|---|---|
| **v** 18:24 19:13 | 78:16 88:2 | 127:4 129:21 | **windows** 16:3 |
| **vague** 30:22 | 96:23 148:5 | 130:8,16 153:9 | **wireless** 147:16 |
| 97:23 101:9,15 | 149:16 155:22 | 154:5 | 148:1 |
| 101:17 105:4,9 | **viable** 108:5,6 | **wanted** 58:6,15 | **wish** 17:1 |
| 132:7 133:20 | **video** 7:6,12 | 61:8 97:3 | **witness** 19:18 |
| 135:10 | **videoconfere...** | 157:4 | 20:25 162:20 |
| **vagueness** | 2:19 | **way** 11:1,17,22 | **witnesses** 162:7 |
| 97:24 | **videographer** | 48:16 55:22,25 | **word** 32:3 |
| **value** 138:6 | 4:4 7:4 56:17 | 58:24 60:14 | 88:13 107:1 |
| 139:16,17,20 | 56:20 65:9,12 | 65:5 70:21 | 122:23 150:11 |
| 140:23 142:11 | 110:13 111:4 | 74:11 84:1,10 | **worded** 130:10 |
| 142:13,25 | 147:5,8 160:10 | 97:4 101:7,16 | **words** 89:10 |
| 143:8,16 144:8 | **videotaped** | 104:11 123:19 | 91:21 92:2 |
| 151:22 158:10 | 1:13 2:16 | 125:20 128:24 | 97:9 106:10 |
| 159:12,18 | **view** 45:15 | 132:1 146:23 | 130:5 |
| **values** 138:14 | **villagran** 1:22 | **ways** 49:17 | **work** 17:11,23 |
| 139:13 141:18 | 2:22 7:8 | 81:11 | 19:18 20:23,24 |
| 142:3,14,24 | 162:25 | **we've** 23:1,1 | 20:25 22:14 |
| 143:6 144:9,10 | **virtual** 88:16 | 40:23 47:12 | 78:16 95:12 |
| 144:13 151:4,4 | 90:4,6,8 92:6,8 | 115:18 137:22 | 155:12 156:15 |
| 151:6 | 92:17,21 | 140:4 | **worked** 12:18 |
| **variety** 145:15 | **virtually** 88:25 | **web** 15:24 | 13:2,6,9,10,11 |
| 145:21 | 89:7,15 | **webster's** 5:20 | 19:20 20:6,9 |
| **various** 20:9 | **volume** 1:17 | 94:9 | 20:19 147:15 |
| 74:2,13 75:5 | 2:17 5:5 | **welcome** | **working** 19:23 |
| 75:11 | 161:21 | 111:12 | 19:24 21:2 |
| **veritext** 15:25 | **vs** 1:7 2:7 | **went** 56:23 | **works** 123:19 |
| **version** 46:14 | w | 111:13 | **world** 5:20 |
| 66:12 138:12 | | **west** 3:9,19 | 70:1 94:10 |
| 138:23 | **wait** 94:20 | **whereof** 162:20 | **worst** 138:1,2,5 |
| **versions** 32:17 | **walked** 159:1 | **wholly** 112:13 | 138:8,9,11,15 |
| **versus** 7:11 | **want** 15:24 | 154:25 | 138:20,21 |
| 14:25 18:23,24 | 18:17 22:15 | **wi** 97:15,22 | 139:2,6,15,17 |
| 33:21 73:10 | 32:22 58:10,11 | **widely** 28:7,11 | 139:19 140:12 |
| | 60:21 66:9,9 | 28:13 | 140:13,14,19 |
| | 66:10 75:19,25 | | |

| | |
|---|---|
| 140:20,23 | **york**  3:20,20 |
| 141:6,8,15,16 | **z** |
| 141:20,22,23 | **zero**  141:7,15 |
| 142:2,5,21,22 | 141:24,24 |
| 143:7,9,10,16 | 142:8,10,19 |
| 144:1,4,6,7,19 | 143:2,23 144:1 |
| 145:7 148:19 | 144:11,15,16 |
| 149:6,9,11,20 | 144:23,24 |
| 149:25 150:2,4 | 145:3 151:1,5 |
| 150:13,16,17 | 151:7 153:11 |
| 151:3,8,11,13 | 156:14 |
| 151:17,23 | **zeros**  141:11 |
| 152:1,22 153:1 | **zoom**  8:21 9:11 |
| 153:4,7,9,10,14 | 15:23 16:4 |
| 153:16,16,20 | |
| 154:6,6,10,11 | |
| 154:17,25 | |
| 155:5,8,12,15 | |
| 156:7,9,18 | |
| 159:2,19 | |

**write**  14:19
**written**  108:7
**wrong**  65:5
**wrote**  119:4

**x**

**x**  159:15

**y**

**yeah**  27:25
36:15 51:19
87:10 115:24
150:12
**year**  12:17
**years**  20:21
44:7

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.