IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| ENTROPIC COMMUNICATIONS, LLC, | § | |
|---|---|---|
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:22-CV-00125-JRG |
| | § | |
| CHARTER COMMUNICATIONS, INC., | § | |
| | § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER

**I.   INTROUDCTION**

Before the Court is Defendant Charter Communications, Inc.'s ("Charter") Motion to Dismiss the Second Amended Complaint for Improper Venue Pursuant to Fed. R. Civ. P. 12(b)(3) ("Motion"). (Dkt. No. 61.) For the reasons set forth herein, the Court finds that it should be and hereby is **DENIED**.

**II.   BACKGROUND**

  **A.   Procedural History**

Plaintiff Entropic Communications, LLC ("Entropic") filed its original complaint on April 27, 2022, alleging infringement of various patents. (Dkt. No. 1.) On July 22, 2022, the parties filed a Joint Motion requesting limited and expedited venue discovery, which the Court granted. (Dkt. Nos. 24, 25.) Entropic filed the operative complaint, the Second Amended Complaint, on January 10, 2023 (Dkt. No. 53.) Venue discovery has now concluded and Charter's Motion to Dismiss the Second Amended Complaint for Improper Venue is now before the Court. (Dkt. No. 61.)

  **B.   The Parties**

   *i)   Entropic*

Plaintiff Entropic is a Delaware limited liability company with an office in Plano, Texas. (Dkt. No. 53 at ¶ 2.)

   *ii)*   *Charter and Its Subsidiaries*

Defendant Charter is a Delaware corporation with its principal place of business in Stamford, Connecticut. (Dkt. No. 53 at ¶ 3.) Charter is a large enterprise that spans a multitude of subsidiaries that it owns manages, two of which are particularly relevant here. (*See* Dkt. No. 68 at 6.) The first, Spectrum Gulf Coast, LLC ("SGC"), owns the physical properties in the District that are discussed below. (Dkt. No. 61 at 1–2.) The second, Charter Communications, LLC ("CC LLC") employs all individuals who work for all of the subsidiaries owned and managed by Charter. (Dkt. No. 61 at 4.) Charter itself does not have any employees, though it clearly has officers that act for it. (*Id.*)

Significantly, all 200+ subsidiaries, including the two mentioned above, have complete overlap of officers and directors with Charter. (Dkt. No. 68 at 11. *See* Dkt. No. 68-2 at 69:15–17 (69:15–17 (Q: "Do any of them have officers who are not officers of [Charter]?" A: "No.").) Charter's corporate representative testified that Charter simply copies the same officer list for every new entity that is created, save for a few irrelevant exceptions. (Dkt. No. 68 at 11. *See* Dkt. No. 68-2 at 42:4–12.)

## III. LEGAL STANDARD

Venue is controlled by 28 U.S.C. § 1400(b) in actions for patent infringement. Pursuant thereto, "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." Under the residency requirement, the Supreme Court held that "a domestic corporation 'resides' only in its State of incorporation for purposes of the patent venue

statute." *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 137 S. Ct. 1514, 1517 (2017).

Entropic does not contend that Charter resides in this District. Rather, Entropic contends that venue is proper because Charter has committed acts of infringement and has a regular and established place of business in this District. (*See, e.g.*, Dkt. No. 68 at 18–29.) Under Section 1400(b), a "regular and established place of business" must be (1) "a physical place in the district"; (2) "regular and established"; and (3) "the place of the defendant." *In re Cray*, 871 F.3d 1355, 1360 (Fed. Cir. 2017). The Federal Circuit set forth a number of considerations relevant to determining if a regular and established place of business is "of the defendant." *Id*. Those considerations include whether the defendant owns or leases the place, exercises other attributes of possession or control over the place, conditions employment on an employee's continued residence in the district, stores materials at a place in the district so that they can be distributed or sold from that place, advertises a place for its business or represents that it has a place of business in the district. *Id*. at 1363–67. A court may also consider the nature and activity of the alleged place of business of the defendant in the district in comparison with that of other places of business of the defendant in other venues. *Id*. These enumerated considerations are not exhaustive but rather illustrative of the types of information relevant for determining whether a physical place is "of the defendant." *Id*. at 1363.

## IV. ANALYSIS

### A. Acts of Infringement

In a footnote to its opening brief, Charter denies that it has committed acts of infringement in this District "because it does not own, lease, or distribute the Accused Cable Modem Products and does because it does not provide the Accused Services." (Dkt. No. 61 at 12, n. 9.)

Entropic responds by arguing that it was only required to allege infringement to satisfy this

3

portion of §1400(b). (Dkt. No. 68 at 18.) Moreover, it argues that it has alleged that Charter is accused of indirect infringement. (*Id.*)

The Court finds that Entropic has satisfied the "acts of infringement" portion of § 1400(b). Entropic has alleged acts of infringement, direct and indirect, which is sufficient. *Seven Networks, LLC v. Google LLC*, 315 F. Supp. 3d 933, 942 (E.D. Tex. July 19, 2018) ("Where a complaint alleges infringement, the allegations satisfy the 'acts of infringement' requirement of § 1400(b) although the allegations may be contested.") (quoting *Symbology Innovations, LLC v. Lego Sys., Inc.*, 282 F. Supp. 3d 916, 928 (E.D. Va. 2017)).

**B.     Regular and Established Place of Business**

*i)     Physical Place in the District*

To satisfy this element, Entropic must show that Charter has a "physical place in the district" *In re Cray*, 871 F.3d at 1360. A "place" must be a "physical, geographical location in the district from which the business of the defendant is carried out." *Id.* at 1362. The Second Amended Complaint identifies at least four physical locations in this District: 1414 Summit Avenue, Plano, Texas 75074; 700 Alma Drive, Plano, Texas 75075; 2100 N. Dallas Parkway, Plano, Texas 75075; and 4255-A Dowlen Road, Beaumont, Texas 77706. (*See* Dkt. No. 53 at ¶¶ 16–17). Thus, the only question is whether "the business of [Charter] is carried out" at these locations. *Cray*, 871 F.3d at 1362.

Charter argues that another subsidiary, SGC, operates these stores to provide services to customers. (Dkt. No. 61 at 13.) Charter also argues that it does not directly own or control any physical place in the District and thus this element cannot be satisfied. (*Id.*)

Entropic responds by arguing that these locations do, in fact, carry out the business of Charter. (Dkt. No. 68 at 21.) Entropic points out that each of the above locations displays the

4

"Spectrum" logo, which is the same logo that appears on the face of Charter's customer service agreements used nationwide. (*Id.*) Entropic then analogizes to *Entropic Communications, LLC v. DirecTV, LLC*, No. 2:22-cv-75, Dkt. No. 109 at 7 (E.D. Tex. Oct. 24, 2022). There, the retail stores in the District bore the Dish name and provided Dish-branded products and services even though the stores were leased and operated by a subsidiary. *Id.* at 7. Relying on this, this Court concluded that the first *Cray* factor was satisfied.

In reply, Charter argues that *DirecTV* is distinguishable from this case because there the "DirecTV" brand was used at the locations, whereas here the evidence shows use of the "Spectrum" brand, and not any "Charter"-specific brand. *Cf. DirecTV* at 7–8. (Dkt. No. 75 at 7.)

In its sur-reply, Entropic argues that Charter is "Spectrum," and "Spectrum" is Charter, so *DirecTV* is on point. (Dkt. No. 80 at 2–3.)

The Court is persuaded that Charter is Spectrum, and Spectrum is Charter. Below is a relevant admission Charter's 2022 SEC 10-K statement:

> We are a leading broadband connectivity company and cable operator serving more than 32 million customers in 41 states through our ***Spectrum*** brand. Over an advanced high-capacity, two-way telecommunications network, we offer a full range of state-of-the-art residential and business services including ***Spectrum*** Internet®, TV, Mobile and Voice. For small and medium-sized companies, ***Spectrum*** Business® delivers the same suite of broadband products and services coupled with special features and applications to enhance productivity, while for larger businesses and government entities, ***Spectrum*** EnterpriseTM provides highly customized, fiber-based solution. ***Spectrum*** Reach® delivers tailored advertising and production for the modern media landscape. We also distribute award-winning news coverage and sports programming to our customers through ***Spectrum*** Networks.

https://www.sec.gov/ix?doc=/Archives/edgar/data/1091667/000109166723000024/chtr-20221231.htm (emphasis supplied). The 10-K statement makes clear that Spectrum is just a brand name or trade name, and it is Charter who is actually operating the business. Moreover, Charter's Spectrum labeled invoices tell customers to send their payments to "Charter Communications."

5

https://www.spectrum.net/support/manage-account/understanding-your-statement-bill/. This helps support the conclusion that "Spectrum" is Charter.

The Court finds that *DirecTV* is on point. *DirecTV*, No. 2:22-cv-75, Dkt. No. 109 at 7 (E.D. Tex. Oct. 24, 2022). There, the retail stores in the District bore the Dish name and provided Dish-branded products and services even though the stores were leased and operated by a subsidiary. So too here, Charter operates stores and provides services in this District under the its brand name, Spectrum. *See DirecTV, LLC*, No. 2:22-cv-75, Dkt. No. 109 at 7 (E.D. Tex. Oct. 24, 2022). The fact that the name of the corporate entity (Charter) behind the brand name (Spectrum) is not the same as the name as the brand is irrelevant because the two names represent the one and same entity. Charter cannot escape venue by operating under a trade name when it is clear that Charter is the entity engaged in the challenged conduct which forms the basis of Plaintiff's suit. The retail stores in this District are thus "physical, geographical location[s] in the district from which the business of the [Charter] is carried out." *Cray*, 871 F.3d at 1362.

    ii)   *Regular and Established Place of Business*

Under the second *Cray* factor, a "regular and established place of business" requires "the regular, physical presence of an employee or other agent of the defendant conducting the defendant's business at the alleged 'place of business.'" *In re Google*, 949 F.3d 1338, 1345 (Fed. Cir. 2020). The Federal Circuit reiterated that "the essential elements of agency are (1) the principal's right to direct or control the agent's actions; (2) the manifestation of consent by the principal to the agent that the agent shall act on his behalf; and (3) the consent by the agent to act." *In re Volkswagen Grp. of Am.*, 28 F.4th 1203, 1208–09 (Fed. Cir. 2022) (quotations omitted). "The power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." *In re Google*, 949 F.3d at

1345–46 (quoting Restatement (Third) of Agency § 1.01 cmt. f(1)).

Charter argues that it does not have any employees at all, and therefore does not have any employees who regularly conduct business in the District.[1] (Dkt. No. 61 at 14.) Moreover, it argues that it does not have any agents employed in the district. (*Id.*) Charter also argues that it has no control over any subsidiary's operations through the LLC agreements and that it is nothing more than a typical manager of its subsidiaries. (*Id.*) Further, Charter contends that it does not maintain or operate the Spectrum-branded stores and does not participate in the hiring or firing of employees. (*Id.*) Finally, Charter argues that the only way these activities can be imputed to Charter is if the corporate veil is pierced. (*Id.* at 15.)

In response, Entropic argues that Charter has the right to direct or control the employees' actions (the first element of agency). Entropic cites to *AGIS*, where this Court found third-party CTDI to be Google's agent for venue purposes based on the fact that Google "directs and controls CTDI's actions" within the established place of business. *AGIS Software Development LLC v. Google LLC*, 2:19-cv-361, 2022 WL 1511757 at *4 (E.D. Tex. May 12, 2022). In that case, Google and CTDI had an agreement that allowed Google to: set physical specifications for a secured area; restrict the area to Google's products and services and limited access to CTDI employees authorized to work on Google's products; move the secured area; and provided instructions for services that CTDI was required to perform for Google customers. *See id.* at *5. CTDI was not an affiliate of Google, and its agreement expressly disclaimed an agency relationship. *Id.* at *8. The similarities between Google and Charter vis-á-vis CTDI are readily apparent.

Further, Entropic again cites to *DirecTV*, where this Court found this element was satisfied because "DISH holds the locations [in the District] out as its own. *Entropic Communications, LLC*

---

[1] This assertion is in stark contrast with evidence from Charter's own website that states it is a company with over 93,000 employees. (*See* Dkt. No. 68 at 24.)

7

*v. DirecTV, LLC*, No. 2:22-cv-75, Dkt. No. 109 at 9 (E.D. Tex. Oct. 24, 2022)) There, the Court noted that the Dish logo appears on vans and other property stored at that location. *Id.* at 10. Entropic argues that in this case the Spectrum logo appears on vans and the buildings themselves at the locations in questions. (Dkt. No. 68 at 23.)

Further still, Entropic argues that Charter has the right to direct or control the employee's actions as the manager of CC, LLC and SGC. (*Id.*) Charter's corporate representative testified that employees are provided to Spectrum stores ███████████████████████ (*Id.*; Dkt. No. 68-2 at 85:10–18.) ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████ (*Id.*) Also, Charter's corporate documents span numerous subsidiaries but are ultimately headed by Charter officers. (Dkt. No. 68 at 24, 12–13.) Charter's corporate representative testified that these Charter officers can direct the work of the employees in their respective departments, which they also represent on their biographies as Charter officers. (*Id.* at 24, 12–13.)

Entropic also argues that Charter has publicly manifested that the employees act on the company's behalf (thus satisfying the second element of agency). (*Id.* at 24.) Charter's website and annual shareholder report both characterize Charter as a company with over 93,000 employees. (*Id.*) Moreover, it uses its website to promote Charter/Spectrum jobs around the country, including within the District. (*Id.*) When Charter announced its new headquarters in another state, it stated that it has "1,700 employees" now working there, even though all are actually employed by Charter Communications, LLC. (*Id.*)

Entropic notes that Charter has acknowledged these workers as its own employees/agents

in federal court filings (even though all employees are technically employed by CC LLC). (*Id.* at 24–25 (citing *Montes v. Charter Communications, Inc.*, No. 7:21-cv-489, Dkt. No 10 at 1, 2 (S.D. Tex. Feb. 2, 2022) ("Ms. Trevino, an employee of Charter"); *Montes v. Charter Communications, Inc.*, No. 7:21-cv-489, Dkt. No 1 at ¶ 12 (S.D. Tex. Dec. 12, 2021) (Charter stating that Anderson, a manager did not owe an individual duty "as Charter's agent")).)

Regarding the third element of agency, Entropic argues that Spectrum employees have consented to act as the agents of Charter. (Dkt. No. 68 at 25.) All applicants apply through the single Charter website. (*Id.*) Moreover, employees are required to sign an arbitration agreement which states that it applies to all disputes "whether made against Charter, or any of its subsidiaries, parent, or affiliated entities." (*Id.*) Charter's corporate representative, when asked at deposition if employees were aware of the distinction between various Charter entities, testified that "[he] would suspect most of them are not." (*Id.*) Indeed, many employees represent on LinkedIn that they work for Charter even though Charter now says they instead work for a subsidiary. (*Id.* at 25–26.) Further, Charter's website claims the employees as its own: "[o]ur diverse, highly skilled employees are our greatest resource . . . ." (*Id.*)

In reply, Charter argues that nothing in the record suggests that the relationship between Charter and its subsidiaries is anything more than a typical parent-subsidiary relationship, and that this is insufficient to establish agency by itself. (Dkt. No. 75 at 8.) Charter also argues that Entropic does not cite any authority for the proposition that acknowledging the existence of employees who support the Spectrum brand is a manifestation of consent for CC LLC employees to act on Charter's behalf. (*Id.* at 9.) Finally, Charter argues that Entropic does not explain how Spectrum employees consented to act as the agents of Charter or how Charter consented to have them act on its behalf. (*Id.*) Charter does not appear to dispute that the employees that work at the physical

9

Charter locations in this District carry out its business, it only disputes whether their activities can be attributed to Charter as agents of the company.

The Court finds that Entropic has fairly shown that the locations in the District are "regular and established place[s] of business" with "the regular, physical presence of an employee or other agent of the defendant conducting the defendant's business at the alleged 'place of business.'" *In re Google*, 949 F.3d at 1345. Specifically, the Court finds that the CC LLC employees, including those staffed at the locations in the District, are agents of Charter.

Charter has the right to direct or control the employee's actions as the manager of Charter Communications, LLC and Spectrum Gulf Coast. Charter's corporate representative testified that employees are provided to Spectrum stores ███████████████████████████ (Dkt. No. 68 at 23.) ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ (*Id.*) The management agreement thus gives Charter the ability to materially control the employees of CC LLC. Further, Charter's corporate representative testified that these Charter officers can direct the work of the employees in their respective departments. (*Id.* at 24, 12–13.)

Charter is correct that a mere corporate relationship is not sufficient to show an agency relationship, but here there is much more than a mere corporate relationship. *See, e.g.*, *E. Texas Med. Ctr. Reg'l Healthcare Sys. v. Slack*, 916 F. Supp. 2d 719, 722 (E.D. Tex. 2013) (Gilstrap, J.) (rejecting agency relationship "based merely on" a "corporate relationship"). As described above, Charter has the right to control the actions of the agents working at the locations in this District. The fact that Charter has not improperly managed its subsidiaries does not have any bearing

whether Charter has the right to control the CC LLC employees. In the worst case scenario, even if Charter's officers did not participate in the hiring and firing of any employee, such has no bearing on whether they have the *right* to do so. At most, Charter can point to testimony from its corporate representative saying that he is "he is uncertain what 'authority [the department heads] have as officers of [Charter].'" (Dkt. No. 75 at 3 (brackets in original omitted).) However, based on all the other facts outlined above, the Court is persuaded that Charter has the right to control the agents working at the locations in this District.

The Court finds that the second element of agency is also satisfied: Charter manifested that the employees act on the company's behalf. Charter uses its website to promote Charter/Spectrum jobs around the country, including within this District. (Dkt. No. 68 at 24.) Moreover, its website and annual shareholder report both characterize Charter as a company with over 93,000 employees. (*Id.*) Further, when Charter announced its new headquarters in another state, it represented that it had "1,700 employees" working there, even though all were actually employed by CC LLC. (*Id.*) Further, Charter has also acknowledged workers as its own employees/agents in federal court filings. (*Id.* at 24–25.) By claiming the CC LLC employees as its own, Charter manifests its consent for the employees of CC LLC to act on its behalf.

Lastly, the Court finds that the CC LLC employees have consented to act as the agents of Charter. They apply through the single Charter website. (*Id.* at 25.) Employees are required to sign an arbitration agreement which states that it applies to all disputes "whether made against Charter, or any of its subsidiaries, parent, or affiliated entities." (*Id.*) Moreover, Charter's corporate representative, when asked if employees were aware of the distinction between various Charter entities, said that "[he] would suspect most of them are not." (*Id.*) Indeed, many employees represent on LinkedIn that they work for Charter even though it now says they instead work for

11

CC LLC, a subsidiary. (*Id.* at 25–26.) These facts all demonstrate that the CC LLC employees believe they are acting on behalf of Charter, and thus have consented to acting on Charter's behalf.

As stated above, the Court finds *DirecTV* to be on point. Ultimately, the Court is persuaded that Charter is Spectrum and Spectrum is Charter. As in *DirecTV*, Defendant placed their brand or trade name on the building, and on trucks parked at these locations. *See DirecTV*, No. 2:22-cv-75, Dkt. No. 109 at 9–10 (E.D. Tex. Oct. 24, 2022). Since Charter holds the locations in this District out as its own, there is therefore no need to pierce the corporate veil. *See id.*

Since the Court finds that the CC LLC employees are agents of Charter, and there is no dispute that the employees that work at the physical Charter locations in the District carry out Charter's business, the second *Cray* factor is satisfied.

### iii) The Place of the Defendant

Under the third *Cray* factor, "'the regular and established place of business' must be 'the place of the defendant.'" *In re Cray*, 871 F.3d at 1363. To be a place of the defendant, "the defendant must establish or ratify the place of business." *Id.*

The parties disagree on whether ratification is a form of imputation, such that the requirements for imputation must be satisfied in order for Entropic to show that Charter has ratified certain locations. Specifically, the parties disagree on whether "corporate separateness" must be shown for Entropic to succeed under a ratification theory. (*See* Dkt. No. 75 at 1–2; Dkt. No. 80 at 4.) Charter maintains that corporate separateness must be shown. (Dkt. No. 75 at 1–2). Meanwhile Entropic maintains that ratification is a separate theory, such that corporate separateness does not have to be shown. (Dkt. No. 80 at 4.) Indeed, the Federal Circuit has held that "[a] threshold inquiry when determining whether the place of business of one company can be imputed to another, related company is whether they have maintained corporate separateness. If corporate separateness has

12

not been maintained, the place of business of one corporation may be imputed to the other for venue purposes." *Andra Grp., LP v. Victoria's Secret Stores, L.L.C.*, 6 F.4th 1283, 1289 (Fed. Cir. 2021). However, this same case makes clear that ratification and corporate separateness are distinct theories, such that corporate separateness need not be shown in order to show ratification. *Id.* ("Andra does not argue that the Defendants have not maintained corporate separateness. Andra contends that each of the Non-Store Defendants has ratified the retail stores as its own based on the criteria outlined in *In re Cray* … ."); *id.* at 1289–90 (analyzing *In re Cray* factors to determine whether defendants ratified the locations in question, not addressing corporate separateness). Further, the Federal Circuit has squarely addressed this in *Celgene*: "Of course, it might be that a parent corporation might specifically ratify a subsidiary's place of business, even if the two do maintain corporate separateness." *Celgene Corp. v. Mylan Pharms. Inc.*, 17 F.4th 1111, 1127 (Fed. Cir. 2021). This makes clear that corporate separateness need not be shown for Plaintiff to succeed on a ratification theory.

a) Ratification

Charter argues that the locations in this District are not "of [Charter]." Charter says it does not own or lease any property in the District and its own name is not associated with any properties within the District. (Dkt. No. 61 at 16.) Charter argues it does not have any employees in Texas; does not conduct any commercial business with the public; and does not make, manufacture, or sell any product anywhere. (*Id.* at 17.) It claims it Charter does not maintain or operate the physical locations identified in the District, and it argues that the use of a common or generic name, Spectrum, cannot support venue under the patent statute where corporate formalities between related companies remain intact. (*Id.*) *Bd. Of Regents v. Medtronic PLC.*, No. 17-CV-0942, 2018 WL 4179080, at *2 (W.D. Tex. July 19, 2018).

13

In response, Entropic relies upon and analogizes these facts to *DirecTV*. (Dkt. No. 68 at 26–27.) In finding that the third *Cray* factor was satisfied under a ratification theory, this Court reasoned in *DirecTV* that customers could use the main Dish website to find Dish service packages and authorized retailers available within the district; that prospective employees could find Dish job listings for positions in the district; and that Dish's website prominently advertised Dish's "nationwide availability." *See*, No. 2:22-cv-75, Dkt. No. 109 at 10 (E.D. Tex. Oct. 24, 2022). Here, Charter holds itself out as a company that provides internet and television services across 41 states. (Dkt. No. 68 at 27, 14–15.) It also advertises retail locations, service packages, and job listings through a nationwide website. (*Id.* at 27, 15–16.) Further, Charter itself actually negotiated and signed the leases for the Spectrum Stores in this District. (*Id.* at 28, 8–9.)

Entropic further contends that the Management Agreement gives Charter wide latitude to manage virtually every aspect of the Charter business, including personnel, operations, and engineering; maintenance and plant upgrades; compliance with regulations; negotiating advertising time; and marketing, sales, and promotions. (*Id.* at 28.) Importantly, the officers between Charter and the officers of the subsidiaries are the same. One such officer said that the existence of the subsidiaries is a "mere formality." (*Id.* at 29, 7, 11.)

Entropic distinguishes *Bd. of Regents v. Medtronic PLC* because the court there held that the mere appearance of a "Medtronic" sign was insufficient to support venue against the parent company. No. 17-CV-0942, 2018 WL 4179080 at*2 (W.D. Tex. July 19, 2018). Here, Charter has directly represented to the public that Charter itself is the entity that offers broadband services under the Spectrum name. (Dkt. No. 68 at 27–28.)



Dkt. No. 68-13 at 4.

In reply, Charter argues that all job listings are under the Spectrum name, not Charter, which distinguishes this case from *DirecTV*. (Dkt. No. 75 at 10.)

The Court finds that Charter has ratified the locations in this District as its own. *DirecTV* is on point. In *DirecTV*, the Defendant advertised service packages and locations in the District via its national website. *DirecTV*, No. 2:22-cv-75, Dkt. No. 109 at 10 (E.D. Tex. Oct. 24, 2022). Indeed, it "advertise[d] its 'nationwide availability' prominently on its website." *Id.* Moreover, Dish listed job postings for locations in the District on this same website. *Id.* Here, Charter holds itself out as a company that provides internet and television services across 41 states. (Dkt. No. 68 at 27, 14–15.) Further, it advertises retail locations, service packages, and job listings through a nationwide website. (*Id.* at 27, 15–16.) The fact that the nationwide website is under the brand or trade name "Spectrum" rather than "Charter" is irrelevant because these two names denote the same singular entity. Moreover, the present case presents facts that go further than those in *DirecTV* in that Charter actually negotiated and signed the leases for Spectrum Stores in this District. (*Id.* at 28, 8–9.)

15

*Medtronic*, as Entropic argues, is inapposite. There, the mere appearance of a "Medtronic" sign was insufficient to support venue against the parent company. No. 17-CV-0942, 2018 WL 4179080 at *2 (W.D. Tex. July 19, 2018). Here, Charter has directly represented to the public that Charter itself is the entity that offers broadband services under the Spectrum brand name. The fact that Charter undertakes certain activities under the "Spectrum" name is irrelevant because, as the Court has found, Charter is Spectrum and Spectrum is Charter.

Finally, the Court finds that multiple *Cray* factors support a finding that venue is proper in this District. Charter has signed the lease agreement for SGC. (Dkt. No. 68 at 28, 8–9.) *In re Cray*, 871 F.3d at 1363 ("Relevant considerations include whether the defendant owns or leases the place."). The Management Agreement gives it wide latitude to manage virtually every aspect of the Charter business. (Dkt. No. 68 at 28.) *In re Cray*, 871 F.3d at 1363 ("Relevant considerations include whether the defendant … exercises other attributes of possession or control over the place."). Charter advertises its locations, service packages, and job listings in this District on its website. (Dkt. No. 68 at 27.) *In re Cray*, 871 F.3d at 1363 ("Marketing or advertisements may also be relevant.").

As a result, the Court finds that Charter has ratified the locations in this District, such that they are "of the [D]efendant." *In re Cray*, 871 F.3d at 1363.

### b) Lack of Corporate Separateness

As an alternative to the evidence of ratification discussed above, the Court now turns to the concept of imputation. For a regular and established place of business of a subsidiary to be imputed to a parent, the corporations must lack formal corporate separateness:

> "[W]hen separate, but closely related, corporations are involved ... the rule is similar to that applied for purposes of service of process. So long as a formal separation of the entities is preserved, the courts ordinarily will not treat the place of business of one corporation as the place of business of the other. On the other

hand, if the corporations disregard their separateness and act as a single enterprise, they may be treated as one for purposes of venue."

*Soverain IP, LLC v. AT&T, Inc.*, No. 217CV00293RWSRSP, 2017 WL 5126158, at *1 (E.D. Tex. Oct. 31, 2017), *report and recommendation adopted*, No. 2:17-CV-00293-RWS, 2017 WL 6452802 (E.D. Tex. Dec. 18, 2017).

Here, Charter argues that (1) Entropic's principal basis for disregarding the corporate separateness of the subsidiaries is the fact that Charter is the manager, and this is insufficient to overcome corporate separateness, (2) Entropic must establish corporate separateness to pursue an alter-ego theory, (3) that the subsidiaries have not failed to follow corporate formalities. (Dkt. No. 61 at 17–19.)

Entropic responds that Charter operates as a single enterprise. Charter holds its property in one subsidiary, but staffs it with employees from another. (Dkt. No. 68 at 1–2, 4). All of Charter's employees belong to a single subsidiary, CC LLC. (*Id.* at 4.) Moreover, all 200+ subsidiaries have complete commonality of officers with each other and their parent Charter. (*See id.* at 11.) Moreover, Charter is the manager of each subsidiary. (Dkt. No. 68 at 6–7.) The operating agreements between Charter and its subsidiaries (direct and indirect) are not negotiated. (Dkt. No. 68 at 7.) Charter's corporate representative testified that:



(Dkt. No. 68-2 at 45:25–46:10 (emphasis supplied).) Charter signs the contracts for all of its subsidiaries, including the real property leases. (Dkt. No. 68 at 2, 8 9.) Moreover, Charter's corporate representative, who is the Deputy General Counsel in charge of forming and managing

entities, testified that he did not distinguish between or treat any differently the different entities in carrying out his role. (Dkt. No. 68 at 11; Dkt. No. 68-2 at 30:6–11.) Charter's officers lead enterprise-wide departments which span numerous subsidiaries. (Dkt. No. 68 at 12–13.) Notably, the subsidiaries do not hold corporate meetings or maintain their own records. (Dkt. No. 68 at 13–14.)

Finally, Entropic argues that Charter holds itself out to the public and the federal government as being one enterprise. (Dkt. No. 68 at 14–18.) The very first sentence of Charter's 10-K annual report states, "[w]e are a leading broadband connectivity company and cable operator serving more than 32 million customers in 41 states through our Spectrum brand." (Dkt. No. 68 at 14; Dkt. No. 68-12 at 1.) Charter's website proclaims that "Charter Communications, Inc. (NASDAQ:CHTR) is a leading broadband connectivity company and cable operator serving more than 32 million customers in 41 states through its Spectrum brand." (Dkt. No. 68 at 15; Dkt. No. 68-13 at 1.) Charter uses the "Spectrum" brand across its entire enterprise. (Dkt. No. 68 at 15; Dkt. No. 68-3 at 95:12–14 ("The Spectrum brand is used for all customer-facing functions in all retail stores in all service.").) Charter uses one website for consumers and to post job openings enterprise-wide. (Dkt. No. 68 at 15–16.) Charter has previously represented to the FCC, the ITC, and other Article III courts that it is one enterprise. (Dkt. No. 68 at 16–18.)

Charter argues that this evidence is insufficient because it never exercised improper control over its subsidiaries, the entities do not carry out business in Charter's name, and the entities followed corporate formalities. (Dkt. No. 75 at 2–4). Again, the Court disagrees.

The Court finds Entropic's arguments persuasive and holds as a matter of fact finding that the subsidiary corporations under Charter "disregard their separateness [from Charter] and act as a single enterprise." Thus, the activities of its subsidiaries (including those that operate the

18

locations in this District) may be properly imputed to Charter.

As noted, Charter unabashedly holds itself out to the world as a single enterprise. It has said this to the federal government in various filings, and it proclaims this to the world through its marketing. (Dkt. No. 68 at 14, 16–18; Dkt. No. 68-12 at 1; Dkt. No. 68-13 at 1.) Moreover, Charter's corporate representative admitted upon deposition that the lines between the different corporations are simply "legal formalities." (Dkt. No. 68-2 at 45:25–46:10.) The internal structure of Charter further confirms this. It staffs its employees throughout the enterprise even though only one subsidiary technically employs them. (Dkt. No. 68 at 12–13.) To facilitate this, Charter signs all contracts and documents on behalf of its subsidiaries. (*Id.* at 2, 8–9.)

Charter misspeaks when it says it must to exercise improper control over its subsidiaries for it to act as a single enterprise. (Dkt. No. 75 at 2–4.) The appropriate inquiry is whether Charter and its subsidiaries "act as a single enterprise." *Soverain IP, LLC*, 2017 WL 5126158, at *1.

As outlined above, the Court finds as a factual finding that Charter and its subsidiaries, including SGC, "act as a single enterprise" so the actions of its subsidiaries are properly imputed to Charter. Accordingly, the Court also finds that the locations in this District are "of the defendant" under a lack of corporate separateness theory.

V. **CONCLUSION**

For all the foregoing reasons, the Court finds that the Motion should be and hereby is **DENIED**. The parties are directed to jointly prepare a redacted version of this Order for public viewing and to file the same on the Court's docket as an attachment to a Notice of Redaction withing five (5) business days of this Order.

19

**So ORDERED and SIGNED this 3rd day of May, 2023.**

                                      RODNEY GILSTRAP  
                                    UNITED STATES DISTRICT JUDGE