```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF TEXAS

 3                      MARSHALL DIVISION

 4  ENTROPIC COMMUNICATIONS, LLC, )(

 5       PLAINTIFF,               )(   CIVIL ACTION NO.

 6                                )(   2:22-CV-125-JRG

 7  VS.                           )(   MARSHALL, TEXAS

 8                                )(

 9  CHARTER COMMUNICATIONS, INC., )(   JUNE 13, 2023

10       DEFENDANT.               )(   9:02 A.M.

11

12              CLAIM CONSTRUCTION HEARING

13        BEFORE THE HONORABLE RODNEY GILSTRAP

14        UNITED STATES CHIEF DISTRICT JUDGE

15

16  FOR THE PLAINTIFF:       Mr. James A. Shimota
                             Ms. Katherine L. Allor
17                           Mr. Jason A. Engel
                             K&L Gates, LLP
18                           70 West Madison Street
                             Suite 3100
19                           Chicago, IL 60602

20  COURT REPORTER:          Ms. Shelly Holmes, CSR, TCRR
                             Official Court Reporter
21                           Honorable Robert W. Schroeder III
                             United States District Judge
22                           Eastern District of Texas
                             Texarkana Division
23                           500 North State Line Avenue
                             Texarkana, TX 75501
24                           shelly_holmes@txed.uscourts.gov

25  (Proceedings recorded by mechanical stenography, transcript
    produced on a CAT system.)
```

```
 1   FOR THE PLAINTIFF:        Mr. Kenneth H. Bridges
                               Bridges IP Consulting
 2                             2113 19th Avenue S
                               Nashville, TN 37212
 3
                               Mr. Matthew A. Blair
 4                             K&L Gates, LLP
                               2801 Via Fortuna
 5                             Suite 650
                               Austin, TX 78746
 6
                               Mr. Connor J. Meggs
 7                             K&L Gates, LLP
                               10100 Santa Monica Boulevard
 8                             8th Floor
                               Los Angeles, CA 90067
 9
                               Mr. J. Wesley Hill
10                             Ward, Smith & Hill, PLLC
                               1507 Bill Owens Parkway
11                             Longview, TX 75604

12
     FOR THE DEFENDANT:        Mr. David S. Benyacar
13                             Kaye Scholer
                               425 Park Avenue
14                             New York, NY 10022

15                             Mr. Deron R. Dacus
                               The Dacus Firm, PC
16                             821 ESE Loop 323
                               Suite 430
17                             Tyler, TX 75701

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 09:02:22 | 1 | COURT SECURITY OFFICER:  All rise. |
| 09:02:24 | 2 | THE COURT:  Be seated, please. |
| 09:02:32 | 3 | This is the time set for claim construction in the |
| 09:03:14 | 4 | Entropic Communications versus Charter Communications |
| 09:03:16 | 5 | matter, this is Civil Case No. 2:22-CV-125. |
| 09:03:20 | 6 | Let me ask for announcements on this record. |
| 09:03:21 | 7 | What says the Plaintiff, Entropic? |
| 09:03:24 | 8 | MR. HILL:  Good morning, Your Honor.  Wesley Hill |
| 09:03:28 | 9 | on behalf of the Plaintiff, Entropic.  With me here today, |
| 09:03:31 | 10 | Your Honor, I have Jim Shimota, Ken Bridges, Katy Allor, |
| 09:03:37 | 11 | Jason Engel, Connor Meggs, and Matt Blair.  And we are |
| 09:03:41 | 12 | ready for our claim construction hearing. |
| 09:03:44 | 13 | Your Honor, I do have one note for the record |
| 09:03:45 | 14 | before we get started, but I'll sit down for the other side |
| 09:03:51 | 15 | to make announcements first. |
| 09:03:51 | 16 | THE COURT:  All right, Mr. Hill. |
| 09:03:53 | 17 | What's the announcement for the Defendant, |
| 09:03:56 | 18 | Charter? |
| 09:03:57 | 19 | MR. DACUS:  Good morning, Your Honor.  Deron Dacus |
| 09:03:59 | 20 | on behalf of Charter.  Here with me is David Benyacar.  And |
| 09:03:59 | 21 | also from Charter, Kirill Abramov.  And we're ready to |
| 09:04:07 | 22 | proceed, Your Honor. |
| 09:04:07 | 23 | THE COURT:  All right.  Thank you, Mr. Dacus. |
| 09:04:07 | 24 | All right.  Mr. Hill, you piqued my interest. |
| 09:04:10 | 25 | What have you got? |

09:04:11  1          MR. HILL:  I wish it was that interesting, Your

09:04:11  2   Honor, but I'm afraid it's not.

09:04:12  3          I just wanted to alert the Court, Your Honor.  We

09:04:14  4   filed a notice of a corrected Exhibit No. 7 to our claim

09:04:20  5   construction opening brief yesterday, yesterday evening

09:04:23  6   about 7:30.  It's ECF No. 117.  It replaces ECF No. 97-7.

09:04:30  7          Your Honor, what we discovered in the final review

09:04:33  8   in preparation for the hearing is that in uploading the

09:04:37  9   declaration of our expert for the record, the exhibits to

09:04:41  10  the declaration that are referenced in it were omitted.

09:04:43  11  They had previously been served.  They were in the record

09:04:47  12  as part of the claim construction process exchanges with

09:04:51  13  the other side, but they were omitted from the brief.

09:04:53  14         And so we filed a notice to provide that complete

09:04:56  15  Exhibit No. 7 so that it would be of record for the Court.

09:05:00  16  But I just wanted to highlight that because it was a

09:05:02  17  last-minute change.

09:05:03  18         THE COURT:  Have you received or have you been

09:05:05  19  told there's any objection to this from the other side?

09:05:07  20         MR. HILL:  I have not.  Granted, it was -- it's

09:05:10  21  short notice for them, Your Honor, but we have not received

09:05:13  22  any objection.

09:05:13  23         THE COURT:  All right.  Does Defendant have an

09:05:14  24  opinion on this?

09:05:15  25         MR. DACUS:  We don't have any objection, Your

09:05:17   1   Honor.   That's fine.

09:05:17   2           THE COURT:  All right.  Then without objection,

09:05:19   3   I'll note that correction.

09:05:20   4           And we'll proceed with argument on claim

09:05:24   5   construction addressing the various disputed terms.

09:05:27   6           We'll start with "a data networking engine

09:05:31   7   implemented in a first circuit that includes at least one

09:05:36   8   processor" and "a cable modem engine implemented in a

09:05:39   9   second circuit which includes at least one processor" from

09:05:44  10   Claim 18 of the '775 patent.

09:05:47  11           Plaintiff is proposing no construction is

09:05:49  12   necessary, and Defendant alleges that the terms are

09:05:51  13   indefinite.

09:05:52  14           Let me hear from the Plaintiff on this first.

09:05:56  15           MS. ALLOR:  Good morning, Your Honor.

09:06:10  16           THE COURT:  Good morning.

09:06:11  17           MS. ALLOR:  So I'd like to start with --

09:06:17  18           THE COURT:  Why don't we start with you

09:06:19  19   identifying yourself for the record?

09:06:20  20           MS. ALLOR:  Oh, I'm sorry.  Ms. Allor.

09:06:22  21           THE COURT:  Thank you.  Please proceed.

09:06:23  22           MS. ALLOR:  Okay.  So here on Slide 5, I've

09:06:26  23   actually grouped the first four terms, and I was hoping we

09:06:29  24   could address all four of them at once since there is this

09:06:32  25   issue of separateness that the -- that Charter has been

09:06:36  1   arguing with respect to these four terms.  And so I think

09:06:40  2   it might be helpful to take them all up at the same time if

09:06:44  3   that would be amenable to you.

09:06:45  4           THE COURT:  Well, I had planned to hear argument

09:06:47  5   concurrently on Terms 2 and 3.

09:06:52  6           MS. ALLOR:  That's fine.  I can take --

09:06:54  7           THE COURT:  I don't have -- I don't have -- the

09:06:57  8   more we can consolidate the process, the better as far as

09:07:00  9   I'm concerned.

09:07:00  10          Does this create any problem for the Defendant if

09:07:03  11  we hear all four of them argued concurrently?

09:07:06  12          MR. BENYACAR:  It doesn't, Your Honor.

09:07:07  13          THE COURT:  All right.  Then let's just take up

09:07:09  14  all four at the same time or the first four.

09:07:11  15          MS. ALLOR:  Okay.  Thank you, Your Honor.

09:07:13  16          So the main issue that permeates these four terms

09:07:17  17  is Charter has been alleging that there is this issue of

09:07:21  18  separateness, that they can't understand how the data

09:07:25  19  networking engine and the cable modem engine can be

09:07:26  20  separate from one another, implemented each in a circuit,

09:07:30  21  and be connected by a data bus.

09:07:33  22          THE COURT:  Is it possible that your view of this

09:07:35  23  separateness runs to the issue of functionality and their

09:07:41  24  issue as to separateness runs as to physical separation?

09:07:44  25  Is that where the parties divide?

| | | |
|---|---|---|
| 09:07:46 | 1 | MS. ALLOR:  That is correct. |
| 09:07:47 | 2 | THE COURT:  Okay. |
| 09:07:48 | 3 | MS. ALLOR:  And Charter's brief doesn't make clear |
| 09:07:51 | 4 | what their physical separateness would actually be.  And so |
| 09:07:55 | 5 | the specification tells us that it is a functional |
| 09:07:59 | 6 | separateness -- sorry about that. |
| 09:08:05 | 7 | And so let's start with, you know, one of the main |
| 09:08:07 | 8 | terms in the first two phrases, which is "circuit."  Both |
| 09:08:11 | 9 | sides agree a "circuit" is a well-known term.  There's a |
| 09:08:14 | 10 | dictionary definition provided by Dr. Almeroth, Charter's |
| 09:08:17 | 11 | expert. |
| 09:08:18 | 12 | And if we look at the second part of that |
| 09:08:19 | 13 | definition:  A combination of electrical components |
| 09:08:24 | 14 | interconnected to perform a particular task. |
| 09:08:26 | 15 | So this part of the definition is really what's |
| 09:08:29 | 16 | being described in the '775 patent.  It's separate |
| 09:08:34 | 17 | functional tasks.  The cable modem engine is operating |
| 09:08:38 | 18 | separately from the data networking engine. |
| 09:08:40 | 19 | And so Dr. Almeroth, Charter's expert, says |
| 09:08:44 | 20 | because of the way the claim language is set up, you can't |
| 09:08:48 | 21 | define the boundaries of the circuit.  But he doesn't |
| 09:08:52 | 22 | dispute that circuit is well-known. |
| 09:08:54 | 23 | If we turn to Slide 7, here are the two figures |
| 09:08:58 | 24 | from the '775 patent that show these two engines.  So the |
| 09:09:03 | 25 | top in blue is the data networking engine, and the bottom |

09:09:06   1   in red is the cable modem engine.

09:09:07   2        The Figure 1 shows it in three blocks showing, you

09:09:15   3   know, a data networking engine at the top, and then there's

09:09:19   4   two processors within the cable modem engine.

09:09:21   5        But the specification tells us we don't have to

09:09:24   6   have two processors in the cable modem engine.  We just

09:09:27   7   need to have the cable modem engine functionally separate

09:09:31   8   from the data networking engine.

09:09:32   9        And so if you look at Figure 2, you can see the

09:09:36   10  functional blocks that are part of each of those two

09:09:38   11  engines.  And you see the data bus that connects those two.

09:09:42   12       Dr. Almeroth doesn't dispute that you could have

09:09:47   13  those circuits be separate.  His problem is -- and

09:09:50   14  Charter's problem is, is that you can draw the box multiple

09:09:54   15  ways.  And that is not a reason to find the claim language

09:09:57   16  indefinite.

09:09:58   17       A POSITA could figure out how to draw the box

09:10:02   18  correctly.  The specification makes very clear the

09:10:04   19  functions that are part of the cable modem engine compared

09:10:07   20  to the data networking engine.  And so there's no confusion

09:10:11   21  as to the language of the terms.  Their -- their position

09:10:14   22  is that those cannot be connected by a data bus and still

09:10:18   23  be considered separate.

09:10:19   24       And we disagree with that.

09:10:22   25       So if you look at the actual language of the

09:10:27   1   claim, it's very clear the functions that each are

09:10:30   2   performing.

09:10:31   3         So on Slide 8, I've got the first half of the

09:10:34   4   claim that's directed to the data networking engine.  We

09:10:36   5   have a circuit, at least one processor programmed with

09:10:40   6   software that causes the data networking engine to perform

09:10:42   7   home networking functions.

09:10:45   8         And then the second half of the claim is the cable

09:10:48   9   modem engine.  Again, a second circuit, at least one

09:10:51   10  processor programmed with software that causes the cable

09:10:56   11  modem engine to perform cable modem functions.  And then it

09:10:59   12  lists out those cable modem functions.

09:11:03   13        So there's no -- there's no lack of clarity as to

09:11:06   14  what this claim language is directed to.  A POSITA

09:11:08   15  understands what a processor is.  A POSITA understands what

09:11:10   16  a circuit is.  And they understand the functions that each

09:11:13   17  of those are supposed to be performing.

09:11:15   18        And so moving on to the actual issue of functional

09:11:24   19  partitioning, which relates to the data bus, the

09:11:27   20  specification describes how you would localize the

09:11:30   21  functions of each in the cable modem engine versus the data

09:11:34   22  networking engine.  And it describes that those would be

09:11:37   23  connected.

09:11:37   24        So Charter's real issue is that they think that

09:11:42   25  the applicant made statements in the prosecution history

09:11:45  1  that say you can't have a data bus.  But the claim clearly

09:11:51  2  has a data bus included.  The examiner allowed the claim

09:11:54  3  with a data bus.  There's no -- there's no limitation that

09:11:59  4  says you can't have two circuits connected by a data bus,

09:12:01  5  and they can't still be separate.

09:12:03  6        THE COURT:  Do you agree that a data bus is a

09:12:05  7  well-established and known term in the relevant art?

09:12:08  8        MS. ALLOR:  Yes.

09:12:08  9        THE COURT:  Okay.

09:12:08  10        MS. ALLOR:  Yes.  And both experts have said so.

09:12:11  11  And Charter doesn't dispute that the data bus is known,

09:12:14  12  same way that they don't dispute that the circuit is known.

09:12:17  13        Their position really rests on how the claim

09:12:20  14  language uses those terms and says that based on that

09:12:24  15  language, it just can't be correct.  And we disagree with

09:12:30  16  that.

09:12:31  17        And if you look again at the definition of

09:12:34  18  circuit, it's interconnected to perform a particular task,

09:12:40  19  and the claims make clear what tasks the data networking

09:12:43  20  engine is doing compared to the cable modem engine.

09:12:46  21        And if you look at Figure 2 again -- oops -- if we

09:12:53  22  turn to Slide 13, the data -- the data networking engine on

09:12:57  23  the top is clearly connected by data bus 118 to the cable

09:13:03  24  modem engine.  So there is no disclaimer in the prosecution

09:13:06  25  history.  There is -- there's clear disclosure of the data

09:13:09   1   bus connecting those two engines.

09:13:11   2         And so a POSITA would understand how to set up

09:13:14   3   those two circuits, they'd understand the functions that

09:13:17   4   each are supposed to perform.  The claim language makes

09:13:20   5   clear what each should be performing, and so there's really

09:13:25   6   no issue of indefiniteness here.

09:13:26   7         And if we -- the last couple of slides that I have

09:13:35   8   here are really just addressing the prior art reference

09:13:38   9   that Charter is saying it acted as a disclaimer in the

09:13:42   10  prosecution history.  And as our expert has explained, as

09:13:45   11  we've explained in our briefing --

09:13:46   12        THE COURT:  This is the Brooks reference?

09:13:47   13        MS. ALLOR:  Yeah, this is the Brooks reference,

09:13:50   14  exactly.

09:13:50   15        And so as you can see there in the picture, Brooks

09:13:53   16  had processor 1, processor 2, and had a CMAC.  The examiner

09:14:02   17  mapped processor 1 and processor 2 each to the data

09:14:05   18  networking engine and the cable modem engine.  The problem

09:14:06   19  was that processor 1 was performing both data networking

09:14:12   20  functions and cable modem functions.

09:14:13   21        And so what the applicant explained to the

09:14:16   22  examiner was you can't have separateness when they're

09:14:19   23  both -- when that -- the one processor is performing both

09:14:23   24  steps.

09:14:24   25        And so the other issue was that the CMAC was also

09:14:28  1  connected to those two processors, and the CMAC was also

09:14:31  2  performing cable modem functions.  So you couldn't have

09:14:35  3  this separateness that's in our claims if you had this --

09:14:38  4  these multiple components all performing the cable modem

09:14:42  5  functions.

09:14:45  6       THE COURT:  Well, my understanding was that during

09:14:47  7  prosecution, the patentee distinguished Brooks because in

09:14:52  8  Brooks the available connecting circuitry would be shared

09:14:56  9  between the processors.

09:14:59  10      Isn't that -- I mean, doesn't that circuitry being

09:15:03  11  shared, doesn't that really go more to the idea of physical

09:15:06  12  separateness than it does functional -- or separateness of

09:15:15  13  functionality?

09:15:15  14      MS. ALLOR:  So the applicant explained that they

09:15:17  15  were sharing components and that they were connected to the

09:15:18  16  CMAC, but the issue of why it was different from the claims

09:15:22  17  was really directed to the cable modem functions being

09:15:28  18  contained in this first processor along with data

09:15:33  19  networking functions.  So it wasn't directed to the

09:15:35  20  connection, it was directed to the single processor

09:15:38  21  performing both tasks.

09:15:39  22      THE COURT:  All right.  Look at -- look at

09:15:43  23  Claim 18, if you will with me, Counsel.  Column 8, Line 24,

09:15:49  24  the phrase that begins "wherein."  I'm sure you're familiar

09:15:53  25  with this.

09:15:54  1    But it says:  "Wherein the cable modem function

09:15:57  2  performed by the cable modem engine are completely

09:16:01  3  partitioned from the home networking functions performed by

09:16:04  4  the data networking engine."

09:16:05  5    Tell me what "completely partitioned" means.  I

09:16:13  6  mean, "partitioned" is one thing, but that extra adjective

09:16:19  7  "completely" I think can be argued that it's more than one

09:16:24  8  type of partition, it's all types of partition if it's

09:16:27  9  completely partitioned.  And why wouldn't all types of

09:16:30  10  partition encompass the kind of physical partition or

09:16:34  11  separation that the Defendant is arguing for here?

09:16:37  12    MS. ALLOR:  So if we look at -- let's go back to

09:16:41  13  Figure 2 here.

09:16:42  14    Partitioning can happen based on functionality

09:16:51  15  that was known at the time of the invention that there were

09:16:53  16  SOCs involved, and you could put all of these functions

09:16:57  17  into an SOC, and they would be partitioned based on their

09:17:01  18  functionality.  So there wouldn't have to be physical

09:17:03  19  separateness, but they could all be operating in the same

09:17:08  20  device.

09:17:08  21    And the same is true today in the actual

09:17:11  22  embodiments that practice these claims is you can have

09:17:16  23  multiple circuits in a single device, and they're connected

09:17:20  24  by a data bus, but that does not make them the same

09:17:24  25  circuit.  That does not make them the same physical device.

09:17:27  1        And so "completely partitioned" simply means that

09:17:31  2    the functions are partitioned.  And the specification

09:17:33  3    supports that read.

09:17:37  4        If we look at Column -- let me see here -- if we

09:17:44  5    look at Column 4, Lines 13 to 24, this is describing

09:17:49  6    functional partitioning, and this is describing exactly

09:17:51  7    what is -- what is claimed, that the functions are

09:17:56  8    separate, that they are implemented in separate circuits,

09:17:59  9    but they are connected by a data bus.

09:18:02  10        And so they operate separately, and they are

09:18:05  11    partitioned separately.  They can be upgraded separately.

09:18:08  12    Their software can be upgraded without having to affect the

09:18:13  13    physical hardware.

09:18:14  14        THE COURT:  All right.  I don't want to finish the

09:18:20  15    argument on your side without touching on what we

09:18:23  16    identified as the fourth term from Claim 19, this "DOCSIS

09:18:28  17    functions."

09:18:29  18        I want to hear what your view is, particularly

09:18:31  19    with regard to the Defendant's proposed posture.  I'm not

09:18:38  20    sure I've ever seen an argument that Claim 19 is defined by

09:18:45  21    a lack of change in the scope of Claim 18.  I'm not sure

09:18:51  22    this is not more about Claim 18 than it is about Claim 19,

09:18:55  23    but the claim term comes from Claim 19.

09:18:57  24        What's your view on this fourth issue?

09:18:59  25        MS. ALLOR:  So if we look at Figure 1 again, which

09:19:04  1   I have here on Slide 18, you have three separate components

09:19:11  2   shown in the cable modem engine.  You've got the DOCSIS 2.0

09:19:16  3   PHY, which is the physical layer, you've got the DOCSIS MAC

09:19:22  4   processor, which is implemented in the second layer of the

09:19:23  5   OSI, and then you've got the DOCSIS controller, which is

09:19:26  6   somewhere above that second layer.

09:19:30  7        In Claim 18, you wouldn't necessarily have to

09:19:33  8   implement the DOCSIS PHY in the same device as the other

09:19:40  9   two functions of the cable modem engine.  You could have

09:19:42  10  those DOCSIS 2.0 functions in a separate device.

09:19:48  11       In Claim 19, you are required to have all of those

09:19:50  12  in one, and so that's where the distinguishing point is, is

09:19:54  13  that these are three separate phases, separate layers, and

09:19:59  14  they're all implemented in the same device if you add on

09:20:04  15  all DOCSIS functions on Claim 19.

09:20:07  16       And so that is where they're ignoring that there's

09:20:12  17  this option to have other DOCSIS functions performed

09:20:16  18  outside of the DOCSIS controller and the DOCSIS MAC

09:20:20  19  processor.

09:20:21  20       THE COURT:  So what's your view on the statement

09:20:24  21  that what this really is in this fourth term is an effort

09:20:30  22  to get a narrow definition of cable modem engine?

09:20:33  23       MS. ALLOR:  By the -- by Charter to get a narrow

09:20:38  24  definition?

09:20:38  25       THE COURT:  Yes.

09:20:39   1          MS. ALLOR:  I think that's exactly what they're
09:20:40   2   trying to do.  They're trying to basically read Claim 19
09:20:45   3   out, say there's no -- there's no need to look at it.  I
09:20:49   4   think that in the end, it really doesn't matter that they
09:20:52   5   infringe both claims, and so the scope should be different
09:20:56   6   because of it being a dependent claim and adding additional
09:21:01   7   limitations.  But if you were to find in favor of Charter,
09:21:04   8   I don't think it impacts infringement.
09:21:06   9          THE COURT:  All right.  Do you have further
09:21:08  10   arguments on any of these four -- these first four terms
09:21:14  11   that we've combined?
09:21:16  12          MS. ALLOR:  No.  So I'll sit back down, and then
09:21:18  13   we do have the last term of the '775 after that.
09:21:21  14          THE COURT:  All right.
09:21:22  15          MS. ALLOR:  Thank you, Your Honor.
09:21:23  16          THE COURT:  Let me hear from Charter at this
09:21:24  17   point.
09:21:24  18          MR. BENYACAR:  Good morning, Your Honor.
09:21:44  19          THE COURT:  Good morning.
09:21:45  20          MR. BENYACAR:  David Benyacar for Charter.
09:21:47  21          THE COURT:  Please proceed, Counsel.
09:21:48  22          MR. BENYACAR:  Thank you.
09:21:48  23          So while we have no objection to addressing the
09:21:54  24   claims in the order counsel proposed, we do disagree with
09:21:59  25   the reasons why they grouped them.

09:22:00  1          The first term, what I refer to as the circuit

09:22:03  2  limitations, that is not an issue of separateness.  That is

09:22:07  3  not the issue.  In fact, the claim says a first circuit and

09:22:12  4  a second circuit where the second circuit is separate from

09:22:15  5  the first circuit.

09:22:16  6          So separateness is not some issue we're taking

09:22:19  7  with this claim.  The claim expressly says that the two

09:22:22  8  circuits have to be separate.

09:22:24  9          THE COURT:  Do you believe they have to be on

09:22:25  10  separate chips, and is there any support for that?

09:22:28  11          MR. BENYACAR:  We do not -- we right now do not

09:22:31  12  take the position that they have to be on separate chips.

09:22:33  13          THE COURT:  Okay.

09:22:34  14          MR. BENYACAR:  That is not our position.

09:22:36  15          Our position is that -- well, our position is that

09:22:41  16  the claim has several limitations.  There's a data

09:22:46  17  networking engine and a cable modem engine, which I show in

09:22:48  18  blue.

09:22:49  19          But that's not the only limitation.  The

09:22:51  20  limitation also requires that that data networking engine

09:22:54  21  be implemented in a first circuit that includes at least

09:22:59  22  one processor, that requires more than a cable modem

09:23:04  23  engine.  It requires that the cable modem engine be

09:23:05  24  implemented in a second circuit that includes at least one

09:23:09  25  processor where the second circuit is separate from the

09:23:12   1   first circuit.

09:23:12   2        Those are limitations over and above just having a

09:23:15   3   data networking engine and a cable modem engine.

09:23:17   4        THE COURT:  Does that not -- does that not bring

09:23:20   5   up the issue of separateness, the second circuit being

09:23:24   6   separate from the first circuit?

09:23:25   7        MR. BENYACAR:  Well, our position, Your Honor,

09:23:26   8   there is -- there is a separateness issue in the claim, but

09:23:29   9   our position is that there is no way to know even whether

09:23:33   10  there is a first circuit and a second circuit because --

09:23:40   11  well, because circuit -- and using the definition that

09:23:43   12  counsel put up -- depends on the perspective of the viewer,

09:23:48   13  right?

09:23:48   14       Well, as an initial matter, let me start by saying

09:23:56   15  a person of skill in the art needs to be able to look at

09:23:58   16  this claim, look at an accused device and say, okay, do I

09:24:03   17  not just have a data networking engine and a cable modem

09:24:06   18  engine, but do I have one in a first circuit, one in a

09:24:10   19  second circuit and the two circuits are separate, all of

09:24:13   20  those?  And you have the definition of circuit that can

09:24:15   21  apply to your claim in order to evaluate an accused device.

09:24:19   22       Now, the specification does not provide any

09:24:21   23  context for this.  There's no concept of circuits in the

09:24:26   24  specification.  The word "circuit" is not even used in the

09:24:29   25  specification.  So we can't get any guidance from the

09:24:33  1   specification on what is meant by a first circuit and a

09:24:36  2   second circuit.  What meaning of circuit is being applied

09:24:40  3   there?

09:24:41  4        Now, what I have on the slide now on Slide 7 is

09:24:44  5   the same definition that Ms. Allor put up.  And there are

09:24:51  6   two definitions here.  And as Your Honor knows, there's no

09:24:57  7   dispute between the parties that this is -- this is the

09:25:02  8   plain meaning definition of circuit.  Counsel also uses the

09:25:05  9   same definition.

09:25:06  10       And you can see that the first definition is a

09:25:09  11  path that can carry electrical current.  Now, even --

09:25:13  12  there's no dispute about this, even transistors, individual

09:25:17  13  transistors have multiple circuits between them.

09:25:20  14       There's no dispute what I have on Claim 9, using

09:25:24  15  that definition of circuit, the disclosed data networking

09:25:28  16  engine and cable modem engines would each include billions

09:25:31  17  of circuits.  So what does that mean?

09:25:34  18       Well, the claim requires that you have a data

09:25:38  19  networking engine implemented in a first circuit that

09:25:40  20  includes at least one processor and a second circuit that

09:25:43  21  includes at least one processor.

09:25:45  22       So according to the claim, you have processors in

09:25:49  23  circuits.  But using that first definition of circuit, you

09:25:52  24  would not have processors in circuits.  You have circuits

09:25:55  25  in processors.  Each processor would be billions of

09:25:59   1   circuits.  So using that definition, you wouldn't infringe

09:26:01   2   Claim 18.

09:26:02   3          So as a result, they don't like that definition

09:26:05   4   because it wouldn't -- let's assume hypothetically that the

09:26:11   5   figure -- cable modem 100 that Ms. Allor also showed was an

09:26:14   6   accused device because we can look at it that way because

09:26:18   7   there's no concept of circuit in the spec.  So let's just

09:26:21   8   look at that as an example and say, I'm one of skill in the

09:26:24   9   art.  I want to look at figure -- cable modem 100 and say

09:26:27   10  does that infringe?

09:26:28   11         Well, I would look at this first definition that I

09:26:30   12  have in red, any path that can carry electrical current,

09:26:34   13  and I would say, no, it doesn't infringe.  I don't have --

09:26:37   14  I don't have different multiple processors on a circuit.  I

09:26:40   15  have -- every individual processor has billions of

09:26:43   16  circuits.  So there's no infringement.

09:26:48   17         THE COURT:  Let me ask you this, you've said at

09:26:50   18  least twice that there's nothing in the spec here that

09:26:53   19  addresses this or gives you context.  Is your argument on

09:26:57   20  indefiniteness tied to that, and is it -- is it a flavor of

09:27:05   21  what I might characterize as a written description issue,

09:27:08   22  or is your argument unrelated to the fact that you say

09:27:12   23  there's a lack of support in the specification?

09:27:14   24         MR. BENYACAR:  So there is a written description

09:27:17   25  issue, but my argument is not -- is not directly tied to

09:27:21  1  that.  My argument is if the specification had provided

09:27:25  2  some context or explanation of which of the many different

09:27:28  3  definitions of circuit to employ, the result here might be

09:27:32  4  different.  We may be able to look at the specification and

09:27:35  5  see what's meant.

09:27:35  6          But the specification is silent.  So we're stuck

09:27:38  7  with the plain meaning of circuit.  And according to the

09:27:41  8  plain meaning of circuit, an individual path can be a

09:27:44  9  circuit.

09:27:44  10          Now -- so they don't like Definition 1 because it

09:27:48  11  would result -- it would mean cable modem 100 does not

09:27:51  12  infringe.

09:27:51  13          So they look to Definition No. 2, and Definition

09:27:56  14  No. 2 is what constitutes a circuit depends on the level at

09:28:00  15  which you want to consider.  In other words, according to

09:28:04  16  the definition itself, what constitutes a circuit depends,

09:28:07  17  depends on how you want to look at it.  You can look at it

09:28:10  18  at any level.

09:28:11  19          This is the very definition that Ms. Allor showed,

09:28:15  20  okay?  Definition No. 2 says:  At one level, a computer

09:28:20  21  consists of a single circuit; at another it consists of

09:28:26  22  hundreds of interconnected circuits.  It all depends on how

09:28:29  23  you want to look at it.

09:28:30  24          So let's --

09:28:32  25          THE COURT:  So is the argument -- I'm trying to

09:28:36  1  follow where you're headed and try to guess where you're

09:28:39  2  going in the future here.

09:28:40  3      But, I mean, are you really telling me that a

09:28:42  4  POSITA would not know what a circuit is because there's no

09:28:44  5  definition of circuit in the specification?

09:28:46  6      MR. BENYACAR:  No, Your Honor.

09:28:48  7      THE COURT:  Okay.

09:28:48  8      MR. BENYACAR:  Absolutely not.

09:28:49  9      There -- we agree that what's shown on the -- the

09:28:54  10  definition that's shown on the screen and the definition

09:28:56  11  that Ms. Allor showed is a plain meaning definition of

09:29:00  12  circuit that everyone of skill in the art would understand.

09:29:02  13      THE COURT:  All right.

09:29:03  14      MR. BENYACAR:  My argument is that what

09:29:06  15  constitutes a circuit depends.  The definition says it.

09:29:12  16  Let's -- the very definition Ms. Allor showed says:  At one

09:29:17  17  level, a computer consists of a single circuit; at another,

09:29:22  18  it consists of hundreds of interconnected circuits.

09:29:25  19      That's the plain meaning definition.  The plain

09:29:28  20  meaning definition of circuit is it depends.

09:29:32  21      There's another definition, which Ms. Allor

09:29:33  22  showed, which is any path that can carry electrical

09:29:36  23  current, but they don't like that one because that would

09:29:39  24  result in no infringement.  So I'm just focusing on No. 2

09:29:42  25  now.

09:29:42  1        So let's take the first -- what I have highlighted

09:29:44  2   in yellow.  At one level, a computer consists of a single

09:29:48  3   circuit.  So let's say that I'm someone skilled in the art,

09:29:53  4   and I want to make cable modem 100, and I want to know,

09:29:56  5   well, do I satisfy the limitation of two separate circuits?

09:29:59  6        I can look at that and say, well, no.  At one

09:30:02  7   level, a computer consists of a single circuit, so my whole

09:30:05  8   cable modem is only one circuit.  I don't infringe because

09:30:10  9   I don't have two separate circuits.  I don't have two

09:30:13 10   circuits at all.  It's one circuit.

09:30:14 11        So under this definition of circuit where the

09:30:21 12   entire computerized device is a single circuit, I don't

09:30:24 13   have a data networking engine implemented in a first

09:30:27 14   circuit and a cable modem engine implemented in a second

09:30:31 15   circuit.  It's all in one circuit.

09:30:33 16        So cable modem 100, if I was making that, would

09:30:39 17   not infringe because it's one circuit.

09:30:41 18        And this is an important point because under

09:30:45 19   Entropic's own reading of the specification, it's one

09:30:48 20   circuit.  How do I know that?  Because this is in their

09:30:51 21   brief.  This is in their opening brief at Page 8.

09:30:55 22        They contend that cable modem 100 is all on what's

09:30:58 23   called the system on chip.  That's their position.  They

09:31:01 24   say -- if you look at the bottom, they say that's what the

09:31:06 25   '775 discusses, a chip implementing cable modem system 100.

09:31:09   1   The overall system including both engines.  This is their

09:31:13   2   position.  The whole thing is a system on chip.

09:31:17   3          So what's the plain meaning of a system on chip?

09:31:22   4   This is -- this is a plain meaning definition of system on

09:31:27   5   chip from a dictionary.  System on chip, a silicon

09:31:31   6   integrated circuit.  It's one circuit.  So if they're right

09:31:35   7   and it's a system on chip, then I'm someone skilled in the

09:31:38   8   art.  I'm going, well, what's a -- I have a system on chip.

09:31:41   9   What is it?  I look at this, and I say, oh, it's one

09:31:44  10   circuit.  I don't infringe.

09:31:44  11          So yet the gist of their argument is that they're

09:31:59  12   allowed to -- because the definition says -- Definition

09:32:03  13   No. 2 says, it's a combination of electrical components to

09:32:06  14   perform the function, their basic argument is, well, we can

09:32:09  15   combine whatever we want.  Like, we don't have to take

09:32:12  16   those definitions.  Whatever combination suits me when I'm

09:32:17  17   accusing a device, that's what I'll pick, and that'll be a

09:32:20  18   circuit.

09:32:21  19          So another way to read the definition is the data

09:32:25  20   networking engine, the DOCSIS controller, and the DOCSIS

09:32:27  21   MAC processor could all be separate circuits.  They don't

09:32:30  22   perform functions.  They don't like that way to read it

09:32:34  23   because you wouldn't have the cable modem engine on a

09:32:37  24   second circuit.

09:32:38  25          So the law here is that if there are multiple ways

09:32:45   1    to read a claim that result in different claim scope, the

09:32:50   2    claim is indefinite.

09:32:52   3         This is the -- this case is the sine qua non of

09:32:55   4    that because the very definition of circuit says it depends

09:32:59   5    on how you look at it, and the specification provides us no

09:33:02   6    guidance.

09:33:03   7         So let me provide one final example of their -- of

09:33:08   8    the way they would read this.

09:33:10   9         Let's make believe that Entropic had a claim that

09:33:15 10    was the exact opposite for Claim 18.  Let's make believe.

09:33:18 11    And rather than say the cable modem engine and the data

09:33:21 12    networking engine are implemented in two separate circuits,

09:33:24 13    this opposite claim says they're both implemented in the

09:33:28 14    same single circuit.

09:33:29 15         Well, Entropic would then say, oh, okay.  Well,

09:33:34 16    that same cable modem with engine 100, it infringes that

09:33:37 17    claim, too, because, see, the definition says the entire

09:33:40 18    computer can be one circuit.  The entire computer is

09:33:42 19    something that performs functions.  So cable modem 100

09:33:45 20    would infringe that opposite claim as well.  That can't be.

09:33:53 21         Circuit -- the very definition of circuit is it

09:33:55 22    depends on how you look at it.  The entire computer can be

09:33:59 23    a circuit and the individual component can be a circuit and

09:34:01 24    any place in between, and which one you pick changes the

09:34:04 25    claim scope.  So the claim is indefinite.

09:34:09    1              THE COURT:  All right.

09:34:09    2              MR. BENYACAR:  All right.  So, I'm sorry, I just

09:34:11    3    have to go over here and move this slide.

09:34:23    4              THE COURT:  You're free to put Mr. Dacus to work

09:34:26    5    any way you'd like to.

09:34:29    6              MR. BENYACAR:  Thank you, Your Honor.

09:34:29    7              MR. DACUS:  He's witnessed my technological

09:34:31    8    skills, Your Honor.  That's why he walked over here.

09:34:36    9              MR. BENYACAR:  So what Your Honor said about

09:34:41   10    completely partitioned is exactly what happened during

09:34:46   11    prosecution.

09:34:46   12              The applicants argued -- and these are the same

09:34:48   13    components Ms. Allor showed being highlighted.  The

09:34:51   14    applicant said that sharing means there's no complete

09:34:56   15    partition.  And the applicant pointed to this -- said that

09:35:01   16    because connecting circuitry would be shared, there's no

09:35:04   17    complete partitioning.  That's what the applicant said.

09:35:07   18              The language that I have highlighted in green

09:35:18   19    here, Your Honor, is the complete partitioning language in

09:35:21   20    the claim.  So it's the very claim language that the

09:35:23   21    applicant was participate -- was partitioning.  You see, it

09:35:27   22    says that because the processors share the same data paths,

09:35:34   23    system bus 108 and ASB 210, there's no complete

09:35:37   24    partitioning.

09:35:38   25              And there's no dispute that ASB 210 is -- is a

09:35:44   1   data bus.  There's no dispute.

09:35:50   2          This is from Entropic's expert, Dr. Kramer.  It

09:35:53   3   says:  Processors 102 and 104 are connected directly by

09:35:57   4   system bus 108, also known as the advanced system bus 210.

09:36:03   5   There's no dispute that what I've highlighted in there,

09:36:03   6   what was distinguished by the applicant, was the existence

09:36:05   7   of a data bus.

09:36:06   8          And in addition, not only the connected circuitry

09:36:13   9   was distinguished, the applicant also said, oh, those --

09:36:16  10   that cable modem engine and data processing engine (sic),

09:36:19  11   they also share a memory device.

09:36:21  12          And I have that highlighted here on Page 45.  You

09:36:26  13   see I have that highlighted.

09:36:28  14          Sharing the same direct memory access controls --

09:36:28  15          THE COURT:  Could you slow down a little bit,

09:36:30  16   please?

09:36:30  17          MR. BENYACAR:  I apologize, Your Honor.

09:36:31  18          THE COURT:  Thank you.

09:36:31  19          MR. BENYACAR:  So we have the sharing of the

09:36:40  20   connecting circuitry, the sharing of the data bus, and on

09:36:47  21   Slide 45, the sharing of the direct memory access

09:36:50  22   controller.

09:36:51  23          And the applicant distinguished the very claim

09:37:00  24   language, the very completely partitioned claim language in

09:37:02  25   our claim here on the basis that there was shared

09:37:06  1  connecting circuitry, shared data bus, and shared memory.

09:37:08  2          And so that's how we construe the completely

09:37:14  3  partitioned limitation, exactly that way, and that's why

09:37:18  4  data bus is indefinite.

09:37:21  5          It's not because, as Ms. Allor seemed to suggest,

09:37:25  6  that we don't know that the claim calls for a data bus.  Of

09:37:28  7  course, we know that.  But the applicants distinguished the

09:37:32  8  prior art on the grounds that there was a data bus

09:37:34  9  connecting them.

09:37:36  10          THE COURT:  All right.  Let me have your targeted

09:37:39  11  argument on this fourth claim, the DOCSIS functions.

09:37:45  12          MR. BENYACAR:  Yes, Your Honor.

09:37:45  13          THE COURT:  The interplay between Claims 18 and

09:37:49  14  19.

09:37:49  15          MR. BENYACAR:  Yes.  I apologize, it takes me a

09:37:54  16  minute to get there.

09:37:55  17          Okay.  On the left is Claim 19.  It says:  All

09:38:06  18  DOCSIS functions are localized in the cable modem engine.

09:38:11  19  Okay.  So now we have not argued that cable modem engine

09:38:15  20  and data networking engine are indefinite because we

09:38:17  21  thought in view of the spec we understood what they meant.

09:38:21  22          A cable modem engine is what performs the cable

09:38:23  23  modem functions, and the data networking engine is what

09:38:24  24  performs the data networking functions.  So we didn't think

09:38:28  25  they were indefinite.

09:38:29  1          But DOCSIS is indisputably a cable modem function.

09:38:35  2          What I have on the Slide 47 on the right is an

09:38:38  3  excerpt from Dr. Kramer's report, Entropic's expert, where

09:38:42  4  he says:  Cable modem functions, e.g., DOCSIS.  So there's

09:38:47  5  no dispute that DOCSIS is a cable modem function.

09:38:51  6          Claim 19 says:  All DOCSIS functions are localized

09:38:54  7  in the cable modem engine.

09:38:55  8          Now, Your Honor said something to Ms. Allor, which

09:38:57  9  I agree with, you said, is this really more an issue of

09:39:00  10  Claim 18?  In some way it is because if this can be true

09:39:06  11  that all DOCSIS functions are not localized in a cable

09:39:09  12  modem engine, then cable modem engine is indefinite.

09:39:11  13          Let's look at what the specification says about

09:39:14  14  the cable modem engine.

09:39:16  15          Sorry, Your Honor.  Let's just do it this way.  I

09:39:46  16  apologize.

09:40:01  17          The specification says that there's a cable modem

09:40:04  18  system architecture with a cable modem engine that performs

09:40:07  19  all cable modem functions.  That's what we thought a cable

09:40:14  20  modem engine was.

09:40:15  21          It further says:  DOCSIS and VoIP functionality is

09:40:18  22  implemented in the cable modem engine because DOCSIS is a

09:40:21  23  cable modem function.

09:40:22  24          The bottom quote also says:  Cable modem engine

09:40:25  25  implements the entire DOCSIS cable modem functionality,

09:40:28  1   because DOCSIS is a cable modem function.

09:40:30  2        So the whole point -- and this is on Slide 49 --

09:40:37  3   of having a cable modem engine and a data networking engine

09:40:41  4   is to make sure that the cable modem functions are

09:40:47  5   partitioned from the data networking functions.

09:40:50  6        So in the quote at the top, data and home

09:40:53  7   networking functionality is provided by a data networking

09:40:55  8   engine and DOCSIS and VoIP functionality is provided by a

09:40:58  9   cable modem engine.  And the point of that is to make sure

09:41:01  10  that home networking functionality is completely decoupled

09:41:05  11  from the DOCSIS functionality.

09:41:06  12       So I would respectfully suggest that in Claim 19,

09:41:13  13  if it means what Ms. Allor says it means, which is why you

09:41:17  14  can have a cable modem function, but it doesn't have to

09:41:20  15  perform all DOCSIS functionality, then cable modem engine

09:41:22  16  is indefinite.  Because if it's not something that performs

09:41:25  17  all the cable modem functionality, there's no way to know

09:41:29  18  what it means.

09:41:33  19       THE COURT:  All right.

09:41:33  20       MR. BENYACAR:  Thank you, Your Honor.

09:41:35  21       THE COURT:  Let me see if the Plaintiff has any

09:41:41  22  brief follow-up.

09:41:43  23       MS. ALLOR:  So I want to turn to the ELMO and put

09:42:09  24  up -- oops, sorry about that.

09:42:12  25       So this is Slide 43 of Charter's presentation, and

09:42:17  1  this is with regards to the completely partitioned

09:42:22  2  discussion.

09:42:23  3        And when they -- our reply brief really outlines,

09:42:26  4  you know, our issues with Brooks and how the applicant

09:42:30  5  distinguished over it.

09:42:31  6        But I just want to point to what they had up on

09:42:33  7  the slide and show you that the applicant specifically was

09:42:38  8  addressing the cable modem functions being completely

09:42:42  9  partitioned.

09:42:42  10        So if you see that right here, completely

09:42:45  11  partitioned, and you have functions.

09:42:48  12        So they weren't discussing the physical

09:42:51  13  partitioning.  They were discussing the functions being

09:42:55  14  partitioned.

09:42:56  15        And I think we just want to keep going back to

09:42:57  16  that and say, you know, there's no disclaimer in the file

09:43:01  17  history.  The use of the data bus does not change the claim

09:43:04  18  language.  It does not mean you can't have the cable modem

09:43:08  19  engine and the data networking engine be partitioned from

09:43:10  20  one another.

09:43:11  21        And our reply brief, it's at Pages 2 to 3, is

09:43:18  22  where we, you know, reiterate this argument, and I think

09:43:21  23  we've really made it clear.

09:43:23  24        So going back to one of the definitions that

09:43:26  25  counsel put up numerous times -- if you go to our slides.

09:43:35  1          So the circuit definition, you heard Charter

09:43:44  2    explain that if we go with the first definition, that you

09:43:48  3    wouldn't have any idea how to define the circuit.  Any path

09:43:50  4    that can carry electrical current, that it would cover the

09:43:55  5    cable modem engine and the data networking engine

09:43:56  6    implemented in a single SOC.

09:43:58  7          But they're ignoring that an SOC can have multiple

09:44:05  8    processors on it, and the claims require at least two

09:44:08  9    processors, at least one for the cable modem engine and at

09:44:10  10   least one for the data networking engine.

09:44:11  11         So the context of the definition of circuit is

09:44:13  12   what's important for these terms.  And any path that can

09:44:18  13   carry electrical current, that is not what's being

09:44:20  14   described in the patent.  It's discussing the particular

09:44:23  15   tasks being implemented in two separate engines that are

09:44:28  16   separate from one another.

09:44:29  17         And so that is why the definition of circuit would

09:44:32  18   be clearly understood by a POSITA, and they would have no

09:44:35  19   trouble understanding the boundaries of the claims.

09:44:39  20         And then with respect to Claim 19, I just want to

09:44:48  21   go back to that one last time.

09:44:52  22         What Charter is really trying to do is limit Claim

09:44:57  23   18, and you heard Mr. Benyacar admit that, that they really

09:45:00  24   want Claim 18 limited to all DOCSIS functions.  And the

09:45:04  25   specification doesn't say that.

09:45:05   1        The specification has other functions that are not
09:45:09   2   required by Claim 18 that could be implemented in Claim 19.
09:45:14   3   And that's claim differentiation.  You know, that's a, you
09:45:19   4   know, clear issue when you're looking at the two claims.
09:45:24   5   And so we would disagree with his read that all DOCSIS
09:45:26   6   functions are required by Claim 18.
09:45:29   7        THE COURT:  Counsel for Charter tells me that
09:45:33   8   there's just no help in the specification at all.  It
09:45:36   9   doesn't provide any context, doesn't give you any guidance.
09:45:43  10   I would gather and assume that you don't agree with that,
09:45:47  11   but I'd like to hear your view on that.
09:45:49  12        MS. ALLOR:  I don't.  And I'll show you in the
09:45:53  13   specification -- if we could just go to the '775 patent.
09:46:08  14   And if you go to Column 3.
09:46:10  15        And this is what Charter's relying on for the next
09:46:13  16   two terms are this portion of Column 3.  So at the bottom
09:46:18  17   is what I'm going to focus on.  And it's describing --
09:46:23  18        THE COURT:  Which line number?
09:46:41  19        MS. ALLOR:  Sorry.
09:46:46  20        So it's actually at the top of Column 3.
09:46:48  21        And so the DOCSIS PHY 112, if you see it here at
09:46:54  22   Line 9 and Column 3, that's referring to the DOCSIS
09:46:58  23   physical layer, and that is something separate and distinct
09:47:03  24   from the DOCSIS MAC processor.
09:47:04  25        The DOCSIS MAC processor is performing MAC

09:47:08   1   functions, and the DOCSIS PHY layer is -- as you can see

09:47:13   2   here, exchanges voice data.

09:47:15   3           And so those two are separate, and they can be

09:47:19   4   implemented in a single cable modem engine, or you could

09:47:25   5   have that DOCSIS PHY -- DOCSIS 2.0 PHY in a separate

09:47:31   6   component.

09:47:32   7           And so I think that's where they're trying to read

09:47:35   8   Claim 18 as requiring the DOCSIS physical layer functions

09:47:39   9   as part of the cable modem engine.  And that is not part of

09:47:44  10   the claims.  It could be, but it's not limited to that.

09:47:47  11   And that's why Claim 19 says all DOCSIS functions.  So it

09:47:52  12   includes the physical layer functions.

09:47:56  13           THE COURT:  All right.  What else?

09:47:57  14           MS. ALLOR:  That's all I had for those rebuttal

09:48:00  15   terms.

09:48:01  16           If you want to -- if you'd like to move on to the

09:48:04  17   next two terms, Your Honor, "DOCSIS MAC processor" and

09:48:10  18   "DOCSIS controller."

09:48:10  19           And that starts at Slide --

09:48:15  20           THE COURT:  I would like to do those next, but

09:48:17  21   since you're only proposing plain and ordinary meaning and

09:48:20  22   the Defendants offered a specific construction,

09:48:24  23   alternatively arguing it's indefinite, I'd like to hear

09:48:26  24   from the Defendant on these first.

09:48:27  25           MS. ALLOR:  Okay.  That'll be great.  Thank you.

09:48:34 1          THE COURT:  I reserve the right to set the order.

09:48:36 2          MS. ALLOR:  Of course.  Of course.

09:48:37 3          THE COURT:  All right.  Let me hear from Charter

09:48:39 4   on "DOCSIS MAC processor" and "DOCSIS controller."

09:48:42 5          MR. BENYACAR:  Thank you, Your Honor.

09:48:56 6          To begin, DOCSIS MAC processor and DOCSIS

09:49:00 7   controller do not have plain and ordinary meanings.  No

09:49:01 8   party has pointed to a dictionary to say that these are

09:49:05 9   well-known terms in the art.  They are not.

09:49:07 10         So Entropic takes a very simple view of how to

09:49:14 11  construe these.  They say, and this is in their brief,

09:49:17 12  well, the DOCSIS MAC processor is just the device that does

09:49:22 13  DOCSIS MAC processing.  And a DOCSIS controller is just the

09:49:25 14  device that controls DOCSIS functions.  This is on Page 14

09:49:29 15  of their opening brief.

09:49:30 16         And as we say in our brief, that's simplistic but

09:49:34 17  incorrect because it would not serve to distinguish a

09:49:38 18  DOCSIS MAC processor from a DOCSIS controller.

09:49:41 19         And the reason for that is in the specification,

09:49:44 20  the DOCSIS controller, the only DOCSIS controller

09:49:48 21  disclosed, also performs DOCSIS MAC functions.  And the

09:49:52 22  disclosed DOCSIS MAC processor also controls DOCSIS

09:49:57 23  functions.

09:49:57 24         So they would be indistinguishable under

09:50:01 25  Entropic's plain meaning construction.

09:50:04  1          What I have on the slide now, on Slide 31, is the

09:50:10  2     specification's description of the functions that the

09:50:14  3     DOCSIS controller performs.  It's a lot.

09:50:17  4          But among those are numerous DOCSIS MAC functions.

09:50:25  5     DOCSIS MAC management message processing, MAC address

09:50:31  6     learning, voice MAC driver.  This is undisputed.  This is

09:50:34  7     in Dr. Almeroth's report, and it's undisputed by

09:50:37  8     Dr. Kramer, that the disclosed controller performs DOCSIS

09:50:43  9     MAC functions.  Therefore, under Entropic's plain meaning,

09:50:46  10    the DOCSIS controller is also a DOCSIS MAC processor

09:50:48  11    because it performs DOCSIS MAC functions.

09:50:50  12         Similarly, the DOCSIS MAC processor controls

09:50:59  13    DOCSIS functions.  It controls the DOCSIS MAC functions

09:51:03  14    that it performs.  Therefore, the DOCSIS MAC processor

09:51:09  15    disclosed in the specification is also a DOCSIS controller.

09:51:15  16         The DOCSIS controller -- the disclosed DOCSIS

09:51:19  17    controller performs DOCSIS MAC functions, and the disclosed

09:51:24  18    DOCSIS MAC processor performs DOCSIS functions, and so,

09:51:28  19    therefore, there would be no way to distinguish between

09:51:31  20    them according to Entropic's plain meaning.

09:51:35  21         THE COURT:  So are you telling me that DOCSIS

09:51:37  22    doesn't have a plain meaning known in the art, and MAC

09:51:41  23    doesn't have a plain meaning known in the art?

09:51:43  24         MR. BENYACAR:  No, they do.  They absolutely do.

09:51:45  25         But there's a device in the spec called a DOCSIS

09:51:50    1    controller.

09:51:50    2        The word "DOCSIS" has a plain meaning in the art,

09:51:53    3    and the word "controller" has a plain meaning in the art.

09:51:59    4    But those plain meanings don't exclude the DOCSIS

09:52:04    5    controller from performing DOCSIS MAC functions, and, in

09:52:06    6    fact, in the specification, they do.  The DOCSIS controller

09:52:10    7    performs DOCSIS MAC functions.

09:52:13    8        So let me go back a couple of slides.

09:52:18    9        If Entropic was right that what a DOCSIS MAC

09:52:22   10    processor is, is a device that performs DOCSIS MAC

09:52:26   11    functions, then the disclosed DOCSIS controller is a

09:52:31   12    DOCSIS MAC processor because it performs DOCSIS MAC

09:52:34   13    functions.

09:52:45   14        If Entropic was right that a DOCSIS MAC processor

09:52:52   15    performs DOCSIS MAC functions, then it's also a DOCSIS

09:52:56   16    controller because it controls the DOCSIS functions it

09:52:59   17    performs.  There would be no way to distinguish between the

09:53:02   18    two.

09:53:03   19        Now, ordinarily, you might say, okay, well,

09:53:08   20    there's no -- you know, what difference does it make?

09:53:09   21    Right?  So the DOCSIS controller is also a DOCSIS MAC

09:53:11   22    processor, and the DOCSIS MAC processor is also a DOCSIS

09:53:13   23    controller.  So what.

09:53:13   24        But the reason why that's important is twofold.

09:53:19   25    One is, of course, the claim calls them out separately.

09:53:22  1   You should be able to know the way to tell the difference.

09:53:25  2        But more importantly, the claim requires what the

09:53:31  3   specification describes as the DOCSIS controller bypass

09:53:35  4   limitation.  Downstream data has to be sent from the DOCSIS

09:53:40  5   MAC processor to the data networking engine -- this is in

09:53:45  6   blue, and you see the excerpt from the spec -- without

09:53:50  7   involving controller 116.

09:53:52  8        And this is claimed.  So this is Claim 18.  The

09:53:57  9   DOCSIS MAC processor forwards packets to the data

09:54:01 10   networking engine without the involvement of the DOCSIS

09:54:05 11   controller.

09:54:06 12        Well, according to Entropic's plain meaning, if a

09:54:11 13   DOCSIS MAC processor is a DOCSIS controller and a DOCSIS

09:54:15 14   controller is a DOCSIS MAC processor, then that limitation

09:54:18 15   would be impossible to perform.

09:54:19 16        So the claim would be indefinite.  But we're not

09:54:28 17   saying it's indefinite.  We're saying you can distinguish

09:54:31 18   the two.  They're not phrases that have plain meanings.

09:54:37 19        But you can look at the spec and say, oh, okay.  I

09:54:40 20   see what it is.  You're saying the DOCSIS controller is

09:54:42 21   what performs the functions that you said in the spec.  And

09:54:46 22   you're saying the DOCSIS MAC processor is the thing that

09:54:48 23   performs the functions in the spec.

09:54:49 24        So, okay, if that's the definition I'm going to

09:54:52 25   use, then I know what they are, and then I can -- I can

09:54:56  1  perform a function without the involvement of the DOCSIS

09:55:00  2  controller.

09:55:00  3          THE COURT:  It seems like to me, Counsel, that

09:55:02  4  we're coming back to this theme that what's in the claim is

09:55:06  5  not compatible with what's in the spec, and, therefore, the

09:55:09  6  claim language is indefinite, which, again, may be a very

09:55:14  7  good motion for summary judgment on inadequate description,

09:55:18  8  but I don't know how it applies to the claim construction

09:55:21  9  function.

09:55:22  10          MR. BENYACAR:  So this is -- this absolutely, Your

09:55:27  11  Honor, is not an issue of it not being described in the

09:55:29  12  spec.  If the spec --

09:55:29  13          THE COURT:  It just continues to feel like it when

09:55:32  14  I hear you argue.

09:55:33  15          MR. BENYACAR:  So then I'm saying it wrong,

09:55:35  16  because the specification absolutely describes the DOCSIS

09:55:37  17  controller, and it absolutely describes a DOCSIS MAC

09:55:40  18  processor.  We're not saying that it doesn't.

09:55:43  19          THE COURT:  Okay.

09:55:43  20          MR. BENYACAR:  We're saying that what Entropic

09:55:47  21  wants is for the construction of those terms to be broader

09:55:51  22  than what's in the spec.  They don't say, well, yeah, okay.

09:55:56  23  The spec says what a DOCSIS controller is.  So that's what

09:55:58  24  it is.  They don't want that.

09:56:00  25          They say DOCSIS controller is anything that

09:56:05   1   controls DOCSIS functions.  And there's a DOCSIS MAC

09:56:09   2   processor disclosed in the spec in great detail.  We're not

09:56:12   3   saying there's not.  And we say and that's what it is.

09:56:15   4         And Entropic says, oh, no, it's broader than that.

09:56:18   5   A DOCSIS MAC processor is something that performs DOCSIS

09:56:22   6   MAC functions.

09:56:24   7         Well, if that's the argument you're going to use,

09:56:27   8   then there's no distinction between a DOCSIS MAC processor

09:56:30   9   and a DOCSIS controller.  Our argument is not the spec does

09:56:34  10   not disclose it.  It does.  Our argument is that Entropic's

09:56:37  11   reading of it is so broad that it makes the two terms

09:56:42  12   indistinguishable.

09:56:43  13         THE COURT:  Well, this is not the first time I've

09:56:46  14   heard defense counsel say Plaintiff wants an overly broad

09:56:50  15   reading of the disputed terms.  And believe it or not, I've

09:56:54  16   heard Plaintiff's counsel say Defendant wants an overly

09:56:56  17   narrow reading of the claim language.

09:56:58  18         And that's part of why I'm up here.  The truth is

09:57:03  19   usually somewhere in between.

09:57:06  20         I hear your argument.  And, you know, the second

09:57:13  21   half of your argument is the language is not as broad as

09:57:16  22   the Plaintiff wants.  It's narrower like we want, or it's

09:57:20  23   necessarily indefinite.

09:57:22  24         MR. BENYACAR:  Because there's no way to perform

09:57:23  25   the claimed -- not indefinite because just you don't know

09:57:27  1   what it is.  It's indefinite because you can't perform a

09:57:30  2   claimed limitation.  You can't perform the step of doing

09:57:33  3   anything without the involvement of a DOCSIS controller

09:57:36  4   because the disclosed DOCSIS MAC processor is a DOCSIS

09:57:40  5   controller by their definition.  And so it would be

09:57:44  6   impossible for any DOCSIS MAC processor to do anything

09:57:47  7   without the involvement of the DOCSIS controller.

09:57:48  8        So I just want to be clear, this is not one of

09:57:51  9   those cases where we're saying, oh, they're reading it

09:57:54  10  overly broad just -- and for just that reason, it's

09:57:56  11  indefinite.

09:57:57  12       We're saying if you use their broad definition,

09:57:59  13  there's no way to perform the claim limitation of a DOCSIS

09:58:04  14  MAC processor doing something without a DOCSIS controller

09:58:06  15  because they're both the same thing.

09:58:09  16       THE COURT:  All right.  Anything else on these?

09:58:12  17       MR. BENYACAR:  No, Your Honor.  Just that, again,

09:58:23  18  our construction is not that it's indefinite.  You can save

09:58:29  19  the claim and allow the performance of the -- of the --

09:58:32  20  without the involvement of the DOCSIS controller limitation

09:58:35  21  if you construe the terms consistent with what the

09:58:39  22  specification says, and then you know what they are.

09:58:42  23       THE COURT:  All right.

09:58:42  24       MR. BENYACAR:  Thank you, Your Honor.

09:58:43  25       THE COURT:  Thank you, Counsel.

09:58:45  1          Let me hear from the Plaintiff in response.

09:58:46  2          MS. ALLOR:  Thank you, Your Honor.

09:58:54  3          And I think, you know, the point that you just

09:58:57  4  made that, you know, Defense is asking for, you know, you

09:59:02  5  to look at the specification and construe it exactly as is

09:59:06  6  in there and that is too narrow, that is the main issue, is

09:59:11  7  if you look at the specification, it clearly describes what

09:59:15  8  DOCSIS did at the time and what the MAC processor did and

09:59:19  9  what the controller did.

09:59:22  10         And if we turn here to Slide 20, it --

09:59:25  11         THE COURT:  In essence, you're telling me that if

09:59:27  12  I construe it as spelled out in the specification, then

09:59:31  13  that is to a large extent importing a limitation here

09:59:36  14  that's not proper?

09:59:38  15         MS. ALLOR:  It is.  And it's letting the Defendant

09:59:42  16  have a means-plus-function construction without actually

09:59:46  17  going through the steps and showing that it should be

09:59:50  18  proper.

09:59:50  19         And if we look at the specification, I'm going to

09:59:53  20  jump ahead to the two portions that they are relying on

09:59:56  21  here.

09:59:58  22         On the right is what they're pointing to for

10:00:03  23  the DOCSIS MAC processor.  And the first sentence says:  A

10:00:06  24  processor 114 implements realtime critical MAC functions

10:00:10  25  for both upstream and downstream communications.

10:00:13   1          The realtime aspect is actually in a dependent

10:00:16   2   claim.  So there is the first issue we see is that this

10:00:20   3   specification is broader than what is required and -- or,

10:00:29   4   sorry, it's limiting what's required.  So the Claim 18 is

10:00:32   5   broader.  It's directed to generally the DOCSIS MAC

10:00:36   6   functions.

10:00:39   7          And if you were to look at what DOCSIS functions

10:00:42   8   did at the time of invention compared to what they do now,

10:00:46   9   they've changed a little bit over time.  There may be

10:00:49  10   things that are included that are not included now.  Or

10:00:52  11   there might be things that were excluded then that are now

10:00:52  12   included.

10:00:53  13          And the same thing with respect to the DOCSIS

10:00:55  14   controller.  If you look at the second passage on the right

10:00:58  15   side, the controller implements certain DOCSIS blocks.

10:01:04  16          And one of the things that Mr. Benyacar pointed

10:01:07  17   out was that they're the same.  But they're not the same

10:01:10  18   because the things that he's pointing to as the MAC

10:01:12  19   functions that he's saying the controller is doing, they're

10:01:14  20   not MAC functions.  They're actually controller functions

10:01:18  21   of the MAC.

10:01:19  22          And so take MAC management message, that is

10:01:25  23   managing the messages coming from the MAC.  It's not

10:01:28  24   performing MAC functions.  It's managing the messages.

10:01:31  25          MAC address learning is one of the other things he

| | |
|---|---|
| 10:01:33 | 1 |
| 10:01:37 | 2 |
| 10:01:40 | 3 |
| 10:01:44 | 4 |
| 10:01:49 | 5 |
| 10:01:49 | 6 |
| 10:01:50 | 7 |
| 10:01:51 | 8 |
| 10:01:52 | 9 |
| 10:01:54 | 10 |
| 10:01:58 | 11 |
| 10:02:02 | 12 |
| 10:02:03 | 13 |
| 10:02:07 | 14 |
| 10:02:12 | 15 |
| 10:02:12 | 16 |
| 10:02:17 | 17 |
| 10:02:19 | 18 |
| 10:02:23 | 19 |
| 10:02:29 | 20 |
| 10:02:29 | 21 |
| 10:02:31 | 22 |
| 10:02:33 | 23 |
| 10:02:35 | 24 |
| 10:02:40 | 25 |

pointed to.  Your MAC processor has an address.  Whether it's a DOCSIS MAC processor or just a MAC processor, it has an address that is known.  And the MAC --

THE COURT:  You lost me there.  Too many MACs. It's --

MS. ALLOR:  Sorry.

THE COURT:  -- it's coming from the MAC, but it's not a MAC function?

MS. ALLOR:  Right.  So the DOCSIS controller is controlling the MAC.  It's taking the messages, it's taking the MAC address, and it's learning those, but it's not implementing MAC functions.

And so those two are separate devices, separate implementations.  One is in the -- or, sorry, one is in layer 2.

So if we go back a slide, this is the OSI model that communications are set up in.

And we've got the physical layer, which we talked about earlier that the DOCSIS PHY is implemented in.  And then we've got the DOCSIS MAC processor.  The MAC processor is implemented in layer 2.

And then everything above that interacts with the MAC processor.  And so that's where the DOCSIS controller is implemented is in this layer 3 or layer 4 or between layer 2 and layer 3.  And it's controlling the MAC

10:02:45  1  processor.  But they're not the same.

10:02:46  2      And the specification explains the differences.

10:02:48  3  It shows how they are defined at the time, and it shows in

10:02:53  4  the claim language what functions those -- each are

10:02:57  5  supposed to be performing.

10:02:58  6      But if we were to limit it to what's in the

10:03:01  7  specification, you would be excluding what is claimed by --

10:03:08  8  by limiting it to what was known at the time for DOCSIS.

10:03:11  9  And DOCSIS is a spec -- is a standard, and so there's going

10:03:14  10  to be changes over time.  There's going to be things that

10:03:17  11  are added and removed of the functions that are known for

10:03:20  12  DOCSIS.

10:03:21  13      And so I think by limiting it to exactly what is

10:03:24  14  in the specification, you're really limiting the claims

10:03:28  15  improperly.

10:03:32  16      And one other part of the specification I want to

10:03:35  17  focus on that they are -- so this was another example where

10:03:40  18  they're pointing to MAC being a term that's in the

10:03:43  19  description, but it's not -- it's not actually MAC

10:03:47  20  functions.  It's talking about the voice driver, which is

10:03:51  21  something different than what the MAC processor is doing.

10:03:54  22      But here's -- I wanted to turn to Slide 23.

10:03:57  23      This is another portion of the spec that they're

10:04:00  24  relying on for both MAC processor and DOCSIS controller.

10:04:05  25  And here, they're discussing the different processors that

10:04:09  1  could be implemented in this embodiment, but the claim only

10:04:14  2  requires one processor.

10:04:16  3         And so if you read in this portion of the

10:04:18  4  specification, you're requiring the claims to have two

10:04:22  5  processors in the cable modem engine, which is not what's

10:04:25  6  claimed.  And so that's another thing that we take issue

10:04:27  7  with is reading in these limitations when they're not

10:04:31  8  required by the claim language.

10:04:33  9         THE COURT:  Opposing counsel tells me that I

10:04:36  10  either need to construe this in a way that's consistent

10:04:40  11  with what he says the specification requires, or it's

10:04:45  12  clearly indefinite.

10:04:46  13         I've heard your argument as to whether or not it

10:04:49  14  should be construed as spelled out or as addressed in the

10:04:53  15  specification.

10:04:54  16         What's your argument in regard to the second part

10:04:59  17  of that, that if it's not construed consistent with the

10:05:03  18  guidance from the specification or the embodiment set out

10:05:09  19  in the specification, then it's unavoidably indefinite?

10:05:12  20         MS. ALLOR:  I would say that a POSITA is going to

10:05:15  21  have no problem reading the claim and knowing what's

10:05:17  22  covered.

10:05:18  23         If we -- if we look at the claim language itself,

10:05:23  24  it says:  A DOCSIS controller and a DOCSIS MAC processor,

10:05:27  25  the DOCSIS MAC processor configured to process downstream

10:05:32   1   PDU packets and forward the packets directly to the data

10:05:35   2   networking engine.

10:05:35   3          So that is one function that the data -- sorry,

10:05:41   4   that the DOCSIS MAC processor must perform.

10:05:47   5          A POSITA understands what DOCSIS is, as you

10:05:50   6   mentioned earlier, and as Mr. Benyacar confirmed, and they

10:05:54   7   know what a MAC processor is.  So they understand what the

10:05:57   8   potential functions are that the MAC processor could

10:06:00   9   perform, and they understand that it's related to DOCSIS,

10:06:03  10   and it's described in the specification, but it's not

10:06:04  11   limited to that.

10:06:06  12          And I think that's the problem we're having is

10:06:08  13   Charter is asking you to limit it to exactly what's in the

10:06:11  14   specification when a POSITA would understand that term and

10:06:14  15   would read the claims and would have clarity without

10:06:17  16   requiring exactly what's in the specification.

10:06:22  17          THE COURT:  All right.  What else do you have for

10:06:24  18   me on these two terms?

10:06:26  19          MS. ALLOR:  That's all we have right now on these

10:06:30  20   two terms.

10:06:32  21          THE COURT:  All right.

10:06:32  22          MS. ALLOR:  And that's it for the '775.

10:06:35  23          THE COURT:  So anything further from Charter on

10:06:36  24   these two?

10:06:37  25          MR. BENYACAR:  Yes, Your Honor, just a quick

10:06:39   1   rebuttal.

10:06:39   2        So Ms. Allor pointed to the different MAC

10:06:49   3   functions that are performed by the DOCSIS controller, and

10:06:54   4   she argued, oh, well, they're not really MAC functions for

10:06:57   5   this reason or that reason or the other reason.

10:07:00   6        None of what she said is in the record.  Our

10:07:02   7   expert provided a declaration explaining that these are

10:07:07   8   DOCSIS MAC functions.  Their expert, Dr. Kramer, did not

10:07:10   9   say that they're not.

10:07:11   10        So everything you heard Ms. Allor say is just

10:07:15   11   attorney argument, not in the record, that we're hearing

10:07:18   12   for the very first time now.

10:07:21   13        And there's no basis for stating that these

10:07:23   14   various MAC functions that the DOCSIS controller performs

10:07:28   15   are not really MAC functions just because it's only this or

10:07:32   16   it's only that or it's only the other thing.

10:07:36   17        You also asked Ms. Allor, well, if I use what

10:07:38   18   you're saying, why isn't it indefinite?

10:07:44   19        And one thing Ms. Allor didn't do is explain how

10:07:47   20   if a DOCSIS controller performs DOCSIS MAC functions and

10:07:51   21   vice versa you can possibly perform the claimed function

10:07:56   22   of -- without the involvement of the DOCSIS controller.

10:07:59   23   You asked her why it's not indefinite, and her answer was,

10:08:03   24   well, of course, someone of skill in the art would know.

10:08:05   25   She did not explain how you could possibly perform this

10:08:08   1    step because you can't.

10:08:09   2          Finally, the other thing that Ms. Allor did not

10:08:12   3    say is, oh, well, here is the construction we want, right?

10:08:17   4    So we know from their -- from their papers that it's --

10:08:21   5    that what they say, and there's no way to perform the --

10:08:25   6    without the involvement of the DOCSIS controller under that

10:08:27   7    definition.

10:08:28   8          And in nowhere in Ms. Allor's presentation did she

10:08:31   9    say, oh, this is what a DOCSIS MAC processor actually is.

10:08:35  10    This is what a DOCSIS controller actually is.  This is the

10:08:38  11    reason why a DOCSIS MAC processor does not actually perform

10:08:45  12    DOCSIS functions.

10:08:46  13          So for those reasons, Your Honor, the only way to

10:08:53  14    take the meaning just from the words is to say a DOCSIS

10:08:57  15    controller -- is to say if a DOCSIS controller performs

10:09:02  16    DOCSIS MAC functions, which the disclosed one does, then

10:09:05  17    it's a DOCSIS MAC processor as well.

10:09:08  18          And the DOCSIS -- disclosed DOCSIS MAC processor,

10:09:11  19    under their plain meaning, is also a DOCSIS controller,

10:09:15  20    just as we have up on this slide.  And if that's true, it's

10:09:18  21    impossible to perform the claimed capability of a DOCSIS

10:09:25  22    MAC processor forwarding data to a data networking engine

10:09:28  23    without the involvement of the DOCSIS controller.  That

10:09:31  24    would be impossible, and Ms. Allor had no explanation for

10:09:34  25    that.

| | | |
|---|---|---|
| 10:09:34 | 1 | Thank you, Your Honor. |
| 10:09:34 | 2 | THE COURT:  All right.  Thank you, Counsel. |
| 10:09:36 | 3 | Let's go on to -- excuse me.  Let's go on to the |
| 10:09:46 | 4 | '826 patent.  And we'll take up the disputed language |
| 10:09:49 | 5 | regarding network management messages. |
| 10:09:56 | 6 | Let me hear from the Plaintiff, please. |
| 10:09:59 | 7 | MR. ENGEL:  Good morning, Your Honor. |
| 10:10:00 | 8 | THE COURT:  Good morning. |
| 10:10:01 | 9 | MR. ENGEL:  Jason Engel on behalf of the |
| 10:10:05 | 10 | Plaintiff. |
| 10:10:07 | 11 | And if we could go to Slide 25.  All right. |
| 10:10:10 | 12 | I'm going to be talking about the '826 patent, and |
| 10:10:14 | 13 | as you mentioned the specification term is "network |
| 10:10:17 | 14 | management messages." |
| 10:10:18 | 15 | So if we go to Slide 26, we have Charter's |
| 10:10:22 | 16 | construction, which is messages which report on the status |
| 10:10:27 | 17 | of the network based on an analysis of the measured |
| 10:10:31 | 18 | characteristic. |
| 10:10:31 | 19 | And, you know, in a vacuum, maybe that seems like |
| 10:10:36 | 20 | it could be a potential construction, but then we kind of |
| 10:10:40 | 21 | have to get into what does it exactly mean. |
| 10:10:43 | 22 | But as became clear on briefing, what Charter |
| 10:10:46 | 23 | wants it to mean is the measured characteristic cannot be |
| 10:10:49 | 24 | any part of the message that is sent back, and we think |
| 10:10:53 | 25 | that plainly contradicts with the examples set forth in the |

10:10:58   1   specification.

10:10:58   2        So if we go to Slide 27 of our presentation, we

10:11:03   3   have a passage from the '826 patent at Column 3, Line 60,

10:11:09   4   through Column 4, Line 2.  And it gives examples of the

10:11:13   5   messages and what they may include.

10:11:15   6        It says the message may comprise, for example,

10:11:20   7   network status updates indicating whether one or more

10:11:24   8   communication parameters of one or more received television

10:11:28   9   or DOCSIS channels are outside of acceptable bounds, and/or

10:11:32  10   conveying measured/determined characteristics back to a

10:11:36  11   source of the received signal, e.g., back to the cable head

10:11:40  12   end.

10:11:40  13        So it clearly envisioned a situation in which the

10:11:43  14   messages can be an indication something is outside of

10:11:47  15   acceptable bounds, or it could be the measured

10:11:51  16   characteristic being conveyed back, or it could be a

10:11:54  17   combination of both, or it could include other information.

10:11:58  18        Now, the dispute is centered around the wherein

10:12:01  19   clause shown on Slide 28 for Column -- for Claim 1 of the

10:12:06  20   '826 patent.  And it's the wherein said measured

10:12:10  21   characteristic is different than said network management

10:12:14  22   messages.

10:12:14  23        And I don't think this is anything nefarious.

10:12:17  24   What I think was intended by the claim drafter was

10:12:20  25   clarifying that you have a message structure that is sent

10:12:23   1   back.  It's a message.  It's not just a value, some type of
10:12:27   2   feedback loop that just -- that sends back a value.  You
10:12:33   3   have a message structure.  We're dealing with networks.
10:12:34   4   We're dealing with networks that have messaging structures
10:12:36   5   in place.  And so this is clarifying that what is sent back
10:12:39   6   just isn't a value.  It's an actual network message that is
10:12:43   7   sent back.  In fact, it's a network management message that
10:12:46   8   is sent back.
10:12:46   9          I don't have anything further, Your Honor.  I'm
10:12:54  10   happy to answer any questions you might have.
10:12:57  11          THE COURT:  Let me hear from Defendant first, and
10:13:02  12   then we'll see if I have additional questions for either
10:13:05  13   party.
10:13:06  14          MR. ENGEL:  Thank you, Your Honor.
10:13:07  15          THE COURT:  Thank you.
10:13:07  16          MR. BENYACAR:  First, I just want to state clearly
10:13:16  17   for the record, our position is not that the message that's
10:13:19  18   sent back cannot include the measured characteristic, or
10:13:23  19   it's not a network management message.  That's not our
10:13:25  20   position.
10:13:25  21          Our position is you may send a measured
10:13:29  22   characteristic back, but you also have to send back a
10:13:33  23   characteristic that's not the measured characteristic, a
10:13:37  24   different characteristic.
10:13:39  25          I'll go through this in a minute, but this is the

10:13:41  1  basis of the dispute.  Okay.  If Your Honor, for example,

10:13:47  2  tells me to go to the store and buy apples and I come back

10:13:50  3  and I say, I got you something different.

10:13:53  4            You say, what do you mean?

10:13:54  5            I say, I got you a bag of apples.

10:13:56  6            They're saying, well, those are different.

10:13:59  7            That's the basis -- that's their -- the

10:14:01  8  construction they're really saying is the message with the

10:14:05  9  apples is different than the apples.

10:14:07  10           What we're saying is if you ask for apples and I

10:14:11  11  bring you a bag of apples, it's still apples.  But it's

10:14:14  12  oranges that's different.  It's what's in the bag that

10:14:17  13  matters.  That's the basis of the dispute.

10:14:22  14           So let's go --

10:14:22  15           THE COURT:  So let me ask you this, Counsel.

10:14:23  16           MR. BENYACAR:  Yes.

10:14:24  17           THE COURT:  I'm interested in knowing exactly what

10:14:26  18  you mean by the phrase you're proposing an analysis of.  I

10:14:31  19  understand the rest of your proposed construction, but I'm

10:14:35  20  unclear on what you're trying to convey when you say based

10:14:39  21  on an analysis of the measured characteristics.

10:14:42  22           MR. BENYACAR:  Thank you, Your Honor.  I will -- I

10:14:44  23  will explain that.

10:14:48  24           THE COURT:  And maybe that's -- maybe that's

10:14:49  25  looking in the bag rather than counting the bag as

10:14:52   1   something different than what's in the bag, but I don't get

10:14:55   2   that from an analysis of.

10:14:56   3           MR. BENYACAR:  Understood.

10:14:57   4           So let me tell you what we were trying to do and

10:15:00   5   how that relates to the actual dispute that are between the

10:15:03   6   parties that I just articulated.

10:15:06   7           In the patent, that monitoring module 154 -- this

10:15:09   8   is on Slide 85 -- measures or determines characteristics of

10:15:13   9   that incoming signal in blue on the left.  That's what it

10:15:17  10   does.  That monitoring module that -- can then control the

10:15:24  11   transmission of network management messages on Slide 86.

10:15:35  12           Now, according to the specification, those network

10:15:42  13   management messages can include the determined

10:15:44  14   characteristic itself.  So the monitoring module can

10:15:47  15   measure a characteristic, and then that characteristic can

10:15:51  16   be included in the network management message.  That's the

10:15:53  17   passage that counsel showed a minute ago.

10:15:55  18           So you see on the bottom at Column 3, Lines 51

10:16:00  19   through 57, it says:  Such messages may comprise conveying

10:16:04  20   the measured/determined characteristic.

10:16:07  21           That's sending what you measured directly back in

10:16:10  22   the message.

10:16:10  23           And by the way, that's what '008 patent, Claim 1,

10:16:16  24   is directed to.  In the '008 patent, you report the actual

10:16:19  25   determined characteristic.  In the '826, they didn't claim

10:16:24   1   that.  They claimed something different.

10:16:25   2         In the '826 -- well, in the specification, there's

10:16:32   3   an alternative.  That network management message, instead

10:16:36   4   of conveying what you actually measured, it can do an

10:16:40   5   analysis of what you measured and report that analysis

10:16:43   6   back.

10:16:43   7         Now, that -- the example of that given that I have

10:16:48   8   on the bottom of Lines 51 through 56 of Column 3 is that

10:16:54   9   based on the -- based on the analysis, you determine that

10:17:00   10  the DOCSIS channels are outside acceptable bounds.  So, in

10:17:03   11  effect, you do a measurement, and you say, oh, that's

10:17:05   12  unacceptable.

10:17:06   13        THE COURT:  But you're quoting -- you're quoting

10:17:07   14  the '008, not the '826.

10:17:09   15        MR. BENYACAR:  Yes, I'm sorry, the specifications

10:17:11   16  are identical.

10:17:11   17        THE COURT:  All right.

10:17:12   18        MR. BENYACAR:  I should have made that clear.

10:17:13   19        THE COURT:  Okay.

10:17:13   20        MR. BENYACAR:  The specifications of the two

10:17:14   21  patents are identical.  There's no dispute about that.

10:17:17   22        So because the specification -- and we're not

10:17:24   23  limiting it to, oh, outside acceptable bounds.  We're

10:17:27   24  saying, okay, it's broader.  You did an analysis, and you

10:17:30   25  have some analysis, and we're not limiting it to just

10:17:34   1   determining unacceptability.

10:17:37   2          And we say that's what the '826 is directed to,

10:17:42   3   meaning in the '008, you claimed returning the measured

10:17:46   4   characteristic.  In the '826, you claimed the other option

10:17:50   5   that you gave, which is you do an analysis, and you return

10:17:52   6   that.

10:17:52   7          That's why we're reading it that way because the

10:17:56   8   spec gives two options.  You can return the measured

10:17:59   9   characteristic, or you can do analysis and return that.

10:18:01  10          You -- here, you said the network management

10:18:04  11   message is different than the measured characteristic.  So

10:18:06  12   we say, okay, you're claiming the other embodiment.  That's

10:18:09  13   fine.

10:18:10  14          Well, it's an analysis.  But here's -- and

10:18:19  15   that's where we're getting it from.  Our construction is at

10:18:22  16   the bottom here.  That's why we're saying it's an analysis

10:18:25  17   because it's claiming the embodiment outside acceptable

10:18:29  18   bounds.  You did an analysis.

10:18:31  19          As I mentioned when I started, that's not the core

10:18:37  20   of the parties' dispute here.  Entropic's position is you

10:18:40  21   can return -- have a network management message that

10:18:43  22   includes one thing, the determined characteristic.  And

10:18:47  23   that doing one thing infringes both the '008 claim, which

10:18:51  24   says you determine the characteristic itself, and it also

10:18:55  25   infringes the '826 claim where the measured characteristic

| | | |
|---|---|---|
| 10:18:59 | 1 | is different than the network management message. |
| 10:19:02 | 2 | And we're thinking it can't be both.  If you |
| 10:19:05 | 3 | return the determined characteristic, it can't infringe |
| 10:19:08 | 4 | Claim 1, which says you return the determined |
| 10:19:11 | 5 | characteristic, and the '826, which says you return |
| 10:19:13 | 6 | something different.  How can that be? |
| 10:19:15 | 7 | And as I said, this is the crux of the dispute, |
| 10:19:22 | 8 | which is they say, and we just heard counsel say, oh, well, |
| 10:19:25 | 9 | what the claim drafter was trying to do here was convey the |
| 10:19:29 | 10 | idea that messages have a message structure, and the |
| 10:19:33 | 11 | message structure has the characteristic in it, and the |
| 10:19:36 | 12 | message structure with the message is different than the |
| 10:19:39 | 13 | characteristic. |
| 10:19:40 | 14 | None of that is anywhere in the specification. |
| 10:19:43 | 15 | There's no idea or concept in the specification of the |
| 10:19:47 | 16 | message somehow being -- the message with the |
| 10:19:49 | 17 | characteristic being different than just the |
| 10:19:52 | 18 | characteristic. |
| 10:19:53 | 19 | So that is the heart of the dispute here.  And as |
| 10:20:01 | 20 | counsel just said, he said, well, everyone understands that |
| 10:20:05 | 21 | a message is different than what you send.  Everyone |
| 10:20:13 | 22 | understands that. |
| 10:20:14 | 23 | Now, this idea is not in the specification at all. |
| 10:20:17 | 24 | So that's what he's saying everyone just knows that.  But |
| 10:20:19 | 25 | if everyone knows that, that the message with carrying |

10:20:22   1   something is different than the thing that it's carrying,

10:20:25   2   then the claim language, wherein said measured

10:20:27   3   characteristic is different than the network management

10:20:29   4   messages, that would be redundant because counsel says by

10:20:33   5   its nature it's different.

10:20:35   6        He has to say by its nature because the spec

10:20:38   7   doesn't disclose anything about messages being different

10:20:41   8   than the characteristics.  So you would be vitiating this

10:20:46   9   claim limitation.

10:20:46  10        Now, I thought Your Honor would ask the question

10:20:52  11   about the analysis, and that's why if Your Honor is not

10:20:55  12   inclined to say that the network management message, which

10:20:59  13   is different than the measured characteristic, is an

10:21:02  14   analysis, even though that's the only other thing the

10:21:04  15   patent discloses, it at least has to send a characteristic

10:21:10  16   that's different from the measured characteristic.  It's

10:21:11  17   not different just because the measured characteristic is

10:21:14  18   within the message.

10:21:16  19        That's the heart of the parties' dispute here.

10:21:19  20   And that's what I tried to capture on Slide 96 by providing

10:21:22  21   an alternative construction.

10:21:23  22        The jury cannot be allowed, in our view, to be --

10:21:27  23   to just have a plain meaning and then have them argue to

10:21:31  24   the jury, well, the message is different than what's

10:21:33  25   carrying the message.  That's not -- that's not what

```
10:21:35   1   network management messages means.
10:21:39   2           THE COURT:  All right.
10:21:40   3           MR. BENYACAR:  Thank you, Your Honor.
10:21:40   4           THE COURT:  Thank you.
10:21:47   5           Any follow-up from the Plaintiff?
10:21:52   6           MR. ENGEL:  Yes, briefly, Your Honor.
10:21:55   7           If you recall in counsel's -- Mr. Benyacar's
10:22:12   8   argument, a construction that they propose is messages
10:22:18   9   which report on the status of the network based on an
10:22:21  10   analysis of the measured characteristic.
10:22:23  11           And if you look at what's in Slide 90 of their
10:22:28  12   demonstrative slides, you'll see that they're requiring an
10:22:31  13   extra step to be performed that's not required by the
10:22:33  14   claim.
10:22:33  15           So the analysis that's in the claims is an
10:22:39  16   analysis of the signal to measure a characteristic.  So
10:22:42  17   that's the only analysis that's required of the claim, and
10:22:45  18   that's what next to the red box they put
10:22:49  19   measured/determined characteristics of signals.  That's the
10:22:51  20   analysis.
10:22:51  21           They then required a separate analysis of
10:22:54  22   determined characteristics, for example, outside acceptable
10:22:58  23   bounds.  And so they required a separate step that we don't
10:23:01  24   think is required by the claim at all.
10:23:04  25           And, you know, as we went back to -- if we could
```

| | | |
|---|---|---|
| 10:23:07 | 1 | have our presentation, please. |
| 10:23:09 | 2 | The plain language of the spec says that these |
| 10:23:18 | 3 | network management messages can include the "and/or," and |
| 10:23:21 | 4 | the "or" being conveying the measured or determined |
| 10:23:26 | 5 | characteristic back to a source of the received signal. |
| 10:23:28 | 6 | We haven't seen any analysis of the prosecution |
| 10:23:30 | 7 | history that a message containing the determined |
| 10:23:33 | 8 | characteristic was disclaimed somehow.  And our point is |
| 10:23:36 | 9 | that, you know, the envelope that carries the message isn't |
| 10:23:39 | 10 | the message inside. |
| 10:23:41 | 11 | You know, the envelope can include the contents |
| 10:23:43 | 12 | and can include other things.  It is different than just |
| 10:23:47 | 13 | sending back the piece of paper that has the answer on it, |
| 10:23:50 | 14 | you know, or the value itself, which we think was what was |
| 10:23:53 | 15 | intended to be covered by the claim. |
| 10:23:55 | 16 | THE COURT:  All right.  Thank you. |
| 10:23:57 | 17 | MR. ENGEL:  Thank you, Your Honor. |
| 10:24:00 | 18 | I think I am up next on the '008, unless you tell |
| 10:24:03 | 19 | me that you would like to hear from opposing counsel first. |
| 10:24:06 | 20 | THE COURT:  Well, I'll be honest, I'm usually |
| 10:24:10 | 21 | tempted to hear first from the party that gives me a |
| 10:24:14 | 22 | proposed specific construction, and I'm inundated with |
| 10:24:18 | 23 | plain and ordinary meaning from your side in this case. |
| 10:24:22 | 24 | And had I gotten more specific proposed constructions from |
| 10:24:25 | 25 | the Plaintiff, I might have approached the order of things |

| | | |
|---|---|---|
| 10:24:28 | 1 | differently.  But I have what I have. |
| 10:24:32 | 2 | But as long as you're at the podium, go ahead and |
| 10:24:35 | 3 | give me your argument on "operable to." |
| 10:24:41 | 4 | MR. ENGEL:  I think we've agreed to that term -- |
| 10:24:43 | 5 | THE COURT:  That's right.  I have a note here that |
| 10:24:46 | 6 | you have agreed. |
| 10:24:46 | 7 | MR. ENGEL:  -- with Defendant.  Excuse me. |
| 10:24:47 | 8 | THE COURT:  Okay.  Configured to is the agreement; |
| 10:24:52 | 9 | is that right? |
| 10:24:52 | 10 | MR. ENGEL:  Correct, Your Honor. |
| 10:24:53 | 11 | THE COURT:  Defendant concurs with that? |
| 10:24:55 | 12 | MR. BENYACAR:  Yes, Your Honor. |
| 10:24:55 | 13 | THE COURT:  Okay.  Then let's go on to "digitize a |
| 10:25:03 | 14 | received signal spanning an entire television spectrum," |
| 10:25:07 | 15 | again, from Claim 1 of the '008. |
| 10:25:11 | 16 | MR. ENGEL:  Sure.  So we're on Slide 30 of our |
| 10:25:13 | 17 | presentation, and it's -- the full term is "digitize a |
| 10:25:18 | 18 | received signal spanning an entire television spectrum |
| 10:25:21 | 19 | comprising a plurality of television channels." |
| 10:25:25 | 20 | We have proposed plain and ordinary meaning for |
| 10:25:27 | 21 | this, Your Honor.  The Defendant has proposed an |
| 10:25:30 | 22 | exclusionary construction.  I would say that the received |
| 10:25:35 | 23 | signal contains only television channels. |
| 10:25:37 | 24 | And I think this is a plain misreading not only of |
| 10:25:40 | 25 | the claim language but of the specification and what those |

10:25:42   1   of skill in the art understand about television spectrums

10:25:46   2   and how they're used in the context of these hybrid

10:25:49   3   fiber-coaxial networks that include DOCSIS networks, for

10:25:54   4   example.

10:25:54   5        If we go to Slide 31, we have a couple of examples

10:25:57   6   of what the received signal that's going to come into the

10:26:00   7   front end of the device is going to be.  One example is a

10:26:04   8   signal that has a plurality of television and/or DOCSIS

10:26:08   9   channels that are, you know, multiplexed together into a

10:26:12  10   single signal.

10:26:13  11        We have another passage from the patent where it

10:26:19  12   talks about television and/or DOCSIS channels being part of

10:26:23  13   the signal.  Those citations are listed on Slide 31 of our

10:26:26  14   demonstrative slides.

10:26:27  15        But here's the example I think on Slide 32 that

10:26:30  16   really gives you an example of what is taking place.

10:26:33  17        There's multiple exemplary signals and spectrums

10:26:39  18   given there.  And these are based on the available

10:26:43  19   commercial spectrums at the time.

10:26:44  20        And one of those is a cable television signal,

10:26:47  21   which typically was from about 55 megahertz to a

10:26:53  22   1002 megahertz.  This is the downstream signal on a cable

10:26:57  23   television system.  And this signal can be divided up into

10:27:00  24   a number of different ways.

10:27:01  25        This is the spectrum, it spans from 55 to 1002.

10:27:05  1   The cable operator can put legacy television channels on

10:27:10  2   there.  They can put legacy data channels, which would be

10:27:13  3   SC-QAM channels.  They can put what's now known as OFDMA

10:27:18  4   data channels on there.  They can leave some of those

10:27:20  5   channels empty because maybe there's interference in the

10:27:23  6   network.  But that's the entire television spectrum.

10:27:25  7        The claim clarifies that that spectrum has to

10:27:28  8   include television channels.  That's the comprising element

10:27:30  9   of it.  But it doesn't say you must exclude every other

10:27:35  10  type of, you know, channel or signal from that global

10:27:42  11  entire television signal.  I think that's where the dispute

10:27:45  12  lies for this term.

10:27:46  13       And I think that based on the specification that

10:27:50  14  reading out -- that you can include data channels, for

10:27:55  15  example, in that television spectrum would just fly in the

10:27:59  16  face of what's in the plain language of the spec and the

10:28:01  17  plain language of the claims.

10:28:02  18       There's one other term for this patent, Your

10:28:04  19  Honor.  I assume you want to address that separately?

10:28:07  20            THE COURT:  Yes.

10:28:09  21            MR. ENGEL:  Okay.  Then I am done unless you have

10:28:10  22  any questions.

10:28:11  23            THE COURT:  I'd be interested to know how you

10:28:14  24  account for the recital in the '826, which is a

10:28:20  25  continuation of the '008, of one or both television and

| | | |
|---|---|---|
| 10:28:26 | 1 | data channels in Claim 1 -- |
| 10:28:26 | 2 | MR. ENGEL:  Well, I think -- |
| 10:28:28 | 3 | THE COURT:  -- in the '826. |
| 10:28:29 | 4 | MR. ENGEL:  -- I think that is a clarification, |
| 10:28:31 | 5 | and I believe the language is -- yeah, I think that the |
| 10:29:06 | 6 | clarification there is it can be one or both of television |
| 10:29:10 | 7 | channels and data channels.  So the example there is you |
| 10:29:12 | 8 | could have only television channels, or you could have only |
| 10:29:15 | 9 | data channels, or you could have both. |
| 10:29:18 | 10 | And so I think that's the point that it's saying |
| 10:29:20 | 11 | there is that this would cover a situation where you have |
| 10:29:23 | 12 | only data.  It would cover a situation where you have only |
| 10:29:27 | 13 | television.  It would cover a situation where you have a |
| 10:29:29 | 14 | mix.  Whereas the '008 requires you to have television |
| 10:29:32 | 15 | channels.  Like, you must have television channels in the |
| 10:29:35 | 16 | '008.  We concede that.  But it doesn't mean that you can't |
| 10:29:38 | 17 | have data channels or, you know, channels with no |
| 10:29:41 | 18 | information on them in that spectrum. |
| 10:29:44 | 19 | THE COURT:  All right.  With that, let me hear |
| 10:29:46 | 20 | from the Defendant in response, please. |
| 10:30:06 | 21 | Let me ask you that -- this, Mr. Benyacar, to |
| 10:30:08 | 22 | start off with.  Your proposed construction would limit |
| 10:30:12 | 23 | this received signals to only television channels. |
| 10:30:16 | 24 | Why can't a television spectrum include more than |
| 10:30:19 | 25 | just television channels?  Doesn't -- doesn't the |

10:30:22   1   specification address that?

10:30:23   2           MR. BENYACAR:  No, Your Honor.

10:30:26   3           The specification certainly does disclose

10:30:30   4   embodiments, and we don't dispute this, where the incoming

10:30:32   5   signal includes television and/or data channels.  We don't

10:30:35   6   dispute that that's in the specification.

10:30:37   7           In fact, it's in the passage -- I think counsel

10:30:40   8   may have shown this that I have up.  It says:  The signal S

10:30:44   9   may be the result of a plurality of television and/or

10:30:46  10   DOCSIS channels, which are data channels.

10:30:49  11           We agree, the specification discloses that.

10:30:53  12   However, the specification also discloses an embodiment

10:30:57  13   that spans the television spectrum.

10:30:59  14           And you notice in this portion of the spec in the

10:31:02  15   abstract, it says:  The spanning an entire television

10:31:06  16   spectrum comprising a plurality of television channels.

10:31:09  17           They didn't mention the data channels here.  And

10:31:14  18   there's a reason for that, because spanning has a plain

10:31:19  19   meaning.

10:31:22  20           Again, Plaintiff's position is this term should be

10:31:24  21   construed -- construed to its plain and ordinary meaning.

10:31:28  22   Well, the plain meaning of span is full extent.  A wing

10:31:32  23   span, a bridge span, we know what that means.  And

10:31:35  24   consistent with the specification's own description of the

10:31:39  25   spanning embodiment, which only makes reference to the

| | | |
|---|---|---|
| 10:31:41 | 1 | television channels, that's what -- that's what this |
| 10:31:46 | 2 | limitation covers. |
| 10:31:47 | 3 | Now, as Your Honor pointed out, the patentee knew |
| 10:31:53 | 4 | how to claim the other embodiment.  In the '826, Claim 1, |
| 10:31:57 | 5 | the language in green is the exact language that I showed a |
| 10:32:00 | 6 | minute ago.  The channels comprise one or both of |
| 10:32:03 | 7 | television channels and/or data channels.  They knew how to |
| 10:32:07 | 8 | claim that. |
| 10:32:08 | 9 | In the '008, they claimed the spanning embodiment, |
| 10:32:12 | 10 | which is only the television channels. |
| 10:32:13 | 11 | Now, I will say this, in Entropic's reply brief |
| 10:32:20 | 12 | for the first time -- and I'm not sure if this is what they |
| 10:32:24 | 13 | intended, but they have never said this before.  I |
| 10:32:26 | 14 | understood what they were saying -- |
| 10:32:27 | 15 | THE COURT:  Let me interrupt just a minute -- |
| 10:32:29 | 16 | MR. BENYACAR:  Yes.  I'm sorry, Your Honor. |
| 10:32:29 | 17 | THE COURT:  -- before I lose my thought here. |
| 10:32:34 | 18 | The claim language talks about received signal |
| 10:32:40 | 19 | spanning an entire television spectrum comprising a |
| 10:32:43 | 20 | plurality of television channels.  Now, comprising a |
| 10:32:46 | 21 | plurality of television channels tells me that television |
| 10:32:50 | 22 | channels are in the television spectrum.  It doesn't tell |
| 10:32:53 | 23 | me that only television channels are in the television |
| 10:32:58 | 24 | spectrum. |
| 10:32:58 | 25 | So what tells me that there can't be more than |

10:33:04   1   channels, television channels in the television spectrum is

10:33:07   2   what I'm trying to ask?

10:33:09   3            MR. BENYACAR:  Thank you, Your Honor.

10:33:09   4            And that -- your -- what Your Honor just said, I

10:33:14   5   believed, was the position they took for the first time in

10:33:16   6   their reply brief.  This is how I understood their

10:33:19   7   position, and this is how I understand Your Honor's

10:33:21   8   question, which is you can have an entire spectrum of

10:33:27   9   frequencies.  Let's say from zero to a gigahertz, which I

10:33:31  10   show at the top.

10:33:32  11            Part of that is where the television channels are.

10:33:34  12   If I understand Your Honor's question correctly is, well,

10:33:39  13   how about can there be, like, data channels or other things

10:33:43  14   in there?  That's how I understood what they say in their

10:33:46  15   reply brief, and that's how I understand Your Honor's

10:33:49  16   question, which is you have the television spectrum, which

10:33:52  17   is in blue, but within the television spectrum, there are

10:33:56  18   other things.  And that's the comprising, if I understand

10:34:00  19   Your Honor's question about that.

10:34:02  20            THE COURT:  Well, that, and then as an

10:34:04  21   alternative, why couldn't the non-television channels be in

10:34:07  22   the gray portion of your spectrum?

10:34:09  23            MR. BENYACAR:  Well, because that's outside the

10:34:10  24   span, Your Honor.

10:34:12  25            So you can't read the spanning part out.  So you

| | | |
|---|---|---|
| 10:34:16 | 1 | have a -- you have a spectrum that spans the television |
| 10:34:22 | 2 | spectrum, and it comprises.  So the comprises might mean |
| 10:34:26 | 3 | within that spectrum -- |
| 10:34:27 | 4 | THE COURT:  Okay.  So the blue was the television |
| 10:34:29 | 5 | spectrum? |
| 10:34:30 | 6 | MR. BENYACAR:  Correct, Your Honor. |
| 10:34:31 | 7 | THE COURT:  Okay.  I just didn't read your example |
| 10:34:33 | 8 | right. |
| 10:34:33 | 9 | MR. BENYACAR:  I'm sorry.  So, yes, blue is the |
| 10:34:36 | 10 | television spectrum. |
| 10:34:37 | 11 | THE COURT:  Okay. |
| 10:34:37 | 12 | MR. BENYACAR:  And within that, there could be |
| 10:34:39 | 13 | channels. |
| 10:34:39 | 14 | Now, the truth is, and we didn't hear this from |
| 10:34:43 | 15 | them until their reply brief, that's not the way television |
| 10:34:46 | 16 | spectrums work.  It doesn't work that way, which is why we |
| 10:34:49 | 17 | didn't include that in the construction, and it's why when |
| 10:34:52 | 18 | the specification refers to the spanning, it doesn't |
| 10:34:55 | 19 | reference data channels because it's not the way it works. |
| 10:34:58 | 20 | But we don't want -- we don't want to get hung up |
| 10:35:02 | 21 | on that.  So if Your Honor believes that that's -- that |
| 10:35:08 | 22 | that's what the claim language means, we've proposed, in |
| 10:35:12 | 23 | addition, in response to what they said in their reply |
| 10:35:15 | 24 | brief, that the received signal contains only television |
| 10:35:20 | 25 | channels and data channels which fall between television |

10:35:22   1   channels.

10:35:22   2          And that, I believe, addresses Your Honor's

10:35:26   3   question about what I show on Slide 82, which is, okay,

10:35:30   4   fine.  But it has to be within the blue because otherwise

10:35:34   5   you're vitiating the spanning limitation.

10:35:41   6          THE COURT:  All right.

10:35:42   7          MR. BENYACAR:  Thank you, Your Honor.

10:35:48   8          THE COURT:  Let me get the Plaintiff to react to

10:35:50   9   that alternative.

10:35:53   10          MR. ENGEL:  I'm not sure that the -- Your Honor,

10:36:03   11   that the modified construction would suffice for us, and I

10:36:10   12   think the first time we're hearing it is, you know, during

10:36:13   13   the presentation today.

10:36:13   14          I think the main issue that we were trying to

10:36:16   15   cover and actually brings in one of the dependent claims

10:36:23   16   is, you know, there is an entire television spectrum

10:36:27   17   that's something that's known in the art.  And for --

10:36:29   18   when you have cable at home, you get a wide spectrum.

10:36:32   19   That spectrum includes television channels.  It includes

10:36:34   20   data channels, whether you use them or not.  It includes

10:36:37   21   unused signals.  But it spans from a low point to a high

10:36:43   22   point.

10:36:43   23          And they're trying to limit it just to the point

10:36:45   24   that may be carrying data.  And there's different ways you

10:36:47   25   can configure that because there's different impairments

10:36:49  1   that you have with AM/FM interference, LTE interference.

10:36:53  2        What they're -- what they're really trying to do

10:36:55  3   is say the entire television spectrum consists of

10:36:57  4   television channels or consists of how they've defined it

10:37:01  5   narrowly to be just that narrowband there.

10:37:04  6        So I think if you look at Dependent Claim 3 of the

10:37:09  7   '008 patent -- and I don't know if you have it in front of

10:37:10  8   Your Honor.  I can put it --

10:37:12  9        THE COURT:  No, I do.

10:37:14  10       MR. ENGEL:  -- up on the screen.

10:37:15  11       This kind of gets to the heart of -- not Dependent

10:37:18  12  Claim 3, it would be Dependent Claim 2, I believe.  I

10:37:25  13  misspoke.

10:37:25  14       Yes.  So Dependent Claim 2 gets to kind of what

10:37:28  15  the heart of the part of the invention is.  And, again, I

10:37:32  16  think it's important to look at the claims as a whole and

10:37:35  17  the spec as a whole.

10:37:37  18       This says that the first portion of the digitized

10:37:41  19  signal spans that entire television spectrum.  So this is

10:37:45  20  the spectrum that the cable operator, which is the source

10:37:48  21  of the signal, is providing out to their customers.  And so

10:37:51  22  that -- it's a very wide signal.

10:37:55  23       Now, what you're passing to the data processor is

10:37:59  24  a television channel or a television content, but the

10:38:01  25  signal monitor can look at the entire spectrum, and it can

10:38:05  1   see if there are issues from the top to the bottom.

10:38:07  2        So if you were limited to only that portion that

10:38:10  3   carried television or television interspersed with data,

10:38:14  4   the Defendant's construction is saying you can't analyze

10:38:17  5   the entire television spectrum you've provided to your

10:38:20  6   customers.  And that's the whole point of this invention is

10:38:22  7   to see if we're sending out a wide signal, is our customer

10:38:27  8   having issues across that whole signal?  If so, then we can

10:38:31  9   fix those problems.

10:38:31  10       But if you limit it to only the portion that

10:38:34  11  carries television or television interspersed with data,

10:38:38  12  you're leaving out other parts of the signal that would

10:38:41  13  span that entire television spectrum.

10:38:43  14       So I think in view of the specification, you know,

10:38:46  15  what is an entire television spectrum is clear from the

10:38:51  16  specification and is something that, you know, should be

10:38:53  17  put to the jury to decide.

10:38:57  18       THE COURT:  All right.

10:39:06  19       MR. ENGEL:  I think we have one more term on the

10:39:10  20  '008 patent, Your Honor.  Again, I don't know who you'd

10:39:13  21  prefer to hear from first.

10:39:20  22       THE COURT:  Let me hear from you, Counsel, since

10:39:22  23  you're there at the podium.

10:39:23  24       MR. ENGEL:  Okay.

10:39:24  25       THE COURT:  This is "signal monitor" --

10:39:26   1            MR. ENGEL:  Yeah.

10:39:27   2            THE COURT:  -- "data processor," "channelizer"?

10:39:31   3            MR. ENGEL:  That is correct.  And the -- we're on

10:39:37   4    Slide 33 of our presentation.

10:39:40   5            If I could have the next slide, please.  I'm

10:39:43   6    sorry.  Slide 34, please.

10:39:46   7            So I think this gets down to the heart of the

10:39:52   8    dispute because we're not entirely sure what is being

10:39:56   9    proposed by Charter.  Their construction is three separate

10:40:01  10    pieces of hardware configured to perform the functions the

10:40:04  11    claim ascribes to the signal monitor, data processor, and

10:40:10  12    channelizer, respectively.

10:40:11  13            Now, they've cited case law that talks about

10:40:13  14    distinctness, and I think distinctness is, you know, a

10:40:16  15    degree of something that could be put to the jury to decide

10:40:19  16    or put to the -- you know, the factfinder to decide.

10:40:23  17            But when you're saying that it's three separate

10:40:25  18    pieces of hardware, Charter seems to be implying that you

10:40:29  19    could not have some type of, you know, single integrated

10:40:33  20    circuit or single silicon die that has those three, you

10:40:39  21    know, functional blocks or components.  They can still be

10:40:43  22    distinct if they're on the same integrated circuit.

10:40:46  23            And that's what we pointed to at the '008 patent,

10:40:48  24    Column 4, Lines 51 to 62.  It says:  The various modules of

10:40:52  25    the subassembly 174 -- which includes the channelizer, the

10:40:56  1   signal monitor, and the data processor -- may reside in one

10:41:00  2   or more housings on one or more printed circuit boards

10:41:03  3   and/or one or more integrated circuits, e.g., one or more

10:41:08  4   silicon dice.

10:41:09  5          So if you have one integrated circuit that

10:41:12  6   includes those three components, that clearly should meet

10:41:15  7   the claim as set forth in the specification, but this

10:41:17  8   requirement that they be separate hardware units, I think,

10:41:20  9   is reading something into the claim language and is going

10:41:23  10  to be a little bit confusing down the road to say what's

10:41:27  11  separate hardware.

10:41:27  12         Again, I believe the case law they cited is

10:41:30  13  distinct, and I think we agree that there's argument as to

10:41:34  14  what's going to be distinct when we identify things for

10:41:37  15  infringement down the road.  But requiring that it be three

10:41:39  16  separate pieces of hardware, I think, is reading

10:41:42  17  limitations into the claim.

10:41:43  18         THE COURT:  All right.  Let me hear from the

10:41:47  19  Defendant, please.  What's Charter's position on this,

10:42:04  20  Counsel?

10:42:05  21         MR. BENYACAR:  Charter's position on this, Your

10:42:06  22  Honor, is that they have to be three separate pieces of

10:42:09  23  hardware, three distinct structural elements, however you

10:42:13  24  want to say it.

10:42:14  25         The reason for that is they're called out

```
10:42:18    1   separately in the claim.  As I show on Slide 52, it's a

10:42:25    2   signal monitor, a data processor, and a channelizer.

10:42:28    3          And the law is clear, and this is the law that

10:42:30    4   counsel was pointing to, if you list elements separately,

10:42:35    5   they're presumed to be distinct components, distinct

10:42:40    6   structural elements.

10:42:41    7          And by the way, as the Federal Circuit said in the

10:42:49    8   Kyocera case, even if you disclose different embodiments,

10:42:53    9   one where they're combined and one where they're separate,

10:42:58   10   you're free to claim the one where they're separate.

10:43:00   11          Here, there is no embodiment disclosed where

10:43:04   12   they're combined.  But there is a presumption, if you call

10:43:08   13   them out separately, that they're distinct structural

10:43:11   14   elements.  That is our position.  Our position is not just

10:43:14   15   relying on the presumption that they're distinct structural

10:43:17   16   elements, but there is no way to understand the

10:43:20   17   specification or the claims unless they're distinct

10:43:24   18   structural elements.

10:43:25   19          THE COURT:  How do you get away from the problem

10:43:28   20   you can say on the one hand, there's three separate

10:43:31   21   components, on the other hand, there's one component with

10:43:36   22   three different subparts?  I mean, how do you -- how do you

10:43:40   23   not just go down the pyramid far enough to where you have

10:43:45   24   all these functions within one component, even though

10:43:49   25   you're calling them separate things?
```

| | | |
|---|---|---|
| 10:43:51 | 1 | MR. BENYACAR:  So we're not saying that you can't |
| 10:43:53 | 2 | have discreet structural elements on some bigger device. |
| 10:43:58 | 3 | We're not -- we're not saying that. |
| 10:43:59 | 4 | But it can't just all be, well, it's one |
| 10:44:03 | 5 | processor, and it's just performing different functions, |
| 10:44:05 | 6 | for example.  If you have distinct pieces of hardware all |
| 10:44:09 | 7 | on the same chip that sends information to each other, |
| 10:44:12 | 8 | we're not saying that that's not covered.  But they have to |
| 10:44:14 | 9 | be distinct hardware, distinct structural elements. |
| 10:44:17 | 10 | If they're on some bigger thing, that's okay. |
| 10:44:20 | 11 | That's not our argument.  But the only way the |
| 10:44:23 | 12 | specification and claims make sense is if they're different |
| 10:44:27 | 13 | hardware and if they're different -- |
| 10:44:29 | 14 | THE COURT:  So are we back to talking about |
| 10:44:32 | 15 | physical separation versus functional separation? |
| 10:44:36 | 16 | MR. BENYACAR:  So functional separation, yes.  In |
| 10:44:38 | 17 | this particular case, it has to be physical separation. |
| 10:44:41 | 18 | One, because the claim -- the case law we just looked at |
| 10:44:43 | 19 | says distinct structural components; and, number two, is, |
| 10:44:49 | 20 | as I'm about to talk about, there's no way to understand |
| 10:44:51 | 21 | the specification or the claims unless they're distinct |
| 10:44:53 | 22 | structural claims. |
| 10:44:57 | 23 | The claims show -- I mean, I'm sorry, the figure |
| 10:44:59 | 24 | shows the channelizer, the monitor, and the data processor |
| 10:45:04 | 25 | in Figure 1B.  Now, you can look at Figure 1B and say, |

10:45:09  1  yeah, they're separate, right?  You drew them separately.

10:45:11  2  But let's talk about what they do.

10:45:13  3        The channelizer outputs bands to the data

10:45:20  4  processing module, outputs.  That's what the specification

10:45:24  5  says.  There's no way to understand output from one place

10:45:27  6  to the other unless those two things are separate,

10:45:30  7  physically separate.  And the claim requires this.  The

10:45:33  8  claim requires that the channelizer output signal to a data

10:45:39  9  processor.  There's no way to understand that unless

10:45:41  10  there's physical separateness.  That's what output means.

10:45:45  11        That's separate from the channelizer outputting to

10:45:49  12  the data processor.  The channelizer also outputs to the

10:45:52  13  monitoring module.  There's no way to understand that

10:45:55  14  unless those two are separate, distinct structural

10:46:00  15  components.

10:46:00  16        The claim also requires that.  The claims and the

10:46:04  17  spec require that they be separate structural components.

10:46:08  18  And so we're not just relying on the legal presumption.

10:46:16  19        On Slide 60, I show what the specification says

10:46:21  20  about the monitoring module and the data processor.  It

10:46:23  21  says, they are in a, quote, unquote, parallel arrangement.

10:46:28  22  There's no way for two things to be in a parallel

10:46:31  23  arrangement unless they're physically separate.

10:46:33  24        The specification also says that the monitoring

10:46:42  25  module and the data processing module concurrently process.

10:46:46   1   Well, if they're all one processor, they're not

10:46:48   2   concurrently processing.

10:46:50   3        The claims require that the channelizer

10:46:55   4   concurrently output to two different places, to the

10:46:59   5   monitoring module and the data processing module.

10:47:03   6   Everything in the specification and the claims dictates

10:47:06   7   that they have -- all three of those have to be distinct

10:47:08   8   pieces of hardware, distinct structural components.

10:47:12   9        In fact, Your Honor, in Entropic's own brief, when

10:47:16  10   they're trying to explain how Figure 1B works, they assume

10:47:21  11   they're separate because you can't explain it otherwise.

10:47:25  12        This is from their opening brief at Page 3.  They

10:47:27  13   say there's a channelizer in blue that concurrently outputs

10:47:30  14   to a monitoring device, and then outputs the other one to a

10:47:33  15   data -- to a data processing device.  There's no way to

10:47:38  16   even explain how it works unless they're three separate

10:47:40  17   ones.  Even Entropic couldn't do it.

10:47:43  18        But when it comes to the claims, then they say,

10:47:53  19   oh, well, the claims just don't require it.  They have no

10:47:56  20   explanation of everything we just talked about.  They just

10:47:58  21   say, oh, well, the claims don't require any physical

10:48:01  22   separateness or different pieces of hardware.

10:48:03  23        Now, nowhere in any of their briefing, in their

10:48:07  24   opening or their reply, do they explain how if the

10:48:12  25   channelizer and data processing and signal monitor are all

10:48:15  1  one piece of hardware, how you would do the outputting from

10:48:18  2  the channelizer to the data processor, nor do they explain

10:48:23  3  how you do outputting from the channelizer to the signal

10:48:26  4  monitor, nor do they explain how you can have concurrent

10:48:30  5  outputs from the channelizer to two separate places if all

10:48:34  6  three are the same device, nor do they explain how the data

10:48:38  7  processor and the signal monitor can be in a parallel

10:48:41  8  arrangement if they're all the same the device, or do they

10:48:45  9  explain how the data processor and signal monitor can do

10:48:46  10 concurrent processing if they're all wrapped up in the same

10:48:48  11 processor.  They have no explanation for any of these

10:48:51  12 things.

10:48:51  13         Instead, they point to one sentence from the spec,

10:48:53  14 which is basically intended to say, you can implement this

10:48:57  15 however you want, right?  Consistent with everything we've

10:49:00  16 said, you can implement this however you want.  You can use

10:49:03  17 multiple -- you can have multiple housings, one or more

10:49:11  18 circuit boards, one or more integrated circuits.  It's a

10:49:15  19 broad statement that says, based on everything we've talked

10:49:17  20 about, you can implement it however you want.

10:49:20  21         But they're reading it so that the one line, the

10:49:23  22 one e.g., one or more silicon die, and it says one, that

10:49:26  23 that means the whole thing can be the same device, and you

10:49:27  24 can ignore everything else the specification and the claims

10:49:30  25 say.  That's not what that sentence means.  The sentence is

| | | |
|---|---|---|
| 10:49:33 | 1 | a broad statement.  You can implement it however you want |
| 10:49:35 | 2 | consistent with the disclosure. |
| 10:49:37 | 3 | THE COURT:  Is there something unique about the |
| 10:49:40 | 4 | word "output"?  Does it -- is it not -- can it not be |
| 10:49:43 | 5 | argued to be a synonym for simply sending or transferring? |
| 10:49:47 | 6 | Has it got to pass some boundary to be an output, that if |
| 10:49:51 | 7 | it transfers without passing the boundary, it's not an |
| 10:49:54 | 8 | output?  I'm trying to get your view on that. |
| 10:49:58 | 9 | MR. BENYACAR:  Yes.  So I believe output has a |
| 10:50:01 | 10 | plain meaning, which is out.  It was in, and now it's out. |
| 10:50:04 | 11 | You're outputting. |
| 10:50:05 | 12 | THE COURT:  But in and out of what? |
| 10:50:07 | 13 | MR. BENYACAR:  Well, in and out of the hardware |
| 10:50:09 | 14 | device.  That's the channelizer.  So we say it's a separate |
| 10:50:12 | 15 | structural element.  It's a different hardware device. |
| 10:50:14 | 16 | When you're outputting, you can look at the |
| 10:50:18 | 17 | disclosed embodiment, the channelizer is in red.  That |
| 10:50:21 | 18 | channelizer is a piece of hardware.  It's outputting those |
| 10:50:25 | 19 | two lines.  It's leaving the device and going to another |
| 10:50:27 | 20 | device. |
| 10:50:38 | 21 | THE COURT:  Well, the quandary, as I see it, is |
| 10:50:41 | 22 | you can say in this drawing that you put up here from the |
| 10:50:47 | 23 | figures, you can say that the channelizing -- channelizer, |
| 10:50:50 | 24 | the data processing, and the monitoring are three different |
| 10:50:51 | 25 | components.  But you can also say it's one component with |

10:50:59  1  three subcomponents.  And so this is outputting within the

10:51:03  2  one component from subcomponent to other subcomponent.

10:51:07  3       It seems like to me it's just an issue of how much

10:51:10  4  you subdivide or don't subdivide, and that seems to be as

10:51:14  5  much a matter of semantics as anything else.

10:51:17  6       MR. BENYACAR:  Well, so --

10:51:18  7       THE COURT:  And that's where I -- that's where I

10:51:20  8  find it to be somewhat of a quandary.

10:51:23  9       MR. BENYACAR:  So if you -- if the blue -- the

10:51:27 10  green -- I think you drew a green box around all three of

10:51:31 11  them.

10:51:32 12       THE COURT:  I did.

10:51:32 13       MR. BENYACAR:  If within the green box you had a

10:51:34 14  red box that was its own -- thank you.

10:51:37 15       So you've got a green box that covers everything.

10:51:39 16  Let's say that's one big device, what you drew in green.

10:51:42 17  Within that box, there's a smaller hardware device.  That's

10:51:45 18  the red.  We're not saying it's not covered because there's

10:51:49 19  a green box.  It's still outputting from the smaller red

10:51:53 20  box to another box, which is the monitoring module.

10:51:57 21       THE COURT:  All right.

10:51:58 22       MR. BENYACAR:  Certainly what Your Honor has drawn

10:52:00 23  as the green box, we expect that those distinct structural

10:52:04 24  elements will be within a larger device for sure.  But

10:52:10 25  you -- there still has to be other hardware devices within

| | | |
|---|---|---|
| 10:52:14 | 1 | that bigger device. |
| 10:52:16 | 2 | And if the Court issues our construction, which |
| 10:52:20 | 3 | is -- which is a separate piece of hardware, or the way the |
| 10:52:24 | 4 | claim -- the way the Federal Circuit cases are articulated |
| 10:52:28 | 5 | is distinct structural elements, the jury will then look at |
| 10:52:31 | 6 | what we have and say, okay, is the channelizer a distinct |
| 10:52:35 | 7 | structural element from the data processor?  That would be |
| 10:52:37 | 8 | the jury's quandary. |
| 10:52:39 | 9 | They shouldn't be left to be able to think it |
| 10:52:42 | 10 | doesn't matter.  It can all be mixed up in the same thing, |
| 10:52:46 | 11 | which is what the Plaintiff's position is. |
| 10:52:47 | 12 | THE COURT:  All right. |
| 10:52:48 | 13 | MR. BENYACAR:  Thank you, Your Honor. |
| 10:52:48 | 14 | THE COURT:  Thank you. |
| 10:52:56 | 15 | Let's do this, Counsel, we've almost been in here |
| 10:52:59 | 16 | two hours.  Let's take a short 10-minute plus or minus |
| 10:53:02 | 17 | recess. |
| 10:53:03 | 18 | When we come back, we'll turn to the '690 patent |
| 10:53:07 | 19 | and take up "probe" and "physical layer probe." |
| 10:53:12 | 20 | But until then, let's take a short recess. |
| 10:53:14 | 21 | The Court stands in recess. |
| 10:53:15 | 22 | COURT SECURITY OFFICER:  All rise. |
| 10:53:17 | 23 | (Recess.) |
| 10:53:18 | 24 | COURT SECURITY OFFICER:  All rise. |
| 11:05:48 | 25 | THE COURT:  Be seated, please. |

11:05:52    1          All right.  Let's continue with claim construction

11:05:56    2   in the Entropic versus Charter matter.  And let's turn to

11:06:00    3   the '690 patent.  We'll take up "probe" and "physical layer

11:06:05    4   probe."

11:06:06    5          Let me hear from the Defendant on this first,

11:06:07    6   please.

11:06:21    7          MR. BENYACAR:  Thank you, Your Honor.

11:06:25    8          Your Honor, the specification tells us what a

11:06:30    9   probe is.  A probe does have a plain meaning, and it's

11:06:34   10   entirely consistent with what the specification says.

11:06:36   11          The specification says that probes are typically

11:06:40   12   well-known -- are typically well-defined, I'm sorry, and

11:06:44   13   are sent between nodes of a network.

11:06:47   14          So in this example -- and this is the example we

11:06:50   15   used in the tech tutorial, you have a probe that has a

11:06:53   16   known form, a known bit pattern, and that's defined in

11:06:58   17   advance.  It has a known form.

11:07:02   18          According to the patent, the Node 2, which is

11:07:05   19   called the probe transmitter because it's transmitting the

11:07:08   20   probe, is sent to the probe receiver which receives the

11:07:14   21   probe.

11:07:14   22          Now, because the format of that probe is known in

11:07:16   23   advance, the probe receiver has a reference to use.  And

11:07:19   24   in the patent, that's called the reference probe.  And you

11:07:22   25   see --

```
11:07:22   1              THE COURT:  Let me interrupt, and I apologize,
11:07:24   2    but --
11:07:25   3              MR. BENYACAR:  Yes, Your Honor.
11:07:25   4              THE COURT:  -- your proposal says that what is
11:07:30   5    transmitted is a "packet."  Why would "signal" not be a
11:07:35   6    better description of what's transmitted?
11:07:37   7              MR. BENYACAR:  So that might be okay.  The reason
11:07:43   8    we use "packet" is because "packet" is -- I mean, there are
11:07:46   9    packets.  I don't think "packet" is a disputed issue, but
11:07:50  10    maybe "signal" would be better.
11:07:52  11              The --
11:07:54  12              THE COURT:  Signal seems like the apples, and
11:07:58  13    packet seems like the bag, to me.
11:08:00  14              MR. BENYACAR:  Fair enough, Your Honor.
11:08:05  15              The point in dispute, though, is going to be that
11:08:10  16    the probe has a known form that the probe receiver has in
11:08:18  17    advance, it receives the probe, and it compares the two.
11:08:22  18    And based on the difference, it can determine
11:08:25  19    characteristics of the channel.
11:08:26  20              So like the patent says, and this is on Slide 101,
11:08:30  21    the receiving node knows before reception what reference
11:08:34  22    signal was transmitted, because it knows the form.  It
11:08:37  23    can -- by comparing the reference probe with the actual
11:08:40  24    received probe, the receiver can determine some
11:08:43  25    characteristics of the channel.
```

11:08:44  1            Okay.  So that is the gist of our construction.

11:08:53  2    That is also the plain meaning of probe.  In the patent,

11:09:01  3    probes are applicable to cable networks.  They show here --

11:09:05  4    they say in Figure 1, it can be a coaxial cable system,

11:09:09  5    fiber cable system, an ethernet cable system.  Well, probe

11:09:15  6    has a plain meaning in the cable space.

11:09:15  7            This is -- on Slide 104.  I have an excerpt from

11:09:18  8    the DOCSIS specification, which says, the CMTS needs to

11:09:20  9    receive a transmission with a known pattern on every

11:09:24  10   non-excluded subcarrier.  This known pattern is provided by

11:09:28  11   probing.

11:09:30  12           It's the same thing as the patent talks about,

11:09:35  13   and that's our construction.  You get something that has

11:09:38  14   a known pattern, you have a reference in advance, you

11:09:42  15   compare the two, and that tells you characteristics of the

11:09:45  16   channel.

11:09:45  17           So this is what Entropic says in their briefs

11:09:51  18   about what I just said.  They said, well, we're relying on

11:09:56  19   what the prior art says probes are.  No person of skill in

11:10:00  20   the art would rely upon this discussion to limit the

11:10:03  21   meaning of probe.  This is in their reply brief at Page 6.

11:10:07  22           Then with respect to the DOCSIS specification,

11:10:11  23   they say, oh, you can't rely on that.  That's post

11:10:15  24   priority.  This is in the reply brief also at Page 6.

11:10:17  25           So they say you can't reference what the patent

11:10:19  1  says because that's prior art probes.  You can't reference

11:10:22  2  what DOCSIS says because that's post priority probes.  So

11:10:25  3  you can't rely on either one of those, and, yet, their

11:10:29  4  construction is plain meaning.

11:10:31  5          THE COURT:  Every construction is plain meaning in

11:10:33  6  this particular situation as far as the Plaintiff is

11:10:36  7  concerned.

11:10:36  8          MR. BENYACAR:  Yes, true.

11:10:37  9          But you have a term that's our construction that

11:10:42  10  has the same meaning in the prior art, it has the same

11:10:45  11  meaning after the priority date.  That's the meaning.  They

11:10:49  12  don't argue that somehow, even though it had our meaning

11:10:53  13  before the patent and our meaning after the patent that

11:10:55  14  somehow the patent redefined it.  They're saying it's the

11:10:58  15  plain meaning.  So our construction is that plain meaning.

11:11:02  16          THE COURT:  Well, if there is a plain meaning and

11:11:04  17  that plain meaning is known in the art, why not just say,

11:11:08  18  plain and ordinary meaning?

11:11:08  19          MR. BENYACAR:  I'll tell you why not.

11:11:11  20          THE COURT:  That's why I asked the question.

11:11:13  21          MR. BENYACAR:  Yes.

11:11:14  22          So let me advance if I can and tell you what their

11:11:25  23  position is.

11:11:25  24          This is what Entropic wants to tell the jury probe

11:11:38  25  and probe request mean.

11:11:41   1        So as we just talked about, probe means it has a

11:11:44   2   fixed pattern that you know in advance you get it and you

11:11:48   3   compare it to a reference, and -- and that's what a probe

11:11:51   4   is.

11:11:51   5        What they want to tell the jury, which is why they

11:11:55   6   advocate no construction, is a probe request requests

11:12:00   7   information that the probe receiver did not already know.

11:12:05   8   So in the probe request, for example, I might, you know,

11:12:08   9   ask my colleague, what's your address, because I don't

11:12:13  10   already know it.

11:12:15  11        Then in response, the probe transmitter generates

11:12:27  12   a probe that contains what they call responsive

11:12:30  13   information, which the probe receiver did not already know.

11:12:34  14        So my colleague tells me, oh, I live at 112 Main

11:12:38  15   Street, and I didn't know it before.  So when they say

11:12:41  16   plain and ordinary meaning, they intend to tell the jury it

11:12:44  17   means something the exact opposite of what a probe is.

11:12:46  18        A probe is something you already know the format

11:12:49  19   of, and you compare it to a reference.  When they say no

11:12:52  20   construction, what they want to tell the jury is a probe is

11:12:55  21   new information that you never had before.

11:13:00  22        The jury cannot, in our view, be allowed to

11:13:02  23   consider that.  The jury needs to be told that -- what that

11:13:06  24   meaning is, which is the probe has a known form that the

11:13:11  25   receiver compares to a reference.

| | | |
|---|---|---|
| 11:13:17 | 1 | THE COURT:  All right.  What else, Mr. Benyacar? |
| 11:13:19 | 2 | MR. BENYACAR:  That is it on probe, I believe, |
| 11:13:23 | 3 | Your Honor. |
| 11:13:23 | 4 | THE COURT:  Do you want to make an argument on |
| 11:13:25 | 5 | physical layer probe -- |
| 11:13:26 | 6 | MR. BENYACAR:  Oh, I'm sorry, yes. |
| 11:13:28 | 7 | THE COURT:  -- that's different? |
| 11:13:32 | 8 | MR. BENYACAR:  Yes, I do. |
| 11:13:33 | 9 | THE COURT:  I understand from the briefing you say |
| 11:13:34 | 10 | it means probe; otherwise, it's indefinite. |
| 11:13:38 | 11 | MR. BENYACAR:  Yes.  So let me go to the right |
| 11:13:40 | 12 | place. |
| 11:14:00 | 13 | The issue with physical layer probe is very |
| 11:14:03 | 14 | similar to probe, which is probe had a plain meaning in the |
| 11:14:08 | 15 | prior art, and in the post art.  So the patent -- there's |
| 11:14:13 | 16 | no dispute that the patent only discusses physical layer |
| 11:14:22 | 17 | probes, and post art, post priority, this is an excerpt |
| 11:14:26 | 18 | from the very same DOCSIS specification.  You see in the |
| 11:14:29 | 19 | color purple:  A probe is a wideband physical layer signal. |
| 11:14:35 | 20 | Probes are physical, that's what they are.  That's |
| 11:14:38 | 21 | the plain meaning before the patent.  The patent only |
| 11:14:42 | 22 | discusses physical layer, and the DOCSIS specification |
| 11:14:45 | 23 | explicitly says a probe is a wideband physical layer |
| 11:14:49 | 24 | signal.  That's what probes are. |
| 11:14:50 | 25 | So it's the same thing.  The patent talks about |

11:14:54   1   probes being physical layer -- post priority they're

11:14:59   2   physical layer.  They say plain meaning, but the plain

11:15:03   3   meaning contradicts what the patent says and what the

11:15:05   4   DOCSIS definition is.

11:15:10   5         THE COURT:  All right.

11:15:10   6         MR. BENYACAR:  Thank you, Your Honor.

11:15:11   7         THE COURT:  Thank you.

11:15:12   8         Let me hear from the Plaintiff, please.

11:15:17   9         MR. SHIMOTA:  Thank you, Your Honor.  My name is

11:15:23  10   Jim Shimota.  I'll be responding to counsel and arguing

11:15:25  11   this term.

11:15:26  12         THE COURT:  Please proceed.

11:15:27  13         MR. SHIMOTA:  Thank you.

11:15:28  14         So turning -- well, just straight out the bag,

11:15:34  15   Your Honor, I agree with you a hundred percent that

11:15:35  16   "packet" is the wrong term here.

11:15:38  17         And what counsel did not describe or discuss in

11:15:41  18   his presentation is what they mean by "packet," right?  And

11:15:45  19   it's curiously absent from their briefing as well.

11:15:48  20         And what we think and what we can ascertain from

11:15:51  21   their briefing is that that's just another way in which

11:15:53  22   they're going to try to argue that the term "probe" is

11:15:57  23   limited to a physical layer probe.  And we'll get that --

11:16:02  24   to that in a second.

11:16:03  25         But what we talked about in the '775 patent, and

| | | |
|---|---|---|
| 11:16:08 | 1 | Dr. Almeroth has admitted, our expert agrees, as well, that |
| 11:16:13 | 2 | there is the well-known OSI model, which has multiple |
| 11:16:20 | 3 | layers to it, the first of which is the physical layer. |
| 11:16:21 | 4 | That's the -- that's how the -- that handles the |
| 11:16:24 | 5 | modulation, how the data and the bits are transmitted. |
| 11:16:27 | 6 | The next layer up is the data link layer.  So what |
| 11:16:30 | 7 | you've heard is the MAC.  Everyone knows about that too. |
| 11:16:33 | 8 | And there's different -- and all of these things |
| 11:16:35 | 9 | can be used to describe different type of packets, correct? |
| 11:16:38 | 10 | I mean, we even see every day, you know, we talk about the |
| 11:16:40 | 11 | Internet.  You'll hear things about TCP/IP packets.  Those |
| 11:16:44 | 12 | are even farther up the stack. |
| 11:16:46 | 13 | So we think that the issue with packet -- and |
| 11:16:48 | 14 | rightly so, you pointed out the fact that we've identified |
| 11:16:51 | 15 | a number of terms as being -- having their plain and |
| 11:16:54 | 16 | ordinary meaning because we think there are words that the |
| 11:16:57 | 17 | jury can -- |
| 11:16:58 | 18 | THE COURT:  Every one of these terms you've told |
| 11:17:00 | 19 | me are plain and ordinary meaning.  You haven't offered a |
| 11:17:03 | 20 | specific proposal on any single term today. |
| 11:17:03 | 21 | MR. SHIMOTA:  Okay. |
| 11:17:06 | 22 | THE COURT:  Not that -- not that that's |
| 11:17:06 | 23 | necessarily or innately wrong.  It -- |
| 11:17:11 | 24 | MR. SHIMOTA:  With respect -- |
| 11:17:12 | 25 | THE COURT:  -- it leaves me a little less to work |

```
11:17:14    1   with is all I'll say.
11:17:16    2           MR. SHIMOTA:  Sure.  With respect to -- and we're
11:17:17    3   mindful of that, Your Honor.  And as I was thinking about
11:17:20    4   this yesterday, I think the word "probe" a jury would
11:17:23    5   understand.  But to the extent that you felt a claim
11:17:25    6   construction was appropriate, I think a construction which
11:17:29    7   would read "a signal used to determine one or more
11:17:31    8   characteristics of a channel" would be fine.  That would
11:17:33    9   cover this situation and would work very well for this.
11:17:36   10           And the issue really -- and I will get to probe
11:17:42   11   request eventually, right?  But what they're -- what
11:17:45   12   they're arguing is that we can't be right, we, Entropic,
11:17:49   13   cannot be right, because we're saying that the --
11:17:52   14   that we're saying that the probe cannot be known in
11:17:54   15   advance.  So we're saying that the -- that the signal sent
11:17:57   16   back is not known to the receiver.  That's not right.
11:17:59   17           What we will argue with respect to probe request
11:18:03   18   is that the invention of the '690 patent deals with probes
11:18:07   19   that are flexible, that there are a number of parameters
11:18:10   20   that can be set by the requesting node, and it could be
11:18:14   21   just one.  It could be two.  It could be three.
11:18:17   22           And so what all -- what they're arguing in their
11:18:20   23   construction and what they're getting to eventually is that
11:18:22   24   there needs to be a rigid probe, that the entire form must
11:18:27   25   be known in advance, and there's just no flexibility
```

11:18:30  1    whatsoever.  And that's what we mean when we say that the

11:18:32  2    prior art description is wrong because that's what's

11:18:36  3    contrasted.  We don't dispute the fact that people know

11:18:38  4    what a probe is, right?  And rightly so.  You say it's a

11:18:42  5    signal.

11:18:43  6         And to the extent that the DOCSIS specification is

11:18:46  7    not limited to physical layer probes, it's not -- I think

11:18:52  8    the definition I proposed to you is probably better, but

11:18:55  9    it's not particularly problematic.  It's the issue as to

11:18:59  10   whether or not they're trying to read in a physical layer

11:19:01  11   probe, which is just wrong.  It's contrary to claim

11:19:04  12   differentiation.  It's just wrong.

11:19:06  13        THE COURT:  I agree with you that that physical

11:19:10  14   layer probe is where the real rubber meets the road here.

11:19:14  15        MR. SHIMOTA:  Yeah, okay.  So moving forward then,

11:19:16  16   I think one thing that you've highlighted -- I guess we've

11:19:21  17   already skipped over that -- is the fact that there's a

11:19:25  18   number of arguments today, the gist of which are, well, the

11:19:28  19   specification only discloses one embodiment, Your Honor.

11:19:31  20   And as a consequence of that, if you don't construe the

11:19:35  21   claim as limited to that embodiment, then it's -- then it's

11:19:39  22   just indefinite.

11:19:40  23        And I think you've hit the nail perfectly on the

11:19:43  24   head that to the extent that that argument has any legs --

11:19:46  25   and I'm here to tell you that it doesn't, right, precisely

11:19:49  1  because the OSI model was so well-known at that time, but

11:19:52  2  if it has any legs, that's an argument for summary judgment

11:19:55  3  on written description, that if they're arguing that the

11:20:00  4  particular PHY layer probe is the only embodiment in the

11:20:04  5  specification and then that where we shouldn't be allowed

11:20:08  6  to claim so broadly, that's a written description argument.

11:20:11  7  It's not an indefiniteness argument.

11:20:13  8       One of ordinary skill in the art looking at the

11:20:16  9  claim language as written would see in Claim 9 a physical

11:20:21  10 layer probe, and then looking at Claim 1 would see a probe,

11:20:23  11 and that would clearly convey to an ordinary artisan that

11:20:24  12 the probe in Claim 1 is broader.  It is not limited to the

11:20:28  13 physical layer.

11:20:28  14      And in that event, then, later on an ordinary

11:20:33  15 artist would look to see, well, is there description which

11:20:36  16 corresponds with a probe more than the physical layer?  We

11:20:40  17 say there is.  We would say an ordinary artist would know

11:20:43  18 that based upon the description in the patent.

11:20:45  19      They may dispute that.  We may get to that later.

11:20:47  20 But in terms of construing the claims as written, we think

11:20:50  21 it's a very simple straightforward task.  To the extent

11:20:54  22 that Your Honor wants to construe the probe, I think the

11:20:58  23 construction that I've identified now would work for us.

11:21:02  24 But, otherwise, I agree.  This is a pretty simple dispute,

11:21:05  25 which I will therefore sit down unless you have further

11:21:08   1   questions for me.

11:21:08   2         THE COURT:  No, I think I understand your

11:21:11   3   position.  Thank you, Counsel.

11:21:13   4         MR. SHIMOTA:  Thank you very much, Your Honor.

11:21:14   5         THE COURT:  Anything briefly from the Defendant

11:21:16   6   before we move on?

11:21:17   7         MR. BENYACAR:  Yes, Your Honor.

11:21:21   8         We don't dispute that the OSI model has different

11:21:25   9   layers.  But he hasn't shown anything which shows that

11:21:30  10   probes are anything other than the physical layer.  Yes,

11:21:33  11   there are other layers of the stack.  Probes exist at the

11:21:35  12   physical layer.

11:21:36  13         And you I believe just heard counsel say what I

11:21:42  14   said, which is the prior art definition is wrong, and the

11:21:45  15   post definition is wrong, that somehow the patent has some

11:21:49  16   new meaning of probe.

11:21:51  17         But they didn't offer it, and as we're going to

11:21:54  18   talk about when we talk about probe request, the invention

11:21:59  19   is not a new probe.  The invention is what this -- what the

11:22:04  20   title of the patent is, which is receiver-determined probe.

11:22:08  21   It's not changing what a probe is.

11:22:10  22         What it does is it says, well, probes were

11:22:12  23   predetermined in the prior art.  So if you were to send me

11:22:16  24   a probe, you would send it, and I would just know what form

11:22:19  25   it was supposed to be.

| | | |
|---|---|---|
| 11:22:20 | 1 | In the invention, I would tell you:  Send me a |
| 11:22:24 | 2 | probe which has this form.  And then you would send it to |
| 11:22:28 | 3 | me, and I would do the comparison.  That's the invention. |
| 11:22:30 | 4 | It's not -- the invention is not a new probe. |
| 11:22:32 | 5 | THE COURT:  Tell me -- tell me specifically where |
| 11:22:36 | 6 | there is support for the notion that a probe must be a |
| 11:22:39 | 7 | physical layer probe.  I don't find any general statement |
| 11:22:43 | 8 | in the intrinsic record or clear linkage here.  But you've |
| 11:22:48 | 9 | obviously told me that it's either probe or it's |
| 11:22:52 | 10 | indefinite. |
| 11:22:53 | 11 | Let's assume I don't think it's indefinite. |
| 11:22:55 | 12 | Where is there support for probe being limited to a |
| 11:23:02 | 13 | physical layer probe? |
| 11:23:03 | 14 | MR. BENYACAR:  So the specification does not say a |
| 11:23:06 | 15 | probe must be a physical layer probe.  What the |
| 11:23:09 | 16 | specification describes is physical layer probes. |
| 11:23:12 | 17 | We're not saying and this is not a single one of |
| 11:23:18 | 18 | our argument, oh, well, it's -- you know, the term can |
| 11:23:21 | 19 | only be what the specification says.  We're not saying |
| 11:23:26 | 20 | that. |
| 11:23:26 | 21 | What I put up before is a definition from the |
| 11:23:28 | 22 | DOCSIS specification which says a probe is a physical layer |
| 11:23:35 | 23 | signal. |
| 11:23:35 | 24 | THE COURT:  But how does it being a physical layer |
| 11:23:38 | 25 | signal -- well, that seems to me to be a statement as to a |

| | |
|---|---|
| 11:23:53 | 1 |
| 11:23:58 | 2 |
| 11:24:00 | 3 |
| 11:24:03 | 4 |
| 11:24:06 | 5 |
| 11:24:07 | 6 |
| 11:24:10 | 7 |
| 11:24:13 | 8 |
| 11:24:16 | 9 |
| 11:24:16 | 10 |
| 11:24:19 | 11 |
| 11:24:20 | 12 |
| 11:24:27 | 13 |
| 11:24:28 | 14 |
| 11:24:35 | 15 |
| 11:24:37 | 16 |
| 11:24:38 | 17 |
| 11:24:56 | 18 |
| 11:25:01 | 19 |
| 11:25:05 | 20 |
| 11:25:09 | 21 |
| 11:25:13 | 22 |
| 11:25:18 | 23 |
| 11:25:19 | 24 |
| 11:25:22 | 25 |

specific feature rather than equating probe with physical
layer probe.

          But let me -- let me ask it this way.  Other than
what you've cited from the DOCSIS specification, do you
have additional support for your position?

          MR. BENYACAR:  Only that the only probes discussed
in the patent are physical layer, and probe has a plain
meaning in the art, which I'm showing, which is it is a
physical layer.

          THE COURT:  Okay.  Thank you.

          MR. BENYACAR:  Thank you, Your Honor.

          THE COURT:  All right.  Let's move on to "probe
request," also from the '690 patent.

          Mr. Benyacar, you're at the podium, or you were.
Let me hear from you on this.

          MR. BENYACAR:  I'm back.

          Now, Your Honor, you remember I said a minute ago
that the invention is not changing what a probe is.  Probe
has the same meaning it had in the prior art and post art.

          This is what the invention is.  I'm on Slide 1 --
110 now.  Requiring the transmitting node to send
predetermined probe reduces the amount of flexibility in
the characterization process.

          So, in other words, if you were going to send me a
probe, that probe form is fixed, or you would only have

11:25:26   1   some fixed options, and you would use one of those, and I

11:25:28   2   would know what you're sending.  And according to the

11:25:30   3   patent, the fact that you had to send me a predetermined

11:25:35   4   probe was the problem.

11:25:36   5        And that's where the alleged invention comes in.

11:25:44   6   This is the title of the patent.  This is the alleged

11:25:47   7   invention.  A receiver determined probe.  Not a new probe,

11:25:52   8   not probe means something else.  It's a receiver determined

11:25:56   9   probe, which means if I receive the probe, you're not just

11:25:59   10  going to send me some predefined pattern.  I'm going to

11:26:03   11  tell you what pattern I want, and then you're going to send

11:26:06   12  it to me.

11:26:07   13       Now, I know I told -- I told you what to send me,

11:26:08   14  so when you send it, I'll compare it to what you told me --

11:26:11   15  what I told you to send, and that's how I'll characterize

11:26:15   16  the channel.

11:26:16   17       This is from the patent.  The receiving node may

11:26:23   18  generate a probe request that specifies a plurality of

11:26:26   19  parameters which dictate the form of the probe.  Generate a

11:26:34   20  probe having the form specified by these parameters.  Not a

11:26:38   21  new probe.  I send you parameters, and then you send me a

11:26:41   22  probe that has the form that I told you to send.  That's

11:26:45   23  the invention, the alleged invention.

11:26:48   24       Accordingly, the probe request specifies a

11:26:53   25  plurality of parameters associated with a generation and

11:26:56  1  transmission of a probe, including the content payload of

11:26:59  2  the probe.

11:27:00  3       Now, remember, probe request is the invention,

11:27:05  4  right?  Theoretically, this didn't exist before.  Before,

11:27:09  5  they were all predetermined.  Now, you can send a probe

11:27:12  6  request that -- where I can tell you what I want the form

11:27:15  7  to be.  And this is where the patent tells you what that

11:27:18  8  is.

11:27:18  9       Column 2, Lines 3 through 9, are critical.  It's

11:27:29  10  this new thing they invented called the receiver determined

11:27:33  11  probe with a probe request, and here it's telling you what

11:27:36  12  it is.

11:27:36  13       Now, this says that the probe request includes the

11:27:39  14  content payload of the probe.  Undoubtedly, it can include

11:27:43  15  other things.  And after that passage, it goes on and says:

11:27:47  16  In one embodiment, the parameters further include, in

11:27:50  17  addition to the content payload, and then it lists a bunch

11:27:53  18  of things.

11:27:54  19       And when it's done listing all those things, it

11:27:57  20  says:  Accordingly -- or in other words -- the probe that

11:27:59  21  is transmitted in response to the probe request will have a

11:28:02  22  form dictated by the parameters specified in the probe

11:28:06  23  request.

11:28:06  24       That's what a probe request is.

11:28:10  25       THE COURT:  I'm curious where you're -- I'm

| | | |
|---|---|---|
| 11:28:12 | 1 | curious about your use of the phrase "content payload."  I |
| 11:28:17 | 2 | mean, up until now, you've argued about the form of the |
| 11:28:20 | 3 | probe.  Somehow we seem to be morphing from form of the |
| 11:28:26 | 4 | probe to content payload. |
| 11:28:27 | 5 | MR. BENYACAR:  Yes. |
| 11:28:27 | 6 | THE COURT:  They're not synonymous, are they? |
| 11:28:29 | 7 | MR. BENYACAR:  No, they're not.  But the content |
| 11:28:31 | 8 | payload is a form parameter. |
| 11:28:33 | 9 | So in a packet, and these are packets, again, we |
| 11:28:35 | 10 | talked about this a minute ago, the entire specification is |
| 11:28:38 | 11 | in the context of a packet.  A packet has a payload.  It |
| 11:28:42 | 12 | has a header, and it has a payload, which is the actual |
| 11:28:45 | 13 | information that you want to transmit. |
| 11:28:47 | 14 | What this is saying is the form -- the parameters |
| 11:28:54 | 15 | include at least what that content payload should be.  It |
| 11:28:57 | 16 | can have many other things, but what the content payload of |
| 11:29:00 | 17 | the packet is, that's mandatory. |
| 11:29:05 | 18 | THE COURT:  All right. |
| 11:29:07 | 19 | MR. BENYACAR:  And the reason for that, of course, |
| 11:29:08 | 20 | is that's where you're -- that's where you're going to find |
| 11:29:11 | 21 | that fixed pattern that you're going to do the comparison |
| 11:29:14 | 22 | to, right?  So you have to include that. |
| 11:29:16 | 23 | But you can include a bunch of other things.  But |
| 11:29:21 | 24 | all of those other things constitute the form.  And you |
| 11:29:26 | 25 | notice that in the excerpt from the patent at 2:3-9, you |

11:29:38   1   notice that the word "form" is in quotes.  Well, "form" is

11:29:42   2   a plain English word.  Why did they put it in quotes?

11:29:42   3   Well, because they're telling you what we mean by "form"

11:29:42   4   here.

11:29:46   5        I'm going to send parameters.  It'll include at

11:29:49   6   least a content payload, but it can include other things.

11:29:52   7   But if there are things you use to generate or transmit

11:29:56   8   the probe, those -- that's the form.  And it goes on to

11:29:59   9   list a bunch of things.  And it repeatedly says those are

11:30:03   10   form.

11:30:11   11        This is -- this is the disclosed embodiment, and

11:30:13   12   this is how the patent describes how the disclosed

11:30:18   13   embodiment works.  This is Figure 4, that probe receiver

11:30:23   14   transmits a probe request specifying probe parameters to

11:30:28   15   one or more -- to the node that will transmit the eventual

11:30:31   16   probe having a form that is dictated by the specified

11:30:34   17   parameters.  This is at Slide 115.

11:30:39   18        The receiver of the probe sends a probe request,

11:30:41   19   it has parameters, and the receiver of the probe request

11:30:44   20   generates the probe having the form specified by those

11:30:48   21   parameters.

11:30:48   22        Then the probe transmitter on Slide 116 receives

11:30:56   23   that probe request.  What does it do?  In block 1 -- 202,

11:31:00   24   the probe transmitter uses the specified probe parameters,

11:31:04   25   those that came in the probe request, to generate a probe

11:31:07  1   having a form that complies with the specified parameters.

11:31:10  2          By the way, you notice there's nothing new about

11:31:13  3   what a probe is here.  It's all that it's -- that -- about

11:31:16  4   how the probe gets generated with information in the probe

11:31:19  5   request.

11:31:20  6          The probe transmitter then sends that probe, and

11:31:25  7   the probe receiver uses it to determine the characteristics

11:31:30  8   of the channel.  That's how the disclosed embodiment works.

11:31:33  9          Our construction tracks what the specification

11:31:36  10  says is this new thing called a probe request.  That's the

11:31:41  11  invention.  It's sent by a first node to a second node,

11:31:46  12  which defines the form of a probe to be generated and

11:31:50  13  transmitted by the second node.  The probe request

11:31:53  14  specifies at least the content payload of the probe.

11:31:55  15         That comes exactly from the definition -- from the

11:31:59  16  description of this new thing called a probe request that's

11:32:03  17  the invention of this patent.  And I'm -- we take it right

11:32:06  18  from Column 2, Lines 3 through 9.

11:32:09  19         THE COURT:  So why is importing -- excuse me, why

11:32:12  20  is tracking the specification not akin to importing a

11:32:16  21  limitation into the claims?

11:32:18  22         MR. BENYACAR:  Because it's a new thing.  It's a

11:32:20  23  new thing.  It didn't exist before.

11:32:23  24         You've invented something called the probe

11:32:25  25  request.  So what they want to say is, well, plain meaning.

11:32:29  1  Let's look at what the plain meaning would be.  They say,

11:32:32  2  oh, well, it just means send me a probe.  It's a probe

11:32:35  3  request.

11:32:36  4       That's not the invention.  The invention is tell

11:32:39  5  you what form I need the probe in and send it back.  You're

11:32:43  6  not allowed to read claims that way, particularly not when

11:32:46  7  it's the invention.

11:32:48  8       So according to their plain meaning, probe request

11:32:51  9  just means request a probe.  What that means is I could

11:32:54  10  just say send me a probe, and you send me one.  Nothing

11:32:57  11  about specifying the form, nothing about sending

11:33:02  12  parameters, nothing about the content payload.  It's not

11:33:05  13  what the invention is.

11:33:06  14       This is what they say.  A person of skill in the

11:33:12  15  art would understand that the point of the probe request is

11:33:14  16  for a node to generate a probe containing responsive

11:33:17  17  information.  That's what we went over before.  This is

11:33:20  18  what they -- this is what they want to tell the jury, that

11:33:25  19  a probe request -- as opposed to what we say and what the

11:33:29  20  specification says, which is it defines parameters, they

11:33:33  21  want to tell the jury, I asked you for your address, which

11:33:36  22  I didn't know before.  That's the probe request.  That's

11:33:38  23  not the invention.

11:33:38  24       And probe request cannot be construed by combining

11:33:47  25  its two constituent words.  We have here, you know, the

11:33:52  1  Network Commerce case where the Federal Circuit said you

11:33:55  2  can't just look at download component and say you're

11:33:59  3  downloading a component because the term didn't have a

11:34:02  4  dictionary definition.  And the specification makes clear

11:34:05  5  that the download component must include a boot program.

11:34:09  6      Here, it's not only the specification says what it

11:34:15  7  is, the probe request is the whole invention.  And what

11:34:19  8  they want to do is say, well, plain meaning for something

11:34:22  9  that's the invention.  The whole invention is a receiver

11:34:25 10  determined probe and the probe request.  You have to look

11:34:28 11  to the specification to see what it is.  That's the

11:34:31 12  invention.

11:34:33 13      THE COURT:  All right.

11:34:38 14      MR. BENYACAR:  Okay.  Thank you, Your Honor.

11:34:39 15      THE COURT:  Thank you, Counsel.

11:34:41 16      Let me hear from Plaintiff.

11:34:50 17      Is probe request the whole invention?

11:34:52 18      MR. SHIMOTA:  Well, the invention is a

11:34:57 19  receiver-defined probe.  And so where they -- where they go

11:35:00 20  completely off the rails here again, Your Honor, is that,

11:35:03 21  you're right, they're reading in a particular embodiment

11:35:05 22  into the claim.

11:35:06 23      I mean, if you look at their proposed

11:35:08 24  construction, their construction includes the word

11:35:10 25  "request."  So by -- just on its face, they don't -- that

11:35:13  1  they -- they're going to tell the jury that we all know

11:35:15  2  what the word "request" means, and we just talked about

11:35:17  3  what a "probe" means.  So you could simply say, you know,

11:35:21  4  whatever definition of probe you want, and add a request

11:35:24  5  for whatever that definition is here.

11:35:25  6       But what -- the trick they try to pull is that

11:35:28  7  they say that, well, the invention is a flexible probe, but

11:35:33  8  we're going to make it a little bit inflexible by always

11:35:36  9  saying that the 1s and 0s need to be specified.  The

11:35:40  10  content of the payload, right?

11:35:43  11       And the patent is -- it goes exactly contrary to

11:35:45  12  that.  It says that we're going to ask for a probe.  A

11:35:48  13  receiver is going to say I'm interested in some

11:35:51  14  characteristic of the channel.  I might -- if I'm the

11:35:54  15  receiver, I might be interested in the transmission power.

11:35:58  16  I could care less about the content of the probe.  All I

11:36:00  17  want is to know to send a probe request where you send back

11:36:04  18  a probe at a particular transmission power, agnostic about

11:36:07  19  the 1s and 0s, and the probe comes back, and you can

11:36:10  20  compare the transmission power from what you thought you

11:36:14  21  were going to get to what actually came and so you could

11:36:17  22  see the loss.

11:36:18  23       I don't care at all about the content, right?  And

11:36:20  24  the patent is very, very clear about that.

11:36:22  25       What they're trying to get you to do is take a

11:36:24   1   simple word, "request," we've already talked about "probe,"

11:36:30   2   and read in a particular embodiment.  And I'm going to go

11:36:35   3   on to explain exactly that's wrong.

11:36:36   4           We've talked about the description of a probe in

11:36:40   5   the -- in the specification.  It says a probe -- that the

11:36:44   6   receiving node may generate a probe request that specifies

11:36:48   7   a plurality of parameters to be used in such a

11:36:52   8   receiver-determined probe to generate a probe having the

11:36:54   9   form specified by these parameters.

11:36:56  10           That's just a general description of what a probe

11:37:00  11   is.  In their briefing, they seem to imply that there's

11:37:04  12   some kind of a definition which narrows the scope of what

11:37:07  13   these words mean.  I didn't hear anything about a

11:37:09  14   definition today, and, in fact, there is one.  It defies

11:37:14  15   credulity to say that there's anything close to a clear and

11:37:18  16   unambiguous definition in this patent at all.

11:37:20  17           And they point to one section of it where they

11:37:24  18   find the language that provides for the content payload

11:37:30  19   that they try to say is mandatory.  But if you look in the

11:37:34  20   brief summary of the invention, where you're looking at,

11:37:37  21   and this is at 1 -- yeah, starting at 164 to 242 of the

11:37:41  22   patent, it talks about various embodiments of this

11:37:45  23   receiver-defined probe.

11:37:46  24           And if you look, you know, to the bottom of what

11:37:50  25   we have highlighted, it provides -- and this is something

11:37:54  1  that doesn't show up in their brief, it provides:  In a

11:37:57  2  further embodiment of the method and apparatus, at least

11:38:00  3  one of the probe parameters indicates -- and then they list

11:38:04  4  off the seven -- seven examples.  These aren't even all the

11:38:08  5  parameters that you could use for the form of the probe.

11:38:10  6  But there are just seven examples.  And one of the examples

11:38:14  7  at B is the payload content of the probe.

11:38:17  8        So what that's telling you is that you can use one

11:38:19  9  of those, but you certainly don't need to use all of them,

11:38:22  10  and it absolutely is not mandatory that you need to have

11:38:25  11  the content of the probe specified in every particular

11:38:31  12  probe request.

11:38:31  13        You've hit the nail on the head that they're

11:38:33  14  trying to read in an embodiment into the claim when the

11:38:36  15  words are very clear themselves.

11:38:38  16        And this -- just to underscore that fact, another

11:38:43  17  embodiment in the specification, what they're trying to

11:38:45  18  tell you is that every time you send a probe, the receiver

11:38:49  19  needs to say, I want a particular number of 1s and 0s.

11:38:53  20  They're going to convey that particular information to me,

11:38:57  21  the content of -- there needs to be content.

11:38:59  22        Well, what the specification describes at

11:39:01  23  Column 9, 55 to 63, is a very, very simple probe that

11:39:06  24  contains no information or content.  What it says is in

11:39:11  25  some alternative embodiments, the probe requests specify

11:39:15    1    time-domain probes.

11:39:17    2             For example, a probe request may specify a

11:39:20    3    time-domain probe to generate a square wave or other easily

11:39:25    4    analyzed signal for channel estimate purposes.

11:39:27    5             So what this is talking about there, you see that

11:39:30    6    square wave, in order for there to be information, content

11:39:33    7    to be conveyed, there needs to be a wave that's moving

11:39:37    8    around.  It needs to be modulated.  A square wave itself

11:39:41    9    carries no information whatsoever.  There's no content.

11:39:44   10             And in this scenario, this particular probe is one

11:39:49   11    example of something you could use for -- it's a very

11:39:50   12    simple wave to see if there is reflections in the channel

11:39:53   13    or some type of interference.

11:39:55   14             And so this is just another example of the many

11:39:58   15    different types of probes that are described and disclosed

11:40:00   16    in the patent which are not consistent with the definition

11:40:06   17    that they're providing, kind of the mandatory and flexible

11:40:11   18    probe that must always have a content payload specified.

11:40:14   19             And then just -- you know, just -- lastly, you

11:40:20   20    know, there are a number of -- as we've described in our

11:40:23   21    briefing, there are a number of different types of

11:40:26   22    parameters that can be used to specify the form of the

11:40:28   23    probe, one of which obviously is the payload content of the

11:40:32   24    probe.  We've talked about that a lot, but there are

11:40:35   25    others.

11:40:35  1          There are the number of symbols.  You know, it's

11:40:38  2  not just how much information, the number of 1s and 0s.

11:40:41  3  You could ask for 10 symbols or 8 symbols.  You can vary it

11:40:47  4  every time and be agnostic as to what those symbols carry,

11:40:50  5  but just rather, you know, how the network -- how things

11:40:51  6  are performed.

11:40:52  7          These are all the types of things that form

11:40:55  8  parameters that can be varied but don't need to.  You only

11:40:56  9  need to use one, and that's the whole point of the

11:40:59  10  invention, that the receiver needs to have the flexibility

11:41:01  11  to be able to determine what its interest and -- rather

11:41:05  12  than being locked down to a particular type of probe.

11:41:08  13          So with that, unless you have further questions,

11:41:13  14  that is my presentation on this element, Your Honor.

11:41:16  15          THE COURT:  I don't think I have additional

11:41:17  16  questions.  Thank you.

11:41:19  17          MR. SHIMOTA:  Thank you, Your Honor.

11:41:25  18          THE COURT:  Okay.  Let's go on, and we'll take up

11:41:32  19  "generating the probe in accordance with the first

11:41:35  20  plurality of parameters" in Claim 1 of the '690.  We'll

11:41:40  21  also take up "wherein the probe is generated" from Claim 9

11:41:44  22  of the '690.  And we'll take up "the first plurality of

11:41:49  23  probe parameters comprising," which also comes from Claim 9

11:41:54  24  of the '690.

11:41:55  25          Defendant argues this is indefinite.  Plaintiff

11:41:59   1   argues it's plain and ordinary meaning.

11:42:01   2           Let me hear from the Plaintiff on this first, and

11:42:06   3   then I'll hear from the Defendant.

11:42:07   4           MR. SHIMOTA:  Thank you, Your Honor.

11:42:13   5           As you correctly noted, I mean, there's an up and

11:42:21   6   down choice on this.  It's either there's -- the claims

11:42:25   7   survive, or they're indefinite.  There's no --

11:42:26   8           THE COURT:  It's a wide gulf.

11:42:29   9           MR. SHIMOTA:  There is a wide gulf.

11:42:30  10           But Charter's argument, I mean, they don't --

11:42:33  11   Charter isn't saying it doesn't understand what these words

11:42:36  12   mean.  I mean, that should be clear from the briefing.

11:42:39  13   Rather, what they're saying, again, it's another species of

11:42:41  14   their -- a type of 112 written description argument, which

11:42:45  15   frankly is wrong for reasons I'll tell you.

11:42:47  16           But their definiteness argument rests on the

11:42:50  17   premise -- because what these claims are -- what their

11:42:52  18   problem is, is they're saying that the patent describes a

11:42:56  19   receiver-defined probe, which -- the form of which is

11:42:59  20   defined by a first plurality of probe parameters.

11:43:04  21           And they say the claim goes on to describe the

11:43:07  22   second plurality of parameters -- none of them, right?  And

11:43:07  23   so because there's no description of these second plurality

11:43:11  24   of parameters, then the claims must be indefinite, you

11:43:11  25   know.

11:43:17  1        Again, I think just the claims on their face given

11:43:20  2   that there's no dispute as to what the words mean, to the

11:43:23  3   extent they have an argument, it's one that they should

11:43:25  4   make on summary judgment for written description.  But I'll

11:43:28  5   explain to you why that that summary judgment, when it

11:43:31  6   eventually comes, is going to fail.

11:43:33  7        First, the specification is super clear that while

11:43:38  8   the receiver-defined -- defines at least one probe

11:43:43  9   parameter, the transmitter can also define other

11:43:48  10  parameters, depending on information known at the

11:43:51  11  transmitter.

11:43:52  12       And I'll show you that's where in the

11:43:54  13  specification, but that would be the scenario where, for

11:43:56  14  example, the receiver might say, I want a probe that has a

11:43:59  15  particular content to it, right?  I want to know the 1s and

11:44:06  16  0s.  And it sends that form -- a probe request like that to

11:44:07  17  the transmitter.  The transmitter knows that the channel is

11:44:11  18  poor for whatever reason.  So the transmitter says, well,

11:44:14  19  I'm going to send back the probe with the content

11:44:16  20  requested, but I'm also going to turn up the transmission

11:44:19  21  power.  So I make sure that that probe gets back to the

11:44:22  22  receiving node.  And I'll show you where the specification

11:44:25  23  says that.

11:44:25  24       And there's also -- and the other point in their

11:44:30  25  briefing is that, well, there are -- the only parameters

11:44:32  1  that could relate to a probe are ones relating to its form.

11:44:38  2  And they say, well, because there's only -- that those must

11:44:41  3  be specified by the first set of parameters, and there's

11:44:43  4  nothing else there could be.

11:44:44  5       Well, the specification describes that there are

11:44:47  6  other parameters other than so-called form parameters.

11:44:51  7  They specify time, the time that the transmitter can send

11:44:54  8  the probe back, and they also specify the destination of

11:44:57  9  when the probe can come back.  And so both of which are

11:45:00  10  neither form parameters.

11:45:01  11       So the written description-type argument that

11:45:04  12  Charter advances here is just -- it's wrong on its face as

11:45:07  13  a matter of law, and it's also wrong as a matter of fact.

11:45:10  14  And let me show you why.

11:45:12  15       So if you look to Column 6, Lines 33 to 47, of the

11:45:19  16  specification, it states there:  Alternatively, the probe

11:45:25  17  transmitter can transmit the probe to any other probe

11:45:30  18  base based upon one of the parameters of the probe request

11:45:32  19  or based upon information that previously existed within

11:45:35  20  the transmitting node.

11:45:36  21       This is a very clear disclosure of the fact that a

11:45:41  22  transmitter -- the transmitter of the probe can receive a

11:45:46  23  probe request that has -- you know, that specifies what the

11:45:49  24  form needs to look like.

11:45:50  25       But if the transmitter knows things that will help

11:45:54    1    the information -- it can -- for example, the example I

11:45:57    2    gave before, the probe request could say I want a

11:46:00    3    particular -- the receiving node could say I want a

11:46:04    4    particular cyclic prefix.  It could go to the transmitting

11:46:07    5    node, the transmitting node again could say I think there's

11:46:10    6    problems in the channel.  I think there's interference.  So

11:46:13    7    I'm going to transmit -- I'm not going to transmit the

11:46:16    8    probe back not once but twice to make sure that the

11:46:20    9    receiving node will get it.  The number of times a probe

11:46:23   10    can be transmitted is another form parameter.

11:46:25   11         These are just examples of the ways in which this

11:46:26   12    system can operate such that the receiver is allowed to

11:46:31   13    define probes flexibly, but, nevertheless, the transmitting

11:46:35   14    node can also have a part, have intelligence so the system

11:46:39   15    works better in the process of this -- the probe -- the

11:46:44   16    inventive -- the inventive probes in the patent.

11:46:46   17         And turning to the next portion of their argument

11:46:53   18    that they're -- that they're -- there just simply are no

11:46:57   19    parameters for probes that are other than form parameters,

11:47:01   20    well, they're wrong, and the specification says that.

11:47:03   21         The specification first provides that there's --

11:47:08   22    you can have a different destination address for a probe.

11:47:10   23    And this is a situation where a network operator someplace

11:47:14   24    else says, well, I want node -- the receiving node, I want

11:47:18   25    Node 1 to send a request to Node 3, and it's going to have

11:47:23  1   a specific form, but I want that probe to go to a different

11:47:28  2   address, back to the administrator there.

11:47:31  3         And so in that instance, the transmitter is going

11:47:34  4   to have to put an address on where this probe is going to

11:47:38  5   go.  The destination address is not one of the form

11:47:41  6   parameters, but it nevertheless is a parameter.

11:47:44  7         A kind of a simple example for this is like if you

11:47:46  8   were going to buy a new car, Your Honor, right, and you

11:47:49  9   came and said, I want this particular engine, I want these

11:47:53  10  particular wheel rims, and I want this particular color of

11:47:56  11  my car, well, those are form parameters you can order.

11:47:58  12        Maybe the dealer might specify other aspects of

11:48:00  13  the car you don't want.  But ultimately, you could specify,

11:48:05  14  well, where's my car going to go?  Here's my address.

11:48:07  15  That's not a form parameter.  And when is it -- when is

11:48:10  16  going to arrive at my house?  Is it going to arrive in a

11:48:14  17  month?  Is it going to arrive in a year?  That's another

11:48:14  18  parameter which can be specified by the transmitter, the

11:48:16  19  dealership in this example, both of which are described in

11:48:19  20  the specification.

11:48:20  21        Let me take you to the time.  You know, and then

11:48:24  22  aside from -- as I just said, aside from the destination

11:48:26  23  address, there are parameters aside from form.  Explicit --

11:48:29  24  you know, it's kind of obvious.  We thought it was obvious,

11:48:32  25  but we want to be -- just be clear to the Court that

11:48:34  1   they're also described in the specification.

11:48:36  2        And if you look at the '690 patent, at Column 6,

11:48:40  3   Lines 34 -- 33 to 45, it says that in Block 203, you see

11:48:46  4   that in -- there's an error in there -- there's an error in

11:48:50  5   this section of the patent, Your Honor.  It refers to

11:48:52  6   Figure 5, but what it's meant to be is Figure 4, and you

11:48:56  7   can -- that's clear from the numerals, right?

11:48:59  8        But it's providing that in Block 203, the probe

11:49:05  9   transmitter transmits the generated probe to the probe

11:49:09  10  requester at a specified time.  So this is describing, you

11:49:12  11  know, the transmission side of it.  And you've got the

11:49:15  12  probe transmitter, and the probe transmitter and -- it can

11:49:18  13  decide, well, I'm going to send it in two seconds or an

11:49:21  14  hour, or, you know, it can make -- it's using its

11:49:24  15  intelligence so that it's -- so the system works, and

11:49:24  16  that's another parameter.  Time is not a form.  It doesn't

11:49:29  17  relate to what the probe, the contents, or the preamble or

11:49:31  18  anything like that, but nevertheless is a particular

11:49:34  19  parameter that is specified.

11:49:36  20       So, ultimately, the -- Charter is just wrong.

11:49:43  21  They're wrong that the supposed lack of written description

11:49:47  22  renders these claims -- the claims that nobody disputes

11:49:50  23  they know how they work, renders them indefinite, and

11:49:52  24  they're wrong as a matter of fact that the transmitter

11:49:57  25  can't set form parameters, and there aren't parameters

| 11:50:00 | 1 | other than forms specified in the patent specification. |

11:50:00  1  other than forms specified in the patent specification.

11:50:02  2       And as a consequence of that, I think there are --

11:50:06  3  they haven't carried their burden of showing the clear and

11:50:09  4  convincing evidence burden that the patents are indefinite,

11:50:12  5  and that the language, which nobody disputes is clear on

11:50:14  6  its face would be understandable to a jury should be

11:50:17  7  presented.

11:50:18  8       So with that, I thank you for your time, Your

11:50:21  9  Honor, unless you have further questions.

11:50:22  10       THE COURT:  All right.  Thank you, Counsel.

11:50:23  11       Let me hear from Charter in response.

11:50:24  12       MR. BENYACAR:  So everything counsel just said

11:50:46  13  about the difference between a form parameter and a

11:50:53  14  non-form parameter is nowhere in the specification.  You

11:50:55  15  will not find anywhere in this specification where it says,

11:50:59  16  oh, well, this means form and this means doesn't.  Or this

11:51:02  17  is a form parameter or this isn't.

11:51:04  18       That's completely counsel argument that he doesn't

11:51:07  19  have a single cite for because the specification does not

11:51:11  20  distinguish form parameters from not form parameters.

11:51:15  21  Doesn't exist.

11:51:15  22       As we just saw, the patentee put "form" in quotes

11:51:19  23  because if they're parameters, particularly parameters that

11:51:21  24  are used to generate, which is what this claim is about, so

11:51:25  25  even putting aside from the fact that this idea that the

11:51:28   1   patent somehow distinguishes form from not form, it's

11:51:32   2   nowhere.  It's nowhere.

11:51:33   3           So when counsel says, oh, well, time, that's not

11:51:36   4   form, that's his opinion.  The patent doesn't say anything

11:51:39   5   about that.  It describes all the parameters as being form

11:51:43   6   parameters.

11:51:43   7           So in this case, with respect to this particular

11:51:49   8   term, this relates -- this -- these claim terms relate to

11:51:55   9   generating.  So what the claim requires -- and we'll use --

11:52:01  10   you know, the arguments are the same for both.  So for

11:52:04  11   simplicity, we'll use the language for the '690 patent.

11:52:06  12           The '690 patent requires generating the probe in

11:52:10  13   accordance with the first plurality of parameters and the

11:52:13  14   second plurality of parameters.  Those are the

11:52:15  15   parameters -- the first plurality is sent in the probe

11:52:18  16   request, the second plurality is what theoretically the

11:52:23  17   probe transmitter knows, but wherein the probe has a form

11:52:28  18   that's dictated by the first plurality of parameters.

11:52:32  19           So I don't know why counsel is saying this is a

11:52:34  20   written description argument.  It's not a written

11:52:38  21   description argument.  It's an argument that you can't

11:52:41  22   generate a probe in a way that doesn't have anything to do

11:52:44  23   with its form.  It doesn't even make sense as a matter of

11:52:48  24   English.  Certainly there's nothing in the patent that

11:52:51  25   draws that distinction.

11:52:52  1          So here's what there's no disclosure in the
11:53:01  2   specification of, which is why the claims come out of
11:53:04  3   nowhere.  This is not written description.  This is why
11:53:07  4   we -- there is actually no way to do it because the
11:53:09  5   specification doesn't tell you how.  So, in other words,
11:53:12  6   I'm not arguing, well, it's not in the spec.  I'm saying
11:53:14  7   it's not in the spec because it doesn't make any sense.

11:53:16  8          So what they're saying is you get the first
11:53:22  9   parameters, and instead of generating the probe, you
11:53:25  10  determine a second plurality of parameters at the probe
11:53:29  11  transmitter.  And then what you do is you generate the
11:53:32  12  probe in accordance with the first and second parameters,
11:53:35  13  but the form can be dictated only by the first parameters.

11:53:38  14         That concept is nowhere in the specification.  The
11:53:44  15  specification doesn't distinguish between form and non-form
11:53:47  16  parameters.  And it doesn't disclose generating a probe --
11:53:51  17  you generate it based on two different pluralities, but a
11:53:56  18  form is only on the first plurality.

11:53:59  19         That concept is not in the patent.  So you can't
11:54:01  20  look at the patent to say, oh, well, let me see if I can
11:54:04  21  understand what it means.  That idea is not in the patent.
11:54:06  22  It's not a written description argument.  It's that the
11:54:10  23  specification is going -- not going to help us figure it
11:54:11  24  out.

11:54:11  25         Here's what the patent says.  This is the key

| | | |
|---|---|---|
| 11:54:18 | 1 | language:  The receiving node may generate a probe request |
| 11:54:22 | 2 | that specifies a plurality of parameters to be used in such |
| 11:54:26 | 3 | a receiver determined probe to generate a probe having the |
| 11:54:30 | 4 | form specified by these parameters.  Accordingly, the probe |
| 11:54:35 | 5 | request specifies a plurality of parameters associated with |
| 11:54:39 | 6 | the generation and transmission of a probe. |
| 11:54:42 | 7 | The form parameters are associated with the |
| 11:54:45 | 8 | generation and transmission of a probe.  Nowhere here does |
| 11:54:48 | 9 | it say, oh, well, here are some non-form parameters you can |
| 11:54:52 | 10 | use.  They're all form. |
| 11:54:53 | 11 | Here's what the -- here's what the specification |
| 11:55:01 | 12 | says about what the probe transmitter does.  In Block 202, |
| 11:55:05 | 13 | the probe transmitter uses the specified probe parameters, |
| 11:55:09 | 14 | those are the ones that it got, the form parameters from |
| 11:55:12 | 15 | the probe request, to generate a probe having a form that |
| 11:55:15 | 16 | complies with the specification. |
| 11:55:18 | 17 | So you get form parameters, and you generate a |
| 11:55:21 | 18 | probe according to that.  There is no concept in the patent |
| 11:55:25 | 19 | of you generate, but it doesn't relate to form. |
| 11:55:27 | 20 | Now, in their brief, and counsel showed this, he |
| 11:55:33 | 21 | says, ah, but there are other types of parameters.  He says |
| 11:55:37 | 22 | the payload content -- this is their argument from their |
| 11:55:40 | 23 | brief -- in their reply brief at Page 7. |
| 11:55:42 | 24 | They say, the payload content, that's not form. |
| 11:55:46 | 25 | Forms are things like number of symbols, cyclic prefix, and |

11:55:52  1   transmit power of scaling factor.  Those are form.

11:55:55  2         Now, again, nothing in the spec says that.  No

11:55:59  3   experts said that.  That's just attorney argument that

11:56:02  4   they've decided the ones in green are form, but the payload

11:56:06  5   content is not.  There's no support for this in the

11:56:09  6   specification.

11:56:09  7         In fact, as we say, the only mandatory -- the only

11:56:19  8   mandatory parameter is payload.  So when the patent says,

11:56:23  9   having a form specified by these parameters, accordingly,

11:56:28 10   the probe request specifies a plurality of parameters

11:56:31 11   associated with the generation and transmission of a

11:56:34 12   probe --

11:56:35 13         THE COURT:  Slow down, please.

11:56:35 14         MR. BENYACAR:  I apologize, Your Honor.

11:56:37 15         -- including the content payload of a probe.

11:56:39 16         So it's a form, and then it goes on and puts

11:56:44 17   "form" in quotes, and then it says:  What does that mean?

11:56:46 18         Accordingly, a probe request specifies a plurality

11:56:49 19   of parameters associated with the generation and

11:56:51 20   transmission of a probe, including the content payload of a

11:56:55 21   probe.

11:56:55 22         Their argument is the content payload is not form.

11:57:00 23   It's the only one that's expressly called out as being a

11:57:04 24   form in this key passage.

11:57:05 25         Now, the specification also says -- this is on

11:57:14  1   Slide 139 now -- the probe request specifies a plurality of

11:57:20  2   parameters for the probe that will dictate the form of the

11:57:22  3   probe.  These parameters are discussed in more detail below

11:57:25  4   with respect to Figure 5.

11:57:28  5        Figure 5 is a whole panoply of different

11:57:31  6   parameters.  They're all form.

11:57:33  7        And among those many parameters, which are all

11:57:41  8   form, is the content payload.  It says, Figure 5, the probe

11:57:47  9   request specifies a raw data sequence for the probe, in

11:57:50  10  other words, exactly what the data is going to be in it, or

11:57:52  11  just for the probe's payload.

11:57:54  12       But, in fact, they're all form parameters.

11:57:59  13  There's a whole grouping of a whole bunch of parameters.

11:58:03  14  They're all form parameters.

11:58:04  15       Now, okay.  Well, what's the plain meaning of

11:58:10  16  form?  Well, one plain meaning is a prescribed and set

11:58:14  17  order of words.  So exactly what would be in the content

11:58:17  18  payload would be form, even according to the plain meaning.

11:58:21  19       Now, their argument is -- let's go back and look

11:58:25  20  at their argument.  They say the payload content is not

11:58:29  21  form, but the transmit power, the power at which you

11:58:34  22  transmit the payload, that is the form.

11:58:38  23       It's not in the patent.  It's certainly -- right?

11:58:41  24  The patent tells you what that is.  The power scaling

11:58:44  25  factor for the payload relative to the preamble, so it's

11:58:48  1  the power at which you're going to generate -- so the power

11:58:51  2  at which you're going to transmit the payload.

11:58:55  3       Can it possibly be that the payload content

11:58:58  4  itself, the data sequence, that what you're going to put in

11:59:01  5  it when you generate it is not the form but the power at

11:59:04  6  which you're going to transmit it is?  I mean, that's

11:59:08  7  counsel's argument, and it's completely unsupported.

11:59:12  8  There's nothing in the patent that makes any of the

11:59:14  9  distinctions that he made.

11:59:18  10       THE COURT:  Well, you've got the burden since

11:59:19  11  you're alleging that it's indefinite.

11:59:22  12       Let me see if I can ask this question coherently.

11:59:29  13       The generating limitation involves a first

11:59:33  14  plurality of parameters that dictates the form of the

11:59:35  15  probe.  A second plurality of parameters is not recited as

11:59:39  16  dictating the form of the probe.  The manner in which the

11:59:43  17  generating the probe is in accordance with the second

11:59:47  18  plurality of parameters is simply not recited.

11:59:52  19       So where do you find an inconsistency that gives

11:59:57  20  rise to indefiniteness by clear and convincing evidence?

12:00:00  21       MR. BENYACAR:  Because if you -- if you make

12:00:07  22  something, that relates to its form, right?  So if you make

12:00:10  23  a cup or you make the glasses, the parameters that you use

12:00:15  24  to make the glasses, like should be -- this should be the

12:00:20  25  rim, this should be this far, those relate to its form, and

12:00:24  1   the patent says that.

12:00:25  2         There's no -- there's no explanation of how you

12:00:29  3   would generate something and have that -- the parameters

12:00:32  4   you're using to make it not relate to the form of the

12:00:35  5   thing.

12:00:35  6         Now, I don't -- what I'm saying is that "form" in

12:00:41  7   this patent, because it had quotes around it, they're going

12:00:44  8   to tell you what it means.  So when the claim says "form,"

12:00:47  9   I'm not arguing that makes it indefinite.  All these things

12:00:50  10  relate to form.

12:00:52  11        They are arguing, oh, well, some things are form,

12:00:54  12  and some things aren't, and I'm Entropic, I'm going to

12:00:58  13  decide what those things are.

12:01:00  14        Well, their form is indefinite if they're allowed

12:01:02  15  to do that and say, well -- which is their argument.  The

12:01:06  16  content payload of the probe is not form, but the power at

12:01:09  17  which you transmit it is, well, then form itself is

12:01:13  18  indefinite.  Wasn't my argument.

12:01:16  19        But if they're allowed to say, well, you can

12:01:18  20  generate it in ways that are not form and I, Entropic, will

12:01:22  21  pick what doesn't relate to form in ways that don't

12:01:25  22  correspond to anything in the specification, then it's

12:01:27  23  indefinite for that reason.

12:01:28  24        There's no way to generate something in a way

12:01:32  25  that's unrelated to its form.  And the patent doesn't give

| | | |
|---|---|---|
| 12:01:37 | 1 | any examples and, in fact, says form relates to generation |
| 12:01:40 | 2 | and transmission. |
| 12:01:41 | 3 | The patent says the opposite, right?  Again, we're |
| 12:01:50 | 4 | back to the key language:  The receiver determined probe to |
| 12:01:55 | 5 | generate a probe having the form specified by these |
| 12:01:58 | 6 | parameters. |
| 12:01:59 | 7 | "Form" is in quotes. |
| 12:02:00 | 8 | Accordingly -- meaning in other words or it |
| 12:02:04 | 9 | follows that or however you want to say it -- |
| 12:02:07 | 10 | THE COURT:  I know what accordingly means. |
| 12:02:09 | 11 | MR. BENYACAR:  Okay.  Accordingly, the probe |
| 12:02:11 | 12 | request specifies a plurality of parameters associated with |
| 12:02:14 | 13 | the generation and transmission of a probe. |
| 12:02:17 | 14 | That form parameters in quotes are parameters |
| 12:02:20 | 15 | associated with the generation and transmission of a probe. |
| 12:02:23 | 16 | That's what it is.  That's what it is in the patent.  The |
| 12:02:26 | 17 | patent is crystal clear about this in Column 2, Lines 3 |
| 12:02:30 | 18 | through 9, and it's also consistent with how we would all |
| 12:02:34 | 19 | understand how you would generate something. |
| 12:02:36 | 20 | We couldn't figure out how you would generate |
| 12:02:38 | 21 | these glasses in accordance with parameters that don't |
| 12:02:41 | 22 | relate to the form of the glasses. |
| 12:02:50 | 23 | THE COURT:  Isn't it fairly straightforward to |
| 12:02:52 | 24 | imagine that the first plurality of parameters could |
| 12:02:55 | 25 | specify certain types of data for the payload?  And then |

| | | |
|---|---|---|
| 12:02:59 | 1 | the second plurality of parameters sets forth the data |
| 12:03:03 | 2 | values for the payload?  Is that -- is that not fairly |
| 12:03:08 | 3 | straightforward in your mind? |
| 12:03:09 | 4 | MR. BENYACAR:  So let me just go to the claim |
| 12:03:11 | 5 | language, Your Honor, and see if we can -- I want to make |
| 12:03:16 | 6 | sure I understand. |
| 12:03:16 | 7 | So you're saying the first plurality of parameters |
| 12:03:22 | 8 | would be -- would be the -- |
| 12:03:24 | 9 | THE COURT:  Would specify the types of data for |
| 12:03:28 | 10 | the payload. |
| 12:03:29 | 11 | MR. BENYACAR:  Okay. |
| 12:03:29 | 12 | THE COURT:  And then the second plurality would |
| 12:03:31 | 13 | set forth the data values for the payload. |
| 12:03:34 | 14 | MR. BENYACAR:  The patent says the opposite.  The |
| 12:03:36 | 15 | patent says that the probe request specifies the content |
| 12:03:40 | 16 | payload, not the form of the content payload, the content |
| 12:03:45 | 17 | payload.  In fact, including the content payload of the |
| 12:04:08 | 18 | probe.  I have this underlined in this section. |
| 12:04:10 | 19 | Not the form of what the -- how wide the content |
| 12:04:14 | 20 | payload is going to be, but what it includes. |
| 12:04:20 | 21 | In addition, we looked at Figure 5, which are the |
| 12:04:22 | 22 | parameters that the probe -- are in the probe request, |
| 12:04:25 | 23 | right, and the specification says those are form |
| 12:04:29 | 24 | parameters.  And what it says is the probe receiver sends |
| 12:04:32 | 25 | in the probe request the raw data sequence for the probe or |

```
12:04:35   1   just for the probe's payload.  The whole thing or just for
12:04:38   2   the payload.  That's what's actually in the probe.  It's
12:04:41   3   not just what the content -- what the form is that it's
12:04:45   4   going to fit in.  It's the raw data sequence.  That's the
12:04:49   5   actual bits.
12:04:54   6            THE COURT:  All right.
12:04:58   7            MR. BENYACAR:  Your Honor, if you don't have any
12:05:01   8   more questions, I'll step down.
12:05:02   9            THE COURT:  I don't.
12:05:03  10            Is there anything further from Plaintiff before we
12:05:07  11   move on?
12:05:08  12            MR. SHIMOTA:  I'd just like to clarify one thing
12:05:10  13   for the record, Your Honor.  I think you hit everything
12:05:12  14   very well.
12:05:14  15            Mr. Benyacar has stated repeatedly on the record
12:05:16  16   that in our briefing and in my presentation today that
12:05:19  17   we're taking the position that the payload content is not a
12:05:24  18   form parameter.
12:05:25  19            We've never said that.  I agree, it's one of seven
12:05:28  20   enumerated parameters.  We've never taken that position, so
12:05:30  21   I just want to clarify that for the record.  But,
12:05:34  22   otherwise, unless you have further questions, we'll move
12:05:36  23   on.
12:05:37  24            THE COURT:  No.
12:05:39  25            MR. SHIMOTA:  Thank you, Your Honor.
```

12:05:40  1          THE COURT:  And we're rapidly running out of time,

12:05:44  2    Counsel.

12:05:44  3          MR. SHIMOTA:  Okay.  For our -- may I ask a

12:05:46  4    question, Your Honor?

12:05:47  5          THE COURT:  Go ahead.

12:05:48  6          MR. SHIMOTA:  For our -- for our planning

12:05:49  7    purposes, do you have an idea of approximately how much

12:05:52  8    time we do have?

12:05:55  9          THE COURT:  To be honest with you, no.

12:05:59  10          MR. SHIMOTA:  Okay.  Then we will --

12:06:01  11          THE COURT:  I don't mind going over the specified

12:06:03  12    time limit if we can get finished.  Although, I have a

12:06:07  13    matter at 1:00 o'clock I must be at.

12:06:07  14          MR. SHIMOTA:  Okay.

12:06:12  15          THE COURT:  It's going to take me about 10 minutes

12:06:13  16    to get there.  And we're at about six or seven minutes

12:06:15  17    after 12:00 now, and you've still got a handful of terms

12:06:21  18    remaining.

12:06:22  19          I guess my question to counsel is, is there

12:06:26  20    anything within which we have not covered that you feel

12:06:30  21    especially strongly about presenting oral argument on,

12:06:35  22    because if we do fail to cover orally everything that's

12:06:39  23    left, what's not been covered by way of oral argument I'll

12:06:43  24    decide on the papers.

12:06:44  25          Is there anything within what's left that you

```
12:06:47   1  think is a top priority to cover orally?

12:06:51   2       MR. SHIMOTA:  So I would suggest, Your Honor, that

12:06:52   3  you turn to the '682 patent, I think there's -- I think the

12:06:57   4  '362 is from our perspective fully briefed if that would

12:07:00   5  please you.

12:07:02   6       MR. BENYACAR:  Your Honor, we would take the

12:07:03   7  opposite view.

12:07:10   8       THE COURT:  All right.  Well, the next couple of

12:07:19   9  terms are from the '362.  And then we get on to the '682.

12:07:37  10       All right.  Let's see if we can't get through

12:07:40  11  the -- let's see if we can't get through the remaining

12:07:43  12  terms, but let's move forward with the '362 patent.

12:07:45  13       MR. SHIMOTA:  Thank you, Your Honor.  My colleague

12:07:47  14  or --

12:07:48  15       THE COURT:  Yeah, I want to hear about

12:07:50  16  "downconverting...a plurality of frequencies" and the

12:07:53  17  "order of steps" in Claim 11 of the '362 together.

12:07:57  18       And let's start with the Plaintiff.

12:08:03  19       MR. SHIMOTA:  Okay.  Thank you.  My colleague,

12:08:05  20  Mr. Engel, will handle it.

12:08:07  21       Thank you for your time, Your Honor.

12:08:08  22       THE COURT:  All right.

12:08:09  23       MR. ENGEL:  Thank you, Your Honor.  Mr. Engel, for

12:08:13  24  the record, again.

12:08:15  25       THE COURT:  Go ahead, Mr. Engel.
```

12:08:16  1          MR. ENGEL:  Thank you.

12:08:16  2          So we're going to take both terms together as you

12:08:21  3   have suggested.  It really boils down to the same thing and

12:08:26  4   whether downconverting can be downconverting a digital

12:08:28  5   signal or does it have to be downconversion of an analog

12:08:33  6   signal.  Both go to the order of the steps.

12:08:35  7          If you require downconverting to be analog only,

12:08:39  8   then you have decided the order of the steps, that way we

12:08:43  9   think that it can be done, downconverting of the analog or

12:08:46  10  digital, and we'll explain why.

12:08:47  11         We've cited a couple of cases.  Interactive Gift

12:08:52  12  Express from 2001.  The Federal Circuit case that's clearly

12:08:55  13  on point.  You know, if the claims do not require a

12:08:58  14  specific order and the specification does not mandate a

12:09:01  15  specific order, you cannot and should not require a

12:09:05  16  specific order.

12:09:06  17         There's a more recent case, the Baldwin Graphics

12:09:11  18  case, that's actually pretty on point.  I do have an extra

12:09:15  19  copy of that opinion if you'd like it, Your Honor.

12:09:17  20         But I think in there they found that there was a

12:09:21  21  requirement for a third step, which is the case here to be

12:09:24  22  in order, but that the two intervening steps were capable

12:09:27  23  of being performed in either order, which is the case for

12:09:33  24  the specific claims here.

12:09:33  25         Moving on to the actual claim language, the

12:09:37   1   Defendant's going to take a different view on antecedent

12:09:40   2   basis and usage of terms.  But we've highlighted the

12:09:44   3   introduction of the language and how it's used in the

12:09:47   4   claim.

12:09:47   5        And so in Claim 11, there's downconverting of a

12:09:52   6   plurality of frequencies.  They include desired signals and

12:09:56   7   undesired -- or desired television channels and undesired

12:09:59   8   television channels.

12:10:00   9        The digitizing step includes the same limitation.

12:10:05   10  It uses "said" obviously because it's been introduced

12:10:08   11  previously.  But it's the same plurality of frequencies,

12:10:11   12  you know, comprising the desired and undesired television

12:10:14   13  channels.

12:10:15   14       But notably, when you get down to the selecting

12:10:17   15  step, it's selecting by digital circuitry said plurality of

12:10:24   16  desired television channels from said digitized plurality

12:10:26   17  of frequencies.

12:10:27   18       So our position is if the -- that the -- by not

12:10:35   19  referring to downconverted -- so, for example, in the

12:10:39   20  digitizing step, if it had said, digitizing, you know, a

12:10:45   21  downconverted plurality of frequencies, then there would

12:10:50   22  have been a requirement that downconversion come first.  It

12:10:52   23  doesn't say that.  It doesn't say digitizing the

12:10:52   24  downconverted plurality of frequencies.

12:10:55   25       Now, it does say that in the selecting steps.  We

12:10:59   1   know that digitization has to happen before the selecting

12:11:02   2   step.  So we've created a graphic on the right of Slide 54

12:11:05   3   where we think that downconverting and/or digitizing could

12:11:08   4   happen in either order.  Clearly, by the time you get to

12:11:11   5   the selecting step, they have to be digitized.  That's our

12:11:15   6   plain reading of the claim language, and we think that the

12:11:18   7   specification supports that.

12:11:19   8          So --

12:11:21   9          THE COURT:  And the selecting has got to happen

12:11:23   10   before the output?

12:11:25   11          MR. ENGEL:  That's correct, Your Honor, yeah.

12:11:26   12          Figure 4 is one example.  I think Figure 2 in the

12:11:32   13   patent is another example where you see there's an analog

12:11:35   14   portion on the left-hand side, there's the

12:11:38   15   analog-to-digital converters in the middle, and then

12:11:41   16   there's a digital front end which includes mixers

12:11:41   17   identified as 432.

12:11:44   18          The description of both of those for Figure 4, as

12:11:48   19   well as for Figure 2, I think the mixer is 250, it talks

12:11:51   20   about downconverting those signals to a baseband frequency.

12:11:55   21   That's a downconversion that takes place in the digital

12:11:58   22   domain versus the analog domain.

12:12:00   23          Now, the patent required -- the patent says it can

12:12:03   24   happen either in the analog or the digital.  So our

12:12:06   25   position is the claim claims both, the steps can happen in

| | | |
|---|---|---|
| 12:12:09 | 1 | either order. |
| 12:12:11 | 2 | Now, there's an argument by Defendants that our -- |
| 12:12:15 | 3 | our argument doesn't matter because it's only talking about |
| 12:12:18 | 4 | desired signals and not the whole desired and undesired. |
| 12:12:23 | 5 | So it's not talking about downconverting everything. |
| 12:12:25 | 6 | But I think if you read the specification all the |
| 12:12:28 | 7 | way through, you'll see that it does envision a situation |
| 12:12:32 | 8 | in which it could be desired channels, or it could be a mix |
| 12:12:36 | 9 | of the channels, or it could be all the channels available, |
| 12:12:38 | 10 | which would include the undesired channels. |
| 12:12:40 | 11 | And this kind of gets back to the issue we talked |
| 12:12:44 | 12 | about with the '008 patent earlier today. |
| 12:12:47 | 13 | And so up on Slide 56, we have a passage from the |
| 12:12:51 | 14 | patent -- and I'm not sure -- I'll try to get the cite for |
| 12:12:55 | 15 | you here, Your Honor. |
| 12:12:55 | 16 | But the idea is that there's an N number of these |
| 12:13:02 | 17 | mixers.  This is 250 in Figure 1.  So you can have it |
| 12:13:06 | 18 | corresponding to the desired RF channels, you can have it |
| 12:13:10 | 19 | be any integer value.  And in one embodiment, N can be |
| 12:13:13 | 20 | equal to the number of all available channels that exist in |
| 12:13:15 | 21 | the licensed frequency spectrum to provide system |
| 12:13:18 | 22 | flexibility. |
| 12:13:18 | 23 | And this is what we talked about earlier.  The |
| 12:13:21 | 24 | licensed frequency spectrum is a very wide, you know, |
| 12:13:23 | 25 | spectrum.  It has to include the undesired channels because |

12:13:26  1   I can't envision any situation in which you would be able

12:13:29  2   to provide all of the television channels to end users.  I

12:13:33  3   can't envision a situation in which all the television

12:13:35  4   channels in the spectrum would be desired.

12:13:37  5         So our read is that this is clearly providing to

12:13:43  6   downconversion of desired and undesired channels.  And,

12:13:47  7   again, these N complex mixers are in the digital domain.

12:13:51  8   So we believe this is an example of where the order of the

12:13:53  9   steps doesn't matter for the first two steps because there

12:13:55  10  is support in the specification that it can be done in

12:13:59  11  either order.

12:14:03  12        THE COURT:  All right.  Thank you.  Let me hear

12:14:05  13  from the Defendant, please.

12:14:06  14        MR. ENGEL:  And for the record, the cite from the

12:14:09  15  '362 patent was Column 5, Lines 31 to 38.

12:14:12  16        THE COURT:  All right.  Mr. Benyacar, what's your

12:14:17  17  client's position?

12:14:18  18        MR. BENYACAR:  Our client's position is that the

12:14:21  19  steps have to be performed in the order recited.

12:14:25  20        THE COURT:  Tell me why.

12:14:26  21        MR. BENYACAR:  So as this Court knows, Courts

12:14:36  22  apply two-part tests to determine whether a particular

12:14:38  23  order is required.

12:14:40  24        First, you look at the claim language to determine

12:14:42  25  as a matter of logic or grammar whether the order is

12:14:47   1   required.  If not, you look to the specification to see

12:14:49   2   whether it directly or implicitly requires the order

12:14:52   3   recited.  So on Slide 147, in this case, both of those

12:14:58   4   steps apply.

12:14:58   5          This is Claim 11 I have on Slide 148.  And it's

12:15:05   6   broken up -- I have a line in the middle of the claim steps

12:15:08   7   before and after digitization.

12:15:13   8          So before digitization, you see the claim calls

12:15:16   9   for downconverting a plurality of frequencies.  Then you

12:15:20   10  have the digitizing step.  What you digitize is the

12:15:24   11  plurality of frequencies because obviously it's not digital

12:15:28   12  yet.  That's what you're digitizing.

12:15:29   13         So before digitization, the claim refers to them

12:15:32   14  as a plurality of frequencies.  After digitization, you

12:15:35   15  notice it's now referred to as a digitized plurality of

12:15:43   16  frequencies.  The claim is tracking the order.  After it

12:15:46   17  becomes digital, now they're the digitized plurality of

12:15:50   18  frequencies.

12:15:50   19         Now, in his presentation, counsel took great

12:15:52   20  comfort in the fact that, well, those first two steps, it

12:15:56   21  just says a plurality of frequencies, so sure, the third

12:15:59   22  step has to be performed after.

12:16:00   23         But the first two he says are just a plurality of

12:16:03   24  frequencies.  Well, the only reason that is, is because the

12:16:06   25  downconverting occurs before the digitization.  That's why

12:16:11  1  they're a plurality of frequencies and not a digitized

12:16:14  2  plurality.

12:16:16  3       Let's look at how the claim would have to be

12:16:18  4  rewritten if you did it counsel's way.  This is on Slide

12:16:21  5  149.  Let's say, as counsel suggests, you can do the

12:16:22  6  digitizing step first.  Well, now I move the line up to

12:16:26  7  where you -- now you have a digital signal, right?

12:16:29  8       Well, if you digitize first, then you would

12:16:31  9  digitize a plurality of frequencies, but then the

12:16:34  10  downconverting, you'd have to rewrite that step to be on a

12:16:38  11  digitized plurality of frequencies because now it's

12:16:40  12  digital.  You'd actually have to rewrite the claim to

12:16:42  13  insert "digital."

12:16:43  14       The claim very clearly distinguishes the digitized

12:16:47  15  versus non-digitized.  And if you did the digitizing first,

12:16:47  16  then the downconverting would have to be on a digitized

12:16:51  17  plurality of frequencies.

12:16:51  18       The claims itself as a matter of logic and as a

12:16:57  19  matter of grammar require the claimed order, and the only

12:17:02  20  reason that what counsel relies on, which is that the first

12:17:06  21  two steps are a plurality, that only works because the

12:17:08  22  downconverting is occurring before the digitization.  If it

12:17:13  23  happened after the digitization, they wouldn't be the same.

12:17:16  24       And so the claims on their face require that the

12:17:19  25  downconverting occur before the digitization, or you'd have

12:17:23  1   to rewrite the claim to say a digitized plurality of

12:17:26  2   frequencies, just like the sorting step says.

12:17:30  3           THE COURT:  All right.

12:17:31  4           MR. BENYACAR:  So that's the end of the analysis

12:17:33  5   on the claim language.

12:17:36  6           And I think Function Media is a good example.  The

12:17:39  7   Court said that there was a limitation processing and

12:17:42  8   published the electronic advertisement, which the Plaintiff

12:17:46  9   said could include actually making the advertisement.

12:17:50  10          And the Federal Circuit said, no, because

12:17:51  11  otherwise the claim processing would have been written to

12:17:54  12  be performed on the inputted information.

12:17:57  13          That's the same here.  If you rewrote the claims

12:18:01  14  so that the downconverting occurred after digitization, you

12:18:07  15  would have to rewrite the claim to be on a digitized

12:18:10  16  plurality of frequencies.

12:18:11  17          So the claim itself requires that now we want to

12:18:12  18  talk about how even the second step is satisfied.  The

12:18:15  19  specification implicitly or directly requires that you use

12:18:20  20  the analog mixer.

12:18:23  21          So the point of the invention or one of the main

12:18:28  22  points is you have a very wide signal coming into the

12:18:31  23  system, and you want to reduce the bandwidth because

12:18:34  24  otherwise expensive analog-to-digital converters would be

12:18:38  25  required.  That's what the specification says, and I have

12:18:40  1   excerpted that on Slide 151.

12:18:44  2          So you see, on -- in the figure, the incoming

12:18:50  3   signal has a bandwidth BW1, which is at the bottom,

12:18:55  4   bandwidth No. 1, right?  That's the incoming bandwidth.

12:18:58  5          That bandwidth has desired and undesired channels.

12:19:03  6   It's shown on 153.

12:19:05  7          I've highlighted the desired ones.  The desired

12:19:08  8   ones are the ones that are shaded.  The undesired ones are

12:19:11  9   the ones that are not shaded.

12:19:13  10         And the specification says, you notice, the

12:19:15  11  desired ones are not contiguous because they're undesired

12:19:19  12  ones in between.  So that bandwidth 1 has both desired and

12:19:24  13  undesired channels in it.

12:19:25  14         So what happens next?  There's an analog

12:19:28  15  downconversion.  So counsel didn't show or didn't highlight

12:19:31  16  this part.  There's an analog downconverter, and that

12:19:38  17  analog downconverter downconverts the received signal 102,

12:19:43  18  which is bandwidth BW1, which has the desired and undesired

12:19:48  19  channels, to a zero RF intermediate frequency or low

12:19:51  20  intermediate frequency band.

12:19:51  21         So it's doing downconverting, and it's

12:19:54  22  downconverting both the desired and the undesired channels

12:19:57  23  in the analog domain.  The parties agree that RF signal is

12:20:02  24  an analog signal.

12:20:03  25         So what happens after that -- those analog mixers

12:20:07   1   operate?  Well, on Slide 155, we have the analog-to-digital

12:20:13   2   converters, and you'll notice on Slide 156 that now the

12:20:18   3   input to the analog-to-digital converters are one-half of

12:20:23   4   bandwidth BW1, right?  That was the objective that we

12:20:25   5   looked at before, reduce that signal bandwidth.

12:20:28   6         Well, it started at BW1, and it got reduced to

12:20:31   7   one-half of BW1.  And you know what did that?  Those analog

12:20:36   8   mixers.  The patent says it's one-half of the incoming RF

12:20:41   9   signal thanks to the complex down-mixer architecture.  That

12:20:45  10   component that they want to read out of this claim, that's

12:20:47  11   the invention, but that's not all.

12:20:49  12         So, now, let's look at the digital mixers that

12:20:55  13   Entropic relies on.  What does the patent say about those?

12:20:59  14   It says, it extracts a different one of the desired

12:21:04  15   channels and frequency-shifts the extracted signals.  It's

12:21:09  16   only the desired channels that are downconverted.

12:21:14  17         And if that wasn't clear enough, Your Honor, as if

12:21:19  18   the inventors knew we were going to be having this debate

12:21:24  19   today, they helpfully in one concise passage described the

12:21:28  20   functions of each of these three components we talked

12:21:31  21   about, and they map exactly to the claim language.

12:21:32  22         So let's look at the green, the red, and the blue

12:21:35  23   all in one, you know, one at a time, and see how that maps

12:21:37  24   to the claim.

12:21:39  25         So what does the green analog mixer do?  It has --

12:21:47   1          THE COURT:  What would you do if I told you I was

12:21:50   2   color blind?

12:21:51   3          MR. BENYACAR:  I'd do that.

12:21:53   4          THE COURT:  I'm not --

12:21:54   5          MR. BENYACAR:  Oh.

12:21:55   6          THE COURT:  -- but I see lawyers every day tell me

12:21:57   7   look at the blue and the green and the pink and the purple,

12:22:01   8   and I don't think anybody ever thinks about was the judge

12:22:04   9   or the jury able to tell the color differences.  But

12:22:07  10   anyway, I can.

12:22:07  11          MR. BENYACAR:  I'm relieved that that's not

12:22:10  12   actually that situation.

12:22:10  13          MR. DACUS:  You would have a very poor local

12:22:14  14   counsel if counsel didn't inform him of that, Judge.

12:22:21  15          MR. BENYACAR:  So let's look at this -- the very

12:22:22  16   helpful and concise definition of those three components

12:22:25  17   that the patentee provided and how they correspond to the

12:22:27  18   Claim 11 of the '362 patent.

12:22:29  19          So this has a complex mixer module for

12:22:38  20   downshifting the multiple RF channels, okay.  That is the

12:22:41  21   red, right?  That's what the green analog does.  And that

12:22:45  22   corresponds to the claim downconverting, which is

12:22:50  23   downconverting by a mixer module a plurality of frequencies

12:22:54  24   that comprises a plurality of desired television channels

12:22:55  25   and a plurality of undesired television channels.

12:22:58   1          Now, the only thing that does that is that green

12:23:01   2   analog mixer, and it comes first before the

12:23:04   3   analog-to-digital conversion just as the claims say.

12:23:08   4          And by the way, that's also the component that

12:23:11   5   implements the allegedly novel feature of reducing the

12:23:15   6   bandwidth.

12:23:15   7          Then next you have the analog-to-digital

12:23:21   8   converters, which maps to the red claim language, one in

12:23:25   9   sequence, digitized by a wideband analog-to-digital

12:23:30  10   converter the plurality of desired television channels and

12:23:33  11   the plurality of undesired television channels.  So the

12:23:37  12   analog mixer downconverted both, the analog-to-digital

12:23:41  13   converter digitizes both.

12:23:44  14          Now, what does the patent say about the digital

12:23:49  15   converters that Entropic relies on?  It says that it

12:23:53  16   contains complex mixers that frequency shift the number of

12:23:56  17   desired channels, not the undesired channels.

12:24:02  18          And there is a claim element in Claim 11 which

12:24:04  19   corresponds to that blue element, to the digital mixers,

12:24:08  20   and it's referred to as digital circuitry.  And what does

12:24:11  21   it do?  It selects said plurality of desired television

12:24:18  22   channels.  That's the component that -- that's the step

12:24:21  23   that corresponds to the digital mixers that Entropic is

12:24:25  24   relying on.

12:24:26  25          And this is Entropic's read.  They're saying that

12:24:28   1   that analog downconverting really corresponds to the

12:24:34   2   digital mixers which downconvert only desired, and the

12:24:39   3   claim requires that the downconverting of desired and

12:24:42   4   undesired, and even though that element is separately

12:24:45   5   called for later in the claim and referred to as digital

12:24:48   6   circuitry.

12:24:49   7          So what does Entropic have to say about that last

12:24:56   8   point?  They say, oh, you're ignoring the fact that -- that

12:25:00   9   even though the specification says those things about the

12:25:03  10   digital mixer, it can actually downconvert the undesired

12:25:06  11   channels, too, because counsel says he can't envision a

12:25:11  12   world where you would have, like, all of the frequencies be

12:25:15  13   desired.

12:25:17  14          Well, that is exactly the opposite of what the

12:25:19  15   specification expressly says.  Here's the passage from the

12:25:22  16   specification that counsel relied on in his presentation to

12:25:25  17   you.  It starts by saying:  N is an integer value

12:25:29  18   corresponding to the number of desired RF channels,

12:25:34  19   desired.

12:25:38  20          N can be any integer value.  It's not changing the

12:25:42  21   definition of what N is.  It's still the number of desired

12:25:45  22   channels.  Now, we're saying it can be any integer value.

12:25:49  23   It can be equal to the number of all available channels

12:25:52  24   that exist.  Okay.  That means all of them can be desired.

12:25:54  25   It can change the definition of the variable N, that's

12:25:58  1    still desired channels.

12:26:00  2          N can be equal to the number of all receivable

12:26:04  3    channels.  That's what's desired in this example.

12:26:08  4          N can be equal to an integer value less than the

12:26:11  5    number of receivable channels.  Again, N is still the

12:26:15  6    number of desired channels.

12:26:16  7          And how does it end?  But in the preferred

12:26:19  8    embodiment shown in Figure 2, the number of desired

12:26:21  9    channels is 4.  All of those examples refer to the number

12:26:25  10   of desired channels.  That is what the digital mixers

12:26:34  11   downconvert.  The number of desired channels, they can be

12:26:37  12   any number, but they're desired, and they're desired only.

12:26:39  13         And the claim requires that the downconverting be

12:26:42  14   performed on desired and undesired.  And the only disclosed

12:26:46  15   component that does that is the analog mixers, which not

12:26:50  16   coincidentally is the exact order the claim is written in.

12:26:55  17         THE COURT:  All right.

12:26:55  18         MR. BENYACAR:  Thank you, Your Honor.

12:26:56  19         THE COURT:  Thank you.

12:26:57  20         Okay.  Let's move on to the '682 patent for the

12:27:02  21   last series of disputed terms.

12:27:04  22         Let's start with "a composite SNR-related metric"

12:27:16  23   from Claim 1.

12:27:17  24         Again, the Plaintiff tells me it's plain and

12:27:19  25   ordinary meaning, and the Defendant tells me it's

12:27:21   1   indefinite.

12:27:21   2          Let me hear from the Defendant.  Give me the basis

12:27:28   3   for your indefiniteness argument first, and then I'll hear

12:27:31   4   from the Plaintiff in response.

12:27:32   5          MR. BENYACAR:  So this term calls for a composite

12:27:52   6   SNR-related metric that's based at least in part on a

12:27:55   7   worst-case SNR profile.  Those are two distinct things.

12:28:00   8   One is based at least in part on the other.

12:28:03   9          And every time I say this, counsel jumps and says,

12:28:07  10   ah, that's just a written description argument.  It's

12:28:09  11   not because when -- again, many times when I say that, it's

12:28:12  12   because we can't look to the specification for guidance on

12:28:15  13   what these mean.

12:28:17  14          And that's the case here.  These two different

12:28:19  15   concepts do not appear in the specification.

12:28:21  16          THE COURT:  The fact that they don't appear in the

12:28:22  17   specification doesn't necessarily mean, though, that a

12:28:25  18   person of ordinary skill wouldn't understand them, does it?

12:28:28  19          MR. BENYACAR:  It doesn't.  But let's -- but they

12:28:31  20   do not have plain and ordinary meanings.  And no one has

12:28:34  21   argued otherwise.

12:28:34  22          So to be clear, these are terms that do not have

12:28:37  23   plain and ordinary meanings and --

12:28:40  24          THE COURT:  Isn't that what the Plaintiff is

12:28:42  25   asking me to construe them as?

12:28:44   1          MR. BENYACAR:  Yeah, but there are none.  So once

12:28:46   2   again, they say plain and ordinary meaning, but they cite

12:28:48   3   to none.

12:28:49   4          THE COURT:  All right.

12:28:49   5          MR. BENYACAR:  And by the way, Your Honor, not

12:28:55   6   only do they cite to none, in this case, as in many cases,

12:28:59   7   they don't actually even tell you what the plain and

12:29:01   8   ordinary meaning is.  So they don't say, oh, here's a

12:29:04   9   dictionary or -- right?  And this is another case where

12:29:06  10   they say, oh, you're wrong, but we don't actually have an

12:29:10  11   alternative.  Just don't construe it.

12:29:12  12          So the specification of this patent discloses one

12:29:18  13   concept, you assign cable modems to service groups, and

12:29:24  14   after that, you communicate with all of the cable modems

12:29:27  15   for the service groups in the same way.  There's no dispute

12:29:30  16   about that.

12:29:31  17          So once cable modems are in the service group, the

12:29:34  18   parameters that you use to communicate with all of them are

12:29:36  19   the same.  That's why they're in the group.

12:29:38  20          And composite worst-case SNR profile relates to

12:29:47  21   what you do after you've assigned the cable modems to

12:29:47  22   service groups and how you decide how you're going to

12:29:49  23   communicate with the cable modems in that service group.

12:29:55  24          Now, what the specification says is you notice in

12:29:59  25   Figure 3A, it refers to composite SNR profiles, which I've

12:30:06  1  highlighted in green or underlined in green, and that's

12:30:09  2  Block 308.

12:30:10  3      And the specification explains what block 308 is.

12:30:15  4  It's for any particular service group, you communicate with

12:30:17  5  the cable modems on a particular subcarrier based on the

12:30:21  6  worst-case SNR for that subcarrier among the cable modems

12:30:24  7  in that particular service group.  And the specification

12:30:26  8  repeatedly refers to that as the composite worst-case SNR

12:30:31  9  profile.

12:30:32  10     And you notice that even though 308 uses the term

12:30:37  11  "composite SNR profile," because they don't have to spell

12:30:41  12  out the whole thing because there is only one concept in

12:30:45  13  the patent, a composite worst-case SNR profile.

12:30:49  14     And this is what that is, and this is why it works

12:30:51  15  allegedly to communicate with all of the cable modems in a

12:30:54  16  service group in the same way.

12:30:55  17     What you do is at the bottom of Figure 2B, you see

12:30:58  18  there's sub1, sub2.  Those are the different subchannels

12:31:04  19  that the specification is referring to.

12:31:05  20     Let's say it's subchannels 2, 5, and 7, cable

12:31:10  21  modem A in the service group has the worst SNR of the whole

12:31:14  22  group.  So what you do is you use this composite worst-case

12:31:18  23  SNR profile, and you say you know what, if I want to

12:31:21  24  communicate with the cable modems on subchannel 2, I'm

12:31:23  25  going to pick parameters that suit cable modem A, because

| | | |
|---|---|---|
| 12:31:28 | 1 | if I can communicate with A, I can communicate with any of |
| 12:31:32 | 2 | them because it's the worst case, right? |
| 12:31:34 | 3 | And so it has this composite, and for every |
| 12:31:38 | 4 | subcarrier it has what the worst case is in the service |
| 12:31:42 | 5 | group, and it uses the worst case to communicate, because |
| 12:31:42 | 6 | you know if you can communicate with the worst case, you |
| 12:31:45 | 7 | can communicate with all of them. |
| 12:31:46 | 8 | And so in this example, at each different |
| 12:31:49 | 9 | subcarrier, in this example, I say a different cable modem |
| 12:31:52 | 10 | is the worst case.  And the population of these different |
| 12:31:57 | 11 | worst cases is the composite worst-case SNR profile.  That |
| 12:32:02 | 12 | is what the specification says at Column 5, Lines 40 |
| 12:32:05 | 13 | through 46.  That language that we just discussed is |
| 12:32:09 | 14 | explaining exactly what I -- what I show here.  That's the |
| 12:32:11 | 15 | composite worst-case SNR profile.  It's one concept in the |
| 12:32:17 | 16 | patent. |
| 12:32:17 | 17 | Now, what does the claims say?  The claim says you |
| 12:32:21 | 18 | have two things.  You have a composite SNR-related metric |
| 12:32:25 | 19 | based at least in part on a worst-case SNR profile. |
| 12:32:30 | 20 | Well, what's the difference between those?  We're |
| 12:32:33 | 21 | honestly, like, trying to figure out what Entropic's |
| 12:32:35 | 22 | position is, because through even their reply briefing, |
| 12:32:37 | 23 | they have never said that's what this is and that's what |
| 12:32:40 | 24 | this is.  They say they're different.  But they don't |
| 12:32:42 | 25 | explain how it's different from what the specification |

12:32:44  1   discloses, which is a composite worst case.

12:32:47  2          So here's -- so I've tried to figure this out.

12:32:52  3   They say, so let's start with the second one, worst-case

12:32:56  4   SNR profile.  What does that mean?  They say -- and this is

12:33:01  5   on Page 27 of their opening brief.  They say, the

12:33:04  6   specification describes examples of a worst-case SNR

12:33:08  7   profile.  And then they provide a block quote in which

12:33:11  8   every example is a composite worst-case SNR profile.

12:33:17  9          So we deduced they must agree that worst-case SNR

12:33:22  10  profile is the same as composite worst-case SNR profile.

12:33:25  11  They didn't say, no, in their reply brief.  They didn't

12:33:27  12  say, yes.  They didn't -- but we said, we're assuming

12:33:30  13  that's what you mean.

12:33:30  14         So let's say that that's what it is.  Okay.  Well,

12:33:35  15  what is a composite SNR-related metric, then, if it's not a

12:33:41  16  composite worst-case SNR profile?

12:33:44  17         And this is what Entropic's expert said in his

12:33:47  18  expert report on this issue.  He said, the '682 patent

12:33:52  19  discusses composite SNR-related metric as being a composite

12:33:57  20  of metrics in the context of worst-case SNR because that is

12:34:01  21  part of the disclosed invention.

12:34:03  22         In other words, yeah, you're right, that in the

12:34:07  23  patent, it's a composite worst-case SNR profile, but the

12:34:12  24  patent is only discussing worst case because that's what

12:34:15  25  the invention is.

12:34:16   1          Then he goes on to say, like, in effect, outside

12:34:19   2   the context of the invention -- and this is in the purple

12:34:20   3   language -- the composite SNR-related metric could also

12:34:24   4   include the best-case SNR, which has absolutely nothing to

12:34:27   5   do with the invention nor does he allege it does.

12:34:31   6          But he's saying when you read composite

12:34:35   7   SNR-related metric, the reason why that's not also

12:34:38   8   composite worst-case SNR profile is because in isolation,

12:34:41   9   in a vacuum, it could include the best case.

12:34:43  10          He doesn't say the specification discloses use of

12:34:46  11   a best case, nor does he explain how the specification

12:34:49  12   would disclose using a worst-case SNR profile in part to

12:34:55  13   generate a composite best case.

12:34:58  14          But, Your Honor, we know that you can't construe a

12:35:02  15   claim term in isolation and say, well, in isolation, it

12:35:05  16   could be the best case.

12:35:08  17          So because there's only one concept disclosed and

12:35:14  18   because both the composite worst SNR-related metric and the

12:35:19  19   worst-case SNR profile can only refer to the only concept

12:35:23  20   disclosed, which is the composite worst-case SNR profile,

12:35:25  21   the claim has to be indefinite because you can't base one

12:35:29  22   at least in part on the other.  They're the same thing.

12:35:33  23          THE COURT:  All right.  Let me hear from the

12:35:40  24   Defendant -- excuse me, the Plaintiff, I'm sorry.

12:35:44  25          MR. BRIDGES:  Thank you, Your Honor.  And Kenneth

12:35:48  1    Bridges for the Plaintiff, Entropic, for the record.

12:35:51  2         And I know time is short -- yeah, thank you,

12:35:52  3    Ms. Allor.  I appreciate that.

12:35:52  4         I know time is short, so I will try to make this

12:36:01  5    presentation --

12:36:04  6         THE COURT:  Just tell -- just tell me why opposing

12:36:06  7    counsel is wrong.

12:36:07  8         MR. BRIDGES:  Well, two reasons, Your Honor.

12:36:09  9         Legally, there's no pathway to indefiniteness, and

12:36:11  10   this is a déjà vu.  Your Honor has heard it several times

12:36:16  11   today.  Opposing counsel takes rather strident objection to

12:36:20  12   us pointing out that this is really some kind of written

12:36:20  13   description argument masquerading as an indefiniteness

12:36:24  14   argument, but, I mean, it is.

12:36:25  15        It's not necessarily a mark against them.  I might

12:36:28  16   have tried the same thing myself if I were in their shoes.

12:36:32  17        But Your Honor knows the law very, very well in

12:36:34  18   this area, and I dare say better than I do.  And I would

12:36:36  19   just like to alert the Court to that issue.

12:36:38  20        What this boils down to is an argument by the

12:36:44  21   Defendant that there is no disclosure of anything else

12:36:48  22   other than the particular example that he walked you

12:36:53  23   through.  That is the argument.  And because there is

12:36:56  24   nothing else disclosed other than the particular example he

12:37:01  25   walked you through, that means there is only one thing

12:37:06  1  disclosed in the patent, and as he just said, if there's

12:37:09  2  only one thing and the claim requires two things, then we

12:37:13  3  have a problem.

12:37:14  4      So if we look at the claim, Mr. Benyacar is

12:37:17  5  actually right.  There are two different things that are

12:37:19  6  required by the claim.

12:37:22  7      The first thing -- and I'm, for time purposes,

12:37:26  8  Your Honor, skipping down to the third element, right, to

12:37:29  9  what I think both sides are really arguing about here.  And

12:37:32  10  this is the question of how are we going to decide what

12:37:34  11  communication parameters to use.

12:37:36  12      So we've already sorted our modems out into

12:37:39  13  groups, and we want to decide what parameters to use.

12:37:42  14      Now, the claim could just say decide communication

12:37:47  15  parameters.  But the claim is actually a little bit more

12:37:50  16  specific than that.  The claim says that we have to use a

12:37:52  17  composite SNR metric based at least in part on a profile.

12:37:59  18      The crucial words here are "composite" and

12:38:02  19  "profile."

12:38:03  20      What's composite?  Composite is relating to cable

12:38:09  21  modems.  It is across the service group.

12:38:13  22      Profile, on the other hand, relates to

12:38:17  23  frequencies.  How do we know that?  Well, let's take a look

12:38:20  24  at, for example, dependent claims.  Those are always a

12:38:25  25  great place to go and get more clarity.

| | | |
|---|---|---|
| 12:38:27 | 1 | Here we see in Dependent Claim 6, when we have a |
| 12:38:32 | 2 | service group that has a composite SNR versus frequency |
| 12:38:37 | 3 | profile in this dependent claim -- the key word is |
| 12:38:40 | 4 | "composite."  The dependent claim, however, also is calling |
| 12:38:43 | 5 | out a particular cable modem.  And when it's a particular |
| 12:38:47 | 6 | cable modem, the dependent claim is not using the term |
| 12:38:52 | 7 | "composite."  Composite means for the group. |
| 12:38:55 | 8 | It's the same thing in the specification. |
| 12:38:57 | 9 | Composite means for the group, and you can see in |
| 12:39:00 | 10 | highlighting, Your Honor -- and I'm very glad to hear that |
| 12:39:03 | 11 | you're not color blind because I was staring daggers at |
| 12:39:06 | 12 | Mr. Hill for not knowing that since I like blue in my |
| 12:39:10 | 13 | slides -- a "composite SNR profile" is the term that is |
| 12:39:15 | 14 | used whenever this example, at 5:7-12, is being discussed |
| 12:39:20 | 15 | for a service group.  Whereas, if we're discussing an |
| 12:39:24 | 16 | individual cable modem, you can see in gray, we're |
| 12:39:27 | 17 | discussing just a profile, right? |
| 12:39:31 | 18 | So we have the two different terms, "profile" on |
| 12:39:34 | 19 | its own when we're discussing one cable modem, "composite |
| 12:39:40 | 20 | profile" when we're discussing multiple cable modems. |
| 12:39:44 | 21 | And now, these are -- and there's more examples on |
| 12:39:49 | 22 | the right.  Again, in view of time, we're not going to go |
| 12:39:53 | 23 | through those in detail. |
| 12:39:54 | 24 | What about profile?  The story with profile in the |
| 12:39:57 | 25 | specification is perfectly straightforward.  As Your Honor |

12:40:00   1   undoubtedly knows from prior cases and OFDM, you're using

12:40:04   2   multiple different frequencies.  We call those often

12:40:08   3   subcarriers.  That's what the patent calls them.  You can

12:40:11   4   see them in the figure, sub1, sub2, sub3 along the bottom

12:40:18   5   axis.  Those are different frequencies.  So a profile of a

12:40:21   6   cable modem is across frequencies.

12:40:24   7        A profile of a group of cable modems could also be

12:40:30   8   across frequencies.  It has to be.  In that case, we would

12:40:36   9   cause it -- call it a composite profile.

12:40:38   10        So the two terms, "composite" on the one hand and

12:40:42   11   "profile" on the other hand that are in the claims refer

12:40:45   12   essentially to different dimensions.

12:40:48   13        "Composite" refers to across the cable modems of a

12:40:53   14   group; whereas, "profile" refers across the frequencies.

12:40:59   15   The frequencies may be of one cable modem, or they may be

12:41:02   16   of the group.  That depends.  You can use it either way.

12:41:08   17   If we're talking about frequencies for the entire group,

12:41:10   18   that would be a composite profile.  Composite for the

12:41:15   19   group, profile for the frequencies.

12:41:17   20        What does the claim actually require?  The claim

12:41:19   21   says that we have to use a composite metric based on a

12:41:24   22   worst-case profile.  The composite metric is for the group.

12:41:28   23   That's the group-level measure.  It has to be based at

12:41:31   24   least in part on what?  Look at the orange highlighted

12:41:36   25   claim language, on a worst-case SNR profile.  Of what?  Of

12:41:42   1   said SNR-related metrics.

12:41:46   2          And we've noted with the yellow arrow, where does

12:41:50   3   the antecedent basis come from?  The antecedent basis comes

12:41:52   4   from the introductory element, and that antecedent basis is

12:41:56   5   about each cable modem.  So each cable modem has metrics,

12:42:05   6   and the worst-case profile will be based -- will be of

12:42:09   7   those metrics.  So the worst-case profile is for each cable

12:42:14   8   modem looking across frequencies.

12:42:15   9          That has to form at least part of the basis to

12:42:21   10  inform our composite metric.  Now, does the composite

12:42:25   11  metric have to be one number or many?  It can be one.

12:42:28   12  That's what a metric is.  It's a measure.  Can it be more

12:42:31   13  than one?  Absolutely.

12:42:34   14         So what you can have is composite profiles.  And

12:42:38   15  when you put the two together, you have both across the

12:42:45   16  cable modems and across the frequencies.  And those are the

12:42:49   17  examples which Mr. Benyacar is pointing out in the patent.

12:42:52   18  And there's no question, Your Honor, that is the ultimate

12:42:54   19  version of this patent.

12:42:55   20         When you get down to the granularity of individual

12:42:59   21  frequencies for all of the cable modems in the group, that

12:43:02   22  is its ultimate expression.  But you don't have to have

12:43:05   23  that.

12:43:05   24         A simple example is think about everybody in this

12:43:08   25  room being divided up into the gray suits and the blue

12:43:11   1   suits, and the gray -- and we talk about, let's say, our

12:43:14   2   academic performance in high school.  Maybe I don't want to

12:43:17   3   do that, but for our -- you know, how well did we do?

12:43:21   4        Okay.  Well, what would a metric be for one of the

12:43:24   5   groups?  Well, a metric on its own might be what grade did

12:43:28   6   you get in a class?  The profile of metrics for me, an

12:43:33   7   individual, would be across reading, English, mathematics,

12:43:41   8   science, so that would be looking across the different

12:43:43   9   metrics and their different aspects.

12:43:46   10       For cable modems, that's looking across the

12:43:50   11   frequencies.

12:43:51   12       But I can do that on an individual basis.  I don't

12:43:53   13   have to do that on a group basis.  I could.  I could say

12:43:58   14   that for the group, I want one metric, which takes all that

12:44:04   15   into account, or I have to be as specific as having some

12:44:08   16   separate value for each and every one of the subcarriers.

12:44:13   17   But if I want to do that, I use the words "composite"

12:44:18   18   together with "profile."  And that's what Dependent Claim 6

12:44:21   19   does.

12:44:22   20       In the dependent claim, we do use the two words

12:44:27   21   linked together, "composite" and "profile."  But the

12:44:30   22   independent claim doesn't.  The independent claim simply

12:44:34   23   says that you have to generate a metric which can be a

12:44:39   24   single measure.  For example, an average.  You could take

12:44:43   25   an average of the signal-to-noise ratio values across all

12:44:48   1   the subcarriers.  That's a metric.  That could represent

12:44:51   2   the group.  Is the group really good?  It will have a

12:44:55   3   really high metric.  Is it not good?  It will have a low

12:45:01   4   metric.  That helps us decide what parameters to use.

12:45:03   5        The claim requires I do a little more work to get

12:45:07   6   that metric, though, and what does it require, it requires

12:45:10   7   that for the cable modems in my group, I look at their

12:45:13   8   profiles.

12:45:13   9        So at the end of the day, what this boils down to

12:45:17  10   is a disclosure question.  It really is a written

12:45:20  11   description question.  And in terms of written description,

12:45:25  12   I would simply say this, that when we look at what -- and

12:45:28  13   this has happened many times today, but Charter's counsel

12:45:32  14   tells us what the patent says, but over the course of doing

12:45:34  15   that, actually just refers to examples and says, well,

12:45:40  16   that's all the patent says.

12:45:41  17        So if we take a look at -- if I can change over to

12:45:46  18   the ELMO.  Thank you very much.

12:45:47  19        This is, right, what Mr. Benyacar said.  Well,

12:45:51  20   this is what the patent says.  So we can see the citations

12:45:58  21   here.

12:45:58  22        And we look at the examples that are given, which

12:46:04  23   is this is a -- examples of composite worst-case SNR

12:46:10  24   profile being used.  Yeah, the patent does use that.

12:46:13  25   There's no question about it.  As I said, it's the ultimate

12:46:16   1   version of this.

12:46:17   2           In their briefing, they identify this example from

12:46:19   3   Figure 3A, Block 308, and you can see it, Your Honor, here,

12:46:23   4   Column 5, 40 to 46.  But if we take a quick look at the

12:46:27   5   patent, you'll notice -- could you switch me to the ELMO,

12:46:33   6   please?  Thank you very much.

12:46:34   7           You'll notice that that actually -- a flowchart

12:46:40   8   into Figure 3A, of course, is an example process.  It's an

12:46:49   9   example process.

12:46:50  10           Is there more general disclosure in the patent?

12:46:54  11   There is.

12:46:54  12           Could you switch me back to the slides?  Thank you

12:46:58  13   very much.

12:46:58  14           THE COURT:  Let's see if we can finish up.

12:47:01  15           MR. BRIDGES:  And here's the example of the

12:47:02  16   general disclosure, Your Honor, on 4:40 to 56.  You'll see

12:47:07  17   that the patent says, look, you can have -- you can have

12:47:08  18   measures per service group based on composite metrics of

12:47:17  19   the cable modems assigned to that group, composite metrics.

12:47:21  20           There's no composite profile.  The word "profile"

12:47:24  21   is not being used, just the composite metric.  That's what

12:47:28  22   the claim is requiring.

12:47:29  23           Now, absolutely admittedly, there is an e.g.  The

12:47:34  24   e.g. is one example.  The example is a composite profile.

12:47:40  25   So there's no question that I could use a composite

12:47:45   1   profile, but I don't have to.

12:47:48   2          And we also don't have to guess in the patent what

12:47:51   3   e.g. means because actually at Line -- or Column 2, Line

12:47:54   4   47, the patent's explicit about this, that e.g. is a,

12:47:59   5   quote, non-limiting example, instance, or illustration, and

12:48:02   6   that's what's going on here.

12:48:03   7          So, again, I think that in reality, Your Honor,

12:48:07   8   what we're really dealing with here is a written

12:48:09   9   description question, which this is citation support for a

12:48:14   10   more general disclosure.

12:48:17   11          The specific example, which is sort of the

12:48:20   12   ultimate version of this invention that Mr. Benyacar walked

12:48:24   13   through is an example, and we embrace that, but it is not

12:48:29   14   the sole disclosure.

12:48:31   15          And this is simply not at the end of the day an

12:48:34   16   indefiniteness issue because no one really complains what

12:48:40   17   the terms mean.  There's just a complaint that there's some

12:48:43   18   kind of equivalence in the claim which renders it

12:48:46   19   nonsensical.

12:48:47   20          THE COURT:  All right.  Okay.  Thank you, Counsel.

12:48:50   21          Counsel, I told you we'd allocate three hours

12:48:53   22   today.  Even with our 10-minute recess, we're well over

12:48:58   23   that, and I do have to be somewhere in about 12 minutes.

12:49:01   24          So I am going to take "services groups" and

12:49:08   25   "[communicating with/corresponding to] said one of said

12:49:12   1   plurality of services groups" from the '682, I'm going to

12:49:16   2   take those under submission and decide those on the

12:49:20   3   briefing that you've given me.

12:49:21   4        The rest of these terms we've covered with

12:49:24   5   thorough argument today, and I'll consider those also to be

12:49:29   6   under submission to be determined by the Court based on

12:49:33   7   your briefing and your capable arguments that have been

12:49:37   8   presented as a part of claim construction.

12:49:38   9        That'll complete the claim construction process

12:49:43   10  set for today.  Thank you for your presence and your

12:49:46   11  argument.  You're excused.

12:49:48   12        The Court stands in recess.

12:49:49   13        COURT SECURITY OFFICER:  All rise.

12:49:50   14        (Hearing concluded 12:49 p.m.)

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25

12:50:24   1                       <u>CERTIFICATION</u>

           2

           3          I HEREBY CERTIFY that the foregoing is a true and

           4   correct transcript from the stenographic notes of the

           5   proceedings in the above-entitled matter to the best of my

           6   ability.

           7

           8

           9   <u>/S/ Shelly Holmes        </u>          <u>6/27/2023  </u>
               SHELLY HOLMES, CSR, TCRR                    Date
          10   CERTIFIED SHORTHAND REPORTER
               State of Texas No.: 7804
          11   Expiration Date: 10/31/2023

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25