**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| ENTROPIC COMMUNICATIONS, LLC | Civil Action No. 2:22-CV-00125-JRG |
| *Plaintiff*, | |
| v. | **JURY TRIAL DEMANDED** |
| CHARTER COMMUNICATIONS, INC., | ██████████████ |
| *Defendant*. | |

**PLAINTIFF ENTROPIC COMMUNICATIONS, LLC'S**
**MOTION TO STRIKE OPINIONS OF CHRISTOPHER BAKEWELL**

## <u>TABLE OF CONTENTS</u>

A.  Mr. Bakewell's opinions as to the effect of devices containing MaxLinear chips as non-infringing alternatives should be stricken because no such alternatives were available. ...... 1

    1.  No MaxLinear product supplies the functionality of Charter's ▮▮▮ which infringes the '682 Patent, and therefore cannot be a substitute. ................................. 1

    2.  It is undisputed that <u>no</u> MaxLinear product was <u>non</u>-infringing at the time of the 2013 hypothetical negotiation for U.S. Patent No. 8,223,775 (the "'775 Patent")....... 2

    3.  Mr. Bakewell fails to offer any opinions, or cite to any facts, that the alleged non-infringing alternatives were available at the time of the hypothetical negotiations. .... 3

    4.  Mr. Bakewell lacks any technical foundation for his opinion tha ▮▮▮▮ ▮▮▮▮ devices are non-infringing alternatives. .......................................... 4

    5.  As a matter of law, the hypothetical licensor's own product is not an "alternative" or "substitution." ................................................................. 5

B.  Mr. Bakewell does not analyze—at all—why or how the price of MaxLinear chips is linked to the ▮▮▮▮▮▮▮▮▮▮▮ 35 U.S.C. § 284. ................................................................. 8

C.  The Court should strike Mr. Bakewell's opinions that rely on documents Charter produced *after* reviewing the report of Entropic's damages expert................................... 10

    1.  Mr. Bakewell's opinions based on spreadsheets that Charter appears to have created after the close of fact discovery should be stricken........................................ 11

    2.  Mr. Bakewell's opinions regarding an undisclosed and unproduced license should be excluded. .......................................................................... 13

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AstraZeneca AB v. Apotex Corp.*,
  782 F.3d 1324 (Fed. Cir. 2015)..................................................................................2, 3

*Del Mar Avionics, Inc. v. Quinton Instrument Co.*,
  836 F.2d 1320 (Fed. Cir. 1987)........................................................................................7

*Droplets, Inc. v. Overstock.com, Inc.*,
  No. 2:11-CV-401-JRG-RSP, 2015 WL 12911770 (E.D. Tex. Jan. 9, 2015)............................4

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*,
  879 F.3d 1332 (Fed. Cir. 2018)....................................................................................9, 10

*Hughes Tool Co. v. G. W. Murphy Indus., Inc.*,
  491 F.2d 923 (5th Cir. 1973) ............................................................................................6

*LaserDynamics v. Quanta Comput., Inc.*,
  No. 2:06-CV-348, 2011 WL 197869 (E.D. Tex. Jan. 20, 2011).................................................4

*Majestic Oil, Inc. v. Certain Underwriters at Lloyd's*,
  No. 21-20524, 2023 WL 2549892 (5th Cir. Mar. 17, 2023)...................................................10

*Pall Corp. v. Micron Separations, Inc.*,
  66 F.3d 1211 (Fed. Cir. 1995)..........................................................................................2

*Presidio Components, Inc. v. Am. Technical Ceramics Corp.*,
  875 F.3d 1369 (Fed. Cir. 2017)........................................................................................5

*SmithKline Diagnostics, Inc. v. Helena Lab'ys Corp.*,
  926 F.2d 1161 (Fed. Cir. 1991)........................................................................................5

*SSL Servs., LLC v. Citrix Sys., Inc.*,
  No. 2:08-cv-158-JRG, 2012 WL 1995514 (E.D. Tex. June 4, 2012)........................................4

*Tyco Healthcare Grp. LP v. Applied Med. Res. Grp.*,
  No. 9:06-CV-151, 2008 WL 11348407 (E.D. Tex. July 10, 2008) ...................................10, 11

**Statutes**

35 U.S.C. § 284.......................................................................................................................8

**Other Authorities**

Fed. R. Civ. P. 33(d) .............................................................................................................14

### TABLE OF EXHIBITS

| Exhibit | Title |
|---------|-------|
| A | Rebuttal Expert Report Regarding Damages, August 11, 2023 ("Bakewell Report") |
| B | Expert Report of Dr. Kevin Almeroth Regarding Licensing and Non-Infringing Alternatives, July 21, 2023 ("Almeroth Report") |
| C | Excerpts from the Deposition Transcript of Daniel Boglioli ("Boglioli Tr.") |
| D | Excerpts from the Deposition Transcript of Steven Kaufman ("Kaufman Tr.") |
| E | Excerpts from the Deposition Transcript of Jason Henricks ("Henricks Tr.") |
| F | Excerpts from the Deposition Transcript of Vinod Dani ("Dani Tr.") |
| G | Excerpts from the Deposition Transcript of Curtis Ling ("Ling Tr.") |
| H | December 30, 2022 correspondence sent by Entropic to Charter |
| I | Corrspondence between Charter and Entropic occuring between December 30, 2022 and January 30, 2023 |
| J | Entropic Notice of Deposition of Charter Communications, Inc. Pursuant to FED. R. CIV. P. 30(b)(6) |
| K | Excerpts from the Deposition Transcript of Casey Paiz ("Paiz Tr.") |
| L | CHARTER_ENTROPIC00143762–853 |
| M | CHARTER_ENTROPIC00143855–917 |
| N | CHARTER_ENTROPIC00222787–88 |
| O | CHARTER_ENTROPIC00222789–90 |
| P | CHARTER_ENTROPIC00375842–925 |
| Q | CHARTER_ENTROPIC00387195–205 |
| R | CHARTER_ENTROPIC00394596–637 |
| S | CHARTER_ENTROPIC00186458 |

| Exhibit | Title |
|---------|-------|
| T | CHARTER_ENTROPIC00097699–707 |
| U | CHARTER_ENTROPIC00098504–739 |
| V | CHARTER_ENTROPIC00480401 |
| W | CHARTER_ENTROPIC00480402 |
| X | Entropic's First Set of Interrogatories to Charter (Nos. 1–5) |
| Y | Charter's Objections and Responses to Plaintiff's First Set of Interrogatories (Nos. 1–5) |
| Z | CHARTER_ENTROPIC00480849–50 |
| AA | Charter's Fifth Supplemental Objections and Responses to Plaintiff's Second Set of Interrogatories (No. 7) |
| AB | Excerpts from the Deposition Transcript of William Berger ("Berger Tr.") |
| AC | CHARTER_ENTROPIC00382148–51 |

Plaintiff Entropic Communications, LLC ("Entropic") respectfully moves to strike (1) opinions of Defendant Charter Communication, Inc.'s ("Charter") damages expert, Christopher Bakewell related to "non-infringing alternatives" that are unreliable, unsupported, and contrary to the law; and (2) opinions based on documents that Charter did not produce in discovery and only produced *after* reviewing Entropic's expert reports.

## A. Mr. Bakewell's opinions as to the effect of devices containing MaxLinear chips as non-infringing alternatives should be stricken because no such alternatives were available.

For every Patent-in-Suit, Mr. Bakewell opines that what he refers to as "non-infringing alternatives" (NIAs) affect the reasonable royalty analysis. For the reasons identified below, these opinions, specifically ¶¶ 234–240, 242–43, 250–51, 253–268, 649, 651, 667, should be excluded.

### 1. No MaxLinear product supplies the functionality of Charter's ███ which infringes the '682 Patent, and therefore cannot be a substitute.

Mr. Bakewell's NIA analysis for U.S. Patent No. 10,135,682 (the "'682 Patent") should be stricken because neither Charter nor its experts have identified *any* MaxLinear product or service that could substitute for the functionality of the system that infringes the '682 Patent. In fact, review of Dr. Almeroth's opinions, relied upon by Mr. Bakewell, confirm there can be no

████████ NIAs for this patent. ████████████████████████████

████████████████████████  ███████████████████████

███████████████  ██████████████████████████

██████████████  Shimota Decl., Ex. A, Bakewell Rep. ¶ 215; *Id.*, Ex. B, Almeroth Rep. ¶ 144. But cable modems are irrelevant to the infringing system, which is entirely implemented by the CMTSs, as Charter's technical expert Dr. Almeroth concedes: ███████████████████

████████████████████████████████████████████████

████████████████  Bakewell Report, ¶ 136. Dr. Almeroth instead only identifies

████████████████████████████████████████████████████████████████████

███████████████████████████████████████. *Id.* at ¶ 144. But they are not accused of

infringement and, consequently, there are no NIAs.

Mr. Bakewell cannot—and does not attempt—to contradict Dr. Almeroth. Only Charter's

use of CMTSs infringe; MaxLinear does not supply CMTSs; therefore no MaxLinear products

exist that could substitute for Charter's infringing CMTSs. Accordingly, Mr. Bakewell's opinions

that MaxLinear alternatives affect the hypothetical negotiation for the '682 Patent are *per se*

unreliable. The Court should strike Mr. Bakewell's opinions regarding MaxLinear "alternatives"

or "substitutions" relating to the '682 Patent, including Paragraphs 240, 251 and 267.

## 2. It is undisputed that <u>no</u> MaxLinear product was <u>non</u>-infringing at the time of the 2013 hypothetical negotiation for U.S. Patent No. 8,223,775 (the "'775 Patent").

For a reasonable royalty analysis (the only theory in this case), whether a product is a non-

infringing alternative must—like all other considerations—be assessed at the time of the

hypothetical negotiation. An alternative product offered by a third party cannot be a non-infringing

alternative if it only *later* became licensed or adjudged as non-infringing. *AstraZeneca AB v.

Apotex Corp.*, 782 F.3d 1324, 1340 (Fed. Cir. 2015) (generic pharmaceuticals launched at risk

amid ongoing litigation "would not have been considered as non-infringing alternatives in

November 2003" even though they were later found to be non-infringing in 2007 and thus could

not be considered in a reasonable royalty analysis); *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d

1211, 1222 (Fed. Cir. 1995) (an accused alternative product offered by a third party could not be

considered as a non-infringing alternative before the patentee and the third party voluntarily settled

their litigation).

The parties agree that the hypothetical negotiation date for the '775 Patent would be in or

about 2013. At that time, the '775 Patent was owned by Entropic Communications, Inc. ("Legacy

Entropic"), and it would be the hypothetical licensor. This is also undisputed. Bakewell Report, ¶ 178. At the hypothetical negotiation in 2013, MaxLinear had ***no rights*** to practice the '775 Patent at all. Mr. Bakewell concedes that MaxLinear did not ███████████████████████, as part of ████████████████████. *Id.* at ¶ 30. Nor did MaxLinear have any license in 2013 (the ██████ ████ from Plaintiff was executed in ██████). Therefore it is undisputed that MaxLinear-powered products could not have been "non-infringing alternatives" in 2013. If they were alternatives at all, they were ***infringing***. Infringing alternatives are legally irrelevant to the hypothetical negotiation. It would be no help to Charter to switch from one infringing supplier to another—Charter's use of the alternatives supplied by MaxLinear would still infringe. Perhaps circumstances changed in ██████ when █████████████████████████, but that is irrelevant as a matter of law to the 2013 hypothetical negotiation. Because Mr. Bakewell failed to assess the alternatives ***at the relevant time***, his opinions relating to MaxLinear-supplied alternatives to the '775 Patent are legally impermissible and unreliable.[1] The Court should strike all Mr. Bakewell's opinions of such, including Paragraphs 240 and 242 (both as to MaxLinear-powered devices as NIAs).

### 3.  Mr. Bakewell fails to offer any opinions, or cite to any facts, that the alleged non-infringing alternatives were available at the time of the hypothetical negotiations.

There are five different hypothetical negotiation dates for the six Patents-in-Suit. Only four are relevant, because as discussed *supra*, the '682 Patent infringement is not directed at cable modems, and cable modems cannot function to substitute for CMTSs. For the four relevant dates (those pertaining to first infringement of the '775, U.S. Pat. No. 8,792,008 (the "'008 Patent"), U.S. Pat. No. 9,825,826 (the "'826 Patent"), U.S. Pat. No. 9,210,362 (the "'362 Patent") and U.S. Pat. No. 8,284,690 (the "'690 Patent")), it is incumbent on Mr. Bakewell to determine that any

---

[1] In fact, Mr. Bakewell failed to identify any time period at all in his analysis—a failure that infects all of his opinions regarding non-infringing alternatives, as discussed *infra*.

alternatives were available *at those times*. *AstraZeneca ZB*, 782 F.3d at 1340 (non-infringing alternatives must have been available at the time of first infringement).[2]

For availability, Mr. Bakewell relies on Charter's interrogatory response, ████████

████████████████████████████████████████████████████

████████████████   However, Mr. Bakewell never offers any opinion, or cites any evidence, that any of those ██████████████████████████████████████ as of any of the hypothetical negotiation dates. Again, fatally there is no analysis of the crucial question of *time*. While Dr. Almeroth states that MaxLinear-powered devices were available "at all relevant times," this pronouncement is merely conclusory and devoid of analysis (or mention) of those relevant times (and, as addressed below, Mr. Bakewell does not rely on Dr. Almeroth anyway). Because Mr. Bakewell does not supply any opinion or evidence to cure this defect, his opinions are automatically unreliable.[3] *LaserDynamics v. Quanta Comput., Inc.*, No. 2:06-CV-348, 2011 WL 197869, at *3 (E.D. Tex. Jan. 20, 2011) (striking expert opinions regarding non-infringing alternatives for failure to opine as to availability at the time of first infringement).

Entropic respectfully requests that the Court strike Mr. Bakewell's opinions at Paragraphs 234–240, 242–43, 250–51, 253–268, 649, 651, and 667 for failure to opine or cite evidence that the alleged non-infringing alternatives were available on the dates of the hypothetical negotiations.

### 4. Mr. Bakewell lacks any technical foundation for his opinion that ██████████ ██████████████ are non-infringing alternatives.

Mr. Bakewell's opinions also must be stricken because Mr. Bakewell has no technical

---

[2] Mr. Bakewell agrees. Bakewell Report, ¶ 226 ██████████████████████████████

████████████████████████████████

[3] This is not a case where Charter's experts otherwise cite "numerous documents" evidencing that these non-infringing alternatives were "actually sold on the market" at the time of the hypothetical negotiations, like this Court confronted in *SSL Servs., LLC v. Citrix Sys., Inc.*, No. 2:08-cv-158-JRG, 2012 WL 1995514, at *2–3 (E.D. Tex. June 4, 2012). Such documents evidencing the relevant times are entirely absent from the analysis of Mr. Bakewell and Dr. Almeroth.

foundation for his assertion that ███████████ are non-infringing alternatives. *Droplets, Inc. v. Overstock.com, Inc.*, No. 2:11-CV-401-JRG-RSP, 2015 WL 12911770, at \*2 (E.D. Tex. Jan. 9, 2015) (excluding damages expert testimony regarding alleged NIAs "without an established technical basis for such conclusion"). Mr. Bakewell relies on Dr. Almeroth as to the '682 Patent, as addressed above, but for all remaining patents, Mr. Bakewell exclusively cites Charter's interrogatory response regarding non-infringing alternatives, which contains no technical analysis other than asserting the MaxLinear-powered products are licensed or unaccused. And while Dr. Almeroth submitted an expert report regarding "licensing and non-infringing alternatives," Mr. Bakewell never references it in his report—not once. It merely appears in Mr. Bakewell's long laundry list of "Documents Received" in Attachment C. There's no indication that Mr. Bakewell has ever looked at that report or spoken to Dr. Almeroth to confirm that ███████████████ would be non-infringing alternatives, other than for the '682 Patent. For this independent reason, Mr. Bakewell's opinions on this subject, specifically Paragraphs 234–240, 242–43, 250, 253–268, 649, 651, and 667 must be stricken as lacking any factual basis.

### 5. As a matter of law, the hypothetical licensor's own product is not an "alternative" or "substitution."

A non-infringing alternative must be ***an alternative***. The patentee's own product is not—it is the comparator. In the lost profits context, this is self-evident. *Presidio Components, Inc. v. Am. Technical Ceramics Corp.*, 875 F.3d 1369, 1381 (Fed. Cir. 2017) ("The correct inquiry under *Panduit* is whether a non-infringing alternative would be acceptable ***compared to*** the patent owner's product . . . ."); *SmithKline Diagnostics, Inc. v. Helena Lab'ys Corp.*, 926 F.2d 1161, 1166 (Fed. Cir. 1991) ("by definition, noninfringing products do not represent an embodiment of the invention").

The logic underpinning those cases must apply equally to the reasonable royalty context.[4] Starting from first principles, the purpose of considering an alternative in a reasonable royalty analysis is the assumption that the alternative might affect the parties' bargaining positions, since it might be a reason for the hypothetical licensor to pay less. *See, e.g.*, *Hughes Tool Co. v. G. W. Murphy Indus., Inc.*, 491 F.2d 923, 930–31 (5th Cir. 1973) ("The existence of a non-infringing alternative reduces the value of the patent and thus the damages from infringement."). This possibility exists for one reason—the hypothetical licensor cannot control the alternative. If the alternative is non-infringing and thus beyond the reach of the patent, the patent owner would not be able to exclude. The patent owner could not stop the counterparty from using the substitute, nor could the patent owner change the price of some other company's product. It is entirely different with the licensor's own product. The hypothetical licensor controls that "alternative's" availability and its price—a price that could be raised to charge for the value of the patent in a market where infringement by others is forbidden. Regardless, in the hypothetical negotiation, pointing to the patent owner's own product—which uses the patented technology—would only ***strengthen*** the patent owner's bargaining position. If the only alternative is to use a product that ***still practices the patent***—and where, like here, that product is only sold by the licensor—it is inescapable that the patent's value can only go up. This is why the patent owner's own product is not recognized by the law as an NIA that reduces the value of the patent.

Mr. Bakewell's opinions are illustrative of why the law does not recognize the licensor's own product as an alternative undermining the reasonable royalty. Mr. Bakewell opines that

---

[4] Entropic has searched and located no case that has resolved this precise issue—whether a hypothetical licensor's own product, that practices the patents but is not infringing because it is made by the patent owner, is a "non-infringing alternative" or "substitute" relevant to a reasonable royalty analysis—because Entropic has located no case where an accused infringer has attempted to make such an argument.

MaxLinear would have had less bargaining power, and would have reduced the price of a license (dramatically according to Mr. Bakewell).[5] But why? The threat of not providing a bargain license is no threat at all—it is a boon. The alternative is Charter diverting all its purchases to products using MaxLinear chips, generating extra business and profit.[6] MaxLinear would have accepted less in license fees to avoid securing more business? Mr. Bakewell's conclusion is unmoored from a real-world licensing negotiation and also contrary to law because no licensor would accept such a royalty. *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1328 (Fed. Cir. 1987) ("[The] imposition on a patent owner who would not have licensed his invention for [a given] royalty is a form of compulsory license, against the will and interest of the person wronged, in favor of the wrongdoer."). Precisely because the price of a hypothetical license cannot be driven down by an alternative that is merely the hypothetical licensor's own products, such products cannot be considered NIAs as a matter of law.

---

[5] *See* Bakewell Report, ¶ 647, Exhibit 1.0.

[6] The fact that the devices are sold by third parties to Charter is of no moment because the evidence in this case establishes that ███████████████

*see, e.g.*, Shimota Decl., Ex. C, Boglioli Tr. at 32:5–34:7 ████████████████████████████████ *See, e.g.*, Shimota Decl., Ex. D, Kaufman Tr. at 52:24–53:1 ████████████████████████████

████████████ ); Shimota Decl., Ex. E, Henricks Tr. at 16:14–19 ██████████████

█████████████ "); Shimota Decl., Ex. F, Dani Tr. at 113:10–126:17 ( ███████

█████████ s). Indeed, Mr. Bakewell admits that ███████████████

███████████ " Bakewell Report, ¶ 148.
*See* Boglioli Tr. at 43:15–21 ██████████

██████████████████████████████████████████████ .

Because ███████████████ are not available as alternatives in the hypothetical negotiation, all of Mr. Bakewell's opinions relating to the same should be stricken, including Paragraphs 234–240, 243, 250, 253–268, 649, 651, and 667.

**B.   Mr. Bakewell does not analyze—at all—why or how the price of ███████████ is linked to the "reasonable royalty for the use made of the invention by [Charter]" 35 U.S.C. § 284.**

Even if cable modems powered by MaxLinear chipsets were available as alternatives, Mr. Bakewell still must provide cogent economic analysis of the *effects*. Mr. Bakewell repeatedly references the relative price between ███████████████ . But two issues, at a minimum, must be addressed to link the chips prices relied upon to a reasonable royalty for Charter's use. First, Mr. Bakewell had to tie chip prices to the value of the technology used by Charter. The chips are bought and placed into two types of devices—cable modems and set top boxes. Charter then buys the devices and uses them to provide service to customers. The law requires that damages for patent infringement be "in no event less than a reasonable royalty *for the use made of the invention by the infringer*." 35 U.S.C. § 284. How and why is the price for chips, two steps upstream in the supply chain, tied to the value of Charter's use? Are those prices reflective of real value to Charter, or of economic circumstances of the box manufacturers, or of simple price competition between ███████████████, or other factors? Mr. Bakewell provides no analysis at all as to the effect such chip prices would have had on a hypothetical negotiation between █████████ and Charter, at the relevant times, to agree on a price that reflects ████████████████████████████████████].

Second, the chip prices Mr. Bakewell relies upon exist in a market where infringement is plentiful. █████████ only competitor for the relevant chip products, █████████ has no license and is supplying products used by Charter to infringe. But in the hypothetical negotiation, the

market would be different—Charter and MaxLinear would accept that the patents are valid and infringed as a matter of law. That means they also would accept that MaxLinear could halt the infringement of Charter, Broadcom, or anyone else. If so, ***what would MaxLinear have done to the price of its chips in the hypothetical world?*** Surely MaxLinear would have raised them where it would be the only source of the infringing feature. Indeed, the only evidence in the case on that point confirms it would have. Shimota Decl., Ex. G, Ling Tr. at 219:8–25. Mr. Bakewell has zero analysis of how much MaxLinear would charge when no other party could provide the patented features. Moreover, would MaxLinear even agree to increase supply, instead of maintaining its volume and forcing Charter to take a license? Whatever would have happened, it was incumbent on Mr. Bakewell to ***analyze*** it in providing his opinions on NIAs. He did not.

Any fair review of Mr. Bakewell's opinions reveals that his analysis consists of two conclusory steps. He first identifies a *Georgia-Pacific* factor he says makes the chip prices relevant. He then skips to a desired result—an opinion the royalty would be lower. But *Daubert* demands more—an expert must provide ***analysis*** that ties the evidence to, and explains the effect on, the hypothetical negotiation. *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1350 (Fed. Cir. 2018) ("When performing a *Georgia-Pacific* analysis, damages experts must not only analyze the applicable factors, but also carefully tie those factors to the proposed royalty rate. While mathematical precision is not required, some explanation of both why and generally to what extent the particular factors impact the royalty calculation is needed.") (quoting *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 26 (Fed. Cir. 2012) (cleaned up). Indeed, this is the very reason *Daubert*'s gate-keeping function exists—to prevent conclusory, superficial opinions offered with the imprimatur of an expert that a court then must JMOL as lacking foundation. Here, Mr. Bakewell's report is no better than that in *Exmark*, which

the Federal Circuit rejected as "not enough" because the expert did nothing more than explain the advantages of the invention and state such advantages would have been important. The expert failed "to explain the extent to which [the purported advantages] factored into the value" of the product and the royalty rate. *Id*. Such analysis is critical because, in its absence, "the jury is simply left to speculate or adopt the expert's unsupported conclusory opinion." *Id*.

Because Mr. Bakewell's opinions are conclusory and lack the required analysis to connect the alleged non-infringing alternatives to the value of Charter's use of the invention, the Court should strike Paragraphs 234–240, 242–43, 250–51, 253–268, 649, 651, and 667.

### C.    The Court should strike Mr. Bakewell's opinions that rely on documents Charter produced *after* reviewing the report of Entropic's damages expert.

Entropic moves to strike Mr. Bakewell's opinions that rely on three documents produced more than two weeks after the close of fact discovery. Specifically, after reviewing the report of Entropic's damages report, Charter: (1) appears to have created and then produced two spreadsheets purporting to show the number of Charter's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; and (2) produced a never-before-disclosed license agreement that Mr. Bakewell now contends is a comparable license. Mr. Bakewell's opinions on both should be stricken.

This Court considers the following factors when deciding whether to exclude late-produced documents: "(1) the prejudice to the opposing party of allowing the evidence; (2) the importance of the evidence; (3) the possibility for curing such prejudice by granting a continuance; and (4) the explanation, if any, for the party's failure to comply with the disclosure requirements." *Tyco Healthcare Grp. LP v. Applied Med. Res. Grp.*, No. 9:06-CV-151, 2008 WL 11348407, at *1 (E.D. Tex. July 10, 2008); *see also Majestic Oil, Inc. v. Certain Underwriters at Lloyd's*, No. 21-20524, 2023 WL 2549892, at *3 (5th Cir. Mar. 17, 2023). Charter's approach to fact discovery in this case was dilatory at best—as just one example, Charter dumped 12,917 documents on Entropic (nearly

a third of its total production in this case) on the last day of fact discovery or later. There is no excuse for Charter's failure to produce these three documents in the year-plus that fact discovery was open in this case because Entropic specifically sought them in discovery and Charter knew they were highly relevant. The only explanation is that Charter intentionally withheld them or simply was not diligent. With a trial date of December 4, 2023 fast approaching, Entropic would suffer significant prejudice by the admission of this evidence with no possibility of curing it. *See Tyco Healthcare Grp. LP*, 2008 WL 11348407, at *1 ("Trial is less than four months away, and a continuance is not available . . .").

     **1.    Mr. Bakewell's opinions based on spreadsheets that Charter appears to have created after the close of fact discovery should be stricken.**

Charter has long known of the relevance of its ███████████████, and the numbers of subscribers to that service. Entropic first asked Charter for its subscriber information back in December of last year, seeking "the total number of subscribers" "for every service offered by You as part of the Accused Services" among numerous other specific requests for the specific plans, amounts charged, subscription periods, and other information. *See* Shimota Decl., Ex. H. Shortly thereafter, in response to a request for clarification from Charter, Entropic provided specific details as to the subscriber data and other information it was seeking and called out ███████████ as a specific feature that was relevant to four requests:



Shimota Decl., Ex. I, pp. 2–3 (same re requests 43, 47, 48). In response to this clarification, Charter responded on January 30th that it did not ██████████████████████████████████."
Shimota Decl., Ex. I, p. 1. The parties subsequently had a meet and confer, and counsel for Entropic

explained why it believed ██████████████ was relevant and that Entropic was seeking such information in discovery. Shimota Decl., ¶¶ 2–5; Ghavimi Decl., ¶ 2–7. Charter did not again raise this issue and Entropic understood that the objection was resolved, particularly because, as addressed further below, Charter *did* produce numerous ██████████████ documents.

In March 2023, Entropic then served deposition topics explicitly targeted at Charter's ██████████████ service. *See* Shimota Decl., Ex. J (topic numbers 12, 61, 62, and 63). Charter designated a witness on all four of these topics without objection. In the deposition of one of those topics, Entropic specifically asked about Charter's ████████████████████████ functionality, and the chips contained within. *See* Shimota Decl., Ex. K*, Paiz Tr. at 51:5–53:6, 58:20–60:19. Acknowledging ██████████████ relevance, Charter also produced a considerable number of documents *well prior to the close of discovery* that relate to ██████████████ ██████████████). For example, Charter produced specific training materials (Exs. L & M), specific pricing (Exs. N–Q), technical materials on its ██████████████ focused specifically on the ██████████████ functionality (Exs. R & S), ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ██████████████████████████ These documents span from 2011 to nearly the present day. Charter also produced reams of subscriber data that Mr. Dell also relied upon.

After reviewing Mr. Dell's report, and after the close of fact discovery, Charter claims to have finally put together information on the ██████████████ subscribers. On August 4th, Charter produced two Excel spreadsheets titled ████████████████████████████████ Shimota Decl., Exs. V & W. ████████████████████████████████

████████████████████████ There is no indication of where these documents came from, where the numbers are derived from, or who created them. Indeed, the spreadsheets appear to have been created specifically for this litigation after the close of fact discovery—they are different than any other subscriber data produced in the case, the custodian is ████████████████ a unique custodian only to these two documents, the author metadata field is blank, and the date created is listed as ████████ Mr. Bakewell's report provides no clarity; he simply announces these documents show the number of ████████████ subscribers and no more.

The prejudice to Entropic would be significant. As addressed above, the questions surrounding these two documents, and their reliability and accuracy, are numerous. Who created these spreadsheets? Why? How was it created and using what data? What does ████████ include—for example, does it include all subscribers implementing ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ How many subscribers were there in 2016 and 2017? With fact discovery long closed and trial looming, Entropic has no ability to probe the credibility, reliability, and accuracy of these spreadsheets.

Entropic respectfully requests that the Court strike Mr. Bakewell's opinions relying on these documents, specifically Paragraphs 426, 476–479, 492, and Exhibit 4.0 ████████████

████████████████████████████████ *See* Bakewell Report.

## 2. Mr. Bakewell's opinions regarding an undisclosed and unproduced license should be excluded.

Like the ████████████ subscriber data, Entropic long sought disclosure and production of licenses that Charter asserts are comparable. Entropic first served Interrogatory No. 5 seeking this information on September 8, 2022. Shimota Decl., Ex. X. Charter responded on October 11,

2022 that "[p]ursuant to Fed. R. Civ. P. 33(d), and to the extent that this interrogatory is understood and such documents exist, Charter will produce relevant, responsive, and non-privilege documents from which Entropic may ascertain the requested information." Shimota Decl., Ex. Y. On December 30, 2022, Entropic served a letter requesting "any agreements of any kind that relate to this matter" including "comparable license agreements . . . that you contend are relevant to the determination of damages in this action." Shimota Decl., Ex. H. Charter did not raise any objections to this request and agreed to produce.

Two weeks after the close of discovery—on August 11th, the same day it served Mr. Bakewell's report—Charter produced a ███████████████" that purportedly constitutes a license agreement from ███████████ that Mr. Bakewell ███████████████████████ ████████████████████████████████████████████ See Bakewell Report, ¶ 594; see also Shimota Decl., Ex. Z. Mr. Bakewell relies on the late-produced license agreement and opines that it is a comparable license for three patents that can be used as a ██████████████." Bakewell Report, ¶¶ 592–595. ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████. Instead, Charter and its witnesses consistently called it a product that Charter purchases. See, e.g., Shimota Decl., Ex. AA at 9 ("████████████████████████████████████████ ████████████████████████████████."); Shimota Decl., Ex. AB, Berger Dep. Tr. at 31:6–14 (████████████████████████ ████████████████████████████████████████████

███████████████████████ *See, e.g.*, Shimota Decl., Ex. AC. Charter, however, never disclosed or produced a ████████████████████████████ or even indicated such a license existed—until this document was produced and Mr. Bakewell's report was served on the same day.

The prejudice to Entropic again would be significant. Charter never disclosed████████████ ████████████████████████████ and did not produce any such license. Entropic now has been deprived of any ability to probe in discovery whether this license is comparable. For example, what products does the license even cover—the license itself is silent as to what products or patents it covers other than referencing ████████████████████████████████ ████████████████ ████████████████████████████████████ ████████ If so, how many? And for what inventions? According to the PTO's database, ████ ████████ and its affiliates own well over ████████—it is unclear how many, if any, relate to ████████████████████████████████████████████████. With fact discovery closed and trial looming, Entropic has no ability to seek these answers. Despite this, Mr. Bakewell seeks to offer the jury his opinion that the ████████████████████████████ ████████████████████████████████████████████████ ████████████████████ and (2) the jury should discredit Mr. Dell's damages calculations based on this comparable license because they ████████████████████████████████ Entropic's ability to scrutinize and challenge that opinion, if permitted, has been significantly hindered by Charter's failure to produce the agreement or even disclose that one existed.

Entropic respectfully requests that the Court strike Mr. Bakewell's opinions relying on the late-produced ████ license agreement, specifically Paragraphs 594–95, 596 (regarding the '008, '826, and '362 Patents), Exhibit 1.0 (regarding the '008, '826, and '362 Patents).

---

[7] Entropic has not located it and it has not been cited by Charter or its experts.

Dated: September 11, 2023

Respectfully submitted,

*/s/ James A. Shimota*
James Shimota
Jason Engel
George Summerfield
Katherine L. Allor
Samuel P. Richey
Ketajh Brown
**K&L GATES LLP**
70 W. Madison Street, Suite 3300
Chicago, IL 60602
Tel: (312) 807-4299
Fax: (312) 827-8000
jim.shimota@klgates.com
jason.engel@klgates.com
george.summerfield@klgates.com
katy.allor@klgates.com
samuel.richey@klgates.com
ketajh.brown@klgates.com

Nicholas F. Lenning
Courtney Neufeld
**K&L GATES LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
Tel: (206) 623-7580
Fax: (206) 623-7022
nicholas.lenning@klgates.com
courtney.neufeld@klgates.com

Darlene Ghavimi
Matthew A. Blair
**K&L GATES LLP**
2801 Via Fortuna, Suite 650
Austin, Texas 78746
Tel: (512) 482-6800
darlene.ghavimi@klgates.com
matthew.blair@klgates.com

Christina N. Goodrich
Connor J. Meggs
**K&L GATES LLP**
10100 Santa Monica Blvd., 8th Floor
Los Angeles, CA 90067
Tel: (310) 552-5031

Fax: (310) 552-5001
christina.goodrich@klgates.com
connor.meggs@klgates.com

Peter E. Soskin
**K&L GATES LLP**
Four Embarcadero Center, Suite 1200
San Francisco, CA 94111
Tel: (415) 882-8046
Fax: (415) 882-8220
peter.soskin@klgates.com

Wesley Hill
Texas Bar No. 24032294
Andrea Fair
Texas Bar No. 24078488
Charles Everingham, IV
Texas Bar No. 787447
**WARD, SMITH & HILL, PLLC**
1507 Bill Owens Pkwy
Longview, TX 75604
Tel: (903) 757-6400
wh@wsfirm.com
andrea@wsfirm.com
ce@wsfirm.com

**ATTORNEYS FOR PLAINTIFF
ENTROPIC COMMUNICATIONS, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a) and served via email on all counsel of record on this eleventh day of September, 2023.

*/s/ James A. Shimota*
James A. Shimota

## CERTIFICATE OF CONFERENCE

I hereby certify that the parties personally conferred by telephone on July 27, 2023 regarding Entropic's intent to file a motion to exclude portions of Charter's Rebuttal Expert Report Regarding Damages.

*/s/ James A. Shimota*
James A. Shimota

# EXHIBIT A - Z
# FILED UNDER SEAL

# EXHIBIT AA - AC

# FILED UNDER SEAL