# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | | |
|---|---|---|
| ENTROPIC COMMUNICATIONS, LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:22-CV-00125-JRG |
| | § | |
| CHARTER COMMUNICATIONS, INC., | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM ORDER

Before the Court is Plaintiff Entropic Communications, LLC's Motion to Strike Opinions of Dr. Kevin Almeroth. (Dkt. No. 175.) Defendant Charter Communications, Inc. opposes the Motion. (*See* Dkt. No. 213.) For the following reasons, the motion is **GRANTED-IN-PART** and **DENIED-IN-PART**.

### I.   BACKGROUND

Dr. Almeroth is Charter's technical expert. Entropic moves to strike various portions of his report.

### II.  LEGAL STANDARD

An expert witness may provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702.

Rule 702 requires that judges act as gatekeepers to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow*

1

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). However, "[t]he inquiry envisioned by Rule 702 is ... a flexible one." *Id.* at 594; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) ("*Daubert* makes clear that the factors it mentions do *not* constitute a 'definitive checklist or test.'"). While the party offering the expert bears the burden of showing that the testimony is reliable, it "need not prove to the judge that the expert's testimony is correct...." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 1999) (citing *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

### III. ANALYSIS

#### A. Opinions on the Essentiality of DOCSIS

Entropic moves to strike paragraphs 4, 5, 21, and 25–96 of Dr. Almeroth's opening report. (Dkt. No. 175 at 1.) In these paragraphs, Dr. Almeroth opines that the '690, '008, '826, and '682 Patents are "'essential for compliance with' DOCSIS specifications." (*See id.*)

Entropic argues that these paragraphs should be struck because they contain opinions that are unreliable as a matter of law. (*Id.* at 1–2.) Specifically, these opinions are unreliable, Entropic argues, because Dr. Almeroth does not perform an element-by-element analysis of essentiality, even though he claims that the '690, '008, '826, and '682 Patents are essential to the DOCSIS standard. (*See id.* (quoting *INVT SPE LLC v. Int'l Trade Comm'n*, 46 F.4th 1361, 1377 (Fed. Cir. 2022) ("Claims are standard essential if 'the reach of the claims includes any device that practices the standard.'" (citation omitted))).) Entropic argues that this deficiency infects the entirety of Dr. Almeroth's opinions on this topic. (*See id.* at 2–6.)

In response, Charter argues that Entropic has not cited any case or contract language requiring Dr. Almeroth to do an element-by-element analysis. (Dkt. No. 213 at 1.) Rather, Charter

2

argues, the license extends to "any patented inventions described in the Specifications," which does not require a claim-by-claim analysis. (*Id.* at 1–2.) Charter contends that Dr. Almeroth's "patent-specific analysis began with an assessment of the patent as a whole, claim 1 of each respective patent, and the accused devices." (*Id.* at 2.) Charter then describes such analyses in detail. (*Id.* at 2–4.)

In reply, Entropic re-urges that an element-by-element analysis is required for an essentiality analysis. (Dkt. No. 241 at 1 (quoting, among others, *INVT SPE*, 46 F.4th at 1377).) Further, Entropic argues that "Dr. Almeroth fails to show that *any* claim is essential for practicing the standard." (*Id.* at 2.)

Charter argues in sur-reply that Entropic is missing the point; there are two ways for a patent to be covered under the license: (1) "patents . . . and applications essential for compliance with the Specifications" and (2) "patented inventions described in the Specifications." (Dkt. No. 273 at 1.)

The Court finds that these paragraphs should not be struck. The license extends to "patents . . . and applications essential for compliance with the [standard]" and to "any patented inventions described in the [standard]." (Dkt. No. 213-2 at 2.) The use of "patents, all issued patents, pending applications and subsequently filed applications," in defining "Licensed Technology" governs here. An analysis requiring that all claims be analyzed would replace "patents, all issued patents, pending applications and subsequently filed applications" with "all claims." As the grant provides that "patents" and "applications" define the "Licensed Technology" not "claims" the Court must give these terms meaning.

### B. Opinions Regarding Non-Infringing Alternatives

Entropic moves to strike paragraphs 100–144 of Dr. Almeroth's opening report. (Dkt. No. 175 at 6.) In these paragraphs, Dr. Almeroth opines that "as a non-infringing alternative, Charter

3

could make use of cable modems and set top boxes that rely on MaxLinear chips instead of the accused Broadcom chips." (*See id.*) Charter opposes this request. (*See* Dkt. No. 213.)

The Court notes that it previously granted summary judgment that the Broadcom chips were **not** non-infringing alternatives. Accordingly, these paragraphs are irrelevant and should be struck.

### C. References to the Court's Claim Construction Order

The Court issued its Claim Construction Memorandum Opinion and Order ("Claim Construction Order") (Dkt. No. 123) on June 26, 2023. The Order states:

> The parties are **ORDERED** that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are **ORDERED** to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

(*Id.* at 64.) Entropic argues that paragraphs 142, 351, and 356 of Dr. Almeroth's rebuttal report should be struck for violating the Claim Construction Order. (Dkt. No. 175 at 9–10.)

Entropic argues that paragraph 142 should be struck because "Dr. Almeroth construes the term 'network management messages' by importing the Court's discussion that 'simply sending the measured characteristic to the headend is insufficient.'" (*Id.* at 10.) Such language does not appear in the Court's construction of the term. (*Id.*)

Entropic argues that paragraph 351 should be struck because Dr. Almeroth references a position that "Entropic took … in the claim construction hearing." (*Id.*)

Entropic argues that paragraph 356 should be struck because Dr. Almeroth references an argument Entropic made at the claim construction hearing. (*Id.*)

In response, Charter argues that Dr. Almeroth will not mention the complained-of statements before the jury. (Dkt. No. 213 at 8.) Charter further contends that the presence of these statements, even if improper, do not justify striking the entirety of these paragraphs. (*Id.*)

In reply, Entropic argues that Dr. Almeroth cannot express the opinions in these paragraphs in light of Charter's concession that Dr. Almeroth will not mention the parties' claim construction positions or portions of the Court's claim construction order to the jury. (Dkt. No. 241 at 4.)

In sur-reply, Charter contends that Dr. Almeroth may express to the jury opinions not in violation of the Claim Construction Order. (Dkt. No. 273 at 3–4.)

The Court finds that there is no reason to strike these paragraphs in light of Charter's concession. Dr. Almeroth shall comply with the Court's Claim Construction Order before the jury.

### D. Reliance on Inventor Testimony

Entropic moves to strike paragraphs 199–200, 337, 345–346, 368, and 408–410 of Dr. Almeroth's rebuttal report. (Dkt. No. 175 at 10.) Charter argues that these paragraphs should be struck because Dr. Almeroth construes the scope of claim terms by referencing inventor testimony. (*Id.* at 10–11 (quoting *Howmedica Osteonica v. Wright Med. Tech.*, 540 F.3d 1337, 1346 (Fed. Cir. 2008) ("The subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim.")).)

In response, Charter broadly argues that Dr. Almeroth "appropriately cited the inventor testimony because it is consistent with and confirms his opinions." (Dkt. No. 213 at 9.) Charter also cites to an out of circuit case, *Echologics*, to support its arguments. (*Id.* (citing *Echologics, LLC v. Orbis Intelligent Sys., Inc.*, Case No.: 21-cv-01147-H-AHG, 2023 WL 2752861, at *6 & n.1, *7–8 (S.D. Cal. Mar. 27, 2023) (finding expert opinion created a genuine dispute of material fact, despite "opin[ing] as to the meaning of" a claim term based on inventor testimony, so as to preclude summary judgment)).)

In reply, Entropic argues that *Echologics* actually supports striking the paragraphs because Dr. Almeroth intermingled citations to inventor testimony with citations to the patent specification. (Dkt. No. 241 at 4 (citing *Echologics*, 2023 WL 2752861, at *6 & n.1, *7–8).)

### i. Rebuttal Report ¶¶ 199–200

Entropic argues that Dr. Almeroth improperly relies on inventor testimony to determine the scope of the term "SNR-related metric" and then applies that term to find non-infringement. (Dkt. No. 175 at 10.)

In response, Charter argues that Dr. Almeroth does not create or apply his own construction. (Dkt. No. 213 at 9.) Rather, Dr. Almeroth provides a definition for the term and notes that the inventor's testimony is consistent with such definition. (*Id.*)

The Court finds that these paragraphs should not be struck. As Charter argues, Dr. Almeroth provides a definition for "SNR" and merely supports it with inventor testimony.

### ii. Rebuttal Report ¶ 337

Entropic argues that Dr. Almeroth improperly relies on inventor testimony to determine the scope of "home networking functions," to support the opinion that "'home networking functions' within the meaning of the '775 patent entails far more than simply supporting connectivity via an Ethernet interface from the cable modem to a separate router or home computer." (Dkt. No. 175 at 10–11.)

In response, Charter argues that Dr. Almeroth relies on the specification to understand the scope of the term and cites the inventor's testimony as confirming the determination. (Dkt. No. 213 at 9–10.)

The Court finds that this paragraph should not be struck. Dr. Almeroth opines that "[d]uring his deposition, one of the named inventors of the '775 patent, Dr. Li, confirmed that 'home networking functions' within the meaning of the '775 patent entails far more than simply

supporting connectivity via an Ethernet interface from the cable modem to a separate router or home computer." In the previous paragraph, Dr. Almeroth propounded a similar definition. There is nothing improper about using inventor testimony to confirm a definition.

### iii. Rebuttal Report ¶¶ 345–346

Entropic argues that Dr. Almeroth improperly relies on inventor testimony to determine the scope of the term "the cable modem engine [("CME")] configured to enable upgrades to software in a manner that is independent of upgrades to the software of the data networking engine [("DNE")]." (Dkt. No. 175 at 11.)

In response, Charter argues that Dr. Almeroth relies on the specification as identifying that "[t]he ability to independently upgrade the different functionalities of a chip is one of several 'objectives' of the '775 patent." (Dkt. No. 213 at 10.) Dr. Almeroth then cites the inventor's testimony as "consistent with that stated objective." (*Id.*)

The Court finds that these paragraphs should not be struck. Here, Dr. Almeroth simply uses inventor testimony to confirm his understanding of a term in light of the specification. Nothing about this is improper.

### iv. Rebuttal Report ¶ 368

Entropic argues that Dr. Almeroth improperly relies on inventor testimony to determine the scope of the term "configured to process downstream PDU packets and forward the processed packets directly to the [DNE] without the involvement of the DOCSIS controller," to conclude that shared memory-based communication does not fall within the scope of the claim language. (Dkt. No. 175 at 11.)

In response, Charter argues that Dr. Almeroth relies on the patent specification to understand the scope of the term and cites inventor testimony to confirm non-infringement. (Dkt. No. 213 at 10.)

7

The Court finds that this paragraph should not be struck. Dr. Almeroth simply uses inventor testimony to confirm his understanding that the "accused DOCSIS MAC processor does not forward packets directly to the [DNE]." Dr. Almeroth rendered this opinion in paragraph 364. There is nothing improper about using inventor testimony to confirm it.

### v. Rebuttal Report ¶¶ 408–410

Entropic argues that Dr. Almeroth improperly relies on the testimony of various inventors to define the scope of the term "wideband" to support the conclusions that the scope of the claimed "wideband receiver system" and "wideband analog-to-digital converter (ADC) module" does not include full band capture. (Dkt. No. 175 at 11.)

Charter argues in response that Dr. Almeroth relies on the patent specification to understand the scope of the term "wideband," goes on to explain the difference between full band capture and wideband and cites inventor testimony to illustrate this "well-known difference." (Dkt. No. 213 at 10.)

The Court finds that these paragraphs should not be struck. Here, Dr. Almeroth simply uses inventor testimony to confirm his opinion that "full-spectrum capture and full band capture technologies receive and digitizes the entire spectrum" "[i]n contrast to the 'wideband receiver system' of claim 1." Again, there is nothing improper about using inventor testimony to confirm an understanding.

### E. Interpreting Claim Terms in Light of the Specification

Entropic moves to strike paragraphs 333–336, 351 and 385 of Dr. Almeroth's rebuttal report. (Dkt. No. 175 at 11.) Entropic argues that in these paragraphs Dr. Almeroth improperly imports limitations from the specification. (*Id.* (citing *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1326 (Fed. Cir. 2002) ("limitations from the specification are not to be read into the claims")).)

In response, Charter argues that Dr. Almeroth did not import any specific limitations from the specification, and contends that Entropic's complaints go to weight, not admissibility. (Dkt. No. 213 at 10–11.)

### i. Rebuttal Report ¶¶ 333–336

Entropic argues that Dr. Almeroth improperly attempts to narrow the term "home networking function" by incorporating language from the specification "purportedly requiring the term to include 'routing.'" (Dkt. No. 745 at 11–12.)

In response, Charter argues that Dr. Almeroth is simply rebutting Dr. Kramer. (Dkt. No. 213 at 11.) Dr. Kramer opined that the asserted claims do not require a "built-in router," and Dr. Almeroth is simply rebutting this by opining that a product cannot perform "home networking function[s]" as recited in the claims without having some routing functionality. (*Id.*) Dr. Almeroth bases his opinion in this regard on evidence from the '775 Patent, but, Charter contends, without importing limitations from the specification. (*Id.* at 11–12.)

The Court finds that these paragraphs should not be struck because they contain proper rebuttal opinion. Any criticisms go to weight and not admissibility.

### ii. Rebuttal Report ¶ 351

Entropic argues that that Dr. Almeroth improperly uses the specification of the '775 Patent to narrow the plain meaning of "DOCSIS controller." (Dkt. No. 175 at 12.) Specifically, Entropic argues, Dr. Almeroth "cites to portions of the specification discussing functions of the DOCSIS controller and then faults Dr. Kramer for not identifying how these specific functions are performed in the VIPER processor, used in Charter's cable modems." (*Id.*)

Charter argues that Dr. Almeroth is simply criticizing Dr. Kramer because he "identified the VIPER processor as the alleged DOCSIS controller but failed to identify any evidence supporting this assertion." (Dkt. No. 213 at 12.) Moreover, Almeroth explains that the plain

9

meaning of "DOCSIS controller" requires that a controller carry out DOCSIS functions for it to be a "DOCSIS controller." (*Id.*) Dr. Almeroth then faults Dr. Kramer for not identifying any evidence indicated that the VIPER processor performs DOCSIS control functions. (*Id.*)

The Court finds that these paragraphs should not be struck because they contain proper rebuttal opinion. Any criticisms go to weight and not admissibility.

### iii. Rebuttal Report ¶ 385

Entropic argues that Dr. Almeroth improperly attempts to narrow the meaning of "partitioning" even though the Court construed "wherein the cable modem functions performed by the [CME] are completely partitioned from the home networking functions performed by the [DNE]" as "wherein the [CME] and the [DNE] are not necessarily physically separate but are functionally separate such that the cable modem functions are performed only by the [CME] and the home networking functions are performed only by the [DNE]." (Dkt. No. 175 at 12.) Specifically, Charter argues that Dr. Almeroth contradicts this construction by "point[ing] to language in the '775 Patent that functional partitioning 'is accomplished by localizing data networking functions in the [DNE] processor and localizing cable modem functional [*sic*] in the [CME] processor.'" (*Id.*) Charter also contends that these opinions align with an argument the Court expressly rejected in the Claim Construction Order: "The Court therefore hereby expressly rejects Defendant's proposal that the cable modem engine and the data networking engine cannot share any connecting circuitry, data paths, or memory devices." (*Id.* at 12–13 (quoting Dkt. No. 123 at 17).)

In response, Charter first argues that Dr. Almeroth repeatedly states that he is applying the Court's claim construction, and is not seeking to rehash the arguments raised at claim construction. (Dkt. No. 213 at 12.) In any event, Charter argues, in this paragraph Dr. Almeroth is rebutting Dr. Kramer. (*Id.*) Dr. Kramer opines that "since the alleged 'cable modem engine' . . . and the alleged

10

'data networking engine' run on different operating systems, this necessarily means that the 'functions of the two engines are completely partitioned.'" (*See id.*) Almeroth rebuts this by opining that "[f]unctional separation is not determined by whether the processors run different operating systems." (*Id.*) Entropic notes that this is in line with the Court's Claim Construction Order. (*Id.* at 12–13.)

The Court finds that this paragraph should not be struck. Dr. Kramer opines that the cable modem engine and the data networking engine of BCM33843 are "functionally separate." Dr. Almeroth disagrees because they share memory and a memory controller. As support for this, Dr. Almeroth points to the specification, which discloses that "[p]artitioning" "is accomplished by localizing data networking functions in the data networking engine processor and localizing cable modem functional in the cable modem engine processor." Dr. Almeroth then opines that "[h]aving a shared controller and memory undermines this purpose."

This opinion implicates an argument that the Court expressly rejected at claim construction: "The Court therefore hereby expressly rejects Defendant's proposal that the cable modem engine and the data networking engine cannot share any connecting circuitry, data paths, or memory devices." (Dkt. No. 123 at 17.) However, the Court went on to find that the "completely partitioned" element means that the respective engines "are not necessarily physically separate but are functionally separate such the cable modem functions are performed only by the cable modem engine and the home networking functions are performed only by the data networking engine." *Id*. Dr. Almeroth's opinion in this paragraph does not directly contradict the Court's Claim Construction Order. As such, there is no reason to strike it.

11

### F. Reliance on Documents and Information that Were Improperly Disclosed

Entropic moves to strike paragraphs 11, 20, and 28–29 of Dr. Almeroth's supplemental report because he "relies on documents and information that Charter failed to timely disclose." (Dkt. No. 175 at 13.)

#### i. Supplemental Report ¶¶ 11, 20

Entropic argues that in paragraph 11 Dr. Almeroth relies on two documents and a supplemental interrogatory response that Charter served with the supplemental report on September 7, 2023. (Dkt. No. 175 at 14.) The supplemental interrogatory response alleges that "on August 9, 2023, Charter terminated its development and deployment of all downstream PMA" and that the two documents are screenshots that "reflect the reconfiguration of the ports used on two CMTSs used to carry out the downstream PMA pilot program to shut down the pilot program." (*Id.*) Entropic argues that there was no reason for this one-month delay, and that it is highly prejudicial because Entropic was unable to question Charter's corporate representative about the screenshots. (*Id.*)

Entropic argues that in paragraph 20 Dr. Almeroth "purports to rely on a conversation he had with Charter employee Roger Stafford on September 5, 2023, during which Mr. Stafford provided additional information on Charter's use of downstream PMA." (Dkt. No. 175 at 14.) As noted above, Charter maintains that it terminated all use of PMA by August 9, 2023. (*See id.*) Entropic argues that there is no reason for this delay and that such delay was prejudicial because it precluded Entropic from seeking discovery on these facts. (*Id.* at 14–15.)

In response, Charter argues that it has acted with due diligence and that there is no prejudice. (Dkt. No. 213 at 13–14.) Charter terminated development and deployment of downstream PMA on August 9, 2023 and supplemental its interrogatory response on August 10. (*Id.*) Charter than offered a witness to testify to the issue on August 11 and agreed with Entropic

12

that the parties may serve supplemental reports on the issue. (*Id.*) In Entropic's supplemental report, Dr. Souri "for the first time cast doubt on 'the lack of documentation surrounding Charter's purported "termination" of downstream PMA.'" (*Id.*) Charter asserts that this prompted it to gather and produce documents regarding the termination, which it did on September 7. (*Id.* at 14.) Charter argues that there is good reason for any delay given the compressed timeline. (*Id.*) Additionally, Charter argues that this information is important to ward off a credibility attack. (*Id.*) Charter further argues that there is no prejudice because Entropic deposed Charter's corporate representative on the shutoff on August 11 and never requested additional deposition time of him or Mr. Stafford. (*Id.*)

In reply, Entropic argues that there is no justification for the delay because "Charter was obligated by the discovery order to produce all documents within its possession, custody, or control relevant to the pleaded claims or defenses." (Dkt. No. 241 at 5.) According the Entropic, a one-month delay is too much. (*Id.* at 4–5.) Entropic also argues that the delay was not harmless because it had no opportunity to ask questions concerning the supplemental screenshots or the alleged conversation between Dr. Almeroth and Mr. Stafford. (*Id.* at 5.)

In sur-reply, Charter argues that it was entitled to terminate its PMA program at any time and that the documents at issue did not exist and could not produced until it terminated the PMA program. (Dkt. No. 273 at 5.) Charter thus argues that it is unreasonable for Entropic to demand that "Charter should have produced the supplemental discovery on August 9," the same day it took an action in its network. (*Id.* (citing Dkt. No. 241 at 5).) Charter argues that there is no prejudice to Entropic because "Almeroth and Stafford were both deposed *before* Charter decided to terminate PMA. There were no documents to produce, nor did Entropic ever seek any further

13

deposition testimony on PMA termination." (*Id.* (emphasis in original).) Finally, Charter notes that Entropic does not dispute the importance of the documents to Charter.

The Court finds that these paragraphs should be allowed in, provided that Charter provides a corporate designee to be deposed on the screenshots, and makes available Mr. Stafford to be deposed on his conversation with Dr. Almeroth. It would be prejudicial to present this information to the jury without providing Entropic an opportunity to test it.

The Court finds that the remaining factors tip in favor of not striking the above-cited paragraphs of Dr. Almeroth's supplemental report. The explanation factor is neutral. Charter did act with reasonable speed and diligence once it terminated the PMA program, Charter offers no explanation for why it terminated the program when it did other than "Charter … was entitled to terminate its PMA program at any time." (Dkt. No. 273 at 4–5.) Indeed, Charter is entitled to do so at any time, but when doing so creates delay, Charter must come forward with an explanation for the delay. Asserting that it "was entitled" to take its action when it did, does not explain why it did so when it did. The parties agree that the information is important, and neither party addresses a continuance. Thus, these two factors tip in favor of allowing the information to be presented to the jury, subject to the depositions to mitigate any prejudice.

### ii.  Supplemental Report ¶¶ 28–29

In these paragraphs, Dr. Almeroth relies on a Broadcom article from 2008. (Dkt. No. 175 at 15.) Charter argues that this article was not produced in discovery and appears to originate from the internet. (*Id.*) Accordingly, Charter argues, there is no reason that Dr. Almeroth could not have cited this document in his original rebuttal report. (*Id.*)

In response, Charter argues that this document was actually introduced into the case by Entropic's own expert, Mr. Dell, through his July 21 report. (Dkt. No. 213 at 15.) Moreover, Charter argues that Dr. Almeroth's opinion is timely. (*Id.*) Testimony from a third-party deposition

14

called into question the pricing of a "tuner," which was addressed in Mr. Dell's report. (*Id.*) This topic was therefore ripe for discussion in Dr. Almeroth's supplemental report, Charter argues. (*Id.*)

The Court finds that there is no reason to strike these paragraphs. There is no unfair prejudice to Entropic seeing that it was the one to introduce the document into the case.

### IV.   CONCLUSION

For the foregoing reasons, the Court finds that the Motion (Dkt. No. 175) should be **GRANTED-IN-PART** and **DENIED-IN-PART**. Specifically, the Court **ORDERS** that paragraphs 100–144 of Dr. Almeroth's opening report be **stricken**.

Further, the Court **ORDERS** that Charter make Mr. Stafford available for a deposition and a corporate designee available for a deposition. Both depositions shall be limited to one hour each and may take place by videoconference. Mr. Stafford's deposition shall be limited to the topic of his conversation with Dr. Almeroth that Dr. Almeroth referenced in his supplemental report. The corporate designee shall be prepared to discuss the screenshots relied upon by Dr. Almeroth in his supplemental report. Both such depositions shall take place within seven (7) days of this Order.

**SIGNED this 29th day of November, 2023.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE