IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

ENTROPIC COMMUNICATIONS, LLC,      §
     §
*Plaintiff,*      §
     §
v.      §    CIVIL ACTION NO.  2:22-CV-00125-JRG
     §
CHARTER COMMUNICATIONS, INC.,      §
     §
*Defendant.*      §

## MEMORANDUM ORDER

Before the Court is Defendant Charter Communications, Inc.'s Motion to Strike Dr. Souri's

Improper Opinions. (Dkt. No. 166.) Plaintiff Entropic Communications, LLC  opposes the motion.

(*See* Dkt. No. 205.) For the following reasons, the Court finds that the Motion should be

**GRANTED-IN-PART** and **DENIED-IN-PART**.

### I.     BACKGROUND

Dr. Souri is Entropic's technical expert who opines on issues of infringement. Charter

moves to strike various portions of his report.

### II.    LEGAL STANDARD

An expert witness may provide opinion testimony if "(a) the expert's scientific, technical,

or other specialized knowledge will help the trier of fact to understand the evidence or to determine

a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product

of reliable principles and methods; and (d) the expert has reliably applied the principles and

methods to the facts of the case." FED. R. EVID. 702.

Rule 702 requires that judges act as gatekeepers to ensure "that an expert's testimony both

rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). However, "[t]he inquiry envisioned by Rule 702 is ... a flexible one." *Id.* at 594; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) ("*Daubert* makes clear that the factors it mentions do *not* constitute a 'definitive checklist or test.'"). While the party offering the expert bears the burden of showing that the testimony is reliable, it "need not prove to the judge that the expert's testimony is correct...." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 1999) (citing *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

### III.   ANALYSIS

#### A.  Allegedly New Infringement Theories

Charter seeks to strike paragraphs 317, 324–325, 355, 358–359, 364–365, 373–374, 407–408, 419, 444, 499, 507 of Dr. Souri's opening report, arguing that these paragraphs contain infringement theories Entropic did not disclose in its infringement contentions. (*See* Dkt. No. 166 at 1–3.) According to Charter, Entropic only "accused Charter's downstream Profile Management Application ('PMA') … of infringing the '682 patent" in its infringement contentions. (*Id.* at 2.) However, Dr. Souri accuses Charter's upstream PMA system in his infringement report. (*Id.* at 2–3.) Charter also argues that Dr. Souri presents another theory in his report that was not contained in Entropic's infringement contentions: Charter uses "MER data" in performing "pre-equalization." (*Id.* at 3.)

In response, Entropic argues that it accused Charter's PMA system generally, without "fragment[ing]" its accusations into upstream or downstream transmissions. (Dkt. No. 205 at 1–2.) Entropic also asserts that Dr. Souri's analysis is relevant to the future use of any upstream PMA

system that is developed. (*Id.* at 3–4.) Further, Entropic argues, Charter has not identified any prejudice resulting from Entropic's allegedly previously undisclosed theories. (*Id.* at 5–6.)

In reply Charter argues that upstream PMA cannot be included within the "Charter PMA system" accused by Entropic because Charter has neither developed nor deployed an upstream PMA system. (Dkt. No. 233 at 1.) Charter also argues that Souri's opinions are not relevant to damages because there is no evidence that Charter will deploy upstream PMA. (*Id.*) Additionally, Charter argues that it did not need to show that Entropic's new theories were prejudicial for them to be inadmissible. (*Id.* at 1–2.) Finally, Charter notes that Entropic did not rebut Charter's arguments regarding the newly alleged use of MER data in performing "pre-equalization." (*Id.* at 2.)

In sur-reply, Entropic re-urges that it accused the entire PMA functionality without limiting its accusations to upstream or downstream PMA. (Dkt. No. 260 at 1.) Entropic also re-urges that evidence regarding the upstream use of PMA can be relevant to damages, even if Charter has not yet offered it to its customers. (*Id.* at 1–2.) Entropic points to Charter's own documents allegedly showing Charter's plan to deploy upstream PMA. (*Id.* at 1–2.) Finally, Entropic re-asserts that Charter has not shown any prejudice associated with these opinions.

As a preliminary matter, the Court finds that paragraphs 419, 444, 499, and 507 should be struck. Charter argues that these paragraphs contain a new theory of how Charter performs "pre-equalization," which Entropic does not contest. (*See* Dkt. No. 233 at 2.)

The Court is not persuaded that the paragraphs concerning upstream PMA should be struck. Entropic accuses "the Charter PMA system" in its infringement contentions. (*See* Dkt. No. 166-4 at 2.) Charter argues that Entropic must have meant to only accuse a downstream PMA system because that is the only system Charter has deployed. (*See* Dkt. No. 233 at 1.) However, the

3

purpose of infringement contentions is to provide "fair notice" of the alleged infringement. *See Orion IP, LLC v. Staples, Inc.*, 407 F. Supp. 2d 815, 816 (E.D. Tex. 2006). Entropic did so by accusing the Charter PMA system. Charter is effectively asking the Court to require Entropic to accuse more specific implementations of the PMA system—upstream or downstream—but fair notice is all that is required. In this regard it is also noteworthy that Charter does not identify any prejudice associated with these allegedly new infringement theories despite Entropic's prompting. (*See* Dkt. No. 233 at 1–2.) Charter cannot claim it was not on fair notice if it has not identified any prejudice.

Further, the infringement allegations regarding upstream PMA are not irrelevant even though upstream PMA has not yet been deployed. The parties "may . . . consider the expected or estimated usage . . . of a given invention, assuming proof is presented to support the expectation." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009). Charter states that there is no evidence to support Entropic's assertion that Charter will deploy upstream PMA in the future, but Dr. Souri bases these assertions on Charter documents estimating the benefits received from upstream PMA. (*See* Dkt. No. 233 at 1; Dkt. No. 260 at 1–2.) Whether Charter will or will not deploy upstream PMA is a matter of fact for the jury. *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003). Accordingly, the infringement allegations regarding upstream PMA are sufficiently relevant to damages.

### B.  Opinions Regarding Charter's Intent

Charter moves to strike paragraphs 19, 23, and 30 of Dr. Souri's supplemental report because they discuss Charter's intent. (*See* Dkt. No. 166 at 1.) Charter has disabled two of the technologies accused of infringing some of the asserted patents in this case: downstream PMA and spectrum monitoring. (*Id.* at 3.) Nevertheless, Charter argues that Dr. Souri's opinions suggest that Charter intends to re-enable these technologies. (*Id.* at 3–4.) With respect to downstream PMA,

Dr. Souri criticizes Charter's expert for purportedly "provid[ing] no analysis or opinions, and cit[ing] no documents, as to Charter's representations that the downstream PMA project has been 'terminated' or that Charter no longer has an intention to deploy downstream PMA." (Dkt. No 166-3 at ¶ 19.) Dr. Souri similarly opines that "Charter's documents (and the testimony from Mr. Williams and Mr. Stafford) support that the downstream PMA produced significant capacity gains and that Charter expects those gains to continue or, more likely, increase with further field tests and deployment of downstream PMA." (*Id.* at ¶ 23.) With respect to spectrum analysis, Dr. Souri opines that Charter's expert "provides no opinion or analysis refuting that re-enabling remote spectrum monitoring could similarly be accomplished 'through a configuration change' 'in a matter of hours.'" (*Id.* at ¶ 30.)

Charter argues that these opinions should be struck for three reasons. First, they are conclusory, and unsupported by any evidence. (Dkt. No. 166 at 4–5.) Second, they are outside of his expertise in communications systems. (*Id.* at 5.) Third, they are unreliable, not helpful to the jury, and draw legal conclusions. (*Id.* at 5–6.)

In response, Entropic argues that there is nothing improper about Dr. Souri "testify[ing] as to the underlying facts that in his opinion may show Defendants' state of mind." (Dkt. No. 205 at 7 (citing *Atlas Glob. Techs. LLC v. TP-Link Techs. Co.*, No. 2:21-CV-00430-JRG-RSP, 2023 WL 4847343, at *5 (E.D. Tex. July 28, 2023)).) Moreover, Entropic argues that Dr. Souri is simply pointing out flaws in Dr. Almeroth's analysis in paragraphs 19 and 30. (*Id.*) With respect to paragraph 23, Entropic argues that Dr. Souri is simply summarizing evidence he reviewed in the preceding paragraphs and concluding that Charter concluded downstream PMA worked as expected and would continue to work. (*Id.* at 7–8.) Thus, Entropic argues that Dr. Souri's opinions

(1) are based on facts and data, (2) offer his own conclusions, rather than opinion on Charter's state of mind, and (3) are not improper legal conclusions. (*Id.* at 8.)

In reply, Charter argues that Dr. Souri is not simply responding to Dr. Almeroth but affirmatively opining that Charter intends to "re-enable" downstream PMA and spectrum monitoring. (Dkt. No. 233 at 4.) Charter also re-urges that these opinions are not supported by any evidence. (*Id.*)

In sur-reply, Entropic argues that it "was explicit in its [response] that Dr. Souri will not opine about Charter's mental state" and will simply rebut Dr. Almeroth's claim that Charter "terminated development or deployment of PMA." (Dkt. No. 260 at 4.) Entropic also re-urges that Dr. Souri's opinions are supported by sufficient evidence. (*Id.* at 4–5.)

The Court finds that Dr. Souri's opinions should not be struck. Nowhere in the complained-of paragraphs does Dr. Souri opine that Charter "intends" to re-enable downstream PMA or spectrum monitoring. (*See* Dkt. No. 166-3 at ¶¶ 19, 23, 30.) Rather, these paragraphs contain recitations of facts and criticisms of Dr. Almeroth's findings. These paragraphs are helpful to the jury for this reason. Finally, they do not contain any improper legal conclusion.

### C.  Opinions Regarding Indirect Infringement

Charter seeks to strike paragraphs 79 and 431–434 of Dr. Souri's infringement report, which relate to indirect infringement. (Dkt. No. 160 at 1.) Dr. Souri opines that if Charter does not directly infringe then "Charter indirectly infringes the asserted claims of the '008 and '826 Patents." (*See* Dkt. No. 166-2 at ¶ 79.)

Charter argues that there are two reasons these opinions should be struck. First, Dr. Souri provides no opinions regarding the intent element of indirect infringement. (Dkt. No. 166 at 6–7.) Second, Charter argues that Dr. Souri's opinions that its customers infringe are legally insufficient because Dr. Souri does not show that Charter's customers "both control and benefit from their use

of every element of the claimed system." (*Id.* at 7–8 (citing *Intellectual Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1329 (Fed. Cir. 2017) ("[P]roof of an infringing 'use' of the claimed system under § 271(a) requires the patentee to demonstrate that the direct infringer obtained 'benefit' from each and every element of the claimed system.") (citing *Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1284 (Fed. Cir. 2011))).)

In response, Entropic argues that Dr. Souri need not opine as to every element of indirect infringement for his opinions to be admissible. (Dkt. No. 205 at 9.) Indeed, it would be improper for Dr. Souri to opine on Charter's intent. (*Id.* (citing *Atlas Glob.*, 2023 WL 4847343, *5 (prohibiting an expert from testifying as to the defendant's state of mind but otherwise allowing the expert to offer his opinions related to indirect infringement)).) Confusingly, Entropic also argues that "Charter generally alleges that because Charter's customers do not 'benefit' from system claims 1 and 2 of the '008 Patent, Dr. Souri has failed to show *joint infringement*," but "Dr. Souri is not offering an opinion that Charter and its customers jointly infringe the system claims of the '008 Patent." (*Id.* at 9–10.) Rather, Dr. Souri is offering an opinion that Charter indirectly infringes the system claims of the '008 Patent, wherein Charter's customers are the direct infringers. (*Id.* at 10.) Accordingly, Entropic concludes, "this straw man attack fails."

Charter argues in reply that Dr. Souri cannot conclude that Charter induced infringement without a showing of intent. (Dkt. No. 233 at 4.) Charter does not address its earlier argument regarding benefit.

In sur-reply, Entropic notes that Charter concedes that "Dr. Souri can argue that Charter induced activities of its customers" and argues that there is therefore no reason to strike paragraphs 79 and 431–434 of Dr. Souri's opening report. (Dkt. No. 260 at 5.)

The Court finds that Dr. Souri may not opine that Charter induced infringement because Dr. Souri never opines as to the intent element or recites any other fact to support a factual finding that Charter had the requisite mental state. However, since this limitation does not circumscribe the entirety of paragraphs 71 and 431–434, there is no need to strike the entirety of these paragraphs on this ground.

The Court is also not persuaded by Charter's argument that Dr. Souri needed to, but failed to, show that a benefit of each element of Claims 1 and 2 of the '008 Patent accrued to Charter's customers, the direct infringers. (Dkt. No. 166 at 7 (citing *Intellectual Ventures*, 870 F.3d at 1329).) *Intellectual Ventures* only applies to infringement reads under *Centillion Data System, LLC v. Qwest Communications International, Inc.*, 631 F.3d 1279 (Fed. Cir. 2011). *Intellectual Ventures*, 870 F.3d at 1328 ("We do not decide what standards would govern here if claim 41 were not treated as a system claim under *Centillion*."); *id.* at 1329 ("In an analysis of a system claim under *Centillion*, proof of an infringing 'use' of the claimed system under § 271(a) requires the patentee to demonstrate that the direct infringer obtained 'benefit' from each and every element of the claimed system." (citing *Centillion*, 631 F.3d at 1284).) However, *Centillion* applies only to "circumstances where the claimed system 'include[s] elements in the possession of more than one actor.'" *Grecia v. McDonald's Corp.*, 724 F. App'x 942 (Fed. Cir. 2018) (quoting *Centillion*, 631 F.3d at 1283).

Charter argues that "Claims 1–2 of the '008 patent describe a system for digitizing television signals, analyzing characteristics of the signal, and processing television channels. … Customers do not 'benefit' from these claims because they involve technical processes that occur behind the scenes, do not provide any data to the customer, and do not directly enhance the user's television viewing experience." (Dkt. No. 166 at 7.) However, Charter does not show that the

8

benefit framework laid out in *Intellectual Ventures* and *Centillion* should apply. Charter does not show that the claimed system is one that "include[s] elements in the possession of more than one actor." *Centillion*, 631 F.3d at 1283. Accordingly, these paragraphs should not be struck.

### D.  Opinions Regarding Contracts

Charter seeks to strike paragraphs 426–427 and 433 of Dr. Souri's opening report. (*See* Dkt. No. 166 at 1.) There, Dr. Souri opines that Charter requires its customers to sign a contract to lease the cable modems, and that Charter retains ownership over the equipment. (*Id.* at 8.)

Charter makes two arguments as to why these paragraphs should be struck. (*Id.* at 9–10.) First, Charter argues that Dr. Souri, an expert in telecommunications technology, lacks the qualifications to opine about a legal relationship between Charter and its customers. (*Id.* at 9.) Second, Charter argues that these opinions constitute improper legal conclusions. (*Id.* at 9–10.)

Entropic argues in response that Dr. Souri is simply opining on the nature of the infringing acts themselves, namely who commits the acts of use that he concludes underlies the infringement. (Dkt. No. 205 at 11.) The service agreements are evidence of some of these facts. (*Id.* at 11–13.) Further, Entropic argues that Dr. Souri's opinions do not concern the legal effect of the contracts, but instead concern "who-does-what," which is factual. (*Id.* at 13.)

In reply, Charter notes that Dr. Souri only cites to contracts to support his opinion that "Charter maintains ownership of the … cable modems." (Dkt. No. 233 at 2.) Charter argues that Dr. Souri thus "renders legal conclusions about contractual rights and obligations." (*Id.*)

In sur-reply, Entropic argues that it is an "undisputed fact" that Charter "'maintains ownership over the equipment that it leases to its customers." (Dkt. No. 260 at 2 (citing (Dkt. No. 233 at 2–3).) Moreover, Entropic contends that stating that Charter retains ownership over the equipment does not require "any legal expertise or analysis of the contract terms." (*Id.* at 3.)

9

The Court finds that there is no reason to strike these paragraphs. These opinions do not become legal conclusions simply because Dr. Souri is relying on contracts to form them. Indeed, as Entropic contends, Dr. Souri's opinions are not legal in nature but factual. Moreover, Charter does not dispute the veracity of these factual opinions. Also, Dr. Souri is certainly qualified to read the plain language of a contract.

### E.  Opinions Regarding Joint Infringement

Charter seeks to strike paragraph 425 of Dr. Souri's opening report. There, Dr. Souri opines that Charter jointly infringes the '690 Patent with its users, alleging that Charter directs and controls its users because "Charter conditions participation in the use of the Accused Services, receives a benefit upon performance of the claimed method steps by its customers, and establishes the manner for that performance." (Dkt. No. 166-2 at ¶ 425.)

Charter argues that this paragraph should be struck for three reasons. (Dkt. No. 166 at 10–11.) First, Entropic never disclosed a joint infringement theory in its infringement contentions. (*Id.* at 10.) Second, "whether Charter 'directs or controls' its users … is not a technical question requiring expert testimony to assist the jury." (*Id.*) Third, whether Charter "directs or controls" another entity is outside of Dr. Souri's expertise. (*Id.* at 10–11.)

Entropic contends in response that each of Charter's arguments fails. First, Entropic argues that it was not required to disclose its joint infringement theory in its infringement contentions. (Dkt. No. 205 at 4.) Second, Entropic argues that whether Charter directs or controls its customers is a technical question because, according to Entropic, Charter's architecture allows it to control its customers through technical requirements such as certification requirements. (*Id.* at 10–11.) Third, Entropic argues that Dr. Souri is qualified to offer these opinions because they are technical in nature. (*Id.* at 11.)

10

In reply, Charter re-urges that it is too late to disclose a joint infringement theory for the first time in an expert's report. (Dkt. No. 233 at 3.) Charter also argues that "whether Charter directs or controls its users is purportedly a technical question and that Souri is purportedly qualified to offer opinions as to those technical issues—do[es] not validate Souri's improper joint infringement opinions." (*Id.*)

In sur-reply, Entropic again argues that it did not need to disclose its joint infringement theory in its infringement contentions. (Dkt. No. 260 at 3–4.) Further, Entropic argues, Charter's arguments in reply regarding whether "directing and controlling" is a technical question are pure attorney argument and should be disregarded.

Again, the Court finds that there is no reason to strike this paragraph. First, joint infringement theories need not be disclosed in infringement contentions. *Eon Corp. IP Holdings, LLC v. T-Mobile USA, Inc.*, No. 6:10-cv-379, 2012 WL 12911055, at *3 n. 2 (E.D. Tex. Aug. 10, 2012) ("[I]nfringement contentions serve a notice function and . . . as evident by the text of P.R. 3-1 itself, infringement contentions are focused on notice of the underlying direct infringement and are not the forum for explaining such issues as joint liability, mastermind, or indirect infringement."). Second, the Court finds that Dr. Souri's testimony will help the jury determine whether Charter directs or controls its customers. It will be beneficial to the jury to have the same expert explain the underlying technical facts and explain how those facts lead to a conclusion. Finally, the Court finds that the question of whether Charter directs or controls its customers is not so far afield of Dr. Souri's technical expertise to justify striking this opinion. Entropic may make this attack on cross examination if it wishes.

## IV.    CONCLUSION

For the foregoing reasons, the motion (Dkt. No. 166) is **GRANTED-IN-PART** and **DENIED-IN-PART**.

Specifically, the Court **ORDERS** that paragraphs 419, 444, 499, and 507 of Dr. Souri's opening report shall be **struck**. With regard to paragraphs 71 and 431–434 of Dr. Souri's opening report, the Court **ORDERS** that Dr. Souri may not testify that Charter actually induces infringement. The balance of the Motion is **DENIED**.

**SIGNED this 29th day of November, 2023.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

12