IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| ENTROPIC COMMUNICATIONS, LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:22-CV-00125-JRG-RSP |
| | § | |
| CHARTER COMMUNICATIONS, INC., | § | |
| | § | |
| *Defendants*. | § | |

# REPORT AND RECOMENDATION

Before the Court is Plaintiff Entropic Communications, LLC's Motion For Summary Judgment of Validity under 35 U.S.C. §101 (Dkt. No. 181). After consideration, the Court recommends the motion be **GRANTED** as provided below.

## I.   BACKGROUND

Entropic Communications, LLC filed its initial complaint on April 27, 2022 asserting Charter infringes U.S. Patent Nos. 8,223,775 (the "'775 Patent"), 8,284,690 (the "'690 Patent"), 8,792,008 (the "'008 Patent"), 9,210,362 (the "'362 Patent"), 9,825,826 (the "'826 Patent"), and 10,135,682 (the "'682 Patent") (collectively "the Asserted Patents"). (Dkt. No. 1 at ¶1.)

## II.   APPLICABLE LAW

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Any evidence must be viewed in the light most favorable to the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when there is no genuine dispute of material fact.

1

*Celotex v. Catrett*, 477 U.S. 317, 322 (1986). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine [dispute] of material fact." *Anderson*, 477 U.S. at 247–48. The substantive law identifies the material facts, and disputes over facts that are irrelevant or unnecessary will not defeat a motion for summary judgment. *Id.* at 248. A dispute about a material fact is "genuine" when the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party must identify the basis for granting summary judgment and evidence demonstrating the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. "If the moving party does not have the ultimate burden of persuasion at trial, the party 'must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.'" *Intellectual Ventures I LLC v. T Mobile USA, Inc.*, No. 2:17-CV-00577-JRG, 2018 WL 5809267, at *1 (E.D. Tex. Nov. 6, 2018) (quoting *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000)).

### A. 35 U.S.C. §101

Anyone who "invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof" may obtain a patent. 35 U.S.C. § 101. Since patent protection does not extend to claims that monopolize the "building blocks of human ingenuity," claims directed to laws of nature, natural phenomena, and abstract ideas are not patent eligible. *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). The Supreme Court therefore instructs courts to distinguish between claims that set forth patent ineligible subject matter and those that "integrate the building blocks into something more." *Id*. at 217.

Courts use a two-step framework for analyzing whether claims at issue claim patent-eligible subject matter. *Id*. at 217–18; *Enfish, LLC v. Microsoft Corp*., 822 F.3d 1327, 1334 (Fed. Cir. 2016). First, courts "determine whether the claims at issue are directed to a patent-ineligible concept." *Id*. (quoting *Alice*, 573 U.S. at 217 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc*., 566 U.S. 66, 77–78 (2012)). In doing so, the court must be wary not to over generalize the invention, as "all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 71).

"If this threshold determination is met, [courts] move to the second step of the inquiry and 'consider the elements of each claim, both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application.'" *Enfish*, 822 F.3d at 1334 (quoting *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 79)). A claimed invention is patent-eligible at *Alice* Step Two when the claim limitations "involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1347–48 (Fed. Cir. 2014) (quoting *Alice*, 573 U.S. at 225) (quoting *Mayo*, 566 U.S. at 73 (internal quotation marks and brackets omitted)).

Patent eligibility is a question of law, based on underlying facts. *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018), *cert. denied,* 139 S. Ct. 2747 (2019), *reh'g denied,* No. 18-1199, 2019 WL 3976449 (Aug. 23, 2019). Whether the claim elements or combination are well-understood, routine, and conventional is a question of fact. *Aatrix Software, Inc. v. Green Shades Software, Inc*., 882 F.3d 1121, 1128 (Fed. Cir. 2018).

### III. ANALYSIS

Entropic argues the '690, '008, '826, '362, and '682 Patents are not directed to abstract ideas under *Alice* Step One and thus not ineligible under §101.

#### A. THE '690 PATENT IS NOT DIRECTED TO AN ABSTRACT IDEA

Claim 1 of the '690 Patent provides:

A method comprising:
a) receiving in a first node, a probe request specifying a first plurality of parameters associated with the generation and transmission of a probe, wherein the first plurality of parameters at least specify content payload of the probe and a second node;
b) determining a second plurality of parameters associated with generation and transmission of the probe;
c) generating the probe in accordance with the first plurality of parameters and the second plurality of parameters, wherein the probe has a form dictated by the first plurality of parameters; and
d) transmitting the probe from the first node to the second node.

Entropic argues the '690 Patent is directed "generally to aiding in the diagnosis of problems with subscriber services." (Mot. at 4.) Entropic argues probes are sent to test the status of a communication channel between nodes. (*Id.*) Entropic contends the prior art method was limited to using predetermined parameters such that the receiver node could not affect the probe, limiting the functionality of the process. (*Id.*) Entropic argues the '690 Patent enables use of non-predetermined parameters and this "provides increased diagnostic capabilities for the communication network." (*Id.* at 5.)

Charter argues "the node sending the probe to receive and obey instructions determining the nature of one or more probe parameters" amounts to nothing more than the abstract idea of data processing. (Opp. at 3.) Charter further contends the proposed purpose cited by Entropic, determining characteristics of a communications channel, is not recited anywhere in the claim itself. (*Id.*) Charter contends that without this purpose, the '690 Patent claims amount to "sending,

4

receiving, analyzing, and responding to information," which it contends is not patent eligible. (*Id*. (citing *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014); *First-Class Monitoring, LLC v. United Parcel Serv. Of Am.*, 389 F.Supp. 3d 456, 467 (E.D. Tex. 2019)). Charter further contends Entropic's argument is an attempt to limit the field of use of the abstract idea to a particular technological environment which does not rescue the '690 Patent. (*Id*. at 4 (citing *Affinity Labs of tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1259 (Fed. Cir. 2016)).) Finally, Charter contends the construction of "node" as "any device . . ." further confirms the '690 Patent is directed to an abstract idea. (*Id*.)

Entropic replies that the claims are directed to a "specific improvement over prior art predetermined probes used in communication networks" and this is captured in the Court's construction of "probe." (Reply at 1.) Entropic contends none of the cases cited by Charter are applicable here. (*Id*.) Entropic argues *Elec. Power* related to a method of "'collecting information, analyzing it, and displaying certain results' without more;" that the claims in *buySAFE* "related to methods of conducting financial transactions on generic computers;" and *First-Class Monitoring* is distinguishable in that it noted "[t]he claims are not directed to a technological solution to a technological problem, but merely look to the use of known technology to communicate information of a type that . . . has not previously been transmitted using that technology."(*Id*.)

Charter responds that the construction of "probe" only provides it is "a signal *capable* of being used to determine channel characteristics" but there is no requirement that the probe be used for anything in particular. (Sur-Reply at 1.) Charter reiterates this supports its argument that the '690 Patent claims are not directed to a technical solution to a technical problem. (*Id*.)

5

The Court finds that the asserted claims of the '690 Patent are not directed to an abstract idea under *Alice* Step 1. Charter has not shown the claims are directed to the abstract idea of data processing or merely sending, receiving, analyzing, and responding to information. Rather, the Court finds the claims of the '690 Patent are directed to a technical solution--increasing probe parameter variability by allowing probe parameters to be determined based on the request for the probe--to a technical problem, determining characteristics of a communication channel. (Mot. at 4-5.) This improvement is not merely discussed in the specification but also captured by the claims. In particular, limitations 1(b) and 1(c) capture this advancement, providing a means to transmit parameters not predetermined at the request for the probe.

Further, each of the cases cited by Charter are distinguishable. First, the claim in *Elec. Power Grp., LLC v. Alstom S.A.* related to merely "collecting information" of a particular content, analyzing it "by steps people go through in their minds, or by mathematical algorithms, without more," and presenting the results. 830 F.3d 1350, 1352-54 (Fed. Cir. 2016). That is not the case here. Rather, the particular advancement over the prior technical limitation of predetermined parameters is directed to a novel technique of extracting more information regarding the status of a communication channel. Second, in *buySAFE, Inc. v. Google, Inc.* the claims at issue related to "creating a contractual relationship." 765 F.3d 1350, 1355 (Fed. Cir. 2014). The portion Charter appears to cite relates to *Alice* Step 2 in that it discussed the "invocation of computers add[ing] no inventive concept." *Id*. Here, there is no basic concept people perform mentally like the contract. Next, *First-Class Monitoring, LLC v. United Parcel Serv. of Am., Inc.* provided the claims merely used known technology to communicate information of a type that had not previously been transmitted using that technology. 389 F. Supp. 3d 456, 467 (E.D. Tex. 2019). That is not the case here. Rather, in part, the '690 Patent claims a novel technique for transmitting information rather

than transmitting known information on known technology. Finally, *Affinity Labs of Texas, LLC v. DIRECTV, LLC* discusses the impact of limiting the field of use of an abstract idea. 838 F.3d 1253, 1258-59 (Fed. Cir. 2016). That is not the case here, where the underlying invention is not related to an abstract idea.

Thus Entropic's motion as to the '690 Patent should be **GRANTED**.

### B. THE '008 AND '826 PATENTS ARE NOT DIRECTED TO AN ABSTRACT IDEA

Claim 1 of the '008 Patent provides:

A system comprising:
an analog-to-digital converter operable to digitize a received signal spanning an entire television spectrum comprising a plurality of television channels, said digitization resulting in a digitized signal;
a signal monitor operable to:
    analyze said digitized signal to determine a characteristic of said digitized signal; and
    report said determined characteristic to a source of said received signal;
a data processor operable to process a television channel to recover content carried on the television channel; and
a channelizer operable to:
    select a first portion of said digitized signal;
    select a second portion of said digitized signal; and
    concurrently output said first portion of said digitized signal to said signal monitor and said second portion of said digitized signal to said data processor.


Claim 1 of the '826 Patent provides:

A method comprising:
performing by one or more circuits of a receiver coupled to a television and data service provider headend via a hybrid fiber coaxial (HFC) network:
receiving, via said HFC network, a signal that carries a plurality of channels, wherein said channels comprise one or both of television channels and data channels;
digitizing said received signal to generate a digitized signal;
selecting a first portion of said digitized signal;
selecting a second portion of said digitized signal;
processing said selected second portion of said digitized signal to recover information carried in said plurality of channels;

> analyzing said selected first portion of said digitized signal to measure a characteristic of said received signal; and
> controlling the transmission of network management messages back to said headend based on said measured characteristic of said received signal, wherein said measured characteristic is different than said network management messages.

Entropic argues the '008 and '826 Patents "disclose systems and methods to enable service[] providers to remotely monitor the quality and other characteristics of the signals customers actually receive, by monitoring at a customer's premises." (Mot. at 5.) Entropic argues this replaces the conventional method of physically sending a technician to the customer. (*Id*. at 5-6.) Entropic argues that the specifications describe these solutions, in particular an architecture which simultaneously monitors the signal while also processing the signal. (*Id*. (citing the '008 Patent at 4:7-10; 4:45-50; 6:31-36; 7:15-32 and the '826 Patent at 3:60-4:5; 7:34-55).) Entropic further argues the claims contain structural elements which show the claims are not directed to an abstract idea. (*Id*. at 8 (citing *Visual Memory LLC v. NCIDIA Corp.*, 67 F.3d 51253, 1260 (Fed. Cir. 2017); noting the claims "lay[] out particular structural elements, including a signal monitor . . . a data processor . . . and a channelizer. . .").)

Charter counters that the recited "systems and methods do nothing more than receive a signal, digitize the signal, extract information from the signal, analyze the signal and send information based on that analysis back to the source of the signal." (Opp. at 5-6(citing *Elec. Power*, 830 F.3d at 1353; *buySAF*, 765 F.3d at 1355; *First-Class*, 389 F.Supp. 3d at 467).) Charter argues the depictions of the invention in the patents highlight the abstract nature of the claims showing the structural components cited by Entropic are mere functional blocks. (*Id*. (citing '008 Patent Fig. 1B).) Charter further contends the advantages of remote spectrum monitoring cited by Entropic are not sufficient to rescue the claimed abstract idea. (*Id*. at 6.) Rather, Charter contends the claims "recite generic functional boxes that fail to give any indication of how the method

provides an improvement to remote monitoring or to the functionality of any network, system, or device." (*Id.*) Indeed, Charter contends "remote spectrum monitoring was already well known" citing U.S. Patent No. 5,874,992. (*Id.*) Finally, Charter contests Entropic's citation to *Visual Memory*. (*Id.*) It argues *Visual Memory* requires the patent describe actual differences between the invention and the prior art where the '008 and '826 Patents do not. (*Id.* at 7-8.) Charter contends this is supported by *Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1368 (Fed. Cir. 2019); *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016). (*Id.*)

Entropic replies Charter oversimplifies the claims, ignoring the claimed, specific, structured, combination of defined physical elements. (Reply at 2.) Entropic argues the claimed "analog-to-digital converter, signal monitor, data processor, and channelizer are not functional boxes," citing Charters argument at the claim construction hearing. (*Id.*)

Charter counters that the physical components merely provide a generic environment for the claimed abstract idea. (Sur-Reply at 1-2 (citing *In re TLI*; *BSG Tech*).) Charter further contends "[w]hether Entropic's purported invention solved a problem does not make it non-abstract" rather this is an *Alice* step two argument. (*Id.*)

The Court finds that the asserted claims of the '008 and '826 Patents are not directed to an abstract idea under *Alice* Step 1. Charter has failed to show the claims are directed to "nothing more than receiv[ing] a signal, digitiz[ing] the signal, extract[ing] information from the signal, analyz[ing] the signal and send[ing] information based on that analysis back to the source of the signal." Charter's argument that the claims are made up of nothing but "functional blocks" is more of a *Alice* Step 2 argument. Rather the claims of the '008 and '826 Patents provide structural elements to perform their claimed improvement in remote monitoring.

Again, none of Charter's cited cases are analogous. *Elec. Power*, *buySAF*, and *First-Class* are not analogous as Entropic has demonstrated a clear structural combination of components to improve remote monitoring. Likewise *Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1368 (Fed. Cir. 2019) and *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) are inapposite. *U Univ. of Fla.* relates to claims merely seeking to automate pen and paper methodologies. 916 F.3d at 1367. Charter has not argued that is the case and indeed the patents seek to replace a "pen and paper methodology" with a non-analogous technological solution, not merely to automate it. (*See* Mot. at 5-8.) Finally, *In re TLI* holds that merely applying generic physical components to the abstract idea "of classifying and storing digital images in an organized manner" is still an abstract idea. 823 F.3d at 611. Again, this is not the case here, rather the cited structural components enable the invention.

Finally, Charter's argument that the alleged inventive concept was already known in U.S. Patent No. 5,874,992 is not relevant to a §101 analysis. Rather this is an anticipation or obviousness argument under §§102 and 103.

Entropic's motion as to the '008 and '826 Patents should be **GRANTED**.

### C.  THE '362 PATENT IS NOT DIRECTED TO AN ABSTRACT IDEA

Claim 11 of the '362 Patent provides:

A method comprising:
in a wideband receiver system:
    downconverting, by a mixer module of said wideband receiver system, a plurality of frequencies that comprises a plurality of desired television channels and a plurality of undesired television channels;
    digitizing, by a wideband analog-to-digital converter (ADC) module of said wideband receiver system, said plurality of frequencies comprising said plurality of desired television channels and said plurality of undesired television channels;
    selecting, by digital circuitry of said wideband receiver system, said plurality of desired television channels from said digitized plurality of frequencies; and
    outputting, by said digital circuitry of said wideband receiver system, said selected plurality of television channels to a demodulator as a digital datastream.

10

Entropic argues that the '362 Patent addresses the "problem of increasing the dynamic range of a wideband receiver without expensive data conversion, filtering, and channel selection." (Mot. at 9.) Entropic argues that Charter "err[s] as a matter of law by divorcing the verbs of the claims from the entire remainder, in an attempt to generate generic claims that do not exist." (*Id*.) Entropic contends such an overgeneralization is forbidden under *Alice*. (*Id*. at 9-10 (Citing *Alice* that "[A]n invention is not rendered ineligible for patent simply because it involves an abstract concept.").) Entropic contends prior to the invention, "block tuners were only able to capture a small, contiguous block of the frequency band," so non-contiguous channels could not be captured at the same time." (*Id*.) Entropic argues the '362 Patent is directed to a specific improvement to address this specific problem and thus is directed to eligible subject matter. (*Id*.)

Charter contends that "[s]electing 'desired' television channels from among a larger number of "desired and undesired channels' is an abstract idea." (Opp. at 8). Charter contends this idea "of filtering out portions of a signal" has previously been found to address patent ineligible subject matter. (*Id*. (citing *CardioNet, LLC v. InfoBionic, Inc.*, No. 2020-2123, 2021 WL 5024388, at *4 (Fed. Cir. Oct. 29, 2021)). Charter further contends the claims are performed by generic components noting "downconverting, by a mixer module . . ." "is performed by 'conventional' components in the prior art;" the analog-to-digital conversion step is performed by a "less sophisticated ADC[] than those required by other wideband receivers;" the selecting step is performed by generic "digital circuity;" and the outputting step is performed by "commonly known methods." (*Id*. at 8-9 (citing the '362 Patent).) Charter argues that this demonstrates it does not overgeneralize by divorcing the verbs from the claims. (*Id*. at 9.)

11

Entropic replies that reducing the '362 Patent to merely filtering out portions of a signal is inappropriate. (Reply at 2.) Entropic argues this ignores the key structural elements of the claims, noting the use of a "mixer" and "wideband analog-to-digital converter" was a novel method that reduced the need for more expensive components. (*Id.* at 2-3.) Entropic argues this makes the '362 Patent distinguishable from *CardioNet*. (*Id.*) In particular, Entropic argues that the claim in *CardioNet* amounted to little more than using a mathematical equation to filter data, which is not the case here. (*Id.*)

Charter argues the claims are not directed to any specific tuner architecture as the only structure is "in a wideband receiver" and the remaining elements are simply steps or functional blocks. (Sur-Reply at 3.)

The Court finds that the asserted claims of the '362 Patent are not directed to an abstract idea under *Alice* Step 1. Charter has not shown the claims are directed to the abstract idea of filtering out portions of a signal. Rather, Entropic has shown that the '362 Patent is directed to a concrete improvement to processing wideband signals.

*CaridoNet* is not applicable here. There, the claims amounted to nothing more than applying a "groundbreaking" mathematical function to filter data. *CardioNet*, 2021 WL 5024388, at *4. If that court had permitted such claims, it would have amounted to either enabling the patentee to claim a mathematical function or mere filtering. Neither is the case here. Entropic has shown the '362 Patent is directed to more than merely filtering, rather it is directed to utilizing particular filtering components to reduce the strain on other components. (*See* Mot. at 9-10.) Accordingly, the motion should be **GRANTED** as to the '362 Patent.

### D.  THE '682 PATENT IS NOT DIRECTED TO AN ABSTRACT IDEA

Claim 1 of the '682 Patent provides:

A method comprising:
determining, by a cable modem termination system (CMTS), for each cable modem served by said CMTS, a corresponding signal-to-noise ratio (SNR) related metric;
assigning, by said CMTS, each cable modem among a plurality of service groups based on a respective corresponding SNR-related metric;
generating, by said CMTS for each one of said plurality of service groups, a composite SNR-related metric based at least in part on a worst-case SNR profile of said SNR-related metrics corresponding to said one of said plurality of service groups;
selecting, by said CMTS, one or more physical layer communication parameter to be used for communicating with said one of said plurality of service groups based on said composite SNR-related metric; and
communicating, by said CMTS, with one or more cable modems corresponding to said one of said plurality of service groups using said selected one or more physical layer communication parameter.

Entropic argues that the '682 Patent relates to the use of a CMTS in providing particularized transmission parameters to particular cable modems rather than the prior method of providing the same parameters to all cable modems. (Mot. at 10-11.) Entropic argues this improved slow transmission of noisy communications channels (that might be prone to errors otherwise) by providing faster transmission of less noisy channels. (*Id*. at 11.) Entropic argues this is what is claimed, pointing to the "determining . . ." and "assigning . . ." steps as assigning cable modems into groups based on a noise quality metric while the remaining three steps "recite the CMTS determining appropriate . . . communication parameters." (*Id*. at 12.) Entropic argues this is a "purposeful[] arrange[ment of] the components in a distributed architecture to achieve a technological solution to a technological problem specific to computer networks" under *Amdocs (Israel) Ltd. v. Openet Telecom, Inc*. (*Id*. at 12-13.)

Charter counters that the claims are directed to "the abstract idea of grouping cable modems based on their SNRs and then communicating with the cable modems in the same group in the

same way." (Opp. at 10.) Charter argues that the claimed signal-to-noise ratio "is simply an indication of how well a cable modem hears" and that grouping cable modems based on how well they hear and then communicating with the groups based on their common hearing ability is an abstract idea. (*Id.*) Charter cites *In re Jobin* and *two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC* to suggest such a collection, organization, and grouping is the hallmark of claims directed to abstract ideas. (*Id.*) Charter further argues *Amdocs (Israel)* is distinguishable as here there is no specific structure and the case cite provided by Entropic related to *Alice* Step 2. (*Id.*)

Entropic replies that *Jobin* and *Two-Way Media* are inapposite. (Reply at 4.) Entropic argues by reciting functions of a CMTS that change the way the CMTS communicates with cable modems, it is distinguishable from the techniques of conducting a survey of *Jobin* or the techniques of routing and converting data streams of *two-Way Media*. (*Id.*)

In sur-reply, Charter reurges its comparison to *two-Way Media* arguing there is "no recitation of structure aside from a CMTS, and the claims merely 'recite functions of a CMTS.'" (Sur-Reply at 3.) Charter argues that the claims provide no purposeful arrangement as they are performed by a conventional component of a cable network. (*Id.*)

The Court finds that the asserted claims of the '682 Patent are not directed to an abstract idea under *Alice* Step 1. Charter has failed to show the claims are directed to "the abstract idea of grouping cable modems based on their SNRs and then communicating with the cable modems in the same group in the same way." Indeed, the Court is not convinced that even this is an abstract idea. Entropic has shown the patents are directed to a technique of discriminating between datastreams to best provide service. While grouping is a component of this, it does not dictate that the claims are directed to an abstract idea.

Again, the cases cited by Charter are distinguishable. In *In re Jobin* the Federal Circuit found that the claims at issue were directed to "a method of organizing human activity" namely "conducting a survey or crowdsourcing." 811 F. App'x at 637. That is not the case here. Rather the claims are quite clearly directed to the technique of technical discrimination of data in a particular structure of components, not mere organization. Likewise, in *two-Way Media* the Federal Circuit found the claims routed information using result-based functional language. 874 F.3d at 1337. But Charter has made no showing of that here. Indeed, the claimed signal-to-noise ratio, upon which the claims discriminate, is not result-based functional language. *See* '682 Patent Cl. 1.

Thus, Entropic's motion as to the '682 Patent should be **GRANTED**.

### IV.     CONCLUSION

Having considered the facts, the Court recommends that Charter's motion be **GRANTED,** dismissing the defense based on Section 101..

A party's failure to file written objections to the findings, conclusions and recommendations contained in this report **by not later than December 7, 2023**, bars that party from *de novo* review by the District Judge of those findings, conclusions, and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. FED. R. CIV. P. 72(b)(2); *see also Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (*en banc*). Any objection to this Report and Recommendation must be filed in ECF under the event "Objection to Report and Recommendation [cv, respoth]" or it may not be considered by the District Judge.

**SIGNED this 1st day of December, 2023.**

ROY S. PAYNE  
UNITED STATES MAGISTRATE JUDGE