# EXHIBIT B

CONFIDENTIAL

Page 1

1                  CONFIDENTIAL

2          UNITED STATES DISTRICT COURT

3            EASTERN DISTRICT OF TEXAS

4              MARSHALL DIVISION

5 --------------------------------*

6 ENTROPIC COMMUNICATIONS, LLC,

7            Plaintiff,     Case No.:

8      vs.                 2:22-cv-00125

9 CHARTER COMMUNICATIONS, INC.,

10            Defendant.

11 --------------------------------*

12       STENOGRAPHIC AND VIDEO-RECORDED

13        DEPOSITION OF DANIEL BOGLIOLI

14         Friday, August 11, 2023

15             10:09 a.m.

20 Stenographically recorded by:

21 Josephine H. Fassett, RPR, CCR

22 Job No. 6050918

Veritext Legal Solutions

www.veritext.com                                            888-391-3376

CONFIDENTIAL

Page 2

CONFIDENTIAL

Friday, August 11, 2023
10:09 a.m.

T R A N S C R I P T of the stenographic and video-recorded deposition of DANIEL BOGLIOLI, pursuant to the Federal Rules of Civil Procedure, held at the offices of ARNOLD & PORTER LLP, 250 West 55th Street, New York, New York, on Friday, August 11, 2023, commencing at approximately 10:09 a.m., stenographically recorded by Josephine H. Fassett, a Registered Professional Reporter, Certified Court Reporter, and Notary Public of the states of New York and New Jersey.

Page 3

CONFIDENTIAL

APPEARANCES:

ATTORNEYS FOR PLAINTIFF:

    K&L GATES LLP
    70 West Madison Street
    Suite 3300
    Chicago, Illinois 60602
    312.372.1121
BY: JAMES A. SHIMOTA, ESQ.
    jim.shimota@klgates.com
    NICHOLAS F. LENNING, ESQ. (Seattle office)
    nicholas.lenning@klgates.com

ATTORNEYS FOR DEFENDANT:

    ARNOLD & PORTER LLP
    250 West 55th Street
    New York, New York 10019-9710
    212.836.8000
BY: DANIEL L. REISNER, ESQ.
    daniel.reisner@arnoldporter.com

ALSO PRESENT:
    CARLOS KING, Videographer

Page 4

CONFIDENTIAL

---------------------INDEX----------------------

| WITNESS | PAGE |
|---|---|
| DANIEL BOGLIOLI | |
|   By Mr. Shimota | 10 |
| AFTERNOON SESSION - 167 | |

---------------------EXHIBITS---------------------

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Plaintiff's Notice of Deposition of Dan Boglioli | 8 |
| Exhibit 2 | Notice of Deposition of Charter Communications, Inc. Pursuant to Federal Rule of Civil Procedure 30(b)(6) | 8 |
| Exhibit 3 | Plaintiff's Supplemental Notice of 30(b)(6) Deposition of Charter Communications, Inc. | 8 |
| Exhibit 4 | Email Exchange, Bates CHARTER_ENTROPIC 00476830 to CHARTER_ENTROPIC 00476831 | 57 |
| Exhibit 5 | Defendant's Objections and Responses to Plintiff's Third Set of Interrogatories (No.22) | 87 |

Page 5

CONFIDENTIAL

---------------------EXHIBITS---------------------

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 6 | Charter's Fifth Supplemental Objections and Responses to Plaintiff's Second Set of Interrogatories (No. 7) | 98 |
| Exhibit 7 | Defendant's Objections and Responses to Plaintiffs' Second Set of Interrogatories (Nos. 6 to 21) | 118 |
| Exhibit 8 | Defendant's Supplemental Objections and Responses to Plaintiffs' Fourth Set of Interrogatories (Nos. 37 & 38) | 139 |
| Exhibit 9 | Email, Bates CHARTER_ENTROPIC00480403 | 147 |
| Exhibit 10 | Defendant's First Supplemental Objections and Responses to Plaintiff's First Set of Interrogatories (No. 2) | 153 |
| Exhibit 11 | U.S. Patent 8,223,775 | 155 |
| Exhibit 12 | U.S. Patent 8,792,008 | 155 |
| Exhibit 13 | U.S. Patent 9,825,826 | 155 |
| Exhibit 14 | U.S. Patent 10,135,682 | 155 |

Page 70

CONFIDENTIAL - BOGLIOLI

 2  MR. REISNER: I'm going to caution the
 3  witness not to reveal attorney-client
 4  communications or work product.
 5     If you know based on a position that
 6  was set forth in interrogatory responses --
 7     MR. SHIMOTA: Can you get the rog
 8  responses -- I'm sorry, I spoke over you.
 9     MR. REISNER: Yeah, that's fine. Go
10  ahead.
11  A. I don't know when we served our rog
12  responses. I know at some point we served rog
13  responses that stated we believed that the
14  MaxLinear products were accused. But our belief
15  and somewhat acknowledging our belief are two
16  completely different things.
17  Q. So do you know one way or the other
18  whether Charter had taken a position as to whether
19  or not the MaxLinear chips were non-infringing
20  before June of 2023?
21  A. I don't.
22  Q. Okay. Do you know whether Entropic, my
23  client, had taken a position whether the MaxLinear
24  chips were licensed before June of 2023?
25  A. I don't.

Page 71

CONFIDENTIAL - BOGLIOLI

 2  Q. Do you know if Mr. Abramov knew that?
 3  A. I don't know what Mr. Abramov knew.
 4  Q. So when you had your conversation,
 5  Mr. Abramov's position is that he wanted to
 6  understand how MaxLinear chips worked in June of
 7  2023, correct?
 8  A. Correct.
 9  Q. And as a consequence of his desire to
10  understand how MaxLinear chips worked, he asked
11  Mr. Katz if he could meet with MaxLinear engineers
12  prior to MaxLinear depositions; is that correct?
13  A. That wasn't my testimony.
14  Q. What is your testimony?
15  A. That he asked for access to MaxLinear
16  engineers for outside counsel. I don't know that
17  it related to the depositions. I think
18  depositions were discussed on the call but I don't
19  believe the request was in connection with the
20  depositions.
21  Q. So Mr. Abramov asked if MaxLinear
22  engineers could meet with attorneys from Arnold &
23  Porter; is that correct?
24  A. That's correct. As our other vendors
25  have.

Page 72

CONFIDENTIAL - BOGLIOLI

 2  Q. Your other vendors have met with
 3  attorneys from Arnold & Porter?
 4  A. I believe so.
 5  Q. Okay. And do you know the other vendors
 6  with whom -- who have met with Arnold & Porter?
 7  A. I don't.
 8  Q. Has -- do you know if Technicolor has
 9  met with Arnold & Porter?
10  A. I don't.
11  Q. How would you be able to find that out?
12     MR. REISNER: I'm objecting that
13  that's not within the scope of the
14  30(b)(6).
15  A. I don't know. I have to talk to my
16  outside counsel.
17  Q. Do you know if Mr. Abramov had any other
18  conversations with Mr. Katz?
19  A. I think there was a second phone call.
20  Q. Okay. And what occurred on the second
21  phone call?
22  A. Mr. Katz asked Mr. Abramov to have a
23  discussion with Boris Teksler. I think that's the
24  way you say his name.
25  Q. Yep. That's correct.

Page 73

CONFIDENTIAL - BOGLIOLI

 2     All right. Let's go back real quickly.
 3     We talked about your meeting with
 4  Mr. Petersen and the shutdown of PMA, right?
 5  A. Okay.
 6  Q. Okay? And you said that that was done
 7  this Thursday and that was as a consequence of
 8  problems associated with downstream PMA, correct?
 9  A. I think it was done on Wednesday.
10  Q. On Wednesday. Okay.
11     Was there, like, is there any -- was
12  there any documentation or anything sent to the
13  group indicating that this shutdown of downstream
14  PMA was occurring?
15  A. I don't know. I think he said he
16  discussed it in his staff meeting.
17  Q. Are there any minutes from the staff
18  meeting?
19  A. I don't believe so.
20  Q. Has there been any follow-up to the
21  group saying stop, no more work on PMA?
22  A. Since Wednesday?
23  Q. Yes.
24  A. I don't know what -- what's happened
25  since then.

Page 74

1              CONFIDENTIAL - BOGLIOLI
2      Q.  Do you know if there are any emails to
3  inform people about the shutdown of downstream
4  PMA?
5      A.  I don't.
6      Q.  Do you know if there was any analysis
7  done prior to Wednesday regarding the pros and
8  cons of shutting down PMA?
9      A.  I think Mr. Stafford spoke to those.
10  There were -- there were reports that stalled the
11  project in May, based on problems they were
12  having.  The project had been deployed for proof
13  of concept on 500 modems and future deployment
14  past the 500 had been stalled since May --
15     Q.  Yeah.
16     A.  -- based on problems they were having.
17  I think Mr. Stafford testified to that.
18     Q.  Yeah, but from the point of -- from the
19  point of the stalling of downstream PMA to this
20  Wednesday, were there any analyses done to the
21  pros and cons of shutting down downstream PMA?
22     A.  I don't know.
23     Q.  Okay.  Do you know if there's any
24  documents, you know, regarding the decision to go
25  from a stall of downstream PMA to a shutdown

Page 75

1              CONFIDENTIAL - BOGLIOLI
2  between May and today?
3      A.  Not that I'm aware of.
4      Q.  When you say "not that I'm aware of," is
5  that something that -- is it an "I don't know" or
6  you just --
7      A.  I don't know.
8      Q.  Okay.  All right.
9          MR. REISNER:  Let's try not to talk
10     over each other.
11         MR. SHIMOTA:  Sorry.  I apologize.
12         MR. REISNER:  Both you guys.
13         MR. SHIMOTA:  Yeah.
14     Q.  Is there anyone at -- who would you ask
15  if there were documents regarding the decision to
16  go from a stall of downstream PMA to a shutdown?
17     A.  Probably Mr. Petersen.
18     Q.  When you spoke with him in preparation
19  for your deposition, did you ask him if there were
20  documents regarding the decision to go from the
21  stall to the shutdown of downstream PMA?
22     A.  I did not.
23     Q.  Okay.  Why not?
24     A.  Because it wasn't a topic for my
25  deposition.

Page 76

1              CONFIDENTIAL - BOGLIOLI
2      Q.  So do you know -- so there -- with the
3  downstream PMA there you said they found some
4  problems with it, right?
5      A.  That's my understanding.
6      Q.  Okay.  And do you know if Mr. Petersen's
7  group -- what was Mr. Petersen's group again, do
8  you know?
9      A.  I think it's advanced engineering.
10     Q.  Okay.  Do you know if advanced
11  engineering is doing any work to solve the
12  problems with downstream PMA?
13     A.  There's no more development or
14  deployment.  Charter's not doing anymore
15  development or deployment, so it would not be
16  continuing to attempt to solve problems with
17  downstream PMA.
18     Q.  How do you know that?
19     A.  Because that's what the ceasing of
20  development means, it's not doing any further work
21  on downstream PMA.
22     Q.  Is there any plan to -- so what was the
23  purpose?  Do you have any idea what the purpose of
24  downstream PMA was?
25     A.  Oh, I don't know.  You're...

Page 77

1              CONFIDENTIAL - BOGLIOLI
2      Q.  Do you know if the problems were
3  insurmountable with downstream PMA; unfixable?
4      A.  All Mr. Petersen said is in the current
5  format it was not deployable.  On a large scale.
6      Q.  Is there a format where it would be
7  deployable on a large scale?
8      A.  They did not have a solution of where it
9  was deployable on a large scale.
10     Q.  Okay.  Were there plans to find that
11  solution to deploy it on a large scale?
12     A.  Before the shutdown?
13     Q.  Correct, yes, before the shutdown.
14     A.  I think it was stalled before the
15  shutdown.
16     Q.  Before the stall, were there plans to
17  work on a format to deploy it at a large scale?
18     A.  I think that's what the proof of concept
19  was.
20     Q.  Okay.
21     A.  Was the beginning of an effort to try to
22  see if it was deployable.
23     Q.  Okay. Are there any plans to come up
24  with a replacement for downstream PMA to achieve
25  the same goals or the same functions of it?

20 (Pages 74 - 77)

Page 78

CONFIDENTIAL - BOGLIOLI
2  A. Not at this time.
3  Q. How do you know that?
4  A. Mr. Petersen said so.
5  Q. Do you know how much money was spent on
6 downstream PMA, the development of downstream PMA?
7  A. I don't. I believe Mr. Stafford
8 testified to that.
9  Q. Okay. Do you know if the decision to
10 shut down some of the functionality accused in
11 this case has reached higher level executives like
12 the CEO of Charter?
13  A. I don't believe it has.
14  Q. Okay. Did the advanced engineering
15 group -- well, or did they -- was there any -- has
16 it reached executive vice presidents?
17  A. I don't know.
18  Q. Okay. Did advanced engineering consult
19 with any attorneys before making the decision to
20 shut down downstream PMA?
21  A. So it didn't consult with attorneys with
22 respect to the shutdown. I mean, I've spoken to
23 Mr. Petersen, but I was not involved in the
24 decision to shut down PMA.
25  Q. Were you involved in the decision to

Page 79

CONFIDENTIAL - BOGLIOLI
2 stall downstream PMA?
3  A. I didn't even know it was stalled.
4  Q. Okay. Were any attorneys involved with
5 the decision to stall downstream PMA?
6  A. No.
7  Q. Was there any -- is there any
8 documentation regarding the decision to stall
9 downstream PMA?
10  A. I believe Mr. Stafford produced a
11 bunch -- provided a bunch of documents that were
12 produced. I don't know what was in those
13 documents.
14  Q. Anything else other than Mr. -- aside
15 from what Mr. Stafford has produced, are there any
16 other documents of which you're aware regarding
17 the decision to stall downstream PMA?
18  A. Not that I'm aware of.
19  Q. Okay. Before the stalling of downstream
20 PMA, did anyone in legal ask if it could be, if
21 downstream PMA could be shut down?
22  A. No.
23  Q. Given where things sit with downstream
24 PMA, would Charter be willing to enter into an
25 agreement which forbid it from using downstream

Page 80

CONFIDENTIAL - BOGLIOLI
2 PMA for the life of the '682 patent?
3  A. I don't know. That would depend on a
4 lot of things.
5  Q. What would it depend on?
6  A. If we were found to infringe.
7  Q. Well, so, but my question is: Before
8 you were found to infringe, would you be willing
9 to enter into an agreement today that you would
10 never use downstream PMA during the life of the
11 '682 patent?
12  A. I don't know.
13  Q. What would you need to know to answer
14 that question?
15  A. I don't know what I need to know, I
16 haven't thought about it.
17  Q. So if we were in front of a jury in
18 Texas today and if I asked you whether Charter
19 would be willing to enter into an agreement which
20 forbid it from using downstream PMA for the life
21 of the '682 patent, your testimony to the jury
22 would be you don't know, correct?
23  A. I'd say it would depend on a lot of
24 things. I don't know. It's not something I would
25 do.

Page 81

CONFIDENTIAL - BOGLIOLI
2  Q. What would you tell the jury it would
3 depend on?
4  A. Whether we were -- whether we infringed.
5 The value of a license. Whether we needed it.
6 Whether there were other things we could do like
7 exclusion bands.
8  Q. What do you mean by exclusion bands?
9  A. Another way to obtain a similar effect
10 is to just simply exclude frequencies on which
11 you're having a lot of ingress. It does a similar
12 thing to PMA, I understand, but by a different
13 mechanism. I'm not an expert on exclusion bands.
14  Q. But is that -- how did you learn about
15 exclusion bands?
16  A. Mr. Petersen.
17  Q. Okay. Is that -- is Charter working on
18 exclusion bands right now?
19  A. I think Charter has exclusion bands in
20 place right now. Or is looking into it. I don't
21 know.
22  Q. When did Mr. Petersen tell you about the
23 exclusion bands?
24  A. I believe it was that phone call. It
25 was one of the phone calls. I had a lot of phone