# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | | |
|---|---|---|
| ENTROPIC COMMUNICATIONS, LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:22-CV-00125-JRG |
| | § | |
| CHARTER COMMUNICATIONS, INC., | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM ORDER

Before the Court is Defendant Charter Communications, Inc.'s Motion to Exclude the Expert Opinions of Stephen Dell. (Dkt. No. 169.) Plaintiff Entropic Communications, LLC opposes the motion. (*See* Dkt. No. 203.) For the following reasons, the motion is **DENIED**.

### I. BACKGROUND

Mr. Stephen Dell is Entropic's damages expert. He opines that Entropic is entitled to $1.67 billion dollars as of June 30, 2023.

#### A. Entropic's Acquisition of the Patents-in-Suit

Entropic purchased over 500 patents and patent applications from MaxLinear, Inc. ("MaxLinear") on March 31, 2021 pursuant to a Patent Purchase Agreement ("PPA"), including the six patents Entropic asserts here. (Dkt. No. 169 at 1.) The PPA provides that Entropic will pay $5 million for the patents and will split any net proceeds from the patents with MaxLinear—Entropic keeps 60% and MaxLinear takes 40%. (*Id.*)

1

B.  **Summaries of Dell's Methodologies**

   i.  **The '775 Patent**

According to Dell's report, "the technology enabled by the '775 Patent is fundamental to Charter's delivery of internet service to its customers," is  and ▓▓▓▓ (*Id.* at 2 (citing Dkt. No. 169-2 at ¶ 110).) Dell's opinions are based on "incremental fees to customers who subscribed to the higher tiered internet speeds enabled by the '775 Patent." (*Id.* (citing Dkt. No. 169-2 at ¶ 118).)

Dell first multiplies the additional fees charged for two speed tiers offered by Charter over its flagship service by each tier's expected penetration rate. (*Id.*) Dell then multiplies by Charter's ▓▓▓▓ to "yield[] profits attributable to the benefits of the asserted '775 Patent." (*Id.* at 2–3 (citing Dkt. No. 169-3 at ¶¶ 29, 30).) Dell then applies a 40% multiplier based on the PPA. (*Id.* at 3 (citing Dkt. No. 169-3 at ¶ 33).)

   ii.  **The '008 & '826 Patents**

According to Dell's report, the claimed technology in the '008 and '826 Patents ." (*Id.* (citing Dkt. No. 169-2 at ¶ 137).) Dell relies on ▓▓▓ prepared by Charter and concludes that ▓▓▓ (*Id.* (citing Dkt. No. 169-2 at ¶ 411).) Dell then multiplies by ▓▓▓ (*Id.* (citing Dkt. No. 169-3).)

2

Dell then relies on a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, so Dell multiplies the Total Cost Savings by 36%. (*See id.*)

Further, Dell claims that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and "[t]hus, the value of the asserted '362 Patent represents another level of apportionment that must be accounted for." (*Id.* at 4 (citing Dkt. No. 169-2 at ¶ 418).) Dell ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." (*Id.* (citing Dkt. No. 169-3).) For ▮▮▮▮▮▮▮▮▮, Dell assumes 100% of the Total Cost Savings are attributable to the '008/'826 patents. (*Id.* (citing Dkt. No. 169-3).) Finally, Dell applies the 40% benefit share from the PPA. (*Id.* (citing Dkt. No. 169-3).)

### iii. The '362 Patent

Relying on Dr. Karmer, Dell asserts that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* (citing Dkt. No. 169-2 at ¶ 129).) Dell also relies on Dr. Kramer to assert that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* (citing Dkt. No. 169-2 at ¶ 259).) ▮▮▮ also purportedly ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." (*Id.* (citing Dkt. No. 169-2 at ¶ 130).) Thus, according to Dell there are "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," so Dell ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." (*Id.* (citing Dkt. No. 169-2 at ¶ 452).)

### a. Theory 1

For this theory, Dell uses the same methodology as for the '008 and '826 Patents, described above, but instead of allocating ▮▮ of the ▮▮▮▮▮▮▮▮▮▮▮▮ as he did with the '008 and '826 Patents, Dell attributes ▮▮▮. (*Id.* at 5 (citing Dkt. No. 169-3).)

### b. Theory 2

Dell asserts that "the functionality enabled by the '362 Patent provides Charter the ability to offer ▮▮▮▮▮▮▮▮▮▮▮▮." (*Id.* (citing Dkt. No. 169-2 at ¶ 268).) Relying on a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Dell calculates an "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" which he applies ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* (citing Dkt. No. 169-3).) Dell then multiplies this amount by the number of ▮▮▮▮▮▮▮▮ and the number of ▮▮▮▮▮▮▮▮. (*Id.* (citing Dkt. No. 169-3).) Finally, Dell applies the 40% benefit share from the PPA. (*Id.*)

### c. Theory 3



Dell asserts that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." (*Id.* (citing Dkt. No. 169-2 at ¶ 264).) As support, Dell ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* at 5–6 (citing Dkt. No. 169-2 at ¶ 267).) Dell asserts that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* at 6 (citing Dkt. No. 169-2 at ¶ 267).) Dell then applies the ▮▮ by the number of accuses ▮▮▮▮▮▮▮. (*Id.* (citing Dkt. No. 169-2 at ¶ 267).)

4

### iv. The '682 Patent

According to Dr. Souri, ▮

▮

▮." (*Id.* (citing Dkt. No. 169-2 at ¶ 120).) Dell then estimates potential capacity increases and the associated incremental profit through the expiration of the '682 Patent based on calculations drafted by ▮ and arrives at an ▮

▮." (*Id.* (citing Dkt. No. 169-2 at ¶ 248; Dkt. No. 169-3).) Dell then discounts those figures to ▮ and applies the 40% benefit share from the PPA. (*Id.* at 6–7 (citing Dkt. No. 169-2 at ¶¶ 498, 505).) ▮, Dell attributes ▮ of value to the '682 patent, and attributes ▮ to the '682 patent. (*Id.* at 7 (citing Dkt. No. 169-3).)

### v. The '690 Patent

Dell "applie[s] a similar methodology and framework in determining the anticipated incremental profits" as he does for the '682 patent. (*Id.* (citing Dkt. No. 169-2 at ¶ 511).) Dell projects expected profits associated with the increased capacity through the expiration of the '690 Patent, keeping the values constant. (*Id.* (citing Dkt. No. 169-3).) Dell then ▮

▮

▮ (*Id.* (citing Dkt. No. 169-2 at ¶ 420).) As before, Dell then discounts and applies the 40% benefit share from the PPA. (*Id.* (citing Dkt. No. 169-2 at ¶ 516).)

## II. LEGAL STANDARD

An expert witness may provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product

5

of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702.

Rule 702 requires that judges act as gatekeepers to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). However, "[t]he inquiry envisioned by Rule 702 is ... a flexible one." *Id.* at 594; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) ("*Daubert* makes clear that the factors it mentions do *not* constitute a 'definitive checklist or test.'"). While the party offering the expert bears the burden of showing that the testimony is reliable, it "need not prove to the judge that the expert's testimony is correct...." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 1999) (citing *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

### III. ANALYSIS

#### A. Alleged Failure to Apportion

##### i. The '775 Patent and the '362 Patent (Theory 2)

Charter argues that Dell's use of Charter's overall operating profit margin as a method of apportionment for both the '775 Patent and Theory 2 of the '362 Patent is unreliable because it is "not specific to any patent or accused service." (Dkt. No. 169 at 8 (citing *CSIRO v. Cisco Sys., Inc.*, No. 6:11-cv-343, 2014 WL 3805817, at *6–7 (E.D. Tex. July 23, 2014) (rejecting expert's reliance on profit margins that were not specific to the accused products), *vacated on other grounds*, 809 F.3d 1295 (Fed. Cir. 2015)).) Regarding the '775 Patent, Charter further argues that Dell fails to explain how Charter's operating margin relates to the three "broad pieces" of providing internet service to customers, as Dr. Kramer opined. (*Id.* at 8–9 (citing Dkt. No. 169-2

6

at ¶ 392).) Regarding Theory 2 of the '362 Patent, Charter argues that Dell fails to apportion out non-infringing DVRs by including all DVRs, not just ▮▮▮▮▮▮▮▮▮▮." (*Id.* at 9.) Further, Charter argues that Dell assumes there are no other technical contributions necessary for ▮▮▮▮ ▮▮▮▮▮▮ beyond the '362 Patent without providing any analysis to support that assumption. (*Id.*)

In response, Entropic argues that Dell's use of profit margins is reliable because it is the best available data and tied to the facts of the case. (Dkt. No. 203 at 1–2.)

Entropic also argues that Dell properly apportioned in his analysis of the damages for the '775 Patent. (*Id.* at 2.) According to Entropic, Dell apportioned three times: when he analyzed the incremental revenue derived from the plans enabled by the '775 Patent, when he applied Charter's own profit margin to isolate Charter's expected profit, and when he ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ (*Id.* at 2–3.)

Finally, Entropic contends that Dell properly apportioned the damages flowing from Theory 2 of the '362 Patent. (*Id.* at 3–4.) Entropic notes that Charter has not identified any devices in Dell's analysis that are unaccused of infringement and argues that it could not because Dell's analysis only concerns accused devices. (*Id.* at 3.) The question of the proper damages base is a question for the jury, Entropic argues, as is the question of "what devices are capable of providing what service." (*Id.* at 3–4.)

Charter re-urges in reply that Dell's use of Charter's corporate-wide profit margin is too untethered from the specifics of the case to be reliable. (Dkt. No. 239 at 1–2.) Charter also argues

7

that it is Entropic's burden to show that 100% of DVRs is the royalty base. (*Id.* at 1 (citing *IP Innovation L.L.C. v. Red Hat, Inc.*, 705 F. Supp. 2d 687, 690 (E.D. Tex. Mar. 2, 2010)).)

In sur-reply, Entropic's argues that Charter's arguments run contrary to law that an "infringer's profits or revenues" are relevant to a *Georgia-Pacific* analysis. (Dkt. No. 281 at 1 (citing *Soverain Software LLC v. Newegg Inc.*, 836 F. Supp. 2d 462, 476 (E.D. Tex. 2010), *rev'd in part on other grounds*, 705 F.3d 1333 (Fed. Cir. 2013)).) Entropic also argues that Charter's new argument regarding Entropic's burden to show that '100% of the [DVRs is the] royalty base" is irrelevant because "Dell does not use DVRs as a royalty base—his analysis is based on the costs savings enabled by Charter's use of the '362 Patent." (*Id.*)

The Court is not persuaded by Charter's arguments. First, Dell has apportioned for the value of the technology for the '775 Patent. Dell separated the incremental revenue derived from the plans enabled by the '775 Patent, multiplied by Charter's profit margin, and adjusted downwards to reflect Charter's investments in its network and infrastructure. The use of Charter's profit margin as an adjustment factor is not so untethered from the specifics of the case that exclusion is warranted. Charter's own profit margin is inherently closely tied to the facts of this case—it is Charter's after all. Any such challenge to this use goes to weight, not admissibility. Dell did not need to tie profitability to the "three broad pieces" of internet service.

Second, Charter's challenges to the damages base for Theory 2 of the '362 Patent go to weight and not admissibility. Indeed, whether 100% of the DVRs constitute the royalty base is Entropic's burden, and it will be up to Entropic to prove to the jury that all of the devices in Dell's royalty base contain the claimed invention. Whether or not Entropic can make such a showing, however, is a matter for cross examination and not *Daubert*.

8

### ii.     The '008 & '826 Patents and the '362 Patent (Theory 1)

Charter argues that Dell's "███████████████████████████████████ ███████████████████████ should be excluded because it lacks any reliable factual foundation." (Dkt. No. 169 at 9–10 (citing Dkt. No. 169-2 at ¶ 414).) According to Charter, even though Dell relies on a document, his opinion "is based on nothing more than his own misinterpretation of the document and rank speculation." (*Id.* at 10.) Regarding Dell's allocation of 75% of Cost Savings to the '008 and '826 Patents and 25% to the '362 Patent, Charter argues that these opinions suffer from a "complete lack of economic analysis to quantitatively support" the allocation. (*Id.* (quoting *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012)).)

In response, Entropic first argues that there is a classic fact question: interpretation of a document. (Dkt. No. 203 at 4–6.) Next, Charter argues that the 75-25 split is based on Dr. Souri's technical analysis that "remote spectrum monitoring is made up of four technologies including: '(1) digitization of the entire received signal (i.e., full-band capture or FBC), (2) determining a characteristic of the digitized signal, (3) reporting the determined characteristic; and (4) leveraging impairment detection algorithms." (*Id.* at 6–7 (citing Dkt. No. 169-2 at ¶ 409).) According to Drs. Kramer and Souri, the '362 Patent covers digitization, and the remaining three technologies are covered by the '008 and '826 Patents. (*Id.* at 7.) Dell properly relied on these opinions, Entropic argues. (*Id.*)

In reply, Charter argues that there are key differences between the document relied upon by Dell and the one Mr. Stafford testified to, whose testimony Dell relies on for support. (Dkt. No. 239 at 2.) Charter also argues that Dr. Souri does not opine that the four technologies are equal in value. (*Id.*)

9

In sur-reply, Entropic argues Dell properly relied on Dr. Souri, to isolate the value of remote spectrum and then further identify the four technologies contributing to the value of remote spectrum monitoring. (Dkt. No. 281 at 2.)

The Court is not persuaded by Charter's arguments. First, the proper interpretation of a document is a matter that is squarely in the province of the jury. Additionally, the document is not the only support for Dell's 36% apportionment; he also relies on Dr. Souri's opinion that "remote spectrum monitoring is a substantial portion of the technical contribution" of Charter's ▇ tools. (Dkt. No. 203 at 6.)

Second, while Dell did assume that the four technologies would be equal, this is not an analytical gap that is so great to warrant exclusion. Dell is an expert and entitled to rely on his judgment. Charter may expose this assumption on cross if it wishes.

### iii. The '682 Patent and the '690 Patent

For the '682 Patent, Charter first argues that Dell acknowledges that Charter and CableLabs contribute to Charter's use of ▇ yet did not attribute any value to these non-infringing components or contributions. (Dkt. No. 169 at 11.) Charter also argues that Dell's assignment of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ should be struck because Dell provides no supporting analysis other than citing an "understanding of the technical contribution of the '690 Patent from Dr. Souri." (*Id.* (citing Dkt. No. 169-2 at ¶ 420).) Further, Charter contends that the discussion with Dr. Souri does not provide a reliable foundation. (*Id.*)

In response, Entropic argues that the systems referred to by Charter "are either long-existing technologies that provide no technical value according to Entropic's technical expert or are part of the system that performs the ***infringing*** method." (Dkt. No. 203 at 7 (emphasis in

10

original).) It is therefore proper to attribute 100% of the technical value of the ▓ to the '682 and '690 Patents, Entropic argues. (*Id.* at 7–9.)

In reply, Charter argues that Dell did not disclose any analysis that led him to conclude that 10% of the value should be assigned ▓. (Dkt. No. 239 at 2.)

In sur-reply, Entropic argues that Dell relied on Dr. Souri's opinion that the '682 Patent's contribution is "substantially all" of the value and that the '690 Patent's contributions are "a minor piece of the technical innovation." (Dkt. No. 281 at 2–3.)

The Court finds that Charter's arguments go to weight, and not admissibility. Whether or not technologies should have been included in the apportionment is for the jury to decide. Dell's opinions in this regard are clearly supported by Dr. Souri. (*See* Dkt. No. 203 at 8.) Similarly, Dell's opinion that 10% of the value should be assigned ▓ is also supported by Souri's testimony that opinion that the '682 Patent's contribution is "substantially all" of the value and that the '690 Patent's contributions are "a minor piece of the technical innovation." (Dkt. No. 281 at 2–3.) Any daylight between Dell's and Dr. Souri's testimonies should be elucidated on cross. Exclusion is not the appropriate remedy.

### iv. The '362 Patent (Theory 3)

Charter argues that Dell's opinion that there is ▓ in savings in unreliable when Dell "(i) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Dkt. No. 169 at 12.)

In response, Entropic notes that Dell relied on Dr. Kramer to select the best comparable devices to isolate the incremental value of the '362 Patent. (Dkt. No. 203 at 9.) In turn, Entropic argues, Dr. Kramer's analysis was detailed and thorough. (*Id.*) Charter's argument that Dell should have used different devices concerns which evidence is "best" and thus goes to weight, not

11

admissibility, Entropic contends. (*Id.* (citing *GREE, Inc. v. Supercell Oy*, No. 2:19-cv-00070-JRG-RSP, 2020 WL 4057640, at *5 (E.D. Tex. July 20, 2020).)

In reply, Charter argues that Dell has provided no justification for why 100% of the purported cost savings between the two DVR models would be attributed to the '362 Patent. (Dkt. No. 239 at 3.) Charter also asserts that Entropic (and Dell) have chosen two new models that show a higher cost savings. (*Id.*)

In sur-reply, Entropic argues that Dell has simply supplemented his expert report based on new documents and deposition testimony from third-party ▓▓▓▓. (Dkt. No. 281 at 3.) Nonetheless, Entropic contends, Dell's supplement continues on the same premise. (*Id.*) Moreover, Entropic argues that Dell has appropriately relied on Dr. Kramer's report regarding the benefits of the '362 Patent. (*Id.*) Dr. Kramer specifically opines that he "would expect similar cost savings across all set-top boxes." (*Id.* at 3–4.)

Again, the Court is not persuaded by Charter's arguments. As an expert, Dell is entitled to rely on the opinions of other experts, such as Dr. Kramer. In turn, Dr. Kramer opines that he "would expect similar cost savings across all set-top boxes," and that the "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" *Id.* at 3–4.) Neither of Dr. Kramer's opinions have been challenged or struck, and Charter has otherwise not addressed them. As such, Dell's opinions maintain sufficient basis in fact to be presented to the jury. Robust cross examination is the best mechanism by which to expose any inconsistencies between Dell's opinions and other facts.

### B. Dell's Lump Sum Opinions Based on Infringement of Method Claims

Charter argues that Dell's lump sum opinions for the method claims are unreliable because "(i) he does not confine his analysis to only those CMTSs that have actually performed the claimed

12

method, and (ii) he uses static projections for calculating royalties through patent expiration." (Dkt. No. 169 at 12–14.)

In response, Entropic argues that the Federal Circuit has "expressly endorsed" lump sum reasonable royalties. (Dkt. No. 203 at 10 (citing *Lucent Techs., Inc. v Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009)).) Moreover, Entropic contends that Dell's opinion that the parties would have decided on a lump sum license (over a running royalty) is based on considerable evidence. (*Id.* at 10–11.)

In reply, Charter argues that it has ███████████████████████████████, meaning that Dell's opinions must be unreliable. (Dkt. No. 239 at 3.) Further, Charter argues that Dell's opinions are contrary to the Federal Circuit's guidance: a patentee "can only receive infringement damages on those devices that actually performed the patented method during the relevant infringement period." (*Id.* at 3–4 (quoting *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 576 F.3d 1348, 1359 (Fed. Cir. 2009)).)

In sur-reply, Entropic argues that the law requires an analysis of the extent of actual and anticipated use, which Dell does. (Dkt. No. 281 at 4 (citing *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 772 (Fed. Cir. 2014) ("But [the district court] did err in treating the profits IPC actually earned during the period of infringement as a royalty cap. That treatment incorrectly replaces the hypothetical inquiry into what the parties would have anticipated, looking forward when negotiating, with a backward-looking inquiry into what turned out to have happened.")).)

The Court finds that Dell may present his lump sum opinions to the jury. Dell's opinion that the parties would have selected a lump sum payment over a running royalty is sufficiently supported. Moreover, such an opinion is permissible. *Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*, 909 F.3d 398, 412 (Fed. Cir. 2018) ("we have held that a jury may award

13

a lump-sum, paid-in-full royalty in lieu of a running royalty on future sales"). Finally, Charter's unilateral decision to ▮▮▮▮▮▮▮▮▮▮▮ cannot render Dell's opinions inadmissible. Indeed, Dell addresses Charter's ▮▮▮▮▮▮▮▮▮▮▮. *See* Dell Supp. Rep. at ¶¶ 53–55.

### C. Dell's Other Lump Sum Opinions

Charter argues that Dell's other lump sum opinions, the ones that do not depend on infringement of method claims, should be excluded because his projections are static and therefore not "realistic." (Dkt. No. 169 at 14–15 (quoting *Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*, No. 2:15-CV-00011-RSP, 2018 WL 3089701 at *7 (E.D. Tex. Mar. 7, 2018)).)

In response, Entropic argues that Dell's use of a static projection is reliable because a "static projection accounts for potential increases and decreases by holding the numbers constant." (Dkt. No. 203 at 11.)

In reply, Charter argues that Dell's uses of a static projection "ignore[s] the constantly-evolving cable and internet industry." (Dkt. No. 239 at 4.) Charter re-urges that "Dell's static projection could not possibly be 'realistic projections of future sales' in this industry." (*Id.* at 4–5 (quoting *Ericsson*, 2018 WL 3089701 at *7).)

In sur-reply, Entropic argues that Charter "cites no case law for the extraordinary proposition that lump sum royalties are inherently unreliable in the cable industry." (*Id.*) Finally, Entropic re-urges that Dell's opinion that the parties would have agreed to a lump sum payment is supported by sufficient evidence. (*Id.* at 4–5.)

The Court finds that Dell's use of a static projection is not so unreliable as to warrant exclusion. Indeed, it is an assumption that Dell opines the parties would have made, but Dell is an economics expert and this is well within his expertise. Charter's complaints can be presented in the form of questions on cross.

14

### D. Dell's Application of a Benefit Share From the PPA

For all of the asserted patents, Dell's justification for a 60/40 profit split is based on the "benefit share" of "net monetization proceeds" from the PPA that "would allow the parties to recognize the business risk incurred by Charter in commercializing, building, and maintaining the network in which the patents at issue are implemented." (Dkt. No. 169 at 15 (citing Dkt. No. 169-2 at ¶ 387).)

Charter argues that these opinions should be excluded because Dell fails to cite to any facts, economic studies, or articles that would support his conclusion that the PPA is analogous. (*Id.*) Accordingly, Charter argues, "Dell's split is indistinguishable from the 25% rule of thumb that has been rejected by the Federal Circuit." (*Id.* (citing *Uniloc USA Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011)).)

In response, Entropic argues that Dell's use of the PPA to support the 60/40 split is reliable. (Dkt. No. 203 at 11–13.) Specifically, Entopic contends that the PPA is reliable because it involves two of the three parties in the hypothetical negotiation, and because it concerns the patents-in-suit. (*Id.* at 12.) Further, Entropic argues that the "book of wisdom," and "would acknowledge the distribution of monetization proceeds and sharing percentages of 60%/40% as a reasonable economic indicator and framework demonstrating Entropic's willingness to share or apportion Charter's incremental profits directly attributed to the use of the [patents]." (*Id.* (quoting Dkt. No. 169-2 at ¶¶ 446, 457, 475, 513).) Thus, Entropic argues, Dell's use of the 60/40 split is not akin to the 25% rule of thumb. (*Id.* at 12–13.)

In reply, Charter argues that the PPA is a non-analogous agreement, and Dell's reliance upon it is arbitrary. (Dkt. No. 239 at 5.)

In sur-reply, Entropic argues that Charter's arguments go to weight, not admissibility. (Dkt. No. 281 at 5.)

15

The Court agrees with Entropic: Charter's arguments go to weight not admissibility. The PPA includes the patents-in-suit and is between two of the three parties present in the hypothetical negotiation. (*See* Dkt. No. 203 at 12.) In other words, the PPA is a real-world data point of profit sharing. Charter points to no specific reason why the PPA is so "completely non-analogous" that any opinions deriving from it should be excluded.

### E. Alleged Credibility Determinations

Charter argues that Dell makes credibility determination in his supplemental report at paragraphs 54, 57, and 66–67. (Dkt. No. 169 at 15.) This, Charter contends, is improper. (*Id.* (quoting *Skidmore v. Precision Printing & Pkg., Inc.*, 188 F.3d 606, 618 (5th Cir. 1999) ("Credibility determinations, of course, fall within the jury's province.")).)

In response, Entropic argues that the identified paragraphs simply contain Dell's



(Dkt. No. 203 at 13.)

In reply, Charter argues that "Dell has no technical background to make any determination on whether ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" (Dkt. No. 239 at 5 (quoting Dkt. No. 203 at 13).)

In sur-reply, Entropic argues that "Dell's observations relate to general and economic considerations—a topic about which he is well-qualified to opine." (Dkt. No. 281 at 5.)

The Court is not persuaded by Charter's arguments. Since Dell is qualified to opine on extraordinarily complex hypothetical negotiations, he is certainly qualified to opine that certain testimony is unsupported by documents or inconsistent with other evidence.

16

## IV.   CONCLUSION

For the foregoing reasons, the Court finds that the Motion (Dkt. No. 169) should be and hereby is **DENIED**.

**SIGNED this 5th day of December, 2023.**

<span style="text-align:center">
_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE
</span>